**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
633 Howard St.
San Francisco, CA 94105
Tel: (415) 651-7990

**CLARKSON LAW FIRM, P.C.**
Yana Hart (SBN 306499)
*yhart@clarksonlawfirm.com*
Bryan P. Thompson (SBN 354683)
*bthompson@clarksonlawfirm.com*
Cassandra Rasmussen (*Admitted PHV*)
*crasmussen@clarksonlawfirm.com*
Jiaming Zheng (SBN 363184)
*jzheng@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| GINA BARTONE, MATEO CANU, CHARLES GRAUDINS, JAMES DIEDRICH, MONIQUE SAINZ, NIKOLAUSE TUCKER, NEIL CHEN, RICKFORD FRASER, KRISTI STEWART, CLARINDA BYRD, JOSEPH VAN DEN BERGHE, DANIEL DOERR, RAHLEISHA DAVIS, DEVON DLUGOSZ, LADDIE MARTINEK, JEFFRY WOODHEAD, JASON HATCH, VICTOR MITCHELL, and CHANDRA BALDERSON individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC and LUXOTTICA OF AMERICA, INC. <br> Defendants. | Case No.: 3:26-cv-01897-EMC <br><br> Assigned to Hon. Edward M. Chen <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMAND** |

Clarkson Law Firm, P.C.  | 633 Howard Street | San Francisco, CA 94105

Plaintiffs Gina Bartone, Mateo Canu, Charles Graudins, James Diedrich, Monique Sainz, Nikolause Tucker, Neil Chen, Rickford Fraser, Kristi Stewart, Clarinda Byrd, Joseph Van den Berghe, Daniel Doerr, Rahleisha Davis, Devon Dlugosz, Laddie Martinek, Jeffry Woodhead, Jason Hatch, Victor Mitchell, and Chandra Balderson ("Plaintiffs"), individually and on behalf of all others similarly situated, as more fully described below (the "Class" and "Class members"), bring this class action Complaint against Defendant Meta Platforms, Inc. ("Meta") and Defendant Luxottica of America, Inc. ("Luxottica") (collectively, "Defendants"), and allege the following based upon information and belief, unless otherwise expressly stated as based upon personal knowledge.

## I.     INTRODUCTION

1.      The new AI economy holds extraordinary promise to deliver life-improving benefits. But it's also defined by grave risks, including mass surveillance, the erosion of privacy, and the relentless extraction of personal data from the lives of ordinary people—data on which generative AI tools are trained and depend.

2.      The general public is increasingly concerned about who is watching, what is being captured, and how that information will be used. From government agencies targeting individuals based on personal characteristics to private companies racing for AI dominance, the incentives for powerful interests to observe, record, analyze, and store the most personal details of people's lives have never been greater. Consumers are worried, regulators are scrambling, and the tech companies driving the AI economy know exactly how sensitive it all is. For ordinary people, privacy is now an everyday worry.

3.      Privacy is also a material factor in consumer decision-making. The overwhelming majority of Americans believe companies should not collect or share data without clear, affirmative consent. Study after study confirms this. For example, 92% of Americans demand consent before

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

1

data is sold or shared;[1] nearly 80% worry about how companies collect their information.[2]

4.      Consumers  act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data when prompted.[3] People value control over their data, and privacy influences their purchasing decisions. When given a real choice, consumers choose privacy.

5.      Against this backdrop, Meta introduced its artificial intelligence powered glasses. But consumers were cautious. After the company's multiple scandals, including Cambridge Analytica, meta pixel tracking, and repeated privacy failures, many consumers were hesitant to embrace the product.

6.      Meta responded by branding the Glasses around privacy. It made privacy a core product attribute front and center, including on a dedicated privacy page on its website, repeating its privacy promise and otherwise reinforcing the message. The assurances were bold. Light indicators when the glasses are recording. Total control settings. Glasses can only connect to your one device. A prominent headline, in bold declaring, "**designed for privacy, controlled by you**." The message was simple, reassuring, and clear.

7.      Mark Zuckerberg personally reinforced this narrative, countering the notion that the Glasses could see, hear, and retain everything, and emphasizing that "giving people control" was the essential feature. Meta's dedicated website reinforced the promise: "You're in control of your data and content."

---

[1] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/ (last accessed March 23, 2026).

[2] *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last accessed March 23, 2026).

[3] Margaret Taylor, *How Apple Screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook (last accessed March 23, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

8. Meta knows that privacy carries a real premium in the marketplace. Consumers routinely seek and pay more for products they believe will protect their data. VPN subscriptions, encrypted messaging platforms, privacy-focused browsers, devices marketed as minimizing data collection. Apple is a prominent example. It has successfully positioned privacy as a premium feature and priced its products accordingly.

9. Meta positioned its Glasses squarely within this category: a product that respects privacy as a core feature and therefore is more attractive and valuable to consumers. Meta's coordinated media strategy worked. Consumers trusted Meta's assurances and paid for privacy they thought they controlled – because that is what Meta promised. As Meta continued reinforcing its privacy messaging, sales in 2025 tripled compared to those of 2024.[4]

10. But Meta's promises were false. What no one could even imagine, and what Meta never disclosed, is that moments captured by the glasses were not private at all. Each time users activated the device, snippets of their private lives were recorded and transmitted across the globe to strangers for review.

11. Recent whistleblower accounts confirm that when consumers use their Meta AI Glasses' AI features, the footage is not processed privately or locally, as consumers expected. Instead, videos captured through the Glasses, including highly sensitive moments inside homes and other private spaces, are transmitted to Meta's servers and then routed to a subcontractor in Kenya, where human workers manually view and label the footage to train Meta's AI models.

12. Meta's delivery of sensitive moments into the hands of offshore contractors working for a few dollars an hour is an unacceptable invitation to hackers, kidnappers, and other criminals. These contractors report seeing everything: People changing clothes, using the bathroom, engaging in sexual activity, handling financial information, and conducting other private activities inside their homes that no reasonable consumer would ever expect a stranger to watch. They say that Meta's supposed "face anonymization" does not work. And those who raise concerns about the highly personal nature of what they are forced to watch and label are fired.

___

[4] Nichoals Brown, *Big buzz, small market: Meta's smartglasses are a specialty gadget this holiday*, REUTERS (Nov. 25, 2025), https://www.reuters.com/business/big-buzz-small-market-metas-smartglasses-are-specialty-gadget-this-holiday-2025-11-25/ (last visited Mar. 25, 2026).

3

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

13.     That is not what consumers bargained for. Meta compromised purchasers, users, and other members of the public's privacy. No reasonable consumer would understand "designed for privacy" or "controlled by you" to mean that their most intimate moments could be viewed by strangers overseas to train AI. Nor would any reasonable consumer expect such surveillance—regardless of the affirmative privacy representations.

14.     Despite Meta's representations, the AI Glasses are an unreasonably dangerous product. They transmit intimate, in-home recordings to loosely supervised low wage contractors overseas, operating with limited oversight and minimal accountability. The built-in risks are enormous, including identity theft, extortion, reputational harm, threats to personal safety, kidnapping, and misuse of the collected data.

15.     Meta's failure to inform purchasers that sensitive videos and recordings are being transmitted offshore, to be viewed by strangers and embedded into Meta's AI models, is a material omission. Reasonable purchasers would view this information as critical to their decision to buy the product, as the public reaction and widespread outrage to the revelations in this lawsuit confirm.

16.     When sensitive data is handled by poorly supervised low-paid offshore contractors, breaches and misuse follow. In the high-profile Ledger/Shopify breach, for example, rogue employees at an outsourced vendor sold records belonging to hundreds of thousands of customers, leading to substantial financial losses, phishing scams, harassment, extortion and more. Third-party/vendor compromise is one of the top causes of data breaches. According to the latest statistics, 77% of data breaches over the past three years originated with a vendor or third party. Offshore vendors are particularly vulnerable to bribery and coercion for data access.

17.     Plaintiffs bring this class action on behalf of both purchasers and users of the products. For purchasers, this case centers on Meta's deceptive advertising and material omissions. Plaintiffs seek to hold Meta responsible for its affirmatively false advertising and failure to disclose the true nature of its surveillance and its connection to the company's AI data collection pipeline. Purchasers were harmed because they paid a price premium at the time of purchase by relying on Meta's misrepresentations and omissions of material facts.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

18. For users, this case is about unlawful tracking, sharing, and transmitting of their data to the offshore contractors to train their AI models. Users were harmed when their private moments, communications, and behaviors were intercepted, recorded, and transmitted without their knowledge or consent, constituting a profound invasion of privacy.

19. "Designed for privacy" cannot mean surveillance. And "controlled by you" cannot mean controlled by someone else.

## II.    JURISDICTION

20. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

21. This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves of this forum by conducting substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

## III.    DIVISIONAL ASSIGNMENT

22. This civil action arises in San Mateo County, California. Accordingly, assignment to the San Francisco Division is proper pursuant to Civil L.R.3-2(c) and Civil L.R.3-2(d).

## IV.    VENUE

23. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant Meta Platforms Inc. resides in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## V.    PARTIES

24. The Defendants' pervasive marketing campaign consistently and uniformly pushed the view that the Meta AI Glasses would keep users' information private, would put users in control of their information, and that the information would not be shared with other people who could see the users in some of their most private and intimate moments, including that the Glasses were

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

"designed for privacy" and "controlled by you." ("Challenged Representations and Omissions").

25.    "Products," "Glasses," and "Meta AI Glasses" are collectively defined and referred to herein as the following products: Ray-Ban Meta Gen 1 (Skyler), Ray-Ban Meta Gen 1 (Headliner), Ray-Ban Meta Gen 1 (Wayfarer), Ray-Ban Meta Gen 2 (Wayfarer), Ray-Ban Meta Gen 2 (Skyler), Ray-Ban Meta Gen 2 (Headliner), Oakley Meta HSTN, Oakley Meta Vanguard, and Meta Ray-Ban Display (Wayfarer).

## A.    Plaintiffs

26.    **Plaintiff Gina Bartone** is a citizen and resident of Monmouth County, New Jersey.

27.    While physically in the State of New Jersey, Bartone purchased the Meta AI Glasses from Meta's website at www.meta.com after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

28.    In deciding to make the purchase, Bartone viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Bartone to believe that the Meta AI Glasses were designed for, and would, protect her privacy. Bartone relied heavily on this when deciding to purchase the Product.

29.    At the time of purchase, Bartone did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect her privacy.

30.    Bartone did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

31.    Bartone would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Bartone otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

32.     Plaintiff Bartone cares deeply about her privacy and would not have purchased or used the Product in the manner that she did if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

33.     Bartone desires to purchase Defendants' Products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected her privacy, as advertised.

34.     In the future, Plaintiff Bartone will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure her privacy is protected and images and videos taken with the Glasses not collected, stored, and viewed by currently unknown third parties.

35.     Additionally, Bartone would not have used the Products as she did if she knew that Defendants would possess her highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

36.     Bartone is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

37.     Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Bartone is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

38.     On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Bartone's Meta AI Glasses depicting private settings and personal activities that Plaintiff Bartone reasonably expected to remain private. Plaintiff Bartone did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

Bartone, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

39.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Bartone's seclusion, solitude, and private life, Plaintiff Bartone has suffered a loss of privacy, frustration of her reasonable expectations of privacy, mental anguish, and lost value in her personal data, and faces an ongoing risk of further unauthorized disclosure.

40.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Bartone has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

41.    **Plaintiff Mateo Canu** is a citizen of California and has resided in Los Angeles County, California, at all times relevant to this Complaint. Canu purchased the Meta AI Glasses from the Sunglass Hut store after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

42.    In deciding to make the purchase, Canu viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Canu to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Canu relied heavily on this when deciding to purchase the Product.

43.    At the time of purchase, Canu did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

44.    Canu did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

45.    Canu would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

Omissions and/or had Canu otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

46.     Plaintiff Canu cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

47.     Canu desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected his privacy, as advertised.

48.     In the future, Plaintiff Canu will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

49.     Additionally, Canu would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

50.     Canu is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

51.     Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Canu is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

52.     On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Canu's Meta AI Glasses depicting private settings and personal activities that Plaintiff Canu reasonably expected to remain private. Plaintiff Canu did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models.

FIRST AMENDED CLASS ACTION COMPLAINT

This highly sensitive visual and audio data is no longer under the control of Plaintiff Canu, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

53.     As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Canu's seclusion, solitude, and private life, Plaintiff Canu has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

54.     As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Canu has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

55.     **Plaintiff Charles Graudins** is a citizen and resident of Shelby County, Alabama.

56.     While physically present in the State of Alabama, Graudins purchased the Meta AI Glasses from Amazon —one of Defendants' authorized retailers—after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

57.     In deciding to make the purchase, Graudins viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Graudins to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Graudins relied heavily on this when deciding to purchase the Product.

58.     At the time of purchase, Graudins did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

59.     Graudins did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

60.     Graudins would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Graudins otherwise known that the Challenged Representations and

10

FIRST AMENDED CLASS ACTION COMPLAINT

Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

61.     Plaintiff Graudins cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

62.     Graudins desires to purchase Defendants' Products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected his privacy, as advertised.

63.     In the future, Plaintiff Graudins will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

64.     Additionally, Graudins would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

65.     Graudins is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

66.     Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Graudins is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

67.     On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Graudins's Meta AI Glasses depicting private settings and personal activities that Plaintiff Graudins reasonably expected to remain private. Plaintiff Graudins did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Graudins, and Meta cannot assure him that it will not be viewed, distributed, or used by unauthorized parties.

68.     As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Graudins's seclusion, solitude, and private life, Plaintiff Graudins has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

69.     As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Graudins has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

70.     **Plaintiff James Diedrich** is a citizen and resident of Madison County, Alabama.

71.     While physically present in the State of Alabama, Diedrich purchased the Meta AI Glasses from the Ray-Ban online store after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

72.     In deciding to make the purchase, Diedrich viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Diedrich to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Diedrich relied heavily on this when deciding to purchase the Product.

73.     At the time of purchase, Diedrich did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

74.     Diedrich did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

75.     Diedrich would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Diedrich otherwise known that the Challenged Representations and

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

12

FIRST AMENDED CLASS ACTION COMPLAINT

Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

76.    Plaintiff Diedrich cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

77.    Diedrich desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

78.    In the future, Plaintiff Diedrich will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

79.    Additionally, Diedrich would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

80.    Diedrich is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

81.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Diedrich is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

82.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Diedrich's Meta AI Glasses depicting private settings and personal activities that Plaintiff Diedrich reasonably expected to remain private. Plaintiff Diedrich did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

Diedrich, and Meta cannot assure him that it will not be viewed, distributed, or used by unauthorized parties.

83.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Diedrich's seclusion, solitude, and private life, Plaintiff Diedrich has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

84.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Diedrich has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

85.    **Plaintiff Monique Sainz** is a citizen of Arizona and has resided in Pima County, Arizona, at all times relevant to this Complaint. Sainz purchased the Meta AI Glasses from the Meta Store after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

86.    In deciding to make the purchase, Sainz viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Sainz to believe that the Meta AI Glasses, were designed for, and would, protect her privacy. Sainz relied heavily on this when deciding to purchase the Product.

87.    At the time of purchase, Sainz did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect her privacy.

88.    Sainz did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

89.    Sainz would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Sainz otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

14

FIRST AMENDED CLASS ACTION COMPLAINT

90.    Plaintiff Sainz cares deeply about her privacy and would not have purchased or used the Product in the manner that she did if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

91.    Sainz desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected her privacy, as advertised.

92.    In the future, Plaintiff Sainz will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure her privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

93.    Additionally, Sainz would not have used the Products as she did if she knew that Defendants would possess her highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

94.    Sainz is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

95.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Sainz is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

96.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Sainz's Meta AI Glasses depicting private settings and personal activities that Plaintiff Sainz reasonably expected to remain private. Plaintiff Sainz did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Sainz, and Meta cannot assure her that it will not be viewed, distributed, or used by unauthorized parties.

FIRST AMENDED CLASS ACTION COMPLAINT

97. As a direct and proximate result of Meta's intentional and surreptitious intrusion upon Plaintiff Sainz's seclusion, solitude, and private life, Plaintiff Sainz has suffered a loss of privacy, frustration of her reasonable expectations of privacy, mental anguish, and lost value in her personal data, and faces an ongoing risk of further unauthorized disclosure.

98. As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Sainz has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

99. **Plaintiff Nikolause Tucker** is a citizen and resident of Arapahoe County, Colorado.

100. While in the State of Colorado, Tucker purchased the Meta AI Glasses from the Meta online store after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

101. In deciding to make the purchase, Tucker viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Tucker to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Tucker relied heavily on this when deciding to purchase the Product.

102. At the time of purchase, Tucker did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

103. Tucker did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

104. Tucker would not have purchased the Products or would not have paid as much for the Products had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Tucker otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

105. Plaintiff Tucker cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record,

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

106.    Tucker desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

107.    In the future, Plaintiff Tucker will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the Glasses are not collected, stored, and viewed by currently unknown third parties.

108.    Additionally, Tucker would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

109.    Tucker is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

110.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Tucker is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

111.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Tucker's Meta AI Glasses depicting private settings and personal activities that Plaintiff Tucker reasonably expected to remain private. Plaintiff Tucker did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Tucker, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

FIRST AMENDED CLASS ACTION COMPLAINT

112. As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Tucker's seclusion, solitude, and private life, Plaintiff Tucker has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

113. As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Tucker has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

114. **Plaintiff Neil Chen** is a citizen and resident of Broward County, Florida.

115. While physically present in the State of Colorado, Chen purchased the Meta AI Glasses from Sunglass Hut—one of Defendants' authorized retailers—after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

116. In deciding to make the purchase, Chen viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Chen to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Chen relied heavily on this when deciding to purchase the Product.

117. At the time of purchase, Chen did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

118. Chen did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

119. Chen would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Chen otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

120.    Plaintiff Chen cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

121.    Chen desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

122.    In the future, Plaintiff Chen will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

123.    Additionally, Chen would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

124.    Chen is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

125.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Chen is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

126.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Chen's Meta AI Glasses depicting private settings and personal activities that Plaintiff Chen reasonably expected to remain private. Plaintiff Chen did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Chen, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

FIRST AMENDED CLASS ACTION COMPLAINT

127.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Chen's seclusion, solitude, and private life, Plaintiff Chen has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

128.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Chen has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

129.    **Plaintiff Rickford Fraser** is a citizen and resident of Hampden County, Massachusetts.

130.    While physically present in the Commonwealth of Massachusetts, Fraser purchased the Meta AI Glasses from a Walmart Eye Clinic—one of Defendants' authorized retailers of the Product—after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

131.    In deciding to make the purchase, Fraser viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Fraser to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Fraser relied heavily on this when deciding to purchase the Product.

132.    At the time of purchase, Fraser did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

133.    Fraser did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

134.    Fraser would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Fraser otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

135. Plaintiff Fraser cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

136. Fraser desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

137. In the future, Plaintiff Fraser will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

138. Additionally, Fraser would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

139. Fraser is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

140. Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Fraser is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

141. On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Fraser's Meta AI Glasses depicting private settings and personal activities that Plaintiff Fraser reasonably expected to remain private. Plaintiff Fraser did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Fraser, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

21

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

142. As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Fraser's seclusion, solitude, and private life, Plaintiff Fraser has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

143. As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Fraser has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

144. **Plaintiff Kristi Stewart** is a citizen of Michigan and has resided in Montcalm County, Michigan at all times relevant to this Complaint. Stewart requested, and received, the Meta AI Glasses from her husband, who purchased them on eBay.

145. At the time she began using them, Stewart did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect her privacy. Stewart believed, based on Defendants' representation regarding the device and in setting it up, that her information would be protected and would not be shared with other people and that she could control how her data was shared and used.

146. Stewart did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

147. Stewart would not have purchased or used the Products had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Stewart otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

148. Plaintiff Stewart cares deeply about her privacy and would not have requested or used the Product in the manner that she did if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

149.    Stewart desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected her privacy, as advertised.

150.    In the future, Plaintiff Stewart will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure her privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

151.    Additionally, Stewart would not have used the Products as she did if she knew that Defendants would possess her highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

152.    Stewart is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

153.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Stewart is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

154.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Stewart's Meta AI Glasses depicting private settings and personal activities that Plaintiff Stewart reasonably expected to remain private. Plaintiff Stewart did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Stewart, and Meta cannot assure her that it will not be viewed, distributed, or used by unauthorized parties.

FIRST AMENDED CLASS ACTION COMPLAINT

155.     As a direct and proximate result of Meta's intentional and surreptitious intrusion upon Plaintiff Stewart's seclusion, solitude, and private life, Plaintiff Stewart has suffered a loss of privacy, frustration of her reasonable expectations of privacy, mental anguish, and lost value in her personal data, and faces an ongoing risk of further unauthorized disclosure.

156.     As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Stewart has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

157.     **Plaintiff Clarinda Byrd** is a citizen of Michigan and has resided in Oakland County, Michigan, at all times relevant to this Complaint. Byrd purchased the Meta AI Glasses in person from the Lens Crafters in Troy, Michigan—one of Defendants' authorized retailers of the Product— after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

158.     In deciding to make the purchase, Byrd viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Byrd to believe that the Meta AI Glasses were designed for, and would, protect her privacy. Byrd relied heavily on this when deciding to purchase the Product.

159.     At the time of purchase, Byrd did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect her privacy.

160.     Byrd did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

161.     Byrd would not have purchased the Products or would not have paid as much for the Products had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Byrd otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

FIRST AMENDED CLASS ACTION COMPLAINT

162. Plaintiff Byrd cares deeply about her privacy and would not have purchased or used the Product in the manner that she did if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

163. Byrd desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected her privacy, as advertised.

164. In the future, Plaintiff Byrd will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure her privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

165. Additionally, Byrd would not have used the Products as she did if she knew that Defendants would possess her highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

166. Byrd is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

167. Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Byrd is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

168. On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Byrd's Meta AI Glasses depicting private settings and personal activities that Plaintiff Byrd reasonably expected to remain private. Plaintiff Byrd did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Byrd, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

169.    As a direct and proximate result of Meta's intentional and surreptitious intrusion upon Plaintiff Byrd's seclusion, solitude, and private life, Plaintiff Byrd has suffered a loss of privacy, frustration of her reasonable expectations of privacy, mental anguish, and lost value in her personal data, and faces an ongoing risk of further unauthorized disclosure.

170.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Byrd has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

171.    **Plaintiff Joseph Van den Berghe** is a citizen and resident of Dakota County, Minnesota.

172.    Van den Berghe purchased the Meta AI Glasses in-person from Scheels located in Eden Prairie, Minnesota—one of Defendants' authorized retailers of the Product—after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

173.    In deciding to make the purchase, Van den Berghe viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Van den Berghe to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Van den Berghe relied heavily on this when deciding to purchase the Product.

174.    At the time of purchase, Van den Berghe did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

175.    Van den Berghe did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

176.    Van den Berghe would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Van den Berghe otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

privacy protections.

177.    Plaintiff Van den Berghe cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

178.    Van den Berghe desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

179.    In the future, Plaintiff Van den Berghe will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the Glasses not collected, stored, and viewed by currently unknown third parties.

180.    Additionally, Van den Berghe would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

181.    Van den Berghe is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

182.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Van den Berghe is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

183.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Van den Berghe's Meta AI Glasses depicting private settings and personal activities that Plaintiff Van den Berghe reasonably expected to remain private. Plaintiff Van den Berghe did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it

FIRST AMENDED CLASS ACTION COMPLAINT

to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Van den Berghe, and Meta cannot assure him that it will not be viewed, distributed, or used by unauthorized parties.

184.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Van den Berghe's seclusion, solitude, and private life, Plaintiff Van den Berghe has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

185.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Van den Berghe has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

186.    **Plaintiff Daniel Doerr** is a citizen and resident of Clark County, Nevada.

187.    While physically present in the State of Nevada, Doerr purchased the Meta AI Glasses from Meta's website at www.meta.com after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

188.    In deciding to make the purchase, Doerr viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Doerr to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Doerr relied heavily on this when deciding to purchase the Product.

189.    At the time of purchase, Doerr did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

190.    Doerr did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

191.    Doerr would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Doerr otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

192.    Plaintiff Doerr cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

193.    Doerr desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

194.    In the future, Plaintiff Doerr will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

195.    Additionally, Doerr would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

196.    Doerr is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

197.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Doerr is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

198.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Doerr's Meta AI Glasses depicting private settings and personal activities that Plaintiff Doerr reasonably expected

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

to remain private. Plaintiff Doerr did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Doerr, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

199.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Doerr's seclusion, solitude, and private life, Plaintiff Doerr has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

200.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Doerr has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

201.    **Plaintiff Rahleisha Davis** is a citizen of New York and has resided in Queens County, New York, at all times relevant to this Complaint. Davis purchased the Meta AI Glasses from the Ray-Ban online store after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

202.    In deciding to make the purchase, Davis viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Davis to believe that the Meta AI Glasses, were designed for, and would, protect her privacy. Davis relied heavily on this when deciding to purchase the Product.

203.    At the time of purchase, Davis did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect her privacy.

204.    Davis did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

FIRST AMENDED CLASS ACTION COMPLAINT

205. Davis would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Davis otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

206. Plaintiff Davis cares deeply about her privacy and would not have purchased or used the Product in the manner that she did if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

207. Davis desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected her privacy, as advertised.

208. In the future, Plaintiff Davis will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure her privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

209. Additionally, Davis would not have used the Products as she did if she knew that Defendants would possess her highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

210. Davis is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

211. Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Davis is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

212. On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Davis's Meta AI Glasses depicting private settings and personal activities that Plaintiff Davis reasonably expected

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

to remain private. Plaintiff Davis did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Davis, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

213.    As a direct and proximate result of Meta's intentional and surreptitious intrusion upon Plaintiff Davis's seclusion, solitude, and private life, Plaintiff Davis has suffered a loss of privacy, frustration of her reasonable expectations of privacy, mental anguish, and lost value in her personal data, and faces an ongoing risk of further unauthorized disclosure.

214.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Davis has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

215.    **Plaintiff Devon Dlugosz** is a citizen of North Carolina and has resided in Mecklenburg County, North Carolina, at all times relevant to this Complaint. Dlugosz purchased the Meta AI Glasses from Target Optical after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

216.    In deciding to make the purchase, Dlugosz viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Dlugosz to believe that the Meta AI Glasses, were designed for, and would, protect her privacy. Dlugosz relied heavily on this when deciding to purchase the Product.

217.    At the time of purchase, Dlugosz did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect her privacy.

218.    Dlugosz did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

219.    Dlugosz would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Dlugosz otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

220.    Plaintiff Dlugosz cares deeply about her privacy and would not have purchased or used the Product in the manner that she did if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

221.    Dlugosz desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected her privacy, as advertised.

222.    In the future, Plaintiff Dlugosz will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure her privacy is protected and images and videos taken with the Glasses not collected, stored, and viewed by currently unknown third parties.

223.    Additionally, Dlugosz would not have used the Products as she did if she knew that Defendants would possess her highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

224.    Dlugosz is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

225.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Dlugosz is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

226.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Dlugosz's Meta AI Glasses depicting private settings and personal activities that Plaintiff Dlugosz reasonably expected to remain private. Plaintiff Dlugosz did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Dlugosz, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

227.    As a direct and proximate result of Meta's intentional and surreptitious intrusion upon Plaintiff Dlugosz's seclusion, solitude, and private life, Plaintiff Dlugosz has suffered a loss of privacy, frustration of her reasonable expectations of privacy, mental anguish, and lost value in her personal data, and faces an ongoing risk of further unauthorized disclosure.

228.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Dlugosz has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

229.    **Plaintiff Victor Mitchell** is a citizen and resident of Harris County, Texas.

230.    Mitchell purchased the Meta AI Glasses in-person at a Target located in Texas—one of Defendants' authorized retailers—after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

231.    In deciding to make the purchase, Mitchell viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Mitchell to believe that the Meta AI Glasses were designed for, and would, protect his privacy. Mitchell relied heavily on this when deciding to purchase the Product.

232.    At the time of purchase, Mitchell did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

233. Mitchell did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

234. Mitchell would not have purchased the Products or would not have paid as much for the Products had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Mitchell otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

235. Plaintiff Mitchell cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

236. Mitchell desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

237. In the future, Plaintiff Mitchell will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

238. Additionally, Mitchell would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

239. Mitchell is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

240. Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Mitchell is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

35

accurately described.

241. On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Mitchell's Meta AI Glasses depicting private settings and personal activities that Plaintiff Mitchell reasonably expected to remain private. Plaintiff Mitchell did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Mitchell, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

242. As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Mitchell's seclusion, solitude, and private life, Plaintiff Mitchell has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

243. As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Mitchell has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

244. **Plaintiff Laddie Martinek** is a citizen and resident of Pike County, Pennsylvania.

245. Martinek purchased the Meta AI Glasses in-person at Lens Crafters located in Pennsylvania—one of Defendants' authorized retailers—after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

246. In deciding to make the purchase, Martinek viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Martinek to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Martinek relied heavily on this when deciding to purchase the Product.

247. At the time of purchase, Martinek did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

248.    Martinek did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

249.    Martinek would not have purchased the Products or would not have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Martinek otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

250.    Plaintiff Martinek cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

251.    Martinek desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

252.    In the future, Plaintiff Martinek will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

253.    Additionally, Martinek would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

254.    Martinek is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

255.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Martinek is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are

accurately described.

256.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Martinek's Meta AI Glasses depicting private settings and personal activities that Plaintiff Martinek reasonably expected to remain private. Plaintiff Martinek did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Martinek, and Meta cannot assure him that it will not be viewed, distributed, or used by unauthorized parties.

257.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Martinek's seclusion, solitude, and private life, Plaintiff Martinek has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

258.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Martinek has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

259.    **Plaintiff Jeffry Woodhead** is a citizen and resident of Salt Lake County, Utah.

260.    While physically present in the State of Utah, Woodhead purchased the Meta AI Glasses from Lens Crafters —one of Defendants' authorized retailers—after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

261.    In deciding to make the purchase, Woodhead viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Woodhead to believe that the Meta AI Glasses were designed for, and would, protect his privacy. Woodhead relied heavily on this when deciding to purchase the Product.

262.    At the time of purchase, Woodhead did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

263.    Woodhead did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

264.    Woodhead would not have purchased the Products or would not have paid as much for the Products had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Woodhead otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

265.    Plaintiff Woodhead cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

266.    Woodhead desires to purchase Defendants' Products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected his privacy, as advertised.

267.    In the future, Plaintiff Woodhead will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the Glasses not collected, stored, and viewed by currently unknown third parties.

268.    Additionally, Woodhead would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

269.    Woodhead is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

270.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Woodhead is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are

39

FIRST AMENDED CLASS ACTION COMPLAINT

accurately described.

271.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Woodhead's Meta AI Glasses depicting private settings and personal activities that Plaintiff Woodhead reasonably expected to remain private. Plaintiff Woodhead did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Woodhead, and Meta cannot assure him that it will not be viewed, distributed, or used by unauthorized parties.

272.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Woodhead's seclusion, solitude, and private life, Plaintiff Woodhead has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

273.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Woodhead has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

274.    **Plaintiff Jason Hatch** is a citizen and resident of Frederick County, Virginia.

275.    While in the Commonwealth of Virginia, Hatch purchased the Meta AI Glasses from the Ray-Ban online store after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

276.    In deciding to make the purchase, Hatch viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Hatch to believe that the Meta AI Glasses, were designed for, and would, protect his privacy. Hatch relied heavily on this when deciding to purchase the Product.

277.    At the time of purchase, Hatch did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy.

40

FIRST AMENDED CLASS ACTION COMPLAINT

278.    Hatch did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

279.    Hatch would not have purchased the Products or would not have paid as much for the Products had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Hatch otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

280.    Plaintiff Hatch cares deeply about his privacy and would not have purchased or used the Product in the manner that he did if he knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

281.    Hatch desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected his privacy, as advertised.

282.    In the future, Plaintiff Hatch will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure his privacy is protected and images and videos taken with the Glasses not collected, stored, and viewed by currently unknown third parties.

283.    Additionally, Hatch would not have used the Products as he did if he knew that Defendants would possess his highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

284.    Hatch is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

285.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Hatch is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately

41

FIRST AMENDED CLASS ACTION COMPLAINT

described.

286.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Hatch's Meta AI Glasses depicting private settings and personal activities that Plaintiff Hatch reasonably expected to remain private. Plaintiff Hatch did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Hatch, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

287.    As a direct result of Meta's intentional and surreptitious intrusion upon Plaintiff Hatch's seclusion, solitude, and private life, Plaintiff Hatch has suffered a loss of privacy, frustration of his reasonable expectations of privacy, mental anguish, and lost value in his personal data, and faces an ongoing risk of further unauthorized disclosure.

288.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Hatch has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

289.    Plaintiff Chandra Balderson is a citizen of West Virginia and has resided in Wood County, West Virginia, at all times relevant to this Complaint. Balderson purchased the Meta AI Glasses from the Ray-Ban online store as a gift for her husband as he requested them after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent. Balderson also began using them as well as being recorded while her husband was using the Meta AI Glasses.

290.    In deciding to make the purchase, Balderson viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Balderson to believe that the Meta AI Glasses, were designed for, and would, protect her husband and subsequently her privacy. Balderson relied heavily on this when deciding to purchase the Product.

FIRST AMENDED CLASS ACTION COMPLAINT

291.    At the time of purchase, Balderson did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect her privacy.

292.    Balderson did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising and marketing that contradicted the prominent Challenged Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

293.    Balderson would not have purchased the Products or would not have paid as much for the Products had Defendants not made the false and misleading Challenged Representations and Omissions and/or had Balderson otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

294.    Plaintiff Balderson cares deeply about her privacy and would not have purchased or used the Product in the manner that she did if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Products.

295.    Balderson desires to purchase Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' products were designed for and actually protected her privacy, as advertised.

296.    In the future, Plaintiff Balderson will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure her privacy is protected and images and videos taken with the glasses not collected, stored, and viewed by currently unknown third parties.

297.    Additionally, Balderson would not have used the Products as she did if she knew that Defendants would possess her highly personal information, including images and videos taken on the Products, and store them in a way that does not guarantee the privacy and safety of the videos and images.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

298.    Balderson is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

299.    Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, Balderson is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

300.    On information and belief, Meta deliberately captured, transmitted, and routed to third-party human annotators at Sama imagery and audio recorded on Plaintiff Balderson's Meta AI Glasses depicting private settings and personal activities that Plaintiff Balderson reasonably expected to remain private. Plaintiff Balderson did not provide express consent for Meta to collect this data, disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive visual and audio data is no longer under the control of Plaintiff Balderson, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

301.    As a direct and proximate result of Meta's intentional and surreptitious intrusion upon Plaintiff Balderson's seclusion, solitude, and private life, Plaintiff Balderson has suffered a loss of privacy, frustration of her reasonable expectations of privacy, mental anguish, and lost value in her personal data, and faces an ongoing risk of further unauthorized disclosure.

302.    As a direct and proximate result of the Challenged Representations and Omissions, Plaintiff Balderson has suffered ascertainable monetary losses, including but not limited to overpayment for the Product.

**B.    Defendants**

303.    **Defendant Meta Platforms, Inc.** is a global technology company that provides social media platforms and communication services to users worldwide as well as advertising services to millions of companies. Meta is comprised of several well-known platforms, including Facebook, Instagram, Threads, and WhatsApp. Meta is incorporated in Delaware with its principal place of business located at 1 Meta Way, Menlo Park, CA 94025.

44

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

304.    At all relevant times, Meta was conducting business in the State of California, including the Class Period. Meta is one of the owners, manufacturers, marketers, and distributors of the Products, and is the company that created, authorized, and controlled the use of the Challenged Representations and Omissions to market the Meta AI Glasses. Meta and its agents promoted, marketed, and sold the Products at issue throughout the United States and, in particular, within this judicial district. The unfair, unlawful, deceptive, and misleading Challenged Representations and Omissions on the Products were prepared, authorized, ratified, and/or approved by Meta and its agents, and were disseminated throughout California and the nation by Meta and its agents to deceive and mislead consumers in the State of California and throughout the United States into purchasing the Meta AI Glasses.

305.    **Defendant Luxottica of America, Inc.** is an Ohio corporation with its principal place of business located at 4000 Luxottica Place, Mason, OH 45040-8114. On information and belief, Luxottica of America, Inc., in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States. The unfair, unlawful, deceptive, and misleading Challenged Representations and Omissions on the Products were prepared, authorized, ratified, and/or approved by Luxottica and its agents, and were disseminated throughout California and the nation by Luxottica and its agents to deceive and mislead consumers in the State of California and throughout the United States into purchasing the Meta AI Glasses.

## VI.    FACTUAL ALLEGATIONS

### A.    Background: Meta's AI Glasses

306.    In 2021, Meta partnered with EssilorLuxottica, the parent company of Ray-Ban and Oakley, to launch the Meta AI Glasses. The product line now includes multiple models sold under the Ray-Ban Meta and Oakley Meta brands, all of which share the same core hardware and software architecture: a built-in ultra-wide camera capable of recording videos and images, and a microphone array that captures spatial audio.

307.    What distinguishes the Meta AI Glasses from ordinary eyewear is not the camera and microphones, but the infrastructure behind them. The Glasses are designed to function as an ambient AI interface housed in a frame that looks nearly identical to standard Ray-Ban Wayfarers and

45

Oakley models. The built-in assistant responds to spoken prompts, allowing wearers to translate foreign-language text in real time, identify objects and landmarks, get directions, send messages, make phone calls, and more. Users can take hands-free photos and videos, record up to three minutes of continuous footage, and livestream first-person video directly to Facebook and Instagram, broadcasting their surroundings to an unlimited audience.

308.    Each of these functions relies on the same underlying process. When a user initiates a recording, captures an image, or invokes the AI assistant, the Glasses transmit what the wearer sees to Meta's cloud servers, where it is analyzed using visual recognition, location data, and other contextual inputs, then stored and used to train Meta's AI models. This transmission occurs in real time and in whatever environment the wearer happens to occupy, whether a public sidewalk, a private residence, a gym, or a bathroom.

**B.    Defendants' Meta Glasses Are Unreasonably Dangerous**

309.    Any time a consumer sends a command to the Glasses, the Glasses see what the user sees, including private moments inside the user's house, bedroom, bathroom, and more. As has been revealed, this footage is sent offshore for review and labeling by strangers.

310.    Meta's AI Glasses are not just sunglasses to be worn outside. They are also prescription glasses that many customers wear from the moment they wake up to the moment they go to sleep. Some customers use Glasses that transition automatically from regular glasses to sunglasses by dimming the lenses when exposed to sunlight. Many people wear them all day, every day, like a watch.

311.    Regardless, people increasingly buy AI glasses as an everyday accessory – similar to a phone or a watch – for the integration of technology into something they already wear. Those features include use of voice assistant (equivalent of Apple Siri or Google accessible at your fingertips), translation features, navigation support, and built-in microphones and speakers that remove the need for separate headphones.

312.    But unlike a phone or other intermittent-use device, AI glasses are uniquely positioned on the customer's face and are worn continuously throughout the day, including through deeply

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

private and sensitive moments. As a result, any data collection is persistent, comprehensive, and inseparable from the product's ordinary and intended use.

313.     Because these devices are worn continuously and are capable of collecting audio, visual, and behavioral data throughout the day, they also raise heightened concerns. If the comprehensive, intimate data consisting of audio, visual, and behavioral data is being collected and transmitted without clear, affirmative user understanding or control, that practice is central to the product's function – embedded into how the product operates at all times. The continuous and persistent nature of the data captured any time the AI functions in the Glasses is activated and/or "on" includes highly sensitive categories of accessed information – from financial information (viewing of financial data and taking screenshots or asking AI clarifying questions), medical or health related information (including discussions with providers regarding medication or diagnosis or review of medical records), sensitive data relating to minors (images, voices, activities of children in homes, schools), or even intimate moments with lovers, friends, or colleagues. Meta is aware that the collection of such sensitive data is a foreseeable consequence of wearing AI Glasses.

314.     Customers reasonably expect that any data generated through their use of AI Glasses – particularly the devices worn continuously throughout the day as intended by Meta – will remain stored locally on the device to which the Glasses are connected, or otherwise under their direct control.

315.     Customers would not reasonably expect their intimate and deeply personal data to be broadly collected, accessed, or retained by the manufacturer and third parties across the world; nor would they expect it to be used to train Meta's large language models.

316.     These facts are material to a reasonable consumer's purchasing decision. A consumer deciding whether to adopt a device worn continuously on one's face – capable of capturing real-time audio, visual, and behavioral data – would consider it highly important to know whether personal and sensitive information (and that of family and friends) is being collected beyond the device, transferred to foreign jurisdictions, or repurposed for secondary uses such as AI training. The omission of this information deprives consumers of the ability to make an informed choice about whether to purchase or use the Product at all.

FIRST AMENDED CLASS ACTION COMPLAINT

317.    Recent whistleblower accounts reveal that when consumers use their Meta AI Glasses' AI features, the footage is not processed privately or locally as consumers expected. Instead, videos captured through the Glasses, including highly sensitive moments inside homes and other private spaces, are transmitted to Meta's servers and then routed to a subcontractor in Kenya, where human workers manually view and label the footage to train Meta's AI models.[5]

318.    Troves of sensitive moments – hackers' and kidnappers' dream – are all funneled into the hands of offshore contractors working for a few dollars an hour.[6] These contractors report seeing everything: People changing clothes, using the bathroom, engaging in sexual activity, handling financial information, and conducting other private activities inside their homes that no reasonable consumer would ever expect a stranger to watch. They say that Meta's supposed "face anonymization" does not work. And those who raise concerns about the highly personal nature of what they are forced to watch and label are fired.[7]

319.    Meta's failure to disclose this information when it first introduced the AI Glasses to the market is critical. Meta's AI Glasses as designed are unreasonably dangerous, as they introduce significant risks that exceed any ordinary consumers' expectations, and cannot be avoided without abandoning the Product's core use.

320.    Access to the data collected by these glasses – be it financial details, health related information, information about minors, family members, partners, friends – presents a uniquely valuable target for unauthorized access and misuse of this information. The access, use, interception, and disclosure of this data exposes customers to serious harms, including identity theft, financial fraud, profiling, stalking, and other forms of exploitation. The combination of always-on

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

[5] *She Came Out of the Bathroom Naked, Employee Says*, SVENSKA DAGBLADET (Feb. 27, 2026), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything (last visited Mar. 25, 2026).

[6] '*AI Is African Intelligence': The Workers Who Train AI Are Fighting Back*, 404 MEDIA (Mar. 12, 2026) https://www.404media.co/ai-is-african-intelligence-the-workers-who-train-ai-are-fighting-back/ (last visited Mar. 25, 2026).

[7] *She Came Out of the Bathroom Naked, Employee Says*, SVENSKA DAGBLADET (Feb. 27, 2026), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything (last visited Mar. 25, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT

collection, intimate proximity to the customers, and transmission of data across jurisdictions amplifies these risks in a way that is materially different from other consumer technology.

**C.    Defendants Misrepresent the Meta AI Glasses as "Designed for Privacy" (Challenged Misrepresentation)**

321.    Many consumers were skeptical about trusting Meta given prior Meta scandals, including Cambridge Analytica. To reassure skeptical consumers, Meta made express representations regarding privacy to assure customers that they need not worry about the data captured by the Glasses because the customers would control it.

322.    Meta's updated privacy policy for the AI Glasses in April 2025, which included requiring that certain AI features remain "always-on," only amplified consumer concern.[8]

323.    After slow sales in 2024, Meta double down on reassuring the public that consumers would maintain control over their data that was collected by the Glasses. This included the launch of a targeted and specific marketing and advertising campaign portraying the Glasses as a product "designed for privacy, controlled by you."[9]



---

[8] *Meta's Controversial Data Policy on Ray-Ban Smart Glasses Sparks Privacy Debate*, OPENTOOLS (May 1, 2025), https://opentools.ai/news/metas-controversial-data-policy-on-ray-ban-smart-glasses-sparks-privacy-debate#section0 (last visited Mar. 4, 2026).
[9] Screenshot taken from *Ray Ban Meta Glasses Product Page*, META, https://www.meta.com/ai-glasses/privacy/ (last visited Mar. 4, 2026).

49

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

324. Defendants assured consumers that they will have control of their own data. On a page dedicated to the Product's privacy, they tout: "You're in control of your data and content" and "Clear, easy device and app settings" to "help you manage your information, giving you control over what content you choose to share with others, and when."[10]



325. Defendants promoted (and still do) the Meta AI Glasses as "Built for your privacy and others' too," representing that Defendants have taken steps to protect the privacy of not only the user of the Meta AI Glasses, but also of the people who may be captured in photos and videos taken by users. Defendants explicitly promise that "When you use your glasses camera for AI features, we take steps to protect people's privacy, like removing key identifiable information."[11]



_____

[10] *Ibid.*

[11] *Ibid.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

326.    The Product purchase page on the official Meta Store on Amazon.com promises "PRIVACY CONTROLS — Ray-Ban Meta glasses put you in control of your privacy."

327.    The Meta AI Glasses website even offers tips for consumers on "How to wear your Ray-Ban Meta glasses responsibly," in order to make others feel "safe and comfortable while you're wearing your glasses," implying that safety and privacy are important to Defendants, and that it is possible for consumers to use the Product in a way that keeps data privacy "safe."[12]

328.    Meta further promotes the AI Glasses as a tool that inherently protects the user's privacy, advertising that consumers "can privately view text and multimedia messages."[13]



· **Messaging & Video Calling:** Staying connected while staying in the moment is so much easier when your glasses show you short texts, WhatsApp messages, or Reels your friends are sharing. With Meta Ray-Ban Display, you can privately view text and multimedia messages from WhatsApp, Messenger, Instagram, and your phone, hands-free with just a pinch. You can also take live video calls from WhatsApp and Messenger and show friends and family what you're seeing through the glasses.

329.    In interviews and demonstrations of the Meta AI Glasses and added accessory the EMG wristband, a device which allows users to type messages or otherwise navigate the screen of

---

[12] *Id.*

[13] *Meta Ray-Ban Display: AI Glasses With an EMG Wristband*, META (Sept. 17, 2025), https://about.fb.com/news/2025/09/meta-ray-ban-display-ai-glasses-emg-wristband/.

FIRST AMENDED CLASS ACTION COMPLAINT

their Meta AI Glasses with the movement of a hand or wrist, Meta founder and CEO Mark Zuckerberg has repeatedly promoted the value of being able to type out private messages in a way that is "almost invisible to the people around you," and "without anyone realizing you're doing it,"[14] even saying, "I just think that you want a way to control your computing device that is private and discreet and subtle."[15] In one interview, when asked what would happen when AI Glasses "see everything we see, hear everything we hear," Zuckerberg quickly insisted, "I'm not sure I agree that they're going to see everything. Or maybe there will be some sensor that does, but they're not necessarily going to retain it. I'm not sure that you want them to. . . . **[G]iving people control over that is important.**"[16]

330.    Meta knew that privacy was critical to consumers. Consumers pay a premium for privacy. For example, Apple has positioned itself as providing higher levels of privacy for consumers, and as a result, has obtained a significant business advantage allowing itself to charge a premium for its products and sell more of them.[17]

331.    And Meta knows that poor privacy practices can lead to significantly reduced sales. A 2020 study from Pew Research Center found that "52% of Americans decided not to use a product or service because of concerns over data protection."[18] Not only do privacy promises increase sales, but bad privacy practices can significantly decrease them.

332.    Meta also sought to dispel any skepticism arising from its prior misconduct – Cambridge Analytica or the FTC related allegations about collection and sharing of personal

---

[14] *Introducing Meta Ray-Ban Display, The Future of AI Glasses @ Connect 2025*, SMART GADGET REVIEWS, YOUTUBE (Sept. 28, 2025), https://www.youtube.com/watch?v=IMEpbpt68e0 (last visited Mar. 23, 2026), at 1:45–1:57.

[15] *Mark Zuckerberg on AI Glasses, Superintelligence, Neural Control, and More*, ROWAN CHEUNG, YOUTUBE (Sept. 17, 2025), https://www.youtube.com/watch?v=WuTJkFvw70o (last visited Mar. 23, 2026), at 9:51-10:18.

[16] *Id*. at 33:31–34:14.

[17] *Apple is turning privacy into a business advantage, not just a marketing slogan* CNBC (June 7, 2021) https://www.cnbc.com/2021/06/07/apple-is-turning-privacy-into-a-business-advantage.html (last accessed March 25, 2026).

[18] *Id*.

FIRST AMENDED CLASS ACTION COMPLAINT

information [19] – and to convince consumers that this time, things would be different. Customers would be in control of their data, not Meta.

333.    Meta's privacy promises have led to record sales of the Meta Glasses.[20]

334.    But none of it was true. Customers of Meta AI Glasses cannot control what happens to their data, or the data that they capture of the people around them. Defendants are certainly not keeping this data "safe." Instead, Meta feeds consumer data—captured by consumers through their Meta AI Glasses—to a subcontractor called Sama.[21] At Sama's headquarters in Nairobi, Kenya, thousands of people working as "data annotators" review this sensitive user data, annotating it with labels like "cars," "lamps," and "people" in order to train artificial intelligence used in Meta products.[22]

335.    Defendants' offshore contractors working as "data annotators" report seeing deeply private video clips, including videos of bathroom visits, romantic encounters, and other personal moments.[23] One person recounted seeing a video wherein a man placed his Meta AI Glasses on a bedside table and left the room.[24] Afterwards, his wife entered the room and, unknowingly, changed clothes in front of the Meta AI Glasses.[25] The video was sent to people halfway around the world to view and annotate in order to train AI—all without the woman's knowledge that the video of her had been captured in the first place.[26]

---

[19] *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012), https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebookdo.pdf

[20] Nicholas Brown, *Big buzz, small market: Meta's smartglasses are a specialty gadget this holiday*, REUTERS (Nov. 25, 2025), https://www.reuters.com/business/big-buzz-small-market-metas-smartglasses-are-specialty-gadget-this-holiday-2025-11-25/ (last visited Mar. 25, 2026).

[21] *She Came Out of the Bathroom Naked, Employee Says*, SVENSKA DAGBLADET (Feb. 27, 2026), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything (last visited Mar. 4, 2026).

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

53

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

336.    Other data annotators report seeing videos with visible bank cards, private text exchanges, and other private information. This sensitive data lives in Meta's database, viewed by human data annotators and available indefinitely for use to Meta's AI products.[27]

337.    Despite Defendants' advertised promises that they would "take steps to protect people's privacy, like removing key identifiable information," and despite their reported policy of automatically blurring faces that appear in annotation data, human data annotators in Kenya reported that, in fact, anonymization did not reliably work, and faces that should be covered are still visible.[28]

338.    The consumer data is extremely valuable to Meta. New data input is central to AI production, but as AI labs exhaust publicly available data, proprietary sources of new data can cost hundreds of millions of dollars.[29] So instead of paying for this data as other companies do, Meta decided to farm this deeply personal data from unknowing consumers who have already purchased the Products—turning consumers themselves into commodities without them ever knowing it, while falsely assuring them with affirmative promises of privacy.

**D.    Defendants Knowingly Omit and Conceal that Meta's Employees and Contractors Review Intimate Content Captured by the Meta AI Glasses**

339.    Despite marketing the Meta AI Glasses as "designed for privacy," "controlled by you," and equipped with "robust measures to protect user data," Meta failed to disclose that intimate videos, images, and audio are routinely captured by the Glasses, transmitted to Meta's servers, and reviewed by Defendants' employees and contractors. This material omission directly contradicts Meta's affirmative privacy claims and has resulted in the exposure of consumers' most intimate moments to thousands of strangers.

340.    These undisclosed practices – and what Meta does with the users' highly sensitive data – were material to reasonable consumers deciding whether to purchase the Meta AI Glasses. A reasonable consumer would not expect that the footage captured by Meta AI Glasses worn in

---

[27] *Id.*

[28] *Id.*

[29] Hamidah Oderinwale and Anna Kazlauskas, *The Economics of AI Training Data: A Research Agenda*, ARXIV (Oct. 2025), https://arxiv.org/html/2510.24990 (last visited Mar. 4, 2026).

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

everyday life would be transmitted to third-party human contractors for review and analysis of the most intimate and private moments. This is particularly concerning given that these Glasses accompany users throughout their daily routines – in their homes, bathrooms, bedrooms, and other private spaces, capturing deeply private moments: changing clothes, using the toilet, engaging in sexual activity, caring for children, and more.

341.    The exposure to such recordings would be profoundly unexpected to reasonable consumers. Users might anticipate that wearable AI Glasses process visual data automatically to improve functionality, but they would not reasonably expect strangers from other countries to be watching their highly intimate moments.

342.    Transmitting users' most intimate recordings to overseas contractors also created obvious and foreseeable risks. Once such recordings are sent to third-party human contractors, these individuals can copy, retain, distribute, and exploit the recordings – be it for harassment, blackmail, public dissemination, or other reasons. Defendants' omission regarding this unreasonable safety hazard deprived consumers of material information necessary to decide whether to purchase or use these Glasses.

343.    Defendants have known since their initial launch of the Meta AI Glasses in 2021 that human review of videos, audio, and images from users would expose intimate content. Indeed, the inherent risks of human review of user-generated content captured by always-on wearable cameras are well established in the technology industry—putting Defendants on direct notice that consumers would expect prominent disclosure of these risks and that failure to disclose them creates significant privacy harms.

344.    Despite their actual knowledge of the human review pipeline and the inherent safety and privacy risks associated with such sharing of data, Defendants have continued to market the Glasses using the same "designed for privacy," "controlled by you," and similarly false and misleading representations.

345.    By highlighting the Meta AI Glasses' privacy features, while concealing the critical fact that intimate footage is routinely reviewed by Defendants' employees and contractors, Defendants created a false impression that the Glasses provided comprehensive protection of user

FIRST AMENDED CLASS ACTION COMPLAINT

privacy, when in reality the marketed privacy features only provide limited protection against certain surface-level device interactions and do nothing to prevent the most significant privacy risk that the Glasses pose: the exposure of personal footage to strangers.

**E.    Defendants' Omissions Implicate a Central Function of the Meta AI Glasses and Present an Unreasonable Safety Risk to Consumers**

346.    Defendants' failure to disclose that offshore strangers would be viewing user's personal footage to label it for embedding into Meta's AI products implicates and materially affects the central function of the Meta AI Glasses. Defendants marketed the Products' privacy architecture as core product features, essential to a camera and microphone designed to be worn on a user's face throughout daily life, including intimate and private settings. Any consumer who does not wish to have their most intimate moments transmitted to Meta's servers and reviewed by offshore human contractors is left with a $299 to $799 pair of sunglasses frames with no AI or "smart" functionality whatsoever.

347.    Independent of the impact on the central function of the Glasses, Defendants' omission also presents an unreasonable safety issue to consumers. The omissions render the Meta AI Glasses' privacy features materially misleading, transforms the product from a personal device into a surveillance conduit, and exposes consumers to unreasonable risks of dignitary harm, emotional distress, stalking, extortion, identity theft, and reputational injury. Indeed, Meta employees and contractors have described viewing credit card numbers, nudity, sexual activity, and identifiable faces in the footage they reviewed. The exposure of such content to thousands of unknown individuals creates a persistent and unreasonable risk of harm that Meta's marketed privacy features were represented to, but do not, prevent.

**F.    Plaintiffs' and Class members' Data is valuable**

348.    Plaintiffs' and Class members' data has value, and Meta harmed Plaintiffs and the Class members by not compensating them for the value of their data, while hiding how their data would actually be used and monetized.

349.    The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

56

FIRST AMENDED CLASS ACTION COMPLAINT

350. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[30] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[31] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

351. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[32]

352. This economic value of consumer data has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[33]

353. Another example of this is the Neon app, which pays users for recording their phone conversations, which are subsequently passed along to AI developers who use it to train their chatbots. Neon pays users 30 cents per minute when they speak with other Neon members and 15 cents per minute for speaking to a non-Neon user. In either case, only the Neon users' side of the conversation is shared, and users can earn up to $30 per day for their conversations.[34]

---

[30] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (June 25, 2024), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited March 23, 2026).
[31] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ TECHCRUNCH (OCTOBER 13, 2015) (last visited March 23, 2026).
[32] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 HARV.L.REV. 2055, 2056-57 (2004).
[33] *See 10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-selling-your-data/ (last visited March 23, 2026).
[34] Lance Whitney, *This app will pay you $30/day to record your phone calls for AI - but is it worth it?*, ZDNET (September 25, 2025), https://www.zdnet.com/article/this-app-will-pay-you-30day-to-record-your-phone-calls-for-ai-but-is-it-worth-it/ (last accessed March 23, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT

354. This shows the immense value that software and machine learning developers find in the data available in the images, videos, and conversations from the Meta Glasses that are used for training Meta's AI systems, and it is clear that Meta obtains value from these illicitly recorded videos.

355. There are countless other examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

## G. Meta's Systematic Disregard for People's Privacy.

356. Meta's surreptitious tracking of users was not accidental but rather part of its corporate DNA. Meta is a repeat privacy offender and regularly claims to keep its users' information private in order to garner a competitive advantage, while not coming close to honoring its promises of privacy.

357. Meta has been previously warned by regulators and courts of this type of behavior and has been sued repeatedly for its surreptitious tracking. For example, in 2012, Meta (then Facebook) entered into a consent agreement with the Federal Trade Commission ("FTC") after the FTC alleged that Facebook deceived consumers by misrepresenting their ability to control their privacy and personal information and by sharing that information in violation of the privacy choices those consumers made. As part of that agreement, Facebook agreed to make substantial changes prohibiting misrepresentation by Facebook regarding privacy and required clear and prominent privacy notices, limitations on sharing information with app developers, the implementation of a comprehensive privacy program and third-party audits and oversight by the FTC.[35]

358. Despite the 2012 Agreement, Meta continued to violate its users' privacy rights and repeatedly breached the prior FTC agreement. This resulted in the FTC taking further action in 2019 and Facebook agreeing to "pay a record-breaking $5 billion penalty, and submit to new restrictions

[35] *In re Facebook, Inc.*, C-4365, 2012 FTC LEXIS 135 (F.T.C. July 27, 2012), https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebookdo.pdf

FIRST AMENDED CLASS ACTION COMPLAINT

and a modified corporate structure that will hold the company accountable for the decisions it makes about its users' privacy" based on Meta's failure to comply with the 2012 consent agreement.[36]

359.    Yet again, Meta failed to comply with the 2012 and 2019 consent agreements that it had entered into with the FTC, causing the FTC in 2023 to propose revoking the 2019 order and reopening the case to increase the fine, force additional privacy changes, and increase monitoring to force Meta to comply with the prior orders.[37] Despite Meta's attempts to reframe itself as a company that respected user privacy, it acted no differently than it has in the past.

360.    Meta's long history of false statements and privacy scandals is a part of its business model. Meta has repeatedly pushed boundaries on user tracking and data collection, violating user trust, and yet, despite paying billions of fines and settlements, it continues to find ways to obtain more data from consumers through deceptive means, and to sell more products with false promises of privacy and user control of data.

361.    At this point, Meta's pattern is troubling, yet clear: privacy isn't the priority – profit is. Its model is simple: monetize the data, pay the fine, repeat. As long as their profits outweigh the penalties, nothing changes. Meta's pattern of misconduct must be stopped.

## VII.    TOLLING OF STATUTE OF LIMITATIONS

### A.    Discovery Rule

362.    Defendants' knowing and active concealment and denial of the facts alleged herein toll any applicable statute(s) of limitations. Plaintiffs and Class members could not reasonably have discovered the true nature and extent of Meta's collection, transmission, storage, and use of data captured through the Meta AI Glasses until the facts alleged herein became known.

---

[36] *FTC Imposes $5 Billion Penalty, Sweeping New Privacy Restrictions on Facebook*, FEDERAL TRADE COMMISSION, (July 24, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook.

[37] *In re Facebook, Inc.*, C-4365 (F.T.C. May 3, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/C4365-Commission-Order-to-Show-Cause-%28Redacted-Public%29.pdf

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

363.    Plaintiffs and Class members had no reasonable ability to discover, within the applicable statute of limitations, that Defendants were misrepresenting the privacy protections, data practices, and safeguards of the Meta AI Glasses, and could not have discovered through the exercise of reasonable diligence that Defendants were concealing such information and misrepresenting the features, capabilities, privacy controls, reliability, functionality, characteristics, and performance of the Meta AI Glasses.

364.    Any statutes of limitation otherwise applicable to any claims asserted herein thus have been tolled by the discovery rule.

**B.    Fraudulent Concealment**

365.    All applicable statutes of limitations have also been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the material facts alleged herein.

366.    Defendants had a duty to disclose, among other things, the true scope and nature of the data collection, transmission, retention, and use practices associated with the Meta AI Glasses, because such practices are central to the privacy and functionality of the product and were the subject of Defendants' own affirmative marketing representations.

367.    Despite their knowledge, Defendants actively concealed these material facts from Plaintiffs and Class members while continuing to profit from the sale of Meta AI Glasses they marketed as a product "designed for privacy, controlled by you."

368.    As a result of Defendants' active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**C.    Estoppel**

369.    Defendants had a duty to disclose to Plaintiffs and Class members the true character, nature, and quality of the Meta AI Glasses, including the facts that the Glasses transmit user and bystander data to Meta's cloud servers for analysis and AI model training, that the LED privacy indicator is inadequate as a bystander notice mechanism, and that the privacy protections Meta marketed were false.

370. Instead, Defendants concealed the true character, nature, and quality of the Meta AI Glasses and knowingly made misrepresentations about the privacy protections, data practices, reliability, functionality, characteristics, and performance of the Meta AI Glasses.

## VIII.    CLASS ACTION ALLEGATIONS

371. **Class Definition.** Plaintiffs bring this action as a class action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure, Rule 23(a) and 23(b)(3) defined as follows:

**A.    Purchaser Classes:**

**Nationwide Class:**

All persons or entities who purchased the Product in the United States.

**California Subclass:**

All persons or entities who purchased the Product in the State of California.

**Alabama Subclass:**

All persons or entities who purchased the Product in the State of Alabama.

**Arizona Subclass**

All persons or entities who purchased the Product in the State of Arizona.

**Colorado Subclass:**

All persons or entities who purchased the Product in the State of Colorado.

**Massachusetts Subclass:**

All persons or entities who purchased the Product in the Commonwealth of Massachusetts.

**Michigan Subclass:**

All persons or entities who purchased the Product in the State of Michigan.

**Minnesota Subclass:**

All persons or entities who purchased the Product in the State of Minnesota.

**Nevada Subclass:**

All persons or entities who purchased the Product in the State of Nevada.

**New Jersey Subclass:**

All persons or entities who purchased the Product in the State of New Jersey.

**New York Subclass:**

All persons or entities who purchased the Product in the State of New York.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

**North Carolina Subclass:**

All persons or entities who purchased the Product in the State of North Carolina.

**Pennsylvania Subclass:**

All persons or entities who purchased the Product in the Commonwealth of Pennsylvania.

**Texas Subclass:**

All persons or entities who purchased the Product in the State of Texas.

**Utah Subclass:**

All persons or entities who purchased the Product in the State of Utah.

**Virginia Subclass:**

All persons or entities who purchased the Product in the Commonwealth of Virginia.

**West Virginia Subclass:**

All persons or entities who purchased the Product in the State of West Virginia.

**B.    User Classes:**

**Nationwide Class:**

All users of the Product in the United States.

**California Subclass:**

All users of the Product in the State of California.

**Massachusetts Subclass:**

All users of the Product in the Commonwealth of Massachusetts.

**Pennsylvania Subclass:**

All users of the Product in the Commonwealth of Pennsylvania.

372.    Collectively, the Nationwide Purchaser and User Classes and the California, Alabama, Arizona, Colorado, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Texas, Utah, Virginia, and West Virginia Purchaser and User Subclasses (together, "State Subclasses") are referred to as the "Classes" or "the Class".

FIRST AMENDED CLASS ACTION COMPLAINT

373.    **Class Definition Exclusions.** Excluded from the Classes are: (i) Defendants, their assigns, successors, and legal representatives; (ii) any entities in which Defendants have controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

374.    **Reservation of Rights to Amend the Class Definition.** Plaintiffs reserve the right to amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

375.    **Numerosity.** Members of the Classes are so numerous that joinder of all members is impracticable. The Nationwide Classes consist of millions of purchasers dispersed throughout the United States, and the State Subclasses likewise consist of at least thousands of purchasers (if not more) dispersed throughout numerous states across the country. Accordingly, it would be impracticable to join all members of the Classes before the Court.

376.    **Common Questions Predominate.** There are numerous and substantial questions of law or fact common to all members of the Classes that predominate over any individual issues. Included within the common questions of law or fact are:

**A.    For the Purchaser Class:**

  a. Whether Defendants engaged in unlawful, unfair, or deceptive business practices by advertising and selling the Products;

  b. Whether Defendants' advertising and marketing of the Products was false, misleading, or deceptive;

  c. Whether Defendants' Challenged Representations and Omissions represent that the Products have characteristics, uses, or benefits that they do not have;

  d. Whether Defendants' Challenged Representations and Omissions represent that the Products are of a particular standard, quality, or grade when they are of another;

FIRST AMENDED CLASS ACTION COMPLAINT

e.    Whether Defendants' Challenged Representations and Omissions advertise the Products with the intent not to sell them as advertised;

f.    Whether Defendants' Challenged Representations and Omissions are material to reasonable consumers;

g.    Whether Defendants knew or should have known that their advertising and marketing of the Products was false or misleading;

h.    Whether Defendants intended to mislead Plaintiffs and the Class through their Challenged Representations and Omissions;

i.    Whether Defendants affirmatively misrepresented the capabilities, quality, and nature of the Products;

j.    Whether Defendants had a duty to disclose material facts about the Products that were omitted from their representations;

k.    Whether Defendants knew or should have known that the Products did not conform to their advertising, marketing, warranties, and representations, or were not suitable for their intended use;

l.    Whether Defendants breached the terms of their contracts with the consumers, including the express warranties, by not providing products that conform to the advertising and marketing claims;

m.    Whether Defendants breached the implied warranty of merchantability;

n.    Whether Defendants negligently misrepresented the capabilities, quality, and nature of the Products;

o.    Whether Plaintiffs and the Class paid a price premium for the Products as a result of Defendants' Challenged Representations and Omissions;

p.    Whether Plaintiffs and the Class are entitled to damages, restitution, injunctive relief, and/or declaratory relief; and

q.    Whether Defendants were unjustly enriched by their conduct.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

**B.    For the User Class:**

    a.    Whether Meta's conduct constitutes an egregious breach of social norms underlying Plaintiffs' and Class members' privacy rights;

    b.    Whether Meta acted intentionally in violating Plaintiffs' and Class members' privacy rights;

    c.    Whether Defendants designed the Products in a defective manner that rendered them unreasonably dangerous to consumers' privacy and dignitary interests;

    d.    Whether Defendants failed to adequately warn consumers of the risks associated with the Products' data collection, transmission, and human review practices; and

    e.    Whether a safer alternative design existed that was technically and commercially feasible and would have reduced or eliminated the privacy harms at issue;

377.    **Predominance**. The common questions of law and fact predominate over questions that affect only individual Purchaser or User Class members.

378.    **Typicality.** Plaintiffs' claims are typical of the claims of the Purchaser or User Class members that Plaintiffs seek to represent because Plaintiffs, like the Class members, purchased Defendants' misleading and deceptive Products. Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and the Class sustained similar injuries arising out of Defendants' conduct. Plaintiffs' and Class members' claims arise from the same practices and course of conduct and are based on the same legal theories.

379.    **Adequacy.** Plaintiffs are adequate representatives of the Class they seek to represent because Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs will fairly and adequately protect Class members' interests and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

380. **Ascertainability.** Class members can easily be identified by an examination and analysis of the business records regularly maintained by Defendants, among other records within Defendants' possession, custody, or control or the control of third party retailers. Additionally, further Class member data can be obtained through additional third-party retailers who retain customer records and order histories.

381. **Superiority and Substantial Benefit.** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

1. The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Classes;

2. Absent a Class, the members of the Classes will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

3. Given the size of individual Class members' claims, few, if any, Class members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

4. When the liability of Defendants has been adjudicated, claims of all members of the Classes can be administered efficiently and/or determined uniformly by the Court; and

5. This action presents no difficulty that would impede the management by the Court as a class action, which is the best available means by which Plaintiffs and Class members can seek redress for the harm caused to them by Defendants.

382. **Inconsistent Rulings.** Because Plaintiffs seek relief for all members of the Classes, the prosecution of separate actions by individual members would create a risk of inconsistent or

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

383.    **Injunctive/Declaratory Relief.** The prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or declaratory relief with respect to the Classes as a whole.

384.    **Manageability.** Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

385.    **Issues Class.** Alternatively, Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the above-defined classes for some or all the issues identified in the commonality and predominance section, above, as well as other issues which may be later identified.

### IX.    CAUSES OF ACTION FOR THE PURCHASER CLASSES

386.    The following are claims brought by the Plaintiffs on behalf of the Nationwide Purchaser Class ("Purchaser Class") or State Purchaser Subclasses as defined above.

### CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE PURCHASER CLASS

### COUNT ONE

### FRAUD BY MISREPRESENTATION

### (Common Law)

**(Brought By Plaintiffs Against All Defendants on Behalf of the Nationwide Purchaser Class, or Alternatively, the State Purchaser Subclasses)**

387.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

388.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses against all Defendants.

389.    This claim is brought under California law or, alternatively, the laws of the respective

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

states where Plaintiffs purchased the Products.

390. Defendants affirmatively misrepresented the capabilities, quality, and nature of the Products when selling and marketing them.

391. Defendants also knew that their misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendants' representations in making purchasing decisions.

392. Plaintiffs and Purchaser Class members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

393. Plaintiffs and Purchaser Class members would have been reasonable in relying on Defendants' misrepresentations in making their purchasing decisions.

394. Plaintiffs and Purchaser Class members had a right to rely upon Defendants' representations as Defendants maintained monopolistic control over knowledge of the true quality of the Products and the fact that the Products did not protect their privacy as claimed by the Defendants. Plaintiffs and Purchaser Class members sustained damages as a result of their reliance on Defendants' misrepresentations, thus causing Plaintiffs and Purchaser Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT TWO**

**FRAUD BY CONCEALMENT/OMISSION**

**(Common Law)**

**(Brought By Plaintiffs Against All Defendants on Behalf of the Nationwide Purchaser Class, or Alternatively, the State Purchaser Subclasses)**

395. Plaintiffs and the Purchaser Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

396. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses.

397. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

398. Defendants made Material Omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to their customers that they would be unable to maintain privacy and control of their data while using the Product, and that Defendants would subject consumers' captured data to review and data annotation by subcontractors for the purpose of training Meta's AI model. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding whether to purchase Defendants' Products and similar technology.

399. Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

400. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants, who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Purchaser Class members. These omitted facts were material because they directly impact the privacy and safety of sensitive consumer data.

401. Defendants were in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Purchaser Class members. Defendants also possessed exclusive knowledge of the Material Omission.

402. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Purchaser Class members to purchase the Products at a higher price, which did not match the Products' true value.

403. Plaintiffs and the Purchaser Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiffs and the Purchaser Class members were justified.

404. Plaintiffs and the Purchaser Class members reasonably relied on these omissions and suffered damages as a result.

FIRST AMENDED CLASS ACTION COMPLAINT

405.    As a result of these omissions and concealments, Plaintiffs and the Purchaser Class members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase of the Products.

406.    As a result of the concealment and/or suppression of the facts, Plaintiffs and the Purchaser Class members sustained damage. Plaintiffs and the Purchaser Class members reserve their right to elect either to (a) rescind their purchase of the Products and obtain restitution or (b) affirm their purchase of the Products and recover damages.

407.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiffs and the Purchaser Class members. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined.

## COUNT THREE

## NEGLIGENT MISREPRESENTATION

### (Common Law)

**(Brought By Plaintiffs Against All Defendants on Behalf of the Nationwide Purchaser Class, or Alternatively the State Purchaser Subclasses)**

408.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

409.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses.

410.    This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

411.    Defendants had a duty to Plaintiffs and the Purchaser Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

412.    Defendants breached their duty to Plaintiffs and the Purchaser Class by advertising the products as having privacy safeguards and controls they do not actually have.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

413.    Defendants knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendants.

414.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Purchaser Class have suffered actual damages in that they would not have purchased the Products had they known that the Products do not conform to the Product's marketing, advertising, or statements.

415.    Plaintiffs and the Purchaser Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT FOUR

## BREACH OF CONTRACT

## (Common Law)

**(Brought By Plaintiffs Against All Defendants on Behalf of the Nationwide Purchaser Class, or Alternatively the State Purchaser Subclasses)**

416.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

417.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses.

418.    This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

419.    Defendants expressly warranted that the Products would perform as advertised. Defendants' claims regarding the Products constituted an affirmation of fact, promise, and/or description of the goods that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promise. Plaintiffs and the Purchaser Class members placed importance on Defendants' claims.

420.    All conditions precedent to Defendants' liability under this contract have been performed by Plaintiffs and the Purchaser Class members.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

421. Defendants breached the terms of the contract, including the express warranties, with Plaintiffs and the Purchaser Class members by not providing Products that conform to the advertising and marketing claims.

422. As a result of Defendants' breach of contract, Plaintiffs and the Purchaser Class members have been damaged in the amount to be determined at trial.

## COUNT FIVE

## QUASI-CONTRACT / UNJUST ENRICHMENT

## (Common Law)

**(Brought by Plaintiffs Against All Defendants on Behalf of the Nationwide Purchaser Class, or Alternatively, the State Purchaser Subclasses)**

423. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

424. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses.

425. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

426. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

427. Plaintiffs and Purchaser Class members conferred monetary benefits on Defendants by purchasing the Products. Defendants' profits are funded entirely from their generated revenues – including payments made by or on behalf of Plaintiffs and Purchaser Class members. As such, a portion of these payments was attributable to Defendants' Challenged Representations and Omissions.

428. Through their unlawful, unfair and deceptive conduct, Defendants knowingly obtained significant revenue from the premium charged due to the Meta AI Glasses' alleged privacy features.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

429.    The Defendants were able to charge a price premium due to the claimed privacy features they regularly advertised, while actually failing to protect the privacy of their customers through the unlawful collection, use, processing, and transfer of Plaintiffs' and Purchaser Class members' personal data to third parties. Defendants knew that advertising the Products as protecting customers privacy would drive sales and allow them to sell the Products for a higher price, and thus benefited from their false representations.

430.    The Defendants enriched themselves by charging more for the Products through their false claims of privacy, while knowing that the Products would not actually keep this information private. As a result, the value of the Products is significantly less than they were sold for, or would be if the privacy claims were actually true. Due to the Defendants' conduct, Plaintiffs and Purchaser Class Members suffered harm, including paying a premium for the Products even though the privacy features did not exist.

431.    It would be inequitable and unjust to permit the Defendants to retain the enormous economic benefits (financial and otherwise) they have obtained from and/or at the expense of Plaintiffs and Purchaser Class members.

432.    The Defendants will be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by Plaintiffs and Purchaser Class members through the premium charged for the alleged privacy of the Products.

433.    Plaintiffs and Purchaser Class members are therefore entitled to recover the amounts realized by the Defendants at their expense.

434.    Since Plaintiffs and the Purchaser Class members have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of the Defendants' ill-gotten gains, and/or other sums as may be just and equitable. In the absence of completed discovery regarding class certification and merits, forcing an election of remedies at the initial pleading stage is premature.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

## COUNT SIX

### STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Common Law)

### (Brought by Plaintiffs Against All Defendants on Behalf of the Nationwide Purchaser Class, or Alternatively, the State Purchaser Subclasses)

435.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

436.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses.

437.    This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

438.    Meta and Luxottica designed, engineered, manufactured, marketed, distributed, and sold the Products to Plaintiffs and Purchaser Class members.

439.    Meta and Luxottica placed the Products into the stream of commerce, knowing and intending that they would be purchased and used by Plaintiffs and Purchaser Class members throughout the United States without any inspection for defects by end users.

440.    The Products were defective in design when they left Defendants' possession and control because, inter alia, they were designed so that, during ordinary and intended use: (1) they capture continuous photo and video content, including inside homes, bedrooms, and bathrooms, and during other intimate moments; (2) that content is automatically transmitted off-device to Meta's servers and then to human "data annotators" overseas for review and labeling; and (3) this pipeline of intimate, sensitive footage to human annotators is implemented without adequate in-product controls or transparent, conspicuous disclosures consistent with Defendants' privacy-centric representations.

441.    Though Meta has publicly acknowledged that it "sometimes use[s] contractors to review" users' data, purportedly to improve the service, it has claimed that "unless users choose to share media they've captured with Meta or others, that media stays on the user's device" and that any content users do choose to share is "filtered to protect people's privacy."

74

FIRST AMENDED CLASS ACTION COMPLAINT

442. Defendants simultaneously marketed the Products with privacy-centric statements, including that the Products are "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

443. No reasonable consumer would expect that, by using a product advertised as "designed for privacy" in ordinary, foreseeable ways (e.g., wearing it at home, in bedrooms or bathrooms, while undressing, or around family members), their intimate video and audio would be routed to and watched by strangers overseas, cataloguing their "bathroom visits, sex and other intimate moments," and financial details for AI-training purposes.

444. The Products failed to perform as safely as an ordinary consumer would expect because, contrary to Defendants' privacy-centric marketing: (1) they function as surreptitious conduits of highly sensitive and intimate personal and bystander data to human annotators; and (2) the Products' design, including reliance on a small LED indicator light, does not ensure that users or bystanders meaningfully understand that their intimate moments and environments are being recorded, offloaded, and reviewed.

445. Any purported benefits of designing the Products to route intimate user and bystander footage to human annotators rather than relying on less invasive or more privacy-protective AI-training methods are outweighed by the gravity and likelihood of harm, including: (1) exposure of highly intimate, sexual, and bodily content to strangers; (2) exposure of financial information; (3) heightened risks of identity theft, stalking, extortion, and reputational harm; and (4) economic harm from paying for a product that does not conform to its privacy-centric marketing.

446. Plaintiffs and Purchaser Class members used the Products in intended and reasonably foreseeable ways, including wearing them in daily life, inside homes, and around family and friends.

447. A safer alternative design that would have eliminated or reduced injuries to Plaintiffs' privacy was technically and commercially feasible. For example, Meta and Luxottica could have designed the Products such that use of and access to the Products' core AI features was decoupled from the human review pipeline or required explicit user consent for each piece of footage routed to human contractors.

FIRST AMENDED CLASS ACTION COMPLAINT

448. The Products' defective design was a substantial factor in causing Plaintiffs' and Purchaser Class members' injuries, including economic harm (paying a price premium and/or the purchase price itself for Products that were not as represented) and loss of the benefit of their bargain, as well as loss of privacy and dignitary harms associated with the exposure of intimate footage to human annotators.

449. Plaintiffs and Purchaser Class members would not have purchased the Products, or would have paid significantly less for them, had they known of the Products' true design and the attendant privacy risks.

450. As a direct and proximate result of Defendants' defective design, Plaintiffs and Purchaser Class members have suffered and will continue to suffer injury, including ascertainable losses of money or property.

451. Plaintiffs and Purchaser Class members seek all monetary and non-monetary relief allowed by law as a result of Defendants' strict product liability, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

## COUNT SEVEN

### STRICT PRODUCT LIABILITY – FAILURE TO WARN

### (Common Law)

**(Brought by Plaintiffs against All Defendants on Behalf of the Nationwide Purchaser Class, or Alternatively, the State Purchaser Subclasses)**

452. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

453. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses.

454. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

455. Defendants manufactured, designed, marketed, distributed, and sold the Products.

456. At the time the Products were manufactured, distributed, and sold, they had potential and known risks that were known or knowable in light of generally accepted knowledge in the

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

relevant communities, including that: (1) the Products capture highly sensitive video and audio inside private spaces; (2) that media is transmitted to Meta's servers and routed to human annotators in Nairobi, Kenya for review and labeling; (3) annotators "see everything—from living rooms to naked bodies," including bathroom visits, sexual activity, and financial information; (4) it is impossible to both avoid the human review pipeline and make use of the Products' core AI features; and (5) such practices create serious privacy, safety, and dignitary harms.

457.    These potential risks present a substantial danger when the Products are used or misused in an intended or reasonably foreseeable manner because users will naturally wear the Products in homes, bathrooms, bedrooms, and other intimate settings, with spouses, partners, children, guests, and bystanders present.

458.    Ordinary consumers are not likely to recognize these risks, particularly given the Products' marketing as "designed for privacy, controlled by you" and the absence of any clear disclosure that human contractors overseas watch and annotate sensitive footage captured via the Products and that users who wish to make use of the Products' core AI features cannot avoid that human review pipeline.

459.    At all relevant times, safer and feasible alternative designs existed that would have substantially reduced or eliminated the unreasonable privacy and safety risks created by the Meta AI Glasses, including: (a) performing AI processing entirely on-device, without uploading raw, identifiable content to remote servers; (b) limiting uploads to anonymized or redacted images that remove faces, bodies, and other identifying features; (c) obtaining explicit, granular, opt-in consent before routing any content to human reviewers and limiting such review to non-intimate scenes; and (d) allowing users to permanently disable any upload of AI-related content while still retaining local AI functionality. Defendants nevertheless opted for a design that maximized the volume of intimate, identifiable data sent to offshore human reviewers, without disclosing these tradeoffs to consumers.

460.    Defendants failed to provide adequate warnings or instructions concerning: (1) the fact that content captured with the Products would be transmitted to Meta's servers for AI-related processing; (2) the fact that human contractors, including those working for Meta's vendor Sama

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

in Nairobi, would review and annotate highly sensitive user and bystander footage, including bathroom, sexual, and financial scenes; and (3) the nature and extent of privacy, safety, and dignitary risks created by this human-review pipeline.

461.    The small LED indicator light on the Products is inadequate as a warning or notice to users or bystanders regarding the existence and extent of human review and data-annotation practices; it does not meaningfully inform consumers that their intimate footage may be watched by strangers overseas.

462.    Meta's claims that it disclosed to users that some footage may be shared with human reviewers, even if true, are inadequate, because consumers were not provided adequate notice of these supposed disclosures, and these disclosures do not meaningfully inform consumers who wish to make use of the Products' core AI features that they cannot do so while avoiding that human review pipeline.

463.    Defendants knew or, by the use of reasonably developed skill and foresight, should have known of these risks and of the Products' human-review pipeline, as evidenced by: (1) their own design and implementation of the Products and related AI systems; (2) their contracting with Sama and other vendors; and (3) internal knowledge that intimate footage, including nudity, sex, and financial information, was being viewed by annotators.

464.    Defendants had a duty to provide clear, prominent warnings and instructions so that consumers could decide whether to use the Products at all, or use them in ways that would minimize the degree of danger—such as by avoiding use in bathrooms and bedrooms or when handling financial information.

465.    Defendants breached this duty by failing to provide adequate warnings and instructions and by instead emphasizing privacy-centric marketing messages inconsistent with the underlying data-handling and human-review practices.

466.    Plaintiffs and Purchaser Class members were injured, including economic losses such as the Product's purchase price, price premium, and loss of benefit of the bargain, as a direct and proximate result of Defendants' failure to warn.

FIRST AMENDED CLASS ACTION COMPLAINT

467.    Had Defendants provided adequate warnings and instructions about the Products' human-review pipeline and associated risks, Plaintiffs and Purchaser Class members would not have purchased the Products, or would have paid significantly less for them, and would have avoided or mitigated their harm.

468.    Defendants' failure to warn was a substantial factor in causing Plaintiffs' and Purchaser Class members' injuries.

469.    Plaintiffs and Purchaser Class members seek all monetary and non-monetary relief allowed by law, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

## CLAIMS BROUGHT ON BEHALF OF THE CALIFORNIA PURCHASER SUBCLASS

### COUNT EIGHT

**VIOLATIONS OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**

**(Cal. Civ. Code §§ 1750, *et seq*.)**

**(Brought By Plaintiff Canu Against All Defendants on Behalf of the California Purchaser Subclass)**

470.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

471.    Plaintiff Mateo Canu (for purposes of this section, "California Plaintiff") brings this claim on behalf of himself and the California Purchaser Subclass against all Defendants.

472.    The California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA") provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

473.    The Products are "goods," as defined by the CLRA in California Civil Code §1761(a) because they are tangible objects that the California Plaintiff and California Purchaser Subclass members purchased primarily for personal, family, or household purposes.

FIRST AMENDED CLASS ACTION COMPLAINT

474. Defendants are "persons," as defined by the CLRA in California Civil Code §1761(c) because they are corporations.

475. California Plaintiff and California Purchaser Subclass members are "consumers," as defined by the CLRA in California Civil Code §1761(d) because they are individuals who purchased the Products for personal, family, or household purposes.

476. The purchases of the Products by the California Plaintiff and California Purchaser Subclass members are "transactions" as defined by the CLRA under California Civil Code § 1761(e) because California Plaintiff and the California Purchaser Subclass members entered into agreements with Defendants or their authorized vendors to purchase the Products.

477. Defendants violated the following sections of the CLRA by selling the Products to California Plaintiff and the California Purchaser Subclass members through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

    a.    Section 1770(a)(5) by representing that the Products have "characteristics, . . uses [or] benefits . . . which they do not have."

    b.    Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . when they are of another."

    c.    Section 1770(a)(9) by advertising the Products "with [the] intent not to sell [] as advertised."

478. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their Challenged Representations and Omissions were misleading.

479. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including California Plaintiff, to increase the sale of the Products.

480. California Plaintiff and California Purchaser Subclass members could not have reasonably avoided such injury. California Plaintiff and California Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and California Plaintiff and California Purchaser Subclass members would not have purchased the

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

Products and/or would have purchased them on different terms had they known the truth.

481. California Plaintiff and California Purchaser Subclass members suffered harm as a result of Defendants' violations of the CLRA because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

482. California Plaintiff provided Defendants with notice of its CLRA violations pursuant to California Civil Code § 1782(a) on March 12, 2026. California Plaintiff seeks only injunctive relief until such time as the 30-day notice period has expired, and he is afforded leave to amend this complaint to include a request for monetary damages under the CLRA.

483. As a direct and proximate result of Defendants' misconduct in violation of the CLRA, California Plaintiff and the California Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

484. California Plaintiff and California Purchaser Subclass seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. The California Plaintiff and California Purchaser Subclass Members also request a court order requiring Defendants to provide restitution for the money wrongfully acquired. Unless this injunctive relief is granted, The California Plaintiff and California Purchaser Subclass members will suffer irreparable harm.

485. California Plaintiff and California Purchaser Subclass respectfully request that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to § 1780(a)(2). In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

486. California Plaintiff and California Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

487. Injunctive relief is appropriate on behalf of California Plaintiff and the California Purchaser Subclass members because Defendants have failed to make the Challenged Omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Product. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future damage is not reasonably ascertainable at this time. California Plaintiff is currently unable to accurately quantify the damage caused by Defendants' future harm (e.g., the dollar amount that the California Plaintiff and California Purchaser Subclass members overpay for the Products), rendering injunctive relief a necessary remedy.

## COUNT NINE

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§ 17200, et seq.)

### (Brought By Plaintiff Canu Against All Defendants on Behalf of the California Purchaser Subclass)

488. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

489. Plaintiff Mateo Canu (for purposes of this section, "California Plaintiff") brings this claim on behalf of himself and the California Purchaser Subclass against all Defendants.

FIRST AMENDED CLASS ACTION COMPLAINT

490.    California Business & Professions Code, sections 17200, et seq. (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

491.    Defendants, in their pervasive advertising and marketing of the Products, made misleading statements regarding the quality and characteristics of the Products—specifically, the Challenged Representations and Omissions regarding the data safety and privacy of consumers of Meta AI Glasses. Instead, Meta funnels the consumer data, including sensitive videos captured with Meta AI Glasses, to be viewed and annotated by human "data annotators," all so that Meta could use the videos in training Defendants' own AI model.

492.    Defendants do not have any reasonable basis for the Challenged Representations and Omissions made in Defendants' advertising because Defendants did not maintain consumers' data privacy. Thus, the Products fail to deliver the advertised functionality for everyday use and during various activities, as directed and intended by Defendants. Defendants knew (and knows) that they do not maintain the privacy of consumer data captured by the Products, posing a misrepresentation of their functionality, and yet Defendants intentionally advertised and marketed the Products to deceive reasonable consumers and continues to do so presently.

493.    Defendants' advertising and marketing of the Products led to, and continues to lead to, reasonable consumers, including the California Plaintiff and California Purchaser Subclass members, believing that they will be able to maintain the privacy and control of their data while using the Products as Defendants advertised.

494.    California Plaintiff and the California Purchaser Subclass members have suffered injury in fact and have lost money or property as a result of and in reliance upon the Challenged Representations—namely California Plaintiff and the California Purchaser Subclass members lost the purchase price for the Products they bought from the Defendants.

495.    Defendants' conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent

FIRST AMENDED CLASS ACTION COMPLAINT

business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

496.    Defendants failed to avail themselves of reasonably available, lawful alternatives to further their legitimate business interests.

497.    All of the conduct alleged herein occurred and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendants voluntarily alter their conduct or Defendants are otherwise ordered to do so.

498.    Pursuant to Business and Professions Code Sections 17203 and 17535, California Plaintiff and the members of the California Purchaser Subclass seek an order from this Court enjoining Defendants from continuing to engage, use, or employ their practice of false and deceptive advertising and marketing of the Products. Likewise, California Plaintiff and the members of the California Purchaser Subclass seek an order requiring Defendants to disclose such misrepresentations, and to preclude Defendants' failure to disclose the existence and significance of said misrepresentations.

499.    As a direct and proximate result of Defendants' misconduct in violation of the UCL, California Plaintiff and the California Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Further, California Plaintiff and the California Purchaser Subclass members have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, California Plaintiff and California Purchaser Subclass members seek a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate California Plaintiff and

FIRST AMENDED CLASS ACTION COMPLAINT

the California Purchaser Subclass members for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

### *"Unfair" Prong*

500.    Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

501.    Defendants' action of falsely advertising the Products with the Challenged Representations and Omissions encouraged consumers to purchase the Products with the expectation that they would maintain privacy and control over their data while using the Products, as advertised. However, the consumer data is not kept private or protected as advertised, causing financial injuries to consumers, who do not receive Products commensurate with their reasonable expectations, overpay for the Products, and receive Products of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendants' deceptive advertising and marketing of the Products. Accordingly, the injuries caused by Defendants' deceptive advertising and marketing outweigh any benefits.

502.    Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).

503.    Here, Defendants' conduct of falsely advertising that consumers' data privacy would be protected while using the Product despite subjecting consumer data to human review results in financial harm to consumers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of the harm.

504.    Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

505. Defendants' advertising and marketing of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendants knew or should have known of their unfair conduct. Defendants' misrepresentations constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

506. There existed reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations and Omissions.

507. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

508. Pursuant to Business and Professions Code Sections 17203, California Plaintiff and the California Purchaser Subclass members seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practices of advertising and marketing the Products with the Challenged Representations and Omissions.

509. California Plaintiff and the California Purchaser Subclass members have suffered injury in fact, have lost money and purchased an inferior product as a result of Defendants' unfair conduct. California Plaintiff and the California Purchaser Subclass members paid an unwarranted premium for these Products. Specifically, California Plaintiff and the California Purchaser Subclass members paid for Products which were advertised as maintaining consumers' privacy and control over data. California Plaintiff and the California Purchaser Subclass members would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and marketing were deceptive. Accordingly, the California Plaintiff and California Purchaser Subclass members seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Fraudulent" Prong*

510. The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

511.   Defendants used the Challenged Representations and Omissions with the intent to sell the Products to consumers, including California Plaintiff and the California Purchaser Subclass members. The Challenged Representations and Omissions are deceptive, and Defendants knew, or should have known, of their deception. The Challenged Representations and Omissions are likely to mislead consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

512.   As alleged herein, the misrepresentations by Defendants constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

513.   California Plaintiff and the California Purchaser Subclass members reasonably and detrimentally relied on the material and deceptive Challenged Representations and Omissions to their detriment in that they purchased the Products.

514.   Defendants have reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations and Omissions.

515.   Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

516.   Pursuant to Business and Professions Code Sections 17203, California Plaintiff and the California Purchaser Subclass members seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising and marketing the Products with the Challenged Representations and Omissions.

517.   California Plaintiff and the California Purchaser Subclass members have suffered injury in fact and have lost money as a result of Defendants' fraudulent conduct. The California Plaintiff and California Purchaser Subclass members paid an unwarranted premium for the Products. Specifically, California Plaintiff and the California Purchaser Subclass members paid for Products for which Defendants advertised that consumers would maintain privacy and control over their personal data. Instead, Defendants used consumers' captured data for human review by subcontractors and for training of Meta's AI models. Accordingly, California Plaintiff and California Purchaser Subclass members seek damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

### *"Unlawful" Prong*

518.    The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

519.    Defendants' advertising and marketing of the Products, as alleged herein, violates California Civil Code sections 1750, et seq. (the "CLRA") and California Business and Professions Code sections 17500, et seq. (the "FAL") as set forth below in the sections regarding those causes of action.

520.    Additionally, Defendants' use of the Challenged Misrepresentations and Omissions to sell the Products violates California Civil Code sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710 (fraudulent deceit), and 1711 (deceit upon the public), as set forth above.

521.    Defendants' conduct in making the deceptive representations described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendants' misrepresentations of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law claims stated in this lawsuit.

522.    Defendants' advertising and marketing of the Products, as alleged herein, are deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendants knew or should have known of their unlawful conduct.

523.    Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from advertising the Products with the Challenged Representations and Omissions.

524.    All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

525.    Pursuant to Business and Professions Code Section 17203, California Plaintiff and the California Purchaser Subclass members seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of deceptive advertising of the Products.

526.    California Plaintiff and the California Purchaser Subclass members have suffered injury in fact and have lost money as a result of Defendants' unlawful conduct. California Plaintiff and the California Class members paid an unwarranted premium for the Products. California Plaintiff and the California Purchaser Subclass members would not have purchased the Products if they had known about the Challenged Omissions. Accordingly, California Plaintiff and California Purchaser Subclass members seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

**COUNT TEN**

**VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW**

**(Cal. Bus. & Prof. Code §§ 17500, et seq.)**

**(Brought By Plaintiff Canu Against All Defendants on Behalf of the California Purchaser Subclass)**

527.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

528.    Plaintiff Mateo Canu (for purposes of this section, "California Plaintiff") brings this claim on behalf of himself and the California Purchaser Subclass against all Defendants.

529.    The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, et seq., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

530.    Defendants violated section 17500 when they advertised and marketed the Products through the unfair, deceptive, and misleading Challenged Representations and Omissions disseminated to the public through the Products' advertising and marketing. These representations were deceptive because the Products do not conform to them. The representations were material because they are likely to mislead a reasonable consumer into purchasing the Products.

531.    In making and disseminating the Challenged Representations and Omissions alleged herein, Defendants knew or should have known that the representations were untrue or misleading, and acted in violation of § 17500.

532.    Defendants' Challenged Representations and Omissions were specifically designed to induce reasonable consumers, like California Plaintiff and the California Purchaser Subclass members, to purchase the Products.

533.    As a direct and proximate result of Defendants' misconduct in violation of the FAL, California Plaintiff and the California Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Further, the California Plaintiff and the California Purchaser Subclass members have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, the California Plaintiff and California Purchaser Subclass members seek a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate California Plaintiff and the California Purchaser Subclass members for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result, as well as a corrective advertising campaign to correct prior misrepresentations.

## COUNT ELEVEN

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Cal. Com. Code §§ 2314 and 10212)

### (Brought by Plaintiff Canu against All Defendants on Behalf of the California Purchaser Subclass)

534.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

535.    Plaintiff Mateo Canu (for purposes of this section, "California Plaintiff") brings this claim on behalf of himself and the California Purchaser Subclass against all Defendants.

536.    Defendants are and were at all relevant times "merchants" with respect to the Products under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of the Products under § 2103(1)(d).

FIRST AMENDED CLASS ACTION COMPLAINT

537. With respect to leases, Defendants are and were at all relevant times "lessors" of the Products under Cal. Com. Code § 10103(a)(16).

538. The Products are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

539. A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

540. The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

541. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to California Plaintiff and the California Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

542. As a result of Defendants' misleading conduct, California Plaintiff and the California Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

543. Defendants did not exclude or modify the Products' implied warranty of merchantability.

544. Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

545. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, California Plaintiff and the other California Purchaser Subclass members have been damaged in an amount to be proven at trial. California Plaintiff and the California Purchaser

FIRST AMENDED CLASS ACTION COMPLAINT

Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline. California Plaintiff and the California Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

546.    As a result of Defendants' breach of the implied warranty of merchantability, California Plaintiff and the California Purchaser Subclass members have been damaged in the amount to be determined at trial.

<u>COUNT TWELVE</u>

**VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Cal. Civ. Code §§ 1791.1 and 1792)**

**(Brought by Plaintiff Canu Against All Defendants on Behalf of the California Purchaser Subclass)**

547.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

548.    Plaintiff Mateo Canu (for purposes of this section, "California Plaintiff") brings this claim on behalf of himself and the California Purchaser Subclass against all Defendants.

549.    California Plaintiff and the other California Purchaser Subclass members who purchased the Products in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

550.    The Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

551.    Defendants are "manufacturers" of the Products within the meaning of Cal. Civ. Code § 1791(j).

552.    Defendants impliedly warranted to California Plaintiff and the other California Purchaser Subclass members that the Products were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, the Products do not have the quality that a buyer would

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

reasonably expect.

553.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

        a.      Pass without objection in the trade under the contract description.

        b.      Are fit for the ordinary purposes for which such goods are used.

        c.      Are adequately contained, packaged, and labeled.

        d.      Conform to the promises or affirmations of fact made on the container or label.

554.    The Products would not pass without objection in the trade because of the defects in the Products' design and data-handling practices. Because the Products were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you," they are not in merchantable condition and thus not fit for ordinary purposes.

555.    The Products are not adequately labeled because the labeling fails to disclose the Products' human review pipeline and the true nature of the Products' data-handling practices. The Products do not conform to the promises and affirmations made by Defendants, including that the Products were "designed for privacy, controlled by you," "built for your privacy," and that consumers would maintain privacy and control over their personal data while using the Products.

556.    Defendants' breach of the implied warranty of merchantability caused damage to California Plaintiff and the California Purchaser Subclass members who purchased the Products. The amount of damages due will be proven at trial.

557.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, California Plaintiff and the California Purchaser Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

FIRST AMENDED CLASS ACTION COMPLAINT

**CLAIMS BROUGHT ON BEHALF OF THE ALABAMA PURCHASER SUBCLASS**

**COUNT THIRTEEN**

**VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT**

**Ala. Code §§ 8-19-1, *et seq.***

**(on behalf of the Alabama Purchaser Subclass)**

558.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

559.    Plaintiffs James Diedrich and Charles Graudins (for purposes of this section, "Alabama Plaintiffs") bring this claim on behalf of themselves and the Alabama Purchaser Subclass against all Defendants.

560.    Each Defendant is a "person" as defined by Ala. Code § 8-19-3(10).

561.    The Alabama Plaintiffs and Alabama Purchaser Subclass members are "consumers" as defined by Ala. Code § 8-19-3(4).

562.    Defendants will receive notice pursuant to Ala. Code § 8-19-10(e) concerning its wrongful conduct as alleged herein by the Alabama Plaintiffs and Alabama Purchaser Subclass members. However, sending pre-suit notice pursuant to Ala. Code § 8-19-10(e) would have been an exercise in futility for the Alabama Plaintiffs, as Defendants are already aware of the allegedly unfair and unlawful conduct, and have yet to offer class members remedy in accordance with similar consumer protection statutes.

563.    Defendants advertised, offered, or sold goods or services in Alabama, and engaged in trade or commerce directly or indirectly affecting the people of Alabama.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

94

564.    Defendants engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5, including:

a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

c.    Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

565.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

566.    Defendants intended to mislead the Alabama Plaintiffs and Alabama Purchaser Subclass members and induce them to rely on its misrepresentations and omissions.

567.    Defendants misrepresented to the Alabama Plaintiffs and Alabama Purchaser Subclass members the capabilities of the Products related to their privacy features, or lack thereof. The Alabama Plaintiffs and Alabama Purchaser Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

568.    Defendants acted intentionally, knowingly, and maliciously to violate the Alabama Deceptive Trade Practices Act, and recklessly disregarded the Alabama Plaintiffs' and Alabama Purchaser Subclass members' rights. Defendants' knowledge that the Defendants' Products were not as advertised.

569.    As a direct and proximate result of Defendants' deceptive acts and practices, the Alabama Plaintiffs and Alabama Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

FIRST AMENDED CLASS ACTION COMPLAINT

570. Defendants' deceptive acts and practices caused substantial injury to the Alabama Plaintiffs and Alabama Purchaser Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

571. The Alabama Plaintiffs and the Alabama Purchaser Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $100; treble damages; attorneys' fees, costs, and any other relief that is just and proper.

### CLAIMS BROUGHT ON BEHALF OF THE ARIZONA PURCHASER SUBCLASS

### COUNT FOURTEEN

**VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT**

**(Ariz. Rev. Stat. Ann. § 44-1522)**

**(Brought By Plaintiff Sainz Against All Defendants on Behalf of the Arizona Purchaser Subclass)**

572. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

573. Plaintiff Monique Sainz (for purposes of this section, "Arizona Plaintiff") brings this claim on behalf of herself and the Arizona Purchaser Subclass against all Defendants.

574. Arizona Plaintiff and Defendants are "persons" within the meaning of Section 44-1522 of the Arizona Consumer Fraud Act. Ariz. Rev. Stat. Ann. § 44-1522.

575. Arizona prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. Ann. § 44-1522(A).

576. In the course of doing business, Defendants violated the Act by, at minimum, employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that others rely upon such concealment,

FIRST AMENDED CLASS ACTION COMPLAINT

suppression, or omission, in connection with the sale of the Products, including through the misleading, deceptive, and fraudulent Challenged Representations and Omissions.

577. Specifically, Defendants misrepresented that the Products have characteristics, uses, or benefits which they do not have; represented that the Products are of a particular standard, quality, or grade when they are of another; and advertised the Products with the intent not to sell them as advertised.

578. In the course of doing business, Defendants knowingly failed to disclose, suppressed, concealed, and omitted material facts regarding the Products, including the Challenged Omissions, which directly caused harm to Arizona Plaintiff and Arizona Purchaser Subclass members.

579. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their Challenged Representations and Omissions were misleading.

580. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Arizona Plaintiff, to increase the sale of the Products.

581. Defendants had the duty to the Arizona Plaintiff and the Arizona Purchaser Subclass members to disclose the Challenged Omissions because:

    a.    Defendants possessed exclusive knowledge of the true nature and limitations of the Products;

    b.    Arizona Plaintiff and the Arizona Purchaser Subclass members could not reasonably have been expected to learn or discover the facts that Defendants suppressed and failed to disclose; and

    c.    Defendants knew that Arizona Plaintiff and the Arizona Purchaser Subclass members could not reasonably have been expected to learn about or discover the Challenged Omissions.

582. In failing to disclose the Challenged Omissions, Defendants have knowingly and intentionally concealed and omitted material facts and breached their duty to disclose.

FIRST AMENDED CLASS ACTION COMPLAINT

583. The facts that Defendants concealed or did not disclose to Arizona Plaintiff and the Arizona Purchaser Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Products or pay a lesser price. Had Arizona Plaintiff and the Arizona Purchaser Subclass members known the truth, they would not have purchased the Products or would have purchased them on different terms.

584. Arizona Plaintiff and members of the Arizona Purchaser Subclass justifiably relied on these material misrepresentations and omissions and, as a result, suffered harm in the amount of the purchase price they paid for the Products.

585. Arizona Plaintiff and the Arizona Purchaser Subclass members could not have reasonably avoided such injury. Arizona Plaintiff and Arizona Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and they would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

586. Defendants' violations present a continuing risk to Arizona Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

587. As a direct and proximate result of Defendants' misconduct in violation of the Arizona Consumer Fraud Act, Arizona Plaintiff and the Arizona Purchaser Subclass members were harmed. Accordingly, Arizona Plaintiff seeks damages in an amount to be proven at trial, including restitution, and/or disgorgement of ill-gotten gains.

## COUNT FIFTEEN

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Ariz. Rev. Stat. §§ 47-2314 and 47-2A212)

### (Brought by Plaintiff Sainz against All Defendants on Behalf of the Arizona Purchaser Subclass)

588. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

589.    Plaintiff Monique Sainz (for purposes of this section, "Arizona Plaintiff") brings this claim on behalf of herself and the Arizona Purchaser Subclass against all Defendants.

590.    Defendants are and were at all relevant times "merchants" with respect to the Products under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2A103(c), and "sellers" of the Products under § 47-2103(A)(4).

591.    With respect to leases, Defendants are and were at all relevant times "lessors" of the Products under Ariz. Rev. Stat. § 47-2A103(A)(16).

592.    The Products are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2A103(A)(8).

593.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2A212.

594.    The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

595.    To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to Arizona Plaintiff and the Arizona Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

596.    As a result of Defendants' misleading conduct, Arizona Plaintiff and the Arizona Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

597.    Defendants did not exclude or modify the Products' implied warranty of merchantability.

598.    Defendants were provided notice of these issues by, among other things, publicly

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

599. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, Arizona Plaintiff and the other Arizona Purchaser Subclass members have been damaged in an amount to be proven at trial. Arizona Plaintiff and the Arizona Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline. Arizona Plaintiff and the Arizona Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

600. As a result of Defendants' breach of the implied warranty of merchantability, Arizona Plaintiff and the Arizona Purchaser Subclass members have been damaged in the amount to be determined at trial.

## CLAIMS BROUGHT ON BEHALF OF THE COLORADO PURCHASER SUBCLASS

## COUNT SIXTEEN

### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT

### (Col. Rev. Stat. § 6-1-101, *et seq.*)

### (Brought by Plaintiffs Tucker and Chen Against All Defendants on Behalf of the Colorado Purchaser Subclass)

601. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

602. Plaintiffs Nikolause Tucker and Neil Chen (for purposes of this section, "Colorado Plaintiffs") bring this claim on behalf of themselves and the Colorado Purchaser Subclass against all Defendants.

603. Defendants are "persons" under section 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101 *et seq*.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

604.    Colorado Plaintiffs and the Colorado Purchaser Subclass members are "consumers" for purposes of section 6-1-113(1)(a) of the Colorado CPA, each of whom purchased one or more of the Products.

605.    In the course of their business, Defendants participated in deceptive trade practices that violated the Colorado CPA, as described above and below. Defendants are directly liable for these violations of law.

606.    Defendants failed to disclose and actively concealed the material facts that the Products transmit intimate footage to Meta's servers and expose that footage to human annotators overseas, including highly sensitive bathroom, bedroom, sexual, and financial content.

607.    Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including:

1)    knowingly making a false representation as to the characteristics, uses, and benefits of the Products that had the capacity or tendency to deceive the Colorado Plaintiffs and the Colorado Purchaser Subclass members;

2)    representing that the Products are of a particular standard, quality, and grade even though Defendants knew or should have known they are not;

3)    advertising the Products with the intent not to sell them as advertised; and

4)    failing to disclose material information concerning the Products that was known to Defendants at the time of advertisement or sale with the intent to induce Colorado Plaintiffs and the Colorado Purchaser Subclass members to purchase the Products.

608.    Defendants knew that the Products were designed so that intimate footage captured during ordinary use would be transmitted to Meta's servers and routed to human annotators overseas for review and labeling, and that the Products did not maintain consumer privacy as advertised. Defendants, nevertheless, failed to warn Colorado Plaintiffs or the Colorado Purchaser Subclass members about these practices despite having a duty to do so.

609.    Defendants had the duty to Colorado Plaintiffs and the Colorado Purchaser Subclass members to disclose the Products' human review pipeline and the true nature of the Products' data-

FIRST AMENDED CLASS ACTION COMPLAINT

handling practices because:

      a.    Defendants were in a superior position to know the true state of facts about the Products' data-handling and human review practices;

      b.    Colorado Plaintiffs and the Colorado Purchaser Subclass members could not reasonably have been expected to learn or discover that the Products transmitted intimate footage to human annotators overseas until such practices were publicly reported;

      c.    Defendants knew that Colorado Plaintiffs and the Colorado Purchaser Subclass members could not reasonably have been expected to learn about or discover the Products' human review pipeline and associated privacy risks; and

      d.    Defendants actively concealed the human review pipeline and its scope by marketing the Products as "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

610.    Defendants' practices significantly affected the public as consumers of the Products because, among other things, the Products function as conduits of highly sensitive and intimate personal and bystander data to human annotators overseas without adequate disclosure or meaningful consent.

611.    Whether or not a product marketed as "designed for privacy" actually maintains the privacy of intimate user data is a fact a reasonable consumer would consider important in selecting a product to purchase. When the Colorado Plaintiffs and the Colorado Purchaser Subclass members purchased the Products for personal, family, or household purposes, they reasonably expected the Products would maintain the privacy and control over their data as advertised.

612.    Defendants' deceptive practices were likely to and did in fact deceive reasonable consumers, including Colorado Plaintiffs and the Colorado Purchaser Subclass members, about the true privacy and data-handling practices of the Products.

613.    Colorado Plaintiffs and the Colorado Purchaser Subclass members suffered injury-in-

FIRST AMENDED CLASS ACTION COMPLAINT

fact to their legally protected interests as a result of Defendants' violations of the Colorado CPA. Colorado Plaintiffs and the Colorado Purchaser Subclass members currently own or, within the class period, have owned the Products.

614. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were misleading.

615. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Colorado Plaintiffs, to increase the sale of the Products.

616. Colorado Plaintiffs and Colorado Purchaser Subclass members could not have reasonably avoided such injury. Colorado Plaintiffs and the Colorado Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Colorado Plaintiffs and the Colorado Purchaser Subclass members would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

617. Colorado Plaintiffs and the Colorado Purchaser Subclass members suffered harm as a result of Defendants' violations of the Colorado CPA because they relied on Defendants' representations and omissions in deciding to purchase the Products. The representations and omissions were a substantial factor. The representations and omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

618. As a direct and proximate result of Defendants' misconduct in violation of the Colorado CPA, Colorado Plaintiffs and the Colorado Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Accordingly, Plaintiffs seek a monetary award for violation of the Colorado CPA in the form of restitution, and/or disgorgement of ill-gotten gains to compensate Colorado Plaintiffs and the Colorado Purchaser Subclass members for said monies.

619. Colorado Plaintiffs seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged

FIRST AMENDED CLASS ACTION COMPLAINT

herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. The Colorado Plaintiffs also request a court order requiring Defendants to provide restitution to Colorado Plaintiffs and the Colorado Purchaser Subclass for the money wrongfully acquired. Unless this injunctive relief is granted, Colorado Plaintiffs and Colorado Purchaser Subclass members will suffer irreparable harm.

620.    Colorado Plaintiffs respectfully request that the Court enjoin the Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

621.    Colorado Plaintiffs and members of the Colorado Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

622.    Injunctive relief is appropriate on behalf of Colorado Plaintiffs and members of the Colorado Purchaser Subclass because Defendants have failed to make the challenged omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Products. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future damages is not reasonably ascertainable at this time. Colorado Plaintiffs are, currently, unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that Colorado Plaintiffs and Colorado Purchaser Subclass members overpay for the Products), rendering injunctive relief a necessary remedy.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

623.     Pursuant to section 6-1-113(2) of the Colorado CPA, Colorado Plaintiffs and the Colorado Purchaser Subclass members seek monetary relief against Defendants measured as the greater of (a) the amount of actual damages sustained, (b) statutory damages in the amount of $500 for each Plaintiff, and/or (c) three times the amount of actual damages based on Defendants' bad faith conduct.

## COUNT SEVENTEEN

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Col. Rev. Stat. §§ 4-2-314 and 4-2.5-212)

**(Brought by Plaintiffs Tucker and Chen against All Defendants on Behalf of the Colorado Purchaser Subclass)**

624.     Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

625.     Plaintiffs Nikolause Tucker and Neil Chen (for purposes of this section, "Colorado Plaintiffs") bring this claim on behalf of themselves and the Colorado Purchaser Subclass against all Defendants.

626.     Defendants are and were at all relevant times "merchants" with respect to the Products under Colorado Revised Statutes §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of the Products under section 4-2-103(1)(d).

627.     The Products are and were at all relevant times "goods" within the meaning of Colorado Revised Statutes §§ 4-2-105(1) and 4-2.5-103(1)(h).

628.     A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Colorado Revised Statutes §§ 4-2-314 and 4-2.5-212.

629.     The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that

FIRST AMENDED CLASS ACTION COMPLAINT

the Products were "designed for privacy, controlled by you."

630.    To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to Colorado Plaintiffs and the Colorado Purchaser Subclass members in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

631.    As a result of Defendants' misleading conduct, Colorado Plaintiffs and the Colorado Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

632.    Defendants did not exclude or modify the Products' implied warranty of merchantability.

633.    Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

634.    As a direct and proximate result of Defendants' breaches of the warranties of merchantability, Colorado Plaintiffs and the other Colorado Purchaser Subclass members have been damaged in an amount to be proven at trial. Colorado Plaintiffs and the Colorado Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline. Colorado Plaintiffs and the Colorado Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

635.    As a result of Defendants' breach of the implied warranty of merchantability, Colorado Plaintiffs and the Colorado Purchaser Subclass members have been damaged in the amount to be determined at trial.

FIRST AMENDED CLASS ACTION COMPLAINT

**CLAIMS BROUGHT ON BEHALF OF THE MASSACHUSETTS PURCHASER**

**SUBCLASS**

**COUNT EIGHTEEN**

**VIOLATIONS OF MASSACHUSETTS CONSUMER PROTECTION ACT**

**(Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.*)**

**(Brought by Plaintiff Fraser Against All Defendants on Behalf of the Massachusetts**

**Purchaser Subclass)**

636.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

637.    Plaintiff Rickford Fraser (for purposes of this section, "Massachusetts Plaintiff") brings this claim on behalf of himself and the Massachusetts Purchaser Subclass against all Defendants.

638.    The Massachusetts Consumer Protection Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

639.    The Products are "goods," as used by the Act, because they are tangible objects that Massachusetts Plaintiff and the Massachusetts Purchaser Subclass purchased primarily for personal, family, or household purposes.

640.    Massachusetts Plaintiff and Massachusetts Purchaser Subclass members are "persons" as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(a).

641.    Defendants engaged in "trade or commerce" as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b), by offering goods and services and engaging in business practices that directly or indirectly affect the people of Massachusetts.

642.    Defendants violated the Act by selling the Products to Massachusetts Plaintiff and the Massachusetts Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions, constituting unfair methods of competition and unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

643.    Defendants' uniform and material representations and omissions regarding the

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

644. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Massachusetts Plaintiff, to increase the sale of the Products.

645. Massachusetts Plaintiff and Massachusetts Purchaser Subclass members could not have reasonably avoided such injury. Massachusetts Plaintiff and the Massachusetts Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

646. Massachusetts Plaintiff and the Massachusetts Purchaser Subclass members suffered harm as a result of Defendants' violations of the Act because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

647. As a direct and proximate result of Defendants' misconduct in violation of the Act, Massachusetts Plaintiff and the Massachusetts Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

648. Massachusetts Plaintiff and the Massachusetts Purchaser Subclass seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

## COUNT NINETEEN

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (Mass. Gen. Laws C. 106 §§ 2-314 and 2a-212)

### (Brought by Plaintiff Fraser Against All Defendants on Behalf of the Massachusetts Purchaser Subclass)

649.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

650.    Plaintiff Rickford Fraser (for purposes of this section, "Massachusetts Plaintiff") brings this claim on behalf of himself and the Massachusetts Purchaser Subclass against all Defendants.

651.    Defendants are and were at all relevant times "merchants" with respect to the Products under M.G.L. c. 106 § 2-104(1), and "sellers" of the Products under § 2-103(1)(d).

652.    The Products are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

653.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which the Products are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

654.    Defendants impliedly warranted that the Products were of good and merchantable quality and fit, and safe for their ordinary intended use.

655.    Defendants provided Massachusetts Plaintiff and the members of the Massachusetts Purchaser Subclass with an implied warranty that the Products, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendants impliedly warranted that the Products were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Products Defendants manufactured, supplied, distributed, and/or sold would function as represented and would not contain material defects or deficiencies; and (ii) a warranty that the Products would be fit for their intended use.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

656.    However, the Products at the time of sale and thereafter were and are not fit for their ordinary purpose because, as alleged herein, Defendants misrepresented the nature, quality, and characteristics of the Products through the Challenged Representations and Omissions, including by failing to disclose that consumers cannot maintain privacy or control over their personal data while using the Products.

657.    Massachusetts Plaintiff notified Defendants of their breach within a reasonable time, and/or was not required to do so because affording Defendants a reasonable opportunity to cure their breaches would have been futile. In any event, Defendants knew about the defects and deficiencies described herein but chose to conceal them as a means of avoiding compliance with their warranty obligations.

658.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Massachusetts Plaintiff and the Massachusetts Purchaser Subclass members have been damaged in that they purchased the Products they otherwise would not have, overpaid for the Products, did not receive the benefit of their bargain, and the Products suffered a diminution in value.

## CLAIMS BROUGHT ON BEHALF OF THE MICHIGAN PURCHASER SUBCLASS
## COUNT TWENTY
### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### Mich. Comp. Laws §§ 445.901, *et seq.*
### (Brought by Plaintiff Stewart Against All Defendants on Behalf of the Michigan Purchaser Subclass)

659.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

660.    Plaintiffs Kristi Stewart and Clarinda Byrd (for purposes of this section, "Michigan Plaintiffs") bring this claim on behalf of themselves and the Michigan Purchaser Subclass against the Defendants.

661.    The Michigan Plaintiffs, the Defendants, and Michigan Purchaser Subclass members are each "persons" as defined by Mich. Comp. Laws § 445.902(d).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

662. Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws § 445.902(g).

663. Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws § 445.903(1), including:

     a.     Representing that their goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws § 445.903(1)(c);

     b.     Representing that their goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws § 445.903(1)(e);

     c.     Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws § 445.903(1)(bb); and

     d.     Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws § 445.903(1)(cc).

664. The Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

665. The Defendants intended to mislead the Michigan Plaintiffs and Michigan Purchaser Subclass members and induce them to rely on its misrepresentations and omissions.

666. The Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Michigan Purchaser Subclass members' rights. Defendants' knowledge that they shared consumer data with subcontractors for review and data annotation put them on notice that the Meta AI Glasses were not as advertised.

667. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, the Michigan Plaintiffs and Michigan Purchaser Subclass members have suffered and

will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing their Meta AI Glasses.

668.    The Michigan Plaintiffs and Michigan Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, and any other relief that is just and proper.

**CLAIMS BROUGHT ON BEHALF OF THE MINNESOTA PURCHASER SUBCLASS**

**COUNT TWENTY- ONE**

**VIOLATIONS OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**

**(Minn. Stat. § 325F.68, et seq.)**

**(Brought by Plaintiff Van den Berghe Against All Defendants on Behalf of the Minnesota**

**Purchaser Subclass)**

669.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

670.    Plaintiff Joseph Van den Berghe (for purposes of this section, "Minnesota Plaintiff") brings this claim on behalf of himself and the Minnesota Purchaser Subclass against all Defendants.

671.    The Products constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

672.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby ...." Minn. Stat. § 325F.69(1).

673.    In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Minnesota CFA as detailed above. Specifically, in designing and implementing the Products' human review pipeline and in marketing, offering for sale, and selling the Products, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Minn. Stat. § 325F.69(1):

a. using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Products, whether or not any person has in fact been misled, deceived or damaged thereby, including:

i. advertising and marketing the Products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

ii. representing that consumers' data would remain private and under their control when using the Products; and

iii. omitting, suppressing, concealing, and failing to disclose the material facts that: (1) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas in Meta's AI training pipeline, and (2) users who wished to make use of the Products' core AI features could not opt out of the human review pipeline.

674. Defendants' scheme and concealment of the true data-handling and human review practices of the Products were material to Minnesota Plaintiff and the Minnesota Purchaser Subclass, as Defendants intended. Had they known the truth, Minnesota Plaintiff and the Minnesota Purchaser Subclass would not have purchased the Products, or would have paid significantly less for them.

675. Minnesota Plaintiff and Minnesota Purchaser Subclass members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' data-handling and human review pipeline was not disclosed to consumers and was not reasonably discoverable. Minnesota Plaintiff and Minnesota Purchaser Subclass members did not, and could not, unravel Defendants' deception on their own.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

113

676.    Defendants had an ongoing duty to Minnesota Plaintiff and the Minnesota Purchaser Subclass to refrain from unfair and deceptive practices under the Minnesota CFA in the course of their business. Specifically, Defendants owed Minnesota Plaintiff and Minnesota Purchaser Subclass members a duty to disclose all the material facts concerning the Products' human review pipeline because they possessed exclusive knowledge, they intentionally concealed it from Minnesota Plaintiff and the Minnesota Purchaser Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

677.    Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were misleading.

678.    Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Minnesota Plaintiff, to increase the sale of the Products.

679.    Minnesota Plaintiff and Minnesota Purchaser Subclass members could not have reasonably avoided such injury. Minnesota Plaintiff and the Minnesota Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Minnesota Plaintiff and the Minnesota Purchaser Subclass members would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

680.    Minnesota Plaintiff and the Minnesota Purchaser Subclass members suffered harm as a result of Defendants' violations of the Minnesota CFA because they relied on Defendants' representations and omissions in deciding to purchase the Products. The representations and omissions were a substantial factor. The representations and omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

FIRST AMENDED CLASS ACTION COMPLAINT

681. Minnesota Plaintiff and Minnesota Purchaser Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information, including:

      a.     payment of the purchase price and/or price premium;

      b.     loss of the benefit of their bargain; and

      c.     privacy and dignitary harms associated with exposure of intimate footage to human annotators.

682. As a direct and proximate result of Defendants' misconduct in violation of the Minnesota CFA, Minnesota Plaintiff and the Minnesota Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Accordingly, Plaintiffs seek a monetary award for violation of the Minnesota CFA in the form of restitution, and/or disgorgement of ill-gotten gains to compensate Minnesota Plaintiff and the Minnesota Purchaser Subclass members for said monies.

683. Plaintiffs seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. Plaintiffs also request a court order requiring Defendants to provide restitution to Minnesota Plaintiff and the Minnesota Purchaser Subclass for the money wrongfully acquired. Unless this injunctive relief is granted, Plaintiffs will suffer irreparable harm.

684. Plaintiffs respectfully request that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

685. Minnesota Plaintiff and members of the Minnesota Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

FIRST AMENDED CLASS ACTION COMPLAINT

686.    Injunctive relief is appropriate on behalf of Minnesota Plaintiff and members of the Minnesota Purchaser Subclass because Defendants have failed to make the challenged omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Products. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future damages is not reasonably ascertainable at this time. Plaintiffs are, currently, unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that Plaintiffs and Class members overpay for the Products), rendering injunctive relief a necessary remedy.

687.    Defendants' violations present a continuing risk to Minnesota Plaintiff and the Minnesota Purchaser Subclass, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

688.    Pursuant to Minn. Stat. §§ 8.31(3a) and 549.20(1)(a), Minnesota Plaintiff and the Minnesota Purchaser Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Minnesota CFA.

FIRST AMENDED CLASS ACTION COMPLAINT

**COUNT TWENTY-TWO**

**VIOLATIONS OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**

**(Minn. Stat. § 325D.43, et seq.)**

**(Brought by Plaintiff Van den Berghe against All Defendants on Behalf of the Minnesota Purchaser Subclass)**

689.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

690.    Plaintiff Joseph Van den Berghe (for purposes of this section, "Minnesota Plaintiff") brings this claim on behalf of himself and the Minnesota Purchaser Subclass against all Defendants.

691.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices. Minn. Stat. § 325D.44.

692.    In the course of their business, Defendants, through their agents, employees, and/or subsidiaries, violated the Minnesota DTPA as detailed above. Specifically, in designing and implementing the Products' human review pipeline and in marketing, offering for sale, and selling the Products, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Minn. Stat. § 325D.44:

      a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Products;

      b.    Representing that the Products have approval, characteristics, uses, or benefits that they do not have;

      c.    Representing that the Products are of a particular standard, quality and grade when they are not;

      d.    Advertising the Products with the intent not to sell them as advertised; and/or

      e.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

117

FIRST AMENDED CLASS ACTION COMPLAINT

693. Defendants' deceptive trade practices include:

    a.    advertising and marketing the Products as "designed for privacy, controlled by you," "built for your privacy," and similar statements conveying robust privacy protections;

    b.    representing that consumers' data would remain private and under their control when using the Products; and

    c.    omitting, suppressing, concealing, and failing to disclose the material facts that: i) intimate footage, including bathroom visits, sex, nudity, and financial information, would be transmitted to Meta's servers and viewed and annotated by human contractors overseas in Meta's AI training pipeline, and ii) users who wished to make use of the Products' core AI features could not opt out of the human review pipeline.

694. Defendants' scheme and concealment of the true data-handling and human review practices of the Products were material to Minnesota Plaintiff and the Minnesota Purchaser Subclass, as Defendants intended. Had they known the truth, Minnesota Plaintiff and the Minnesota Purchaser Subclass would not have purchased the Products, or would have paid significantly less for them.

695. Minnesota Plaintiff and Minnesota Purchaser Subclass members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' data-handling and human review pipeline was not disclosed to consumers and was not reasonably discoverable. Minnesota Plaintiff and Minnesota Purchaser Subclass members did not, and could not, unravel Defendants' deception on their own.

696. Defendants had an ongoing duty to Minnesota Plaintiff and the Minnesota Purchaser Subclass to refrain from unfair and deceptive practices under the Minnesota DTPA in the course of their business. Specifically, Defendants owed Minnesota Plaintiff and Minnesota Purchaser Subclass members a duty to disclose all the material facts concerning the Products' human review pipeline because they possessed exclusive knowledge, they intentionally concealed it from

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

Minnesota Plaintiff and the Minnesota Purchaser Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

697.    Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were misleading.

698.    Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Minnesota Plaintiff, to increase the sale of the Products.

699.    Minnesota Plaintiff and Minnesota Purchaser Subclass members could not have reasonably avoided such injury. Minnesota Plaintiff and the Minnesota Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Minnesota Plaintiff and the Minnesota Purchaser Subclass members would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

700.    Minnesota Plaintiff and the Minnesota Purchaser Subclass members suffered harm as a result of Defendants' violations of the Minnesota DTPA because they relied on Defendants' representations and omissions in deciding to purchase the Products. The representations and omissions were a substantial factor. The representations and omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

701.    Minnesota Plaintiff and Minnesota Purchaser Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information, including:

      a.    payment of the purchase price and/or price premium;

      b.    loss of the benefit of their bargain; and

      c.    privacy and dignitary harms associated with exposure of intimate footage to human annotators.

702.    As a direct and proximate result of Defendants' misconduct in violation of the Minnesota DTPA, Minnesota Plaintiff and the Minnesota Purchaser Subclass members were

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

harmed in the amount of the purchase price they paid for the Products. Accordingly, Plaintiffs seek a monetary award for violation of the Minnesota DTPA in the form of restitution, and/or disgorgement of ill-gotten gains to compensate Minnesota Plaintiff and the Minnesota Purchaser Subclass members for said monies.

703.    Plaintiffs seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. Plaintiffs also request a court order requiring Defendants to provide restitution to Minnesota Plaintiff and the Minnesota Purchaser Subclass for the money wrongfully acquired. Unless this injunctive relief is granted, Plaintiffs will suffer irreparable harm.

704.    Plaintiffs respectfully request that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

705.    Minnesota Plaintiff and members of the Minnesota Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

706.    Injunctive relief is appropriate on behalf of Minnesota Plaintiff and members of the Minnesota Purchaser Subclass because Defendants have failed to make the challenged omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Products. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have

FIRST AMENDED CLASS ACTION COMPLAINT

been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future damages is not reasonably ascertainable at this time. The Minnesota Plaintiff is currently unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that the Minnesota Plaintiff and Minnesota Purchaser Subclass members overpay for the Products), rendering injunctive relief a necessary remedy.

707.   Defendants' violations present a continuing risk to Minnesota Plaintiff and the Minnesota Purchaser Subclass, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

708.   Pursuant to Minn. Stat. §§ 8.31(3a), 325D.45, and 549.20(1)(a), Minnesota Plaintiff and the Minnesota Purchaser Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Minnesota DTPA.

**COUNT TWENTY-THREE**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Minn. Stat. §§ 336.2-314 and 336.2A-212)**

**(Brought by Plaintiff Van den Berghe Against All Defendants on Behalf of the Minnesota Purchaser Subclass)**

709.   Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

710.   Plaintiff Joseph Van den Berghe (for purposes of this section, "Minnesota Plaintiff") brings this claim on behalf of himself and the Minnesota Purchaser Subclass against all Defendants.

711.   Defendants are and were at all relevant times "merchants" with respect to the Products under Minn. Stat. § 336.2-104(1) and "sellers" of the Products under § 336.2-103(1)(d).

712.   The Products are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

713.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

714.    The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

715.    To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to Minnesota Plaintiff and the Minnesota Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

716.    As a result of Defendants' misleading conduct, Minnesota Plaintiff and the Minnesota Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

717.    Defendants did not exclude or modify the Products' implied warranty of merchantability.

718.    Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

719.    As a direct and proximate result of Defendants' breaches of the warranties of merchantability, Minnesota Plaintiff and the other Minnesota Purchaser Subclass members have been damaged in an amount to be proven at trial. Minnesota Plaintiff and the Minnesota Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline. Minnesota Plaintiff and the Minnesota Purchaser Subclass members paid for a product

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

720. As a result of Defendants' breach of the implied warranty of merchantability, Minnesota Plaintiff and the Minnesota Purchaser Subclass members have been damaged in the amount to be determined at trial.

**CLAIMS BROUGHT ON BEHALF OF THE NEVADA PURCHASER SUBCLASS**

**COUNT TWENTY-FOUR**

**VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**

**(Nev. Rev. Stat. §§ 598.0903, et seq.)**

**(Brought by Plaintiff Doerr Against All Defendants on Behalf of the Nevada Purchaser Subclass)**

721. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

722. Plaintiff Daniel Doerr (for purposes of this section, "Nevada Plaintiff") brings this claim on behalf of himself and the Nevada Purchaser Subclass against all Defendants.

723. The Nevada Deceptive Trade Practices Act prohibits deceptive trade practices in the course of a person's business or occupation. Nev. Rev. Stat. §§ 598.0915–598.0925.

724. The Products are "goods," as used by the Act, because they are tangible objects that Nevada Plaintiff and the Nevada Purchaser Subclass purchased primarily for personal, family, or household purposes.

725. Defendants are "persons" as defined by Nev. Rev. Stat. § 598.0923(1) because it is a corporation.

726. Nevada Plaintiff and the Nevada Purchaser Subclass members purchased goods or services primarily for personal, family, or household purposes.

727. Defendants advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

123

FIRST AMENDED CLASS ACTION COMPLAINT

728.    Defendants violated the following sections of the Act by selling the Products to Nevada Plaintiff and the Nevada Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

a.    Section 598.0915(5) by knowingly making false representations as to the characteristics, uses, or benefits of the Products;

b.    Section 598.0915(7) by representing that the Products are of a particular standard, quality, or grade when Defendants knew or should have known that they are of another;

c.    Section 598.0915(9) by advertising the Products with intent not to sell them as advertised;

d.    Section 598.0923(2) by failing to disclose material facts in connection with the sale of the Products; and

e.    Section 598.0923(A)(3) by violating state and federal statutes or regulations relating to the sale of goods or services.

729.    Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

730.    Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Nevada Plaintiff, to increase the sale of the Products.

731.    Defendants intended to mislead Nevada Plaintiff and Nevada Purchaser Subclass members and induce reliance on its Challenged Representations and Omissions.

732.    Nevada Plaintiff and Nevada Purchaser Subclass members could not have reasonably avoided such injury. Nevada Plaintiff and the Nevada Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

733.    Nevada Plaintiff and the Nevada Purchaser Subclass members suffered harm as a result of Defendants' violations of the Act because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

734.    As a direct and proximate result of Defendants' misconduct in violation of the Act, Nevada Plaintiff and the Nevada Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

735.    Nevada Plaintiff and Nevada Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, restitution, punitive damages, attorneys' fees, filing fees, and costs.

**COUNT TWENTY-FIVE**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Nev. Rev. Stat. §§ 104.2314 and 104A.2212)**

**(Brought by Plaintiff Doerr Against All Defendants on Behalf of the Nevada Purchaser Subclass)**

736.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

737.    Plaintiff Daniel Doerr (for purposes of this section, "Nevada Plaintiff") brings this claim on behalf of himself and the Nevada Purchaser Subclass against all Defendants.

738.    Defendants are and were at all relevant times "merchants" with respect to the Products under Nev. Rev. Stat. § 104.2104(1) and "sellers" of the Products under § 104.2103(1)(c).

739.    The Products are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

740.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

125

741. The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

742. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to Nevada Plaintiff and the Nevada Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

743. As a result of Defendants' misleading conduct, Nevada Plaintiff and the Nevada Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

744. Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

745. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, Nevada Plaintiff and the other Nevada Purchaser Subclass members have been damaged in an amount to be proven at trial. Nevada Plaintiff and the Nevada Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline.

746. Nevada Plaintiff and the Nevada Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

FIRST AMENDED CLASS ACTION COMPLAINT

747. As a result of Defendants' breach of the implied warranty of merchantability, Nevada Plaintiff and the Nevada Purchaser Subclass members have been damaged in the amount to be determined at trial.

**CLAIMS BROUGHT ON BEHALF OF THE NEW JERSEY PURCHASER SUBCLASS**

**COUNT TWENTY-SIX**

**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**

**(N.J. Stat. §§ 56:8-1, *et seq.*)**

**(Brought by Plaintiff Bartone Against All Defendants on Behalf of the New Jersey Purchaser Subclass)**

748. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

749. Plaintiff Gina Bartone (for purposes of this Count "New Jersey Plaintiff") brings this claim on behalf of herself and the New Jersey Purchaser Subclass.

750. Each Defendant is a "person," as defined by N.J. Stat. § 56:8-1(d).

751. Defendants sell "merchandise," as defined by N.J. Stat. § 56:8-1(c) & (e).

752. The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq.*, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

753. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

754. Defendants intended to mislead New Jersey Plaintiff and New Jersey Purchaser Subclass members and induce them to rely on Defendants' misrepresentations and omissions.

755. Defendants acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded New Jersey Plaintiff and New Jersey Purchaser Subclass members' rights. Defendants' knowledge that they shared consumer data with subcontractors for review and data annotation put them on notice that the Meta AI Glasses were not

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

as advertised.

756.   As a direct and proximate result of Defendants' unconscionable and deceptive practices, New Jersey Plaintiff and New Jersey Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing their Meta AI Glasses.

757.   New Jersey Plaintiff and New Jersey Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including any equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

## COUNT TWENTY-SEVEN

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (N.J. Stat. Ann. § 12A:2-314)

**(Brought by Plaintiff Bartone against All Defendants on Behalf of the New Jersey Purchaser Subclass)**

758.   Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

759.   Plaintiff Gina Bartone (for purposes of this section, "New Jersey Plaintiff") brings this claim on behalf of herself and the New Jersey Purchaser Subclass against all Defendants.

760.   New Jersey Plaintiff, the New Jersey Purchaser Subclass members, and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

761.   Defendants are and were at all relevant times "merchants" with respect to the Products under New Jersey Statutes Annotated § 12A:2-104(1) and "sellers" of the Products under section 2-103(1)(d).

762.   The Products are and were at all relevant times "goods" within the meaning of New Jersey Statutes Annotated §§ 12A:2-105(1) and 2A-103(1)(h).

763.   A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to New Jersey Statutes Annotated §§ 12A:2-314 and 2A-212.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

128

764. The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

765. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to New Jersey Plaintiff and the New Jersey Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

766. As a result of Defendants' misleading conduct, New Jersey Plaintiff and the New Jersey Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

767. Defendants did not exclude or modify the Products' implied warranty of merchantability.

768. Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

769. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, New Jersey Plaintiff and the other New Jersey Purchaser Subclass members have been damaged in an amount to be proven at trial. New Jersey Plaintiff and the New Jersey Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline. New Jersey Plaintiff and the New Jersey Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

FIRST AMENDED CLASS ACTION COMPLAINT

have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

770.    As a result of Defendants' breach of the implied warranty of merchantability, New Jersey Plaintiff and the New Jersey Purchaser Subclass members have been damaged in the amount to be determined at trial.

**CLAIMS BROUGHT ON BEHALF OF THE NEW YORK PURCHASER SUBCLASS**

**COUNT TWENTY-EIGHT**

**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW**

**N.Y. Gen. Bus. Law §§ 349 and 350**

**(Brought by Plaintiff Davis against All Defendants on Behalf of the New York Purchaser Subclass)**

771.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

772.    Plaintiff Rahleisha Davis (for purposes of this section, "New York Plaintiff") brings this claim on behalf of herself and the New York Purchaser Subclass against all Defendants.

773.    Defendants engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, as described herein.

774.    Defendants engaged in false advertising in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 350, as described herein.

775.    By the acts and conduct alleged herein, Defendants have committed unfair or deceptive acts and practices by making false representations and omissions regarding the iPhone.

776.    The foregoing deceptive acts and practices were directed at consumers.

777.    The foregoing deceptive acts and practices are misleading in a material way because the Products did not contain the privacy preserving abilities, features and attributes that Defendants advertised.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

778. The New York Plaintiff and the New York Purchaser Subclass members were injured as a result because (a) they would not have purchased and used the Products had they known the truth; (b) they overpaid for the Products on account of Defendants' misrepresentations and omissions; and (c) their Products have experienced a significant loss in use and value because of Defendants' misrepresentations and omissions.

779. On behalf of herself and other members of the New York Purchaser Subclass, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover her actual damages and/or three times actual damages, and reasonable attorneys' fees and costs of suit.

780. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

781. Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded the New York Plaintiff's and New York Purchaser Subclass members' rights. Defendants' knowledge that the privacy preserving features of the Product did not exist put it on notice that the Products were not as advertised.

782. As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, the New York Plaintiff and New York Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

783. Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the thousands of New Yorkers who purchased Defendants Products.

784. The above deceptive and unlawful practices and acts by Defendants caused substantial injury to the New York Plaintiff and New York Purchaser Subclass members that they could not reasonably avoid.

785. The New York Plaintiff and New York Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, and attorney's fees and costs.

FIRST AMENDED CLASS ACTION COMPLAINT

**CLAIMS BROUGHT ON BEHALF OF THE NORTH CAROLINA PURCHASER SUBCLASS**

**COUNT TWENTY-NINE**

**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**

**(N.C. Gen. Stat. § 75-1.1,** *et seq.***)**

**(Brought by Plaintiff Dlugosz against All Defendants on behalf of the North Carolina Purchaser Subclass)**

786.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

787.    Plaintiff Devon Dlugosz (for purposes of this section, "North Carolina Plaintiff") brings this claim on behalf of himself and the North Carolina Purchaser Subclass against all Defendants.

788.    North Carolina Plaintiff and the North Carolina Purchaser Subclass members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, et seq. ("NCUDTPA").

789.    Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in North Carolina General Statutes § 75-1.1(b).

790.    The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

791.    In the course of their business, Defendants participated in deceptive trade practices that violated the NCUDTPA, as described above and below. Defendants are directly liable for these violations of law.

FIRST AMENDED CLASS ACTION COMPLAINT

792. Defendants failed to disclose and actively concealed the material facts that the Products transmit intimate footage to Meta's servers and expose that footage to human annotators overseas, including highly sensitive bathroom, bedroom, sexual, and financial content.

793. Defendants engaged in deceptive trade practices prohibited by the NCUDTPA, including:

(1) knowingly making a false representation as to the characteristics, uses, and benefits of the Products that had the capacity or tendency to deceive North Carolina Plaintiff and the North Carolina Purchaser Subclass members;

(2) representing that the Products are of a particular standard, quality, and grade even though Defendants knew or should have known they are not;

(3) advertising the Products with the intent not to sell them as advertised; and

(4) failing to disclose material information concerning the Products that was known to Defendants at the time of advertisement or sale with the intent to induce North Carolina Plaintiff and the North Carolina Purchaser Subclass members to purchase the Products.

794. Defendants knew that the Products were designed so that intimate footage captured during ordinary use would be transmitted to Meta's servers and routed to human annotators overseas for review and labeling, and that the Products did not maintain consumer privacy as advertised. Defendants, nevertheless, failed to warn North Carolina Plaintiff or the North Carolina Purchaser Subclass members about these practices despite having a duty to do so.

795. Defendants had the duty to North Carolina Plaintiff and the North Carolina Purchaser Subclass members to disclose the Products' human review pipeline and the true nature of the Products' data-handling practices because:

    a.    Defendants were in a superior position to know the true state of facts about the Products' data-handling and human review practices;

    b.    North Carolina Plaintiff and the North Carolina Purchaser Subclass members could not reasonably have been expected to learn or discover that the Products

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

transmitted intimate footage to human annotators overseas until such practices were publicly reported;

c.    Defendants knew that North Carolina Plaintiff and the North Carolina Purchaser Subclass members could not reasonably have been expected to learn about or discover the Products' human review pipeline and associated privacy risks; and

d.    Defendants actively concealed the human review pipeline and its scope by marketing the Products as "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

796.    Defendants' practices significantly affected the public as consumers of the Products because, among other things, the Products function as conduits of highly sensitive and intimate personal and bystander data to human annotators overseas without adequate disclosure or meaningful consent.

797.    Whether or not a product marketed as "designed for privacy" actually maintains the privacy of intimate user data is a fact a reasonable consumer would consider important in selecting a product to purchase. When North Carolina Plaintiff and the North Carolina Purchaser Subclass members purchased the Products for personal, family, or household purposes, they reasonably expected the Products would maintain the privacy and control over their data as advertised.

798.    Defendants' deceptive practices were likely to and did in fact deceive reasonable consumers, including North Carolina Plaintiff and the North Carolina Purchaser Subclass members, about the true privacy and data-handling practices of the Products.

799.    By intentionally failing to disclose material information regarding the Products' data-handling and human review practices, Defendants engaged in an unfair or deceptive act or practice, in that Defendants' practices were immoral, unethical, unscrupulous, or substantially injurious to consumers.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

800. Defendants' acts and practices were deceptive in the sense that they had the capacity or tendency to deceive, because they induced North Carolina Plaintiff and the North Carolina Purchaser Subclass members to purchase the Products when they would not have done so, or would have paid materially less, had they been aware of the information Defendants withheld.

801. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were misleading.

802. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including North Carolina Plaintiff, to increase the sale of the Products.

803. North Carolina Plaintiff and North Carolina Purchaser Subclass members could not have reasonably avoided such injury. North Carolina Plaintiff and the North Carolina Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and North Carolina Plaintiff and the North Carolina Purchaser Subclass members would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

804. North Carolina Plaintiff and the North Carolina Purchaser Subclass members suffered harm as a result of Defendants' violations of the NCUDTPA because they relied on Defendants' representations and omissions in deciding to purchase the Products. The representations and omissions were a substantial factor. The representations and omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

805. Defendants' acts and practices proximately caused actual injury to North Carolina Plaintiff and the other North Carolina Purchaser Subclass members, as North Carolina Plaintiff would not have purchased the Products, or would have paid materially less for the Products, if not for Defendants' misrepresentations and omissions.

806. As a direct and proximate result of Defendants' misconduct in violation of the NCUDTPA, North Carolina Plaintiff and the North Carolina Purchaser Subclass members were

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

harmed in the amount of the purchase price they paid for the Products. Accordingly, the North Carolina Plaintiff seeks a monetary award for violation of the NCUDTPA in the form of restitution, and/or disgorgement of ill-gotten gains to compensate them and the North Carolina Purchaser Subclass members for said monies.

807.    North Carolina Plaintiff seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. The North Carolina Plaintiff also requests a court order requiring Defendants to provide restitution to them and the North Carolina Purchaser Subclass for the money wrongfully acquired. Unless this injunctive relief is granted, the North Carolina Purchaser Subclass members will suffer irreparable harm.

808.    North Carolina Plaintiff respectfully requests that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

809.    North Carolina Plaintiff and members of the North Carolina Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

810.    Injunctive relief is appropriate on behalf of North Carolina Plaintiff and members of the North Carolina Purchaser Subclass because Defendants have failed to make the challenged omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Products. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future damages is not reasonably ascertainable at this time. The North Carolina Plaintiff is, currently, unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that they and the North Carolina Purchaser Subclass members overpay for the Products), rendering injunctive relief a necessary remedy.

811.    North Carolina Plaintiff and the North Carolina Purchaser Subclass members are entitled to all actual and consequential damages resulting from Defendants' unfair and deceptive practices. North Carolina Plaintiff and the North Carolina Purchaser Subclass members are also entitled to recovery of treble damages as provided in North Carolina General Statutes § 75-16. North Carolina Plaintiff and the North Carolina Purchaser Subclass members are further entitled to attorneys' fees and costs based on Defendants' willful violation of the statute.

**COUNT THIRTY**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(N.C. Gen. Stat. § 25-2-314)**

**(Brought by Plaintiff Dlugosz Against All Defendants on behalf of the North Carolina Purchaser Subclass)**

812.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

813.    Plaintiff Devon Dlugosz (for purposes of this section, "North Carolina Plaintiff") brings this claim on behalf of himself and the North Carolina Purchaser Subclass against all Defendants.

814.    Defendants are and were at all relevant times "merchants" with respect to the Products under North Carolina General Statutes § 25-2-314(1) and "sellers" of the Products under section 25-2-103(1)(d).

815.    The Products are and were at all relevant times "goods" within the meaning of North Carolina General Statutes §§ 25-2-105(1) and 25-2A-103(1)(h).

137

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

816.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to North Carolina General Statutes §§ 25-2-314 and § 25-2A-212.

817.    The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

818.    To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to North Carolina Plaintiff and the North Carolina Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

819.    As a result of Defendants' misleading conduct, North Carolina Plaintiff and the North Carolina Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

820.    Defendants did not exclude or modify the Products' implied warranty of merchantability.

821.    Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

822.    As a direct and proximate result of Defendants' breaches of the warranties of merchantability, North Carolina Plaintiff and the other North Carolina Purchaser Subclass members have been damaged in an amount to be proven at trial. North Carolina Plaintiff and the North Carolina Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

extent of this human review pipeline. North Carolina Plaintiff and the North Carolina Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

823.    As a result of Defendants' breach of the implied warranty of merchantability, North Carolina Plaintiff and the North Carolina Purchaser Subclass members have been damaged in the amount to be determined at trial.

### CLAIMS BROUGHT ON BEHALF OF THE PENNSYLVANIA PURCHASER SUBCLASS

### COUNT THIRTY-ONE

### VIOLATIONS OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (73 Pa. Stat. §§ 201-1, *et seq.*)

**(Brought by Plaintiff Martinek Against All Defendants on Behalf of the Pennsylvania Purchaser Subclass)**

824.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

825.    Plaintiff Laddie Martinek (for purposes of this section, "Pennsylvania Plaintiff") brings this claim on behalf of himself and the Pennsylvania Purchaser Subclass against all Defendants.

826.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCP") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. 73 Pa. Stat. § 201-3.

827.    The Products are "goods," as used by the Act, because they are tangible objects that Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass purchased primarily for personal,

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

family, or household purposes.

828. Defendants are "persons" as defined by 73 Pa. Stat. § 201-2(2), which includes corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity.

829. Defendants engage in "trade" or "commerce" as defined by 73 Pa. Stat. § 201-2(3), which includes advertising, offering for sale, sale or distribution of any services and any property, and includes any trade or commerce directly or indirectly affecting the people of Pennsylvania.

830. Defendants violated the following sections of the Pennsylvania UTPCP by selling the Products to Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

    a.    Section 201-2(4)(v) by representing that the Products have characteristics, uses, or benefits which they do not have;

    b.    Section 201-2(4)(vii) by representing that the Products are of a particular standard, quality, or grade when they are of another;

    c.    Section 201-2(4)(ix) by advertising the Products with intent not to sell them as advertised; and

    d.    Section 201-2(4)(xxi) by engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

831. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

832. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Pennsylvania Plaintiff, to increase the sale of the Products.

833. Pennsylvania Plaintiff and Pennsylvania Purchaser Subclass members could not have reasonably avoided such injury. Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to

140

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

834. Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass members suffered harm as a result of Defendants' violations of the Pennsylvania UTPCP because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

835. As a direct and proximate result of Defendants' misconduct in violation of the Pennsylvania UTPCP, Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

836. Pennsylvania Plaintiff and Pennsylvania Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages or one hundred dollars ($100), whichever is greater, treble damages, punitive damages, and reasonable attorneys' fees and costs.

**CLAIMS BROUGHT ON BEHALF OF THE TEXAS PURCHASER SUBCLASS**

**COUNT THIRTY-TWO**

**VIOLATIONS OF TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT**

**(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)**

**(Brought by Plaintiff Mitchell Against All Defendants on Behalf of the Texas Purchaser Subclass)**

837. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

838. Plaintiff Victor Mitchell (for purposes of this section, "Texas Plaintiff") brings this claim on behalf of himself and the Texas Purchaser Subclass against all Defendants.

839. The Texas Deceptive Trade Practices–Consumer Protection Act ("Texas DTPA")

"shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code § 17.44(a).

840.    The Products are "goods," as defined by the DTPA in Tex. Bus. & Com. Code § 17.45(1), because they are tangible objects purchased for use.

841.    Defendants are "persons" as defined by Tex. Bus. & Com. Code § 17.45(3), which includes a corporation, association, or other group, however organized.

842.    Defendants engage in "trade" or "commerce" as defined by Tex. Bus. & Com. Code § 17.45(6), which includes advertising, offering for sale, sale or distribution of any services and any property, and includes any trade or commerce directly or indirectly affecting the people of Texas.

843.    Defendants violated the following sections of the DTPA by selling the Products to Texas Plaintiff and the Texas Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

a.    Section 17.46(b)(5) by representing that the Products have characteristics, uses, or benefits which they do not have;

b.    Section 17.46(b)(7) by representing that the Products are of a particular standard, quality, or grade when they are of another;

c.    Section 17.46(b)(9) by advertising the Products with intent not to sell them as advertised; and,

d.    Section 17.46(b)(24) by failing to disclose information concerning the Products that was known at the time of the transaction with the intent to induce consumers into a transaction they otherwise would not have entered.

844.    Defendants further violated Tex. Bus. & Com. Code § 17.46(b)(2) and (3) by causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of the Products.

FIRST AMENDED CLASS ACTION COMPLAINT

845. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

846. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Texas Plaintiff, to increase the sale of the Products.

847. In engaging in the above-described practices, Defendants acted intentionally and with flagrant disregard of prudent and fair business practices to the extent that Defendants should be treated as having acted intentionally. Tex. Bus. & Com. Code § 17.45(13).

848. Texas Plaintiff and Texas Purchaser Subclass members could not have reasonably avoided such injury. Texas Plaintiff and the Texas Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

849. Texas Plaintiff and the Texas Purchaser Subclass members suffered harm as a result of Defendants' violations of the DTPA because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

850. On March 20, 2026, Texas Plaintiff sent a letter complying with Texas Business and Commercial Code § 17.505(a) contemporaneously with this filing. Therefore, Texas Plaintiff seeks only injunctive relief until such time as the 60-day notice period has expired, and he is afforded leave amend to this complaint to include a request for monetary damages under the DTPA.

851. As a direct and proximate result of Defendants' misconduct in violation of the DTPA, Texas Plaintiff and the Texas Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

852. Texas Plaintiff and Texas Purchaser Subclass members seek only injunctive relief

143

FIRST AMENDED CLASS ACTION COMPLAINT

under the Texas DTPA at this time but reserve the right to monetary damages, including but not limited to attorney's fees and punitive damages, once the 60-day notice period under Texas Business and Commercial Code § 17.505(a) has expired.

**COUNT THIRTY-THREE**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(Tex. Bus. & Com. Code § 2.314)**

**(Brought by Plaintiff Mitchell Against All Defendants on Behalf of the Texas Purchaser Subclass)**

853.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

854.    Plaintiff Victor Mitchell (for purposes of this section, "Texas Plaintiff") brings this claim on behalf of himself and the Texas Purchaser Subclass against all Defendants.

855.    Defendants are and were at all relevant times "merchants" with respect to the Products under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of the Products under § 2.103(a)(4).

856.    The Products are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

857.    A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which the Products are used is implied by law, pursuant to Texas Business and Commercial Code §§ 2.314 and 2A.212.

858.    Defendants impliedly warranted that the Products were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by Defendants would function as represented and would not contain material defects or deficiencies; and (ii) a warranty that the Products would be fit for their intended use.

859.    Defendants breached the implied warranty of merchantability in that the Products were not in merchantable condition when they were sold to Texas Plaintiff and members of the Texas Purchaser Subclass, and said Products were and are unfit for the ordinary purposes for which

144

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

such Products are used because, as alleged herein, Defendants misrepresented the nature, quality, and characteristics of the Products through the Challenged Representations and Omissions.

860.    Texas Plaintiff notified Defendants of their breach within a reasonable time after Texas Plaintiff learned about it.

861.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Texas Plaintiff and members of the Texas Purchaser Subclass have suffered damages, including but not limited to incidental and consequential damages.

## CLAIMS BROUGHT ON BEHALF OF THE UTAH PURCHASER SUBCLASS

## COUNT THIRTY-FOUR

**VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT**

**Utah Code §§ 13-11-1, *et seq*.**

**(Brought by Plaintiff Woodhead Against All Defendants on Behalf of the Utah Purchaser Subclass)**

862.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

863.    Plaintiff Jeffry Woodhead (for purposes of this section, "Utah Plaintiff") brings this claim on behalf of himself and the Utah Purchaser Subclass against all Defendants.

864.    Utah Plaintiff brings this claim on behalf of himself and the Utah Purchaser Subclass.

865.    Each Defendant is a "person" as defined by Utah Code § 13-11-3(5).

866.    Each Defendant is a "supplier" as defined by Utah Code § 13-11-3(6), because they regularly solicit, engage in, or enforce "consumer transactions," as defined by Utah Code § 13-11-3(2).

867.    Defendants engaged in deceptive and unconscionable acts and practices in connection with consumer transactions, in violation of Utah Code § 13-11-4 and Utah Code § 13-11-5, as described herein.

868.    Defendants intended to mislead the Utah Plaintiff and Utah Purchaser Subclass members and induce them to rely on its misrepresentations and omissions.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

869. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

870. Defendants misrepresented to the Utah Plaintiff and Utah Purchaser Subclass members the capabilities of the Products related to their privacy features, or lack thereof. The Utah Plaintiff and the Utah Purchaser Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

871. Defendants had a duty to disclose the above facts due to the circumstances of this case. Defendants' duty to disclose arose from its:

a. Possession of exclusive knowledge regarding the privacy features, or lack thereof, of the Products;

b. Active concealment or misrepresentations regarding the lack of privacy the Products would provide; and

c. Incomplete representations about the Products, while purposefully withholding material facts from the Utah Plaintiff and the Utah Purchaser Subclass that contradicted these representations.

872. Defendants intentionally or knowingly engaged in deceptive acts or practices, violating Utah Code § 13-11-4(2) by:

a. Indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not;

b. Indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;

c. Indicating that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not; and,

d. Indicating that the subject of a consumer transaction will be supplied in greater quantity (e.g., more privacy and data security) than the supplier intends.

873. Defendants engaged in unconscionable acts and practices that were oppressive and led to unfair surprise, as shown in the setting, purpose, and effect of those acts and practices.

146

FIRST AMENDED CLASS ACTION COMPLAINT

874. In addition, there was an overall imbalance in the obligations and rights imposed by the consumer transactions in question, based on the mores and industry standards of the time and place where they occurred. There is a substantial imbalance between the obligations and rights of consumers, such as the Utah Plaintiff and the Utah Purchaser Subclass, who purchased the Products based upon the publicly-available information in the marketplace, and Defendants, which had exclusive knowledge as to the true features, capabilities, and software included in the Products.

875. Defendants' acts and practices were also procedurally unconscionable because consumers, including the Utah Plaintiff and the Utah Purchaser Subclass, had no practicable option but to purchase the Products based upon publicly-available information, despite Defendants' omissions and misrepresentations. Defendants exploited this imbalance in power, and the asymmetry of information, to profit by selling the Products based on false promises of privacy preserving features.

876. As a direct and proximate result of Defendants' unconscionable and deceptive acts or practices, the Utah Plaintiff and Utah Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages including from not receiving the benefit of their bargain in purchasing the Products.

877. The Utah Plaintiff and Utah Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages of $2,000 per violation, amounts necessary to avoid unjust enrichment, under Utah Code §§ 13-11-19, et seq., and reasonable attorneys' fees and costs.

**CLAIMS BROUGHT ON BEHALF OF THE VIRGINIA PURCHASER SUBCLASS**

**COUNT THIRTY-FIVE**

**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**

**Va. Code Ann. §§ 59.1-196, *et seq.***

**(Brought by Plaintiff Hatch Against All Defendants on Behalf of the Virginia Purchaser Subclass)**

878. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

879. Plaintiff Jason Hatch (for purposes of this section, "Virginia Plaintiff") brings this claim on behalf of himself and the Virginia Purchaser Subclass against all Defendants.

880. The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

881. Each Defendant is a "person" as defined by Va. Code Ann. § 59.1-198.

882. Each Defendant is a "supplier" as defined by Va. Code Ann. § 59.1-198.

883. Defendants engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Defendants advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

884. Defendants engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, described herein.

885. Defendants intended to mislead the Virginia Plaintiff and Virginia Purchaser Subclass members and induce them to rely on their misrepresentations and omissions.

886. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

887. Defendants misrepresented to the Virginia Plaintiff and Virginia Purchaser Subclass members the capabilities of the Products related to their privacy features, or lack thereof. The Virginia Plaintiff and Virginia Purchaser Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

888. Defendants had a duty to disclose these facts due to the circumstances of this case. Defendants' duty to disclose also arose from its:

      a. Possession of exclusive knowledge regarding the privacy features, or lack thereof, of the Products;

      b. Active concealment or misrepresentations regarding the lack of privacy the Products would provide; and

148

FIRST AMENDED CLASS ACTION COMPLAINT

c.    Incomplete representations about the Products, while purposefully withholding material facts from the Virginia Plaintiff and the Virginia Purchaser Subclass that contradicted these representations.

889.    The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

a.    Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

b.    Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

c.    Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

890.    Defendants acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded the Virginia Plaintiff and Virginia Purchaser Subclass members' rights. Defendants' knowledge that the advertised privacy preserving features did not exist put it on notice that the Products were not as it advertised.

891.    An award of punitive damages would serve to punish Defendants for their wrongdoing and warn or deter others from engaging in similar conduct.

892.    As a direct and proximate result of Defendants' deceptive acts or practices, the Virginia Plaintiff and Virginia Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

893.    The Virginia Plaintiff and Virginia Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, punitive damages, and attorneys' fees and costs.

## CLAIMS BROUGHT ON BEHALF OF THE WEST VIRGINIA PURCHASER SUBCLASS

### COUNT THIRTY-SIX

149

FIRST AMENDED CLASS ACTION COMPLAINT

**VIOLATIONS OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT**

**W. Va. Code §§ 46A-6-101, *et seq.***

**(Brought by Plaintiff Balderson Against All Defendants on Behalf of the West Virginia Purchaser Subclass)**

894.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

895.    Plaintiff Chandra Balderson (for purposes of this section, "West Virginia Plaintiff") brings this claim on behalf of herself and the West Virginia Purchaser Subclass against all Defendants.

896.    The West Virginia Plaintiff and West Virginia Purchaser Subclass members are "consumers," as defined by W. Va. Code § 46A-6-102(2).

897.    Defendants engaged in "consumer transactions," as defined by W. Va. Code § 46A-6-102(2).

898.    Defendants advertised, offered, or sold goods or services in West Virginia and engaged in trade or commerce directly or indirectly affecting the people of West Virginia, as defined by W. Va. Code § 46A-6-102(6).

899.    Defendants will receive notice pursuant to W. Va. Code § 46A-5-108(a) concerning its wrongful conduct as alleged herein by the West Virginia Plaintiff and West Virginia Purchaser Subclass members. However, sending pre-suit notice pursuant to W. Va. Code § 46A-5-108(a) is an exercise in futility for the West Virginia Plaintiff, because, despite having knowledge of the deceptive acts and practices complained of herein in this lawsuit, Defendants have not cured their unfair and deceptive acts and practices.

900.    Defendants engaged in unfair and deceptive business acts and practices in the conduct of trade or commerce, in violation of W. Va. Code § 46A-6-104, as described herein.

901.    Defendants' unfair and deceptive acts and practices also violated W. Va. Code § 46A-6-102(7), including:

  a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

150

FIRST AMENDED CLASS ACTION COMPLAINT

b.    Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another;

c.    Advertising goods or services with intent not to sell them as advertised;

d.    Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

e.    Using deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; and

f.    Advertising, displaying, publishing, distributing, or causing to be advertised, displayed, published, or distributed in any manner, statements and representations with regard to the sale of goods, which are false, misleading or deceptive or which omit to state material information which is necessary to make the statements therein not false, misleading or deceptive.

902.    Defendants' unfair and deceptive acts and practices were unreasonable when weighed against the need to develop or preserve business, and were injurious to the public interest, under W. Va. Code § 46A-6-101.

903.    Defendants' acts and practices were additionally "unfair" under W. Va. Code § 46A-6-104 because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

904.    The injury to consumers from Defendants' conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

905.    Consumers could not have reasonably avoided injury because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

consumer decision-making. By withholding important information from consumers regarding the lack of privacy of the Products, Defendants created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

906. Defendants' business practices had no countervailing benefit to consumers or to competition.

907. Defendants' acts and practices were additionally "deceptive" under W. Va. Code § 46A-6-104 because Defendants made representations or omissions of material facts that misled or were likely to mislead reasonable consumers, including the West Virginia Plaintiff and West Virginia Purchaser Subclass members.

908. Defendants intended to mislead the West Virginia Plaintiff and West Virginia Purchaser Subclass members and induce them to rely on its misrepresentations and omissions.

909. Defendants representations and omissions were material because they were likely to deceive reasonable consumers.

910. Defendants misrepresented to the West Virginia Plaintiff and West Virginia Purchaser Subclass members the capabilities of the Products related to their privacy features, or lack thereof. The West Virginia Plaintiff and West Virginia Purchaser Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

911. Defendants had a duty to disclose the above-described facts due to the circumstances of this case. Defendants' duty to disclose arose from their:

    a.    Possession of exclusive knowledge regarding the privacy features, or lack thereof, of the Products;

    b.    Active concealment or misrepresentations regarding the lack of privacy the Products would provide; and

    c.    Incomplete representations about the Products, while purposefully withholding material facts from the West Virginia Plaintiff and the West Virginia Purchaser Subclass that contradicted these representations.

912. Defendants' omissions were legally presumed to be equivalent to active

152

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

misrepresentations because Defendants intentionally prevented the West Virginia Plaintiff and West Virginia Purchaser Subclass members from discovering the truth regarding the lack of privacy of the Products.

913.    As a direct and proximate result of Defendants' unfair and deceptive acts or practices and the West Virginia Plaintiff and West Virginia Purchaser Subclass members' purchase of goods or services, the West Virginia Plaintiff and West Virginia Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing their iPhone 16(s).

914.    The West Virginia Plaintiff and West Virginia Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $200 per violation under W. Va. Code § 46A-6-106(a), restitution, any equitable relief, punitive damages, and reasonable attorneys' fees and costs.

## X.    CLAIMS BROUGHT ON BEHALF OF THE USER CLASSES

915.    The following are claims brought by the Plaintiffs on behalf of the Nationwide User Class ("User Class") or State User Subclasses as defined above.

**CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE USER CLASS**

**COUNT THIRTY-SEVEN**

**VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT**

**(18 U.S.C. § 1030 *et seq*.)**

**(Brought by all Plaintiffs against Meta on behalf of the Nationwide User Class, or**

**alternatively, the State User Subclasses)**

916.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

917. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses.

918. A person violates the Computer Fraud and Abuse Act ("CFAA") if they intentionally access a protected computer, lacked authority to access the computer or exceeded granted authority to access the computer, and thereby obtain information from any protected computer. See 18 U.S.C. § 1030(a)(2)(C). A 'protected computer' includes one that is used in or affecting interstate or foreign commerce. 18 U.S.C. § 1030(e)(2).

919. The Products are 'protected computers' under the CFAA because they process and store data and are connected to the Internet.

920. In connection with the design and operation of the Products and associated services, Meta used its access to those protected computers to obtain and alter Plaintiffs' and User Class members' data in ways that exceeded the scope of authorization Plaintiffs and User Class members granted, by:

  a. using data and media captured via the Products for purposes not authorized by Plaintiffs and User Class members, including routing intimate footage to human annotators in Nairobi to watch, label, and use in AI-model training;

  b. obtaining and using intimate media and associated data beyond what was reasonably necessary to provide the advertised consumer-facing functionality; and

  c. using deceptive and privacy-centric marketing to induce Plaintiffs and User Class members to transmit data to Meta's systems while concealing the human review and AI-training uses of that data.

921. Plaintiffs and User Class members did not authorize Meta to expose their intimate footage—including bathroom visits, sex, nudity, and financial information—to human contractors overseas, nor did they authorize Meta to use such footage in the undisclosed manner alleged, particularly considering Meta's privacy-centric representations.

922. Meta knew, or recklessly and intentionally disregarded the extremely high likelihood

154

FIRST AMENDED CLASS ACTION COMPLAINT

that, its use of Plaintiffs' and User Class members' data, as described above, exceeded the authorization that Plaintiffs and User Class members had granted.

923.    As a direct and proximate result of Meta's violations of the CFAA, Plaintiffs and User Class members suffered damage and loss within the meaning of 18 U.S.C. § 1030, including:

      a.    the loss of the value and confidentiality of their data; and

      b.    costs reasonably incurred in investigating and responding to Meta's conduct, and in seeking to remediate the privacy harms described herein.

924.    Plaintiffs and User Class members seek all remedies available under 18 U.S.C. § 1030, including compensatory damages, injunctive and other equitable relief, and reasonable attorneys' fees and costs.

## COUNT THIRTY-EIGHT

## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

## (18 U.S.C. §§ 2510, *et seq.*)

**(Brought by Plaintiffs Against Meta on Behalf of the Nationwide User Class, or Alternatively, the State User Subclasses)**

925.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

926.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses.

927.    The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

928.    In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

929.    The ECPA also makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know that" the communication was

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c) & (d).

930.    The ECPA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, used, or disclosed. 18 U.S.C. § 2520(a).

931.    The ECPA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

932.    The ECPA defines "electronic communication" as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

933.    The ECPA defines 'electronic, mechanical, or other device' as 'any device or apparatus which can be used to intercept a wire, oral, or electronic communication.' 18 U.S.C. § 2510(5).

934.    The ECPA defines "contents,' with respect to any covered communication, to include "any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

935.    The ECPA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

936.    Meta, a corporation, is a person as defined by 18 U.S.C. § 2510(6).

937.    The data and transmissions captured by and transmitted from Plaintiffs' and User Class members' Meta AI Glasses—including visual imagery, audio recordings, and metadata—constitute 'electronic communications,' as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems that affect interstate commerce.

938.    As alleged herein, Meta has intercepted, in real time and as it was transmitted, the contents of electronic communications captured by Plaintiffs' and User Class members' Meta AI Glasses, and has diverted those communications to its own servers and to third-party subcontractors, including Sama, without consent.

156

FIRST AMENDED CLASS ACTION COMPLAINT

939.    Meta intercepted these electronic communications in real time separately from and in addition to accessing data stored in Plaintiffs' and User Class members' devices.

940.    Meta intercepted these data transmissions by routing them from the glasses' onboard sensors, during transmission, to Meta's cloud servers and subsequently to Sama's annotation facilities in Nairobi, Kenya, unbeknownst to Plaintiffs and User Class members.

941.    As detailed herein, the electronic communications that Meta has intercepted are tied to individual users and devices, and not anonymized. Meta's automated face-anonymization system fails in certain lighting conditions, leaving faces and other identifying information fully visible to human annotators at Sama.

942.    Plaintiffs and User Class members have a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses, including private residences, bathrooms, bedrooms, and other intimate settings, and Plaintiffs and User Class members reasonably expected privacy in such settings. Further, there is a reasonable expectation that imagery and audio captured incidentally by a consumer wearable device would not be routed to human reviewers at a third-party subcontractor in a foreign country.

943.    Common understanding and experience of how consumer electronic devices work create a reasonable expectation that a device manufacturer like Meta would not surreptitiously intercept and divert the detailed and personal electronic communications described above to third-party human annotators for review and AI model training.

944.    In further violation of the ECPA, Meta has intentionally disclosed or endeavored to disclose to third parties—including Sama—the contents of the electronic communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(c).

945.    In further violation of the ECPA, Meta has intentionally used or endeavored to use the contents of the electronic communications described above knowing or having reason to know that the information was obtained through interception in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(d).

FIRST AMENDED CLASS ACTION COMPLAINT

946. Specifically, Meta has disclosed and used the contents of the electronic communications described above by routing Plaintiffs' and User Class members' captured imagery and audio to Sama for manual annotation and labeling, and by incorporating the resulting training data into Meta's proprietary AI models, for its own financial and commercial benefit, obtaining substantial profit.

947. As a result, Plaintiffs and User Class members have suffered harm and injury due to the interception, disclosure, and/or use of electronic communications containing their private and personal information.

948. Pursuant to 18 U.S.C. § 2520, Plaintiffs and User Class members have been damaged by Meta's interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the User Class and any profits made by Meta as a result of the violation or (b) statutory damages for each User Class member of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT THIRTY-NINE

## STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Common Law)

### (Brought by Plaintiffs Against Meta on Behalf of the Nationwide User Class, or Alternatively, the State User Subclasses)

949. Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

950. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses.

951. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

FIRST AMENDED CLASS ACTION COMPLAINT

952.    Meta and Luxottica designed, engineered, manufactured, marketed, distributed, and sold the Products.

953.    Meta and Luxottica placed the Products into the stream of commerce, knowing and intending that they would used by Plaintiffs and User Class members throughout the United States without any inspection for defects by end users.

954.    The Products were defective in design when they left Meta's possession and control because, inter alia, they were designed so that, during ordinary and intended use: (1) they capture continuous photo and video content, including inside homes, bedrooms, and bathrooms, and during other intimate moments; (2) that content is automatically transmitted off-device to Meta's servers and then to human "data annotators" overseas for review and labeling; and (3) this pipeline of intimate, sensitive footage to human annotators is implemented without adequate in-product controls or transparent, conspicuous disclosures consistent with Meta's privacy-centric representations.

955.    Though Meta has publicly acknowledged that it "sometimes use[s] contractors to review" users' data, purportedly to improve the service, it has claimed that, "unless users choose to share media they've captured with Meta or others, that media stays on the user's device" and that any content users do choose to share is "filtered to protect people's privacy."

956.    Meta simultaneously marketed the Products with privacy-centric statements, including that the Products are "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

957.    No reasonable consumer would expect that, by using a product advertised as "designed for privacy" in ordinary, foreseeable ways (e.g., wearing it at home, in bedrooms or bathrooms, while undressing, or around family members), their intimate video and audio would be routed to and watched by strangers overseas, cataloguing their "bathroom visits, sex and other intimate moments," and financial details for AI-training purposes.

958.    The Products failed to perform as safely as an ordinary consumer would expect because, contrary to Meta's privacy-centric marketing: (1) they function as surreptitious conduits

FIRST AMENDED CLASS ACTION COMPLAINT

of highly sensitive and intimate personal and bystander data to human annotators; and (2) the Products' design, including reliance on a small LED indicator light, does not ensure that users or bystanders meaningfully understand that their intimate moments and environments are being recorded, offloaded, and reviewed.

959.    Any purported benefits of designing the Products to route intimate user and bystander footage to human annotators—rather than relying on less invasive or more privacy-protective AI-training methods—are outweighed by the gravity and likelihood of harm, including: (1) exposure of highly intimate, sexual, and bodily content to strangers; (2) exposure of financial information; (3) heightened risks of identity theft, stalking, extortion, and reputational harm; and (4) economic harm from paying for a product that does not conform to its privacy-centric marketing.

960.    Plaintiffs and User Class members used the Products in intended and reasonably foreseeable ways, including wearing them in daily life, inside homes, and around family and friends.

961.    A safer alternative design that would have eliminated or reduced injuries to Plaintiffs' privacy was technically and commercially feasible. For example, Meta and Luxottica could have designed the Products such that use of and access to the Products' core AI features was decoupled from the human review pipeline or required explicit user consent for each piece of footage routed to human contractors.

962.    The Products' defective design was a substantial factor in causing Plaintiffs' and User Class members' injuries, including the loss of privacy and dignitary harms associated with the exposure of intimate footage to human annotators.

963.    Plaintiffs and User Class members would not have used the Products had they known of the Products' true design and the attendant privacy risks.

964.    As a direct and proximate result of Meta's defective design, Plaintiffs and User Class members have suffered and will continue to suffer injury, including non-economic harms relating to invasion of privacy and emotional distress.

965.    Plaintiffs and User Class members seek all monetary and non-monetary relief allowed by law as a result of Meta's strict product liability, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

FIRST AMENDED CLASS ACTION COMPLAINT

**COUNT FORTY**

**STRICT PRODUCT LIABILITY – FAILURE TO WARN**

**(Common Law)**

**(Brought by Plaintiffs Against Meta on Behalf of the Nationwide User Class, or**

**Alternatively, the State User Subclasses)**

966.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

967.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses.

968.    This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

969.    Meta manufactured, designed, marketed, distributed, and sold the Products.

970.    At the time the Products were manufactured, distributed, and sold, they had potential and known risks that were known or knowable in light of generally accepted knowledge in the relevant communities, including that: (1) the Products capture highly sensitive video and audio inside private spaces; (2) that media is transmitted to Meta's servers and routed to human annotators in Nairobi, Kenya for review and labeling; (3) annotators "see everything—from living rooms to naked bodies," including bathroom visits, sexual activity, and financial information; (4) it is impossible to both avoid the human review pipeline and make use of the Products' core AI features; and (5) such practices create serious privacy, safety, and dignitary harms.

971.    These potential risks present a substantial danger when the Products are used or misused in an intended or reasonably foreseeable manner because users will naturally wear the Products in homes, bathrooms, bedrooms, and other intimate settings, with spouses, partners, children, guests, and bystanders present.

972.    Ordinary consumers are not likely to recognize these risks, particularly given the Products' marketing as "designed for privacy, controlled by you" and the absence of any clear disclosure that human contractors overseas watch and annotate sensitive footage captured via the Products and that users who wish to make use of the Products' core AI features cannot avoid that

161

FIRST AMENDED CLASS ACTION COMPLAINT

human review pipeline.

973.    At all relevant times, safer and feasible alternative designs existed that would have substantially reduced or eliminated the unreasonable privacy and safety risks created by the Meta AI Glasses, including: (a) performing AI processing entirely on-device, without uploading raw, identifiable content to remote servers; (b) limiting uploads to anonymized or redacted images that remove faces, bodies, and other identifying features; (c) obtaining explicit, granular, opt-in consent before routing any content to human reviewers and limiting such review to non-intimate scenes; and (d) allowing users to permanently disable any upload of AI-related content while still retaining local AI functionality. Meta nevertheless opted for a design that maximized the volume of intimate, identifiable data sent to offshore human reviewers, without disclosing these tradeoffs to consumers.

974.    Meta failed to provide adequate warnings or instructions concerning: (1) the fact that content captured with the Products would be transmitted to Meta's servers for AI-related processing; (2) the fact that human contractors, including those working for Meta's vendor Sama in Nairobi, would review and annotate highly sensitive user and bystander footage, including bathroom, sexual, and financial scenes; and (3) the nature and extent of privacy, safety, and dignitary risks created by this human-review pipeline.

975.    The small LED indicator light on the Products is inadequate as a warning or notice to users or bystanders regarding the existence and extent of human review and data-annotation practices; it does not meaningfully inform consumers that their intimate footage may be watched by strangers overseas.

976.    Meta's claims that it disclosed to users that some footage may be shared with human reviewers, even if true, are inadequate, because consumers were not provided adequate notice of these supposed disclosures, and these disclosures do not meaningfully inform consumers who wish to make use of the Products' core AI features that they cannot do so while avoiding that human review pipeline.

977.    Meta knew or, by the use of reasonably developed skill and foresight, should have known of these risks and of the Products' human-review pipeline, as evidenced by: (1) its own design and implementation of the Products and related AI systems; (2) its contracting with Sama

FIRST AMENDED CLASS ACTION COMPLAINT

and other vendors; and (3) internal knowledge that intimate footage, including nudity, sex, and financial information, was being viewed by annotators.

978.    Meta had a duty to provide clear, prominent warnings and instructions so that consumers could decide whether to use the Products at all, or use them in ways that would minimize the degree of danger—such as by avoiding use in bathrooms and bedrooms or when handling financial information.

979.    Meta breached this duty by failing to provide adequate warnings and instructions and by instead emphasizing privacy-centric marketing messages inconsistent with the underlying data-handling and human-review practices.

980.    Plaintiffs and User Class members were injured, including harms related to invasion of privacy and emotional distress, as a direct and proximate result of Meta's failure to warn.

981.    Had Meta provided adequate warnings and instructions about the Products' human-review pipeline and associated risks, Plaintiffs and User Class members would not have used the Products and would have avoided or mitigated their harm.

982.    Meta's failure to warn was a substantial factor in causing Plaintiffs' and User Class members' injuries.

983.    Plaintiffs and User Class members seek all monetary and non-monetary relief allowed by law, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

<u>**COUNT FORTY-ONE**</u>

**INTRUSION INTO PRIVATE AFFAIRS**

**(Common Law)**

**(Brought by Plaintiffs Against Meta on Behalf of the Nationwide User Class, or**

**Alternatively, the State User Subclasses)**

984.    Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

985.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or alternatively, the State Subclasses.

163

FIRST AMENDED CLASS ACTION COMPLAINT

986. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

987. Plaintiffs and User Class members have a protected privacy interest in the imagery, audio, and associated data captured by their Meta AI Glasses and are entitled to the protection of such data against unauthorized access, disclosure, and use.

988. Plaintiffs and User Class members have a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses—including private residences, bathrooms, bedrooms, gyms, and other intimate or sensitive settings—and in any compilation of personal data resulting from the collection, annotation, and use of such imagery and audio.

989. As Plaintiffs and User Class members go about their daily lives wearing Meta AI Glasses they have unknowingly generated troves of highly sensitive visual and audio data depicting their private lives, which is then captured, transmitted, stored, routed to human annotators at a third-party subcontractor, reviewed, labeled, and used to train Meta's proprietary AI models—all without Plaintiffs knowledge or informed consent.

990. The continued nonconsensual surveillance of individuals in their private capacity, as Meta has done and continues to do, represents a fundamental violation of personal privacy, freedom, and autonomy. It is not simply an intentional intrusion but a profound infringement upon the most personal aspects of one's life.

991. As a result of Meta's intentionally intrusive conduct, Plaintiffs and User Class members have been and still remain today subject to a data collection, transmission, and human review pipeline that compromises their privacy, autonomy, and basic human dignity.

992. Plaintiffs and User Class members have a reasonable expectation that imagery and audio captured by a consumer wearable device in private settings would not be collected by Meta without their express consent, routed to third-party human annotators without their knowledge, or used to train commercial AI models without meaningful disclosure.

993. Without the consent or knowledge of Plaintiffs and User Class members, Meta collected comprehensive visual and audio data that Plaintiffs and User Class members reasonably expected to remain private.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

994.    Meta then disclosed this highly personal and sensitive information to Sama, whose human workforce reviewed, labeled, and annotated the data for Meta's commercial benefit.

995.    Meta intentionally invaded Plaintiffs' and User Class members' privacy interests by deliberately designing a data pipeline that surreptitiously captures, transmits, routes to human reviewers, and uses for AI training their confidential visual and audio data from private settings.

996.    Meta's conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms underlying the right to privacy.

997.    By capturing, transmitting, storing, routing to human annotators, and using for AI training Plaintiffs' and User Class members' private imagery and audio without authorization or consent to do so, Meta intentionally intruded upon Plaintiffs' and User Class members' seclusion, solitude, and private life, without their knowledge or permission.

998.    Meta's conduct infringed Plaintiffs' and User Class members' privacy interests by, among other things: (1) allowing the dissemination and/or misuse of their private imagery and audio data; (2) preventing Plaintiffs and User Class members from maintaining control over the type of information that Meta captures, stores, and routes to third parties; and (3) preventing Plaintiffs and User Class members from conducting personal activities without observation, intrusion, or interference.

999.    Meta has improperly profited from its invasion of Plaintiffs' and User Class members' privacy and its use of Plaintiffs' and User Class members' data for its economic value and its own commercial gain.

1000.    As a direct and proximate result of Meta's unlawful invasion of privacy, Plaintiffs' and User Class members' reasonable expectations of privacy were frustrated, exploited, compromised, and defeated.

1001.    Plaintiffs and User Class members were harmed by Meta's wrongful conduct causing their loss of privacy and the confidentiality of their own private conduct. This intrusion, disclosure of information, and loss of privacy and confidentiality has caused Plaintiffs to suffer mental anguish, actual damages, lost value in their personal data, and an invasion of their privacy in an amount to be determined at trial.

FIRST AMENDED CLASS ACTION COMPLAINT

1002.   Unless, and until, enjoined and restrained by order of this Court, Meta's wrongful conduct will cause irreparable injury to Plaintiffs and User Class members in that their private imagery and audio maintained by Meta and Sama may be viewed, distributed, and used by unauthorized third parties for years to come.

1003.   Plaintiffs and User Class members seek nominal, compensatory, and punitive damages as a result of Meta's actions. Plaintiffs seek actual damages suffered, plus any profits attributable to Meta's use of Plaintiffs' and User Class members' private data. Punitive damages are warranted because Meta's malicious, oppressive, and willful actions were done in conscious disregard of their rights.

## COUNT FORTY-TWO

### QUASI-CONTRACT / UNJUST ENRICHMENT

### (Common Law)

### (Brought by Plaintiffs Against Meta on Behalf of the Nationwide User Class, or Alternatively, the State User Subclasses)

1004.   Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

1005.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or alternatively, the State User Subclasses.

1006.   This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

1007.   To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

1008.   Plaintiffs and User Class members conferred monetary benefits on Meta by using the Products and providing Meta with their data. Meta's profits are funded entirely from their generated revenues – including payments made by or on behalf of Plaintiffs and User Class members. As

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

such, a portion of these payments was attributable to Meta's Challenged Representations and Omissions.

1009. Through its unlawful, unfair and deceptive conduct, Meta knowingly obtained significant revenue from the use of Plaintiffs' and User Class members' data by using and processing it for commercial gain, training its AI systems.

1010. By absconding and misusing Plaintiffs' and User Class members' personal data, Meta was unjustly enriched and received both financial and non-financial benefits. For example, Meta uses the data gathered from the Products to improve its AI and machine learning systems.

1011. Meta enriched itself by saving the costs it reasonably should have spent by obtaining users consent to record and use their private communications. Yet, to increase profits, and at the expense of Plaintiffs and the Class, it gained a competitive and financial advantage by failing to obtain proper consent to record and use this information. Due to Meta's conduct, Plaintiffs and User Class Members suffered harm, including from privacy invasion, loss of compensation/value for their data, and the lost profits from the use of their personal data.

1012. It would be inequitable and unjust to permit Meta to retain the enormous economic benefits (financial and otherwise) they have obtained from and/or at the expense of Plaintiffs and User Class members.

1013. Meta will be unjustly enriched if it is permitted to retain the economic benefits conferred upon it by Plaintiffs and User Class members through obtaining their personal data and the value thereof, and profiting from the unlawful, unauthorized, and impermissible use of this data.

1014. Plaintiffs and User Class members are therefore entitled to recover the amounts realized by Meta at their expense.

1015. Since Plaintiffs and the User Class members have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Meta's ill-gotten gains, and/or other sums as may be just and equitable. In the absence of completed discovery regarding class certification and merits, forcing an election of remedies at the initial pleading stage is premature.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

**CLAIM BROUGHT ON BEHALF OF THE CALIFORNIA USER SUBCLASS**

**COUNT FORTY-THREE**

**VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT**

**(Cal. Pen. Code § 631)**

**(Brought by Plaintiff Canu Against Meta on Behalf of the California User Subclass)**

1016.   Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

1017.   Plaintiff Mateo Canu (for purposes of this section, "California Plaintiff") brings this claim on behalf of himself and the California User Subclass against Meta.

1018.   California Penal Code Section 630 recognizes that 'advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.'

1019.   At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

1020.   The California Wiretapping Act prohibits: "any person . . . who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

1021.   Meta is a "person" within the scope of the California Wiretapping Act.

1022.   The data and transmissions captured by and transmitted from Plaintiffs' and California User Subclass members' Meta AI Glasses — including visual imagery, audio recordings, and associated metadata — constitute messages, reports, and/or communications within the scope of

168

FIRST AMENDED CLASS ACTION COMPLAINT

Cal. Penal Code § 631(a), as they are transfers of signals, data, and intelligence transmitted by a wire, line, or cable system.

1023.   As alleged herein, Meta intercepted, in real time and as they were transmitted, the contents of communications, and diverted those communications to itself and subsequently to Sama without consent.

1024.   Meta intercepted these data transmissions by routing them from the glasses' onboard sensors, during transmission, to Meta's cloud servers and subsequently to Sama's annotation facilities, unbeknownst to the California Plaintiff and California User Subclass members.

1025.   As detailed herein, the electronic communications that Meta intercepted are tied to individual users and devices, and not anonymized. Meta's automated face-anonymization system fails under certain conditions, leaving identifying information visible to Sama's human workforce.

1026.   The Meta AI Glasses worn by the California Plaintiff and California User Subclass members constitute a machine, instrument, or contrivance that captures and transmits communications from the California Plaintiff and California User Subclass members' private environments.

1027.   The California Plaintiff and California User Subclass members have a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses, and the California Plaintiff and California User Subclass members reasonably expected privacy in such settings.

1028.   In further violation of the California Wiretapping Act, Meta intentionally disclosed or endeavored to disclose to third parties — including Sama — the contents of the communications described above while knowing or having reason to know that the information was obtained through the interception of the communications.

1029.   In further violation of the California Wiretapping Act, Meta has intentionally used or endeavored to use the contents of the communications described above knowing or having reason to know that the information was obtained through unlawful interception.

1030.   Specifically, Meta has disclosed and used the contents of the communications described above by routing the California Plaintiff's and California User Subclass members' private

FIRST AMENDED CLASS ACTION COMPLAINT

imagery and audio to Sama for manual annotation and labeling, and by incorporating the resulting training data into Meta's proprietary AI models, for its own financial and commercial benefit, obtaining substantial profit.

1031.  Meta agreed, employed, and conspired with Sama to intercept, collect, transmit, annotate, and use data captured from the California Plaintiff's and California User Subclass members' Meta AI Glasses.

1032.  At all relevant times, the California Plaintiff and California User Subclass members were not aware that Meta was intercepting and routing their data to human annotators, and therefore could not provide consent to have any part of their communications intercepted, recorded, transmitted, disclosed, or used in this manner.

1033.  As a direct and proximate result of Meta's violations of the Wiretapping Act, the California Plaintiff and California User Subclass members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

1034.  Meta was unjustly enriched by its violations of the Wiretapping Act.

1035.  Pursuant to California Penal Code Section 637.2, the California Plaintiff and California User Subclass members have been injured by Meta's violations of the Wiretapping Act, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief, plus reasonable attorneys' fees and costs.

**CLAIM BROUGHT ON BEHALF OF THE PENNSYLVANIA USER SUBCLASS**

**COUNT FORTY-FOUR**

**VIOLATIONS OF PENNSYLVANIA WIRETAPPING AND ELECTRONIC**

**SURVEILLANCE CONTROL ACT**

**(18 Pa. Cons. Stat. §§ 5701, et seq.)**

**(Brought by Plaintiff Martinek Against Meta on Behalf of the Pennsylvania User Subclass)**

1036.  Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

1037.  Plaintiff Laddie Martinek (for purposes of this section, "Pennsylvania Plaintiff")

FIRST AMENDED CLASS ACTION COMPLAINT

brings this claim on behalf of himself and the Pennsylvania User Subclass against Meta.

1038. The Pennsylvania Wiretapping and Electronic Surveillance Control Act (WESCA), 18 Pa. Cons. Stat. § 5701, et seq., prohibits anyone from, among other things, "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, electronic or oral communication." 18 Pa. Cons. Stat. § 5703(1).

1039. WESCA also makes it unlawful for any person to "intentionally disclose[] or endeavor[] to disclose[] to any other person" or to "intentionally use[], or endeavor[] to use[]," the "contents of any wire, oral, or electronic communication, or evidence derived therefrom, knowing or having reason to know that" the communication was obtained in violation of WESCA. 18 Pa. Cons. Stat. § 5703(1), (2), (3).

1040. WESCA provides a private right of action to "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of [WESCA]." Id. at § 5725(a).

1041. WESCA defines "intercept" in relevant part as the "acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

1042. WESCA defines "electronic communication" as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. C.S.A. § 5702.

1043. Meta, as a corporation, and Pennsylvania Plaintiff and Pennsylvania User Subclass members, as individuals, are each a person within the meaning of WESCA.

1044. The data transmissions captured by and transmitted from Pennsylvania Plaintiff's and Pennsylvania User Subclass members' Meta AI Glasses constitute "electronic communications" within the scope of WESCA as they are transfers of data, signals and intelligence transmitted by electromagnetic, photoelectronic, or photooptical systems within the scope of 18 Pa. C.S.A. § 5702.

1045. As alleged herein, Meta intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself and subsequently to Sama without consent.

1046. Meta intercepted these electronic communications in real time separately from and in

FIRST AMENDED CLASS ACTION COMPLAINT

addition to accessing data stored on Meta's servers.

1047. Pennsylvania Plaintiff and Pennsylvania User Subclass members have a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses, and reasonably expected privacy in such settings.

1048. Common understanding and human experience of how consumer electronic devices work create a reasonable expectation that a device manufacturer like Meta would not surreptitiously intercept and divert the detailed and personal electronic communications described above to third-party human annotators.

1049. Meta intercepted these data transmissions by routing them from the glasses' onboard sensors, during transmission, to Meta's cloud servers and subsequently to Sama's annotation facilities, unbeknownst to Pennsylvania Plaintiff and Pennsylvania User Subclass members.

1050. As detailed herein, the electronic communications that Meta has intercepted are tied to individual users and devices, and not anonymized.

1051. In further violation of WESCA, Meta disclosed or attempted to disclose to third parties — including Sama — the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of WESCA.

1052. In further violation of WESCA, Meta used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of WESCA.

1053. Specifically, Meta disclosed and used the contents of the communications described above by routing Pennsylvania Plaintiff's and Pennsylvania User Subclass members' private imagery and audio to Sama for manual annotation and labeling, and by incorporating the resulting training data into Meta's proprietary AI models, for its own financial and commercial benefit, obtaining substantial profit.

1054. At all relevant times, Pennsylvania Plaintiff and Pennsylvania User Subclass members were not aware that Meta was intercepting and routing their data to human annotators, and therefore could not provide consent to have any part of their communications intercepted and recorded,

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

172

FIRST AMENDED CLASS ACTION COMPLAINT

transmitted, disclosed, or used.

1055.   Pennsylvania Plaintiff and the Pennsylvania User Subclass members are "aggrieved persons" within the meaning of the statute. 18 Pa. C.S.A. § 5702.

1056.   As a direct and proximate result of Meta's violations of WESCA, Pennsylvania Plaintiff and Pennsylvania User Subclass members were injured and suffered damages, including, but not limited to, the loss of privacy, the unauthorized disclosure of their private data to third-party human annotators, and economic harm stemming from Meta's exploitation of their data.

1057.   Pursuant to 18 Pa. C.S.A. § 5725, Pennsylvania Plaintiff and Pennsylvania User Subclass members have been injured by the interception, disclosure, and/or use of their communications in violation of the Act and are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Pennsylvania Plaintiff and the Pennsylvania User Subclass or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs.

## CLAIM BROUGHT ON BEHALF OF THE MASSACHUSETTS USER SUBCLASS

### COUNT FORTY-FIVE

### VIOLATIONS OF MASSACHUSETTS WIRETAP ACT

### (Mass. Gen. Laws C. 272 §§ 99, et seq)

**(Brought by Plaintiff Fraser Against Meta on Behalf of the Massachusetts User Subclass)**

1058.   Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

1059.   Plaintiff Rickford Fraser (for purposes of this section, "Massachusetts Plaintiff") brings this claim on behalf of himself and the Massachusetts User Subclass against Meta.

1060.   The Massachusetts Wiretap Act ("MWA"), Mass. Gen. Laws C. 272 § 99, in relevant part, makes it unlawful for any person to "willfully commit[] an interception, attempt[] to commit an interception, or procure[] any other person to commit an interception or to attempt to commit an interception of any wire or oral communication." Mass. Gen. Laws C. 272 § 99(C)(1).

1061.   The MWA also makes it unlawful to "willfully disclose[] or attempt[] to disclose" or

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

"willfully use[] or attempt[] to use" the "contents of any wire or oral communication, knowing that the information was obtained through interception." Mass. Gen. Laws C. 272 § 99(C)(3)(a), (b).

1062.   Meta is a "person" as defined by the MWA, which includes "any individual, partnership, association, joint stock company, trust, or corporation . . . ." Mass. Gen. Laws C. 272 § 99(B)(13).

1063.   The MWA defines "wire communication" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." Mass. Gen. Laws C. 272 § 99(B)(1).

1064.   The MWA defines "contents" as any information concerning the existence, contents, substance, purport, meaning, or identity of parties to a communication. Mass. Gen. Law C. 272 § 99(B)(5).

1065.   The MWA defines "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication[.]" Mass. Gen. Laws C. 272 § 99(B)(4).

1066.   The data and transmissions captured by and transmitted from Massachusetts Plaintiff's and Massachusetts User Subclass members' Meta AI Glasses constitute "wire communications" under the MWA as they are communications "made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection . . . ." Mass. Gen. Law C. 272 § 99(B)(1).

1067.   As alleged herein, Meta has intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself and subsequently to Sama without consent.

1068.   As detailed herein, the electronic communications that Meta has intercepted are tied to individual users and devices, and not anonymized.

1069.   Meta intercepted these data transmissions by routing them from the glasses' onboard sensors, during transmission, to Meta's cloud servers and subsequently to Sama's annotation

174

FIRST AMENDED CLASS ACTION COMPLAINT

facilities, unbeknownst to Massachusetts Plaintiff and Massachusetts User Subclass members.

1070.   Massachusetts Plaintiff and Massachusetts User Subclass members have a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses, and reasonably expected privacy in such settings.

1071.   Common understanding and human experience of how consumer electronic devices work create a reasonable expectation that a device manufacturer like Meta would not surreptitiously intercept and divert the detailed and personal electronic communications described above to third-party human annotators.

1072.   In further violation of the MWA, Meta has disclosed or attempted to disclose to third parties — including Sama — the contents of the communications described above while knowing that the information was obtained through interception in violation of the MWA. Mass. Gen. Laws C. 272 § 99(Q).

1073.   In further violation of the MWA, Meta has used or attempted to use the contents of the communications described above while knowing that the information was obtained through interception in violation of the MWA. Mass. Gen. Laws C. 272 § 99(Q); see *Pine v. Rust*, 404 Mass. 411, 413–414, 535 N.E.2d 1247 (1989).

1074.   Specifically, Meta has disclosed and used the contents of the communications described above by routing Massachusetts Plaintiff's and Massachusetts User Subclass members' private imagery and audio to Sama for manual annotation and labeling, and by incorporating the resulting training data into Meta's proprietary AI models, for its own financial and commercial benefit, obtaining substantial profit.

1075.   Massachusetts Plaintiff and Massachusetts User Subclass members did not consent or otherwise authorize Meta to intercept, disclose, or use their communications.

1076.   Massachusetts Plaintiff and Massachusetts User Subclass members have suffered harm and injury as a direct and proximate result of Meta's interception, disclosure, and/or use of their private and personal information.

1077.   The MWA grants a civil remedy to aggrieved persons. § 99(Q).

1078.   Massachusetts Plaintiff and Massachusetts User Subclass members are each an

175

FIRST AMENDED CLASS ACTION COMPLAINT

"aggrieved person" within the meaning of the MWA as they are each "a party to an intercepted wire or oral communication . . . who would otherwise have standing to complain that [their] personal or property interest or privacy was invaded in the course of an interception." Mass. Gen. Laws C. 272 § 99(B)(6).

1079.   Massachusetts Plaintiff and Massachusetts User Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, liquidated damages, punitive damages, reasonable attorney's fees and costs.

## CLAIM BROUGHT ON BEHALF OF THE NATIONWIDE USER CLASS

## COUNT FORTY-SIX

### DECLARATORY JUDGEMENT

**(28 U.S.C. § 2201, et. seq.)**

**(Brought By Plaintiffs Against Meta on Behalf of the Nationwide User Class, or Alternatively, the State User Subclasses)**

1080.   Plaintiffs restate and reallege the preceding factual allegations set forth above as if fully alleged herein.

1081.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses against Meta.

1082.   The Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.

1083.   Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

1084.   An actual controversy has arisen as to whether Meta unlawfully collected certain information from Plaintiffs and the User Class members, and how Meta continues to use that information for its own financial gain, as well as whether Meta shares that information with unauthorized third parties.

1085.   Plaintiffs and the User Class members are entitled to equitable relief as no adequate remedy at law exists.

FIRST AMENDED CLASS ACTION COMPLAINT

1086.   Meta has not yet implemented adequate protections to protect Plaintiffs and User Class members' personal data, images, or videos, nor has it given adequate notice to all affected class members, leaving individuals potentially unsure if their conversations, images, or videos have been recorded and kept by Meta. Therefore, the equitable relief requested here would prevent ongoing and future harm to Plaintiffs and the User Class members. Since Meta still has Plaintiffs' and User Class members' information, without an injunction, Plaintiffs and the User Class members cannot be sure that the information is secure and private or properly destroyed.

1087.   Injunctive relief is also necessary to protect members of general public from Meta's unlawful recording and storage of private conversations. Without court intervention, Meta will likely continue its privacy violations.

1088.   It is not currently known specifically what information is being kept by Meta, how it is being used, what has been transferred to third parties and the identity of those parties, and when, if ever, it will be destroyed. Therefore, injunctive relief would ensure and provide Plaintiffs and the public with ability to control access to their information, and limit its exposure.

1089.   In addition, discovery—which has not yet been provided—may reveal that the claims providing legal remedies are inadequate. At this time, in the absence of completed discovery regarding class certification and merits, forcing an election of remedies at the initial pleadings stage is premature and likely to lead to subsequent, potentially belated, and hotly contested motions to amend the pleadings to add equitable remedies based on a lengthy historical recount of discovery and analysis of voluminous exhibits, transcripts, discovery responses, document productions, etc., as well as related motions to seal confidential information contained therein. Plaintiffs and the User Class members therefore seek a declaration that Meta violated their privacy and property rights, and Meta must take remedial measures, including, but not limited to:

      a.     Prohibiting Meta from engaging in the wrongful acts stated herein;

      b.     Requiring Meta to implement adequate security and privacy protocols and practices consistent with industry standards, applicable regulations, and federal, state, and local laws;

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

c.    Mandating that Meta provide proper notice to all affected parties, and posted publicly;

d.    Requiring that Meta delete, destroy, and purge Plaintiffs' and User Class members' unlawfully obtained data;

e.    Requiring Meta to engage independent third-party auditors and/or internal personnel to ensure all unlawfully obtained information is permanently deleted and purged from its system; and,

f.    Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request the following from this Court:

a.    **Certification:** For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel;

b.    **Declaratory Relief:** For an order declaring that Defendants' conduct violates the statutes and laws referenced herein consistent with applicable law and pursuant to only those causes of action so permitted;

c.    **Injunction:** For an order requiring Defendants to change their business practices to prevent or mitigate the risk of the consumer deception and violations of law outlined herein. This includes, for example, an order that immediately enjoin Defendants from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described; that require Defendants to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendants' unlawful conduct; and/or that require Defendants to take all further and just corrective action, consistent with applicable law and pursuant to only those causes of

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 633 Howard Street | San Francisco, CA 94105

action so permitted;

d.   **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class requested herein, consistent with applicable law and pursuant to only those causes of action so permitted;

e.   **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted;

f.   **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted;

g.   **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; and

h.   **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all issues and causes of action so triable.

Dated: March 26, 2026                 Respectfully submitted,

**CLARKSON LAW FIRM, P.C.**

*/s/ Ryan J. Clarkson*
Ryan J. Clarkson

*/s/ Yana Hart*
Yana Hart
Bryan P. Thompson
Cassandra Rasmussen
Jiaming Zheng

*Attorneys for Plaintiffs and
the Proposed Classes*

179

FIRST AMENDED CLASS ACTION COMPLAINT