Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Ryan J. Clarkson (SBN 257074)
rclarkson@clarksonlawfirm.com
**CLARKSON LAW FIRM, P.C.**
633 Howard St.
San Francisco, CA 94105
Telephone: (415) 651-7990
Facsimile: (213) 788-4070

Mark C. Molumphy (SBN 168009)
mmolumphy@cpmlegal.com
**COTCHETT PITRE & MCCARTHY**
840 Malcom Road
Burlingame CA 98101
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Interim Co-Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *In re Meta AI Glasses Litigation*<br><br>This document relates to:<br>All actions | Master File Case No. 3:26-cv-01897-EMC<br><br>Assigned to Hon. Edward M. Chen<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION ........ 1

II. FACTS ........ 6

A. Defendants' Meta AI Glasses Are a Central Pillar to Meta's AI Infrastructure ........ 6

B. Defendants Misrepresent that the Meta AI Glasses Are "Designed for Privacy" ........ 7

C. Defendants' Glasses Systematically Record, Intercept, Transmit, and Divulge User and Bystander Data Without Their Knowledge or Consent ........ 19

D. Defendants Knowingly Omit and Conceal that Meta's Employees and Contractors Review Intimate Content Captured by the Meta AI Glasses ........ 22

E. Defendants' Omissions Implicate the Central Function of the Meta AI Glasses and Present an Unreasonable Safety Risk to Consumers, Users and Bystanders ........ 24

F. Defendants' Product Design Completely Disregards Bystanders' Privacy Rights ........ 25

G. Defendants Developed Facial Recognition for the Meta AI Glasses and Refuse to Disavow Deploying It ........ 27

H. First-Person Recordings Are Some of the Scarcest and Most Expensive Inputs in Generative AI, and They Have an Established Market Price ........ 31

I. Meta Systematically Disregards the Privacy of Consumers, Users, and Bystanders ........ 36

III. JURISDICTION ........ 37

IV. DIVISIONAL ASSIGNMENT ........ 38

V. VENUE ........ 38

VI. PARTIES ........ 38

A. Plaintiffs ........ 38

i. Allegations Common to Purchaser Plaintiffs ........ 38

ii. Allegations Common to the User Plaintiffs ........ 40

iii. Allegations Common to the Bystander Plaintiffs ........ 41

iv. Allegations Specific to Each Plaintiff ........ 43

1. Plaintiff Steven Beltran (California) (Purchaser and User) ........ 43

2. Plaintiff Alicia Perez (New York) (Purchaser and User) ... 44

3. Plaintiff Terrance Moore (Illinois) (Purchaser and User) ... 45

4. PL01 (California) (Purchaser and User) ... 46

5. Plaintiff PL02 (Florida and Alabama Purchaser, Alabama User) ... 46

6. Plaintiff James Diedrich (Alabama) (Purchaser and User) ... 47

7. Plaintiff PL03 (Colorado) (Purchaser and User) ... 48

8. Plaintiff PL04 (Florida) (Colorado Purchaser and Florida User) ... 48

9. Plaintiff Rickford Fraser (Massachusetts) (Purchaser and User) ... 49

10. Plaintiff Kristi Stewart (Michigan) (User) ... 50

11. Plaintiff PL05 (Michigan) (Purchaser and User) ... 50

12. Plaintiff Daniel Doerr (Nevada) (Purchaser and User) ... 51

13. Plaintiff PL06 (New York) (Purchaser and User) ... 51

14. Plaintiff PL07 (North Carolina) (Purchaser and User) ... 52

15. Plaintiff PL08 (Texas) (Purchaser and User) ... 53

16. Plaintiff PL09 (Pennsylvania) (Purchaser and User) ... 53

17. Plaintiff Jeffry Woodhead (Utah) (Purchaser and User) ... 54

18. Plaintiff Jason Hatch (Virginia) (Purchaser and User) ... 54

19. Plaintiff PL10 (New York) (Purchaser and User) ... 55

20. Plaintiff Ryanna Hardman (Michigan) (Purchaser and User) ... 56

21. Plaintiff PL11 (Tennessee) (Purchaser and User) ... 56

22. Plaintiff Kevin Russi (Oregon) (Purchaser and User) ... 57

23. Plaintiff PL12 (South Carolina) (Purchaser and User) ... 57

24. Plaintiff Elizabeth Lewis (Washington, D.C.) (Purchaser and User) ... 57

25. Plaintiff PL13 (Georgia) (Purchaser and User) ... 58

26. Plaintiff PL14 (Louisiana) (Purchaser and User) ... 58

27. Plaintiff Favian Aveja Galindo (Indiana) (Purchaser and User)........ 59

28. Plaintiff Angela Ruiz Lopez (Hawaii) (Purchaser and User) ........... 59

29. Plaintiff PL15 (Kansas) (Purchaser and User)........ 60

30. Plaintiff Chelasty Yancy (Florida) (Purchaser and User)........ 60

31. Plaintiff Elvis Dezarn (Ohio) (Purchaser and User) ........ 61

32. Plaintiff PL16 (New Jersey) (User) ........ 61

33. Plaintiff Sahilpreet Singh (New Hampshire) (Purchaser and User)........ 62

34. Plaintiff PL17 (Alaska) (Purchaser and User) ........ 62

35. Plaintiff PL18 (California) (Purchaser and User)........ 63

36. Plaintiff PL19 (California) (Purchaser and User)........ 63

37. Plaintiff PL20 (Illinois Purchaser, Illinois and Florida User)........ 64

38. Plaintiff Mike Miller (Idaho) (Purchaser and User) ........ 65

39. Plaintiff Benita Williams (Tennessee) (Purchaser and User) ........ 66

40. Plaintiff Breandan Dawson (Mississippi) (Purchaser and User)........ 66

41. Plaintiff Russell-Phillip Bodine (Texas) (Purchaser and User)........ 67

42. Plaintiff PL21 (California Purchaser and Maryland User) ........ 67

43. Plaintiff Dijjean Johnson (North Carolina) (Purchaser and User)........ 68

44. Plaintiff Peter Tittl (California) (User) ........ 68

45. Antonio Enriquez (Illinois) (Purchaser and User) ........ 69

46. Jaipaul Sukhai (Connecticut) (Purchaser and User) ........ 69

47. Plaintiff PL22 (Florida) (User) ........ 70

48. Plaintiff PL23 (Connecticut) (Purchaser and User)........ 70

49. Plaintiff Kathleen Decker (Kentucky) (Purchaser and User) ........ 71

50. Plaintiff PL24 (Maine) (Purchaser, User, and Bystander)........ 71

51. Plaintiff PL25 (Maine) (Purchaser and User) ........ 72

52. Plaintiff PL26 (Montana Purchaser and Washington User) ............ 73

53. Plaintiff PL27 (South Carolina) (Purchaser, User, and Bystander) ............ 73

54. Plaintiff PL28 (South Carolina) (User and Bystander) ............ 74

55. Plaintiff PL29 (South Carolina) (User and Bystander) ............ 75

56. Plaintiff Michael Stewart (Michigan) (Purchaser) ............ 76

57. Plaintiff PL30 (California) (Bystander) ............ 76

58. Plaintiff PL31, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander) ............ 76

59. Plaintiff PL32, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander) ............ 77

60. Plaintiff PL33, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander) ............ 77

61. Plaintiff PL34, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander) ............ 78

62. Plaintiff PL35, a minor, by and through their parent GAL1 (Maine) (Bystander) ............ 78

63. Plaintiff PL36, a minor, by and through their parent GAL1 (Maine) (Bystander) ............ 79

64. Plaintiff PL37, a minor, by and through their parent GAL1 (Maine) (Bystander) ............ 79

65. Plaintiff PL38, a minor, by and through their parent GAL1 (Maine) (Bystander) ............ 80

66. Plaintiff PL39, a minor, by and through their parent GAL1 (Maine) (Bystander) ............ 80

67. Plaintiff PL40, a minor, by and through their parent Plaintiff PL26 (Washington) (User and Bystander) ............ 81

68. Plaintiff PL41, a minor, by and through their parent, Plaintiff PL18 (California) (Bystander) ............ 82

69. Plaintiff PL42, a minor, by and through their parent, Plaintiff PL19 (California) (Bystander) ............ 82

70. Plaintiff PL43 (Georgia) (Purchaser and User) ............ 83

71. Plaintiff PL44, a minor, by and through their parent, PL43 (Georgia) (Bystander) ............ 83

72. Plaintiff PL45, a minor, by and through their natural guardian (Florida) (Bystander) ... 83

B. Defendants ... 84

VII. TOLLING OF STATUTE OF LIMITATIONS ... 85

A. Discovery Rule ... 85

B. Fraudulent Concealment ... 85

C. Estoppel ... 86

VIII. CLASS ALLEGATIONS ... 86

A. Purchaser Classes: ... 86

B. User Classes: ... 88

C. Bystander Classes: ... 89

IX. PURCHASER CAUSES OF ACTION ... 94

A. COUNT 1: Fraud by Misrepresentation (Common Law) ... 94

B. COUNT 2: Fraud by Concealment/Omission (Common Law) ... 95

C. COUNT 3: Negligent Misrepresentation (Common Law) ... 97

D. COUNT 4: Breach of Express Warranty ... 98

E. COUNT 5: Quasi-Contract/Unjust Enrichment (Common Law) ... 99

F. COUNT 6: Strict Product Liability – Design Defect (Common Law) ... 100

G. COUNT 7: Strict Product Liability – Failure to Warn (Common Law) ... 102

**Purchaser Claims – California** **105**

H. COUNT 8: California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*) ... 105

I. COUNT 9: California Unfair Competition Law (Cal. Civ. Code § 17200, *et seq.*) ... 108

J. COUNT 10: California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*) ... 115

K. COUNT 11: Breach of Implied Warranty of Merchantability (Cal. Com. Code §§ 2314 and 10212) ... 116

L. COUNT 12: Breach of Implied Warranty (Cal. Civ. Code §§ 1791.1 and 1792) ... 118

Purchaser Claims - Connecticut ... 119

M. COUNT 13: Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*) ........ 119

**Purchaser Claims – Colorado** **120**

N. COUNT 14: Colorado Consumer Protection Act (Col. Rev. Stat. § 6-1-101, *et seq.*) ........ 120

O. COUNT 15: Breach of Implied Warranty of Merchantability (Col. Rev. Stat. §§ 4-2-314 and 4-2.5-212) ........ 124

**Purchaser Claims – Florida** **126**

P. COUNT 16: Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*) ........ 126

**Purchaser Claims – Hawaii** **127**

Q. Count 17: Hawaii Unfair Competition (Haw. Rev. Stat. §§ 480-2, 480-13) ........ 127

**Purchaser Claims – Illinois** **128**

R. COUNT 18: Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. 510/2, *et seq.*) ........ 128

S. COUNT 19: Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq.*) ........ 129

**Purchaser Claims – Maine** **131**

T. COUNT 20: Maine Unfair Trade Practices Act (5 M.R.S.A. § 206, *et seq.*) ........ 131

**Purchaser Claims – Maine** **132**

U. COUNT 21: Maine Uniform Deceptive Trade Practices Act (10 M.R.S.A. § 1211, *et seq.*) ........ 132

**Purchaser Claims – Massachusetts** **134**

V. COUNT 22: Massachusetts Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq.*) ........ 134

W. COUNT 23: Breach of Implied Warranty of Merchantability (Mass. Gen. Laws C. 106 §§ 2-314 and 2a-212) ........ 136

**Purchaser Claims - Michigan** **137**

X. Count 24: Michigan Consumer Protection Act (Mich. Comp. Laws § 445.901, *et seq.*) ........ 137

**Purchaser Claims – Nevada** **139**

Y. COUNT 25: Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. § 598.0903, *et seq.*) ........ 139

Z. COUNT 26: Breach of Implied Warranty of Merchantability (Nev. Rev. Stat. §§ 104.2314, 104A.2212) ..... 141

**Purchaser Claims – New Hampshire** **142**

AA. Count 27: New Hampshire Consumer Protection Act (N.H. Rev. Stat. §§ 358-A:2, 358-A:10) ..... 142

**Purchaser Claims – New York** **143**

BB. COUNT 28: New York General Business Law (N.Y. Gen. Bus. Law §§ 349, 350) ..... 143

**Purchaser Claims – North Carolina** **145**

CC. COUNT 29: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1, *et seq.*) ..... 145

DD. COUNT 30: Breach of Implied Warranty of Merchantability (N.C. Gen. Stat. § 25-2-314) ..... 150

**Purchaser Claims – Oregon** **151**

EE. COUNT 31: Oregon Unlawful Trade Practices Act (O.R.S. § 646.608, *et seq.*) ..... 151

**Purchaser Claims – Pennsylvania** **152**

FF. COUNT 32: Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. § 201-1, *et seq.*) ..... 152

**Purchaser Claims – Texas** **154**

GG. COUNT 33: Texas Deceptive Trade Practices–Consumer Protection Act (Tex. Bus. & Com. Code § 17.41, *et seq.*) ..... 154

HH. COUNT 34: Breach of Implied Warranty of Merchantability (Tex. Bus. & Com. Code § 2.314) ..... 156

**Purchaser Claims – Utah** **157**

II. COUNT 35: Utah Consumer Sales Practices Act (Utah Code § 13-11-1, *et seq.*) ..... 157

**Purchaser Claims – Virginia** **159**

JJ. Count 36: Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, *et seq.*) ..... 159

X. USER PLAINTIFFS CAUSES OF ACTION ..... 161

A. COUNT 37: Computer Fraud and Abuse Act (18 U.S.C. § 1030, *et seq.*) ..... 161

B. COUNT 38: Electronic Communications Privacy Act (18 U.S.C. § 2510, *et seq.*) ..... 164

C. COUNT 39: California Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502) ........ 168

D. COUNT 40: Strict Product Liability–Design Defect (Common Law) ........ 171

E. COUNT 41 Strict Product Liability–Failure to Warn (Common Law) ........ 173

F. COUNT 42: Intrusion into Private Affairs (Common Law) ........ 176

G. COUNT 43: Quasi-Contract/Unjust Enrichment (Common Law) ........ 178

H. COUNT 44: Violations of State Wiretapping and Eavesdropping Statutes ........ 180

i. Florida Security of Communications Act (Fla. Stat. §§ 934.03-934.10) ........ 181

ii. Georgia Eavesdropping Act (Ga. Code Ann. § 16-11-62) ........ 182

iii. Illinois Eavesdropping Act (720 ILCS 5/14-1, *et seq.*) ........ 183

iv. Maine Interception of Wire and Oral Communications Act (15 M.R.S.A. § 710, *et seq.*) ........ 185

v. Maryland Wiretapping and Electronic Surveillance Act (Md. Code Ann., Cts. & Jud. Proc. §§ 10-401, *et seq.*) ........ 186

vi. Massachusetts Wiretap Act (M.G.L. c. 272 § 99) ........ 187

vii. Michigan Eavesdropping (Mich. Comp. Laws § 750.539c) ........ 188

viii. New Hampshire Eavesdropping Statute (N.H. Rev. Stat. § 570-A:1, *et seq.*) ........ 188

ix. Pennsylvania Wiretapping and Electronic Surveillance Control Act (18 Pa. Cons. Stat. § 5701, *et seq.*) ........ 190

x. Washington Privacy Act (Wash. Rev. Code § 9.73.030, *et seq.*) ........ 191

I. COUNT 45: Violations of State Consumer Protection Statutes ........ 193

i. California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) ........ 194

ii. Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*) ........ 195

iii. Washington Consumer Protection Act (Wash. Rev. Code § 19.86.010, *et seq.*) ........ 196

XI. BYSTANDER CAUSES OF ACTION ........ 197

A. COUNT 46: Intrusion Upon Seclusion (Common Law) ........ 197

B. COUNT 47: Right of Publicity (Common Law & Cal. Civ. Code § 3344) ........ 199

C. COUNT 48: Strict Product Liability (Common Law) ..... 201

D. COUNT 49: Strict Product Liability–Failure to Warn (Common Law) ..... 203

E. COUNT 50: Negligence (Common Law) ..... 206

F. COUNT 51: California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*) ..... 208

G. COUNT 52: California Constitutional Right to Privacy (Cal. Const. Art. I § 1) ..... 210

H. COUNT 53: Violations of State Anti-Recording and Eavesdropping Statutes ..... 212

i. California Invasion of Privacy Act (Cal. Pen. Code § 632) ..... 212

ii. Georgia Eavesdropping Act (Ga. Code Ann. § 16-11-62) ..... 213

iii. Maine Interception of Wire and Oral Communications Act (15 M.R.S.A. § 710, *et seq.*) ..... 214

I. COUNT 54: Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*) ..... 215

COUNT 55: Washington Consumer Protection Act (Wash. Rev. Code § 19.86.010, *et seq.*) ..... 216

XII. PRAYER FOR RELIEF ..... 218

Plaintiffs Steve Beltran, Alicia Perez, Terrance Moore, PL01, PL02, James Diedrich, PL03, PL04, Rickford Fraser, Kristi Stewart, PL05, Daniel Doerr, PL06, PL07, PL08, PL09, Jeffry Woodhead, Jason Hatch, PL10, Ryanna Hardman, PL11, Kevin Russi, PL12, Elizabeth Lewis, PL13, PL14, Favian Aveja Galindo, Angela Ruiz Lopez, PL15, Chelasty Yancy, Elvis Dezarn, PL16, Sahilpreet Singh, PL17, PL18, PL19, PL20, Mike Miller, Benita Williams, Breandan Dawson, Russell-Phillip Bodine, PL21, Dijjean Johnson, Peter Tittl, Antonio Enriquez, Jaipaul Sukhai, PL22, PL23, Kathleen Decker, PL24, PL25, PL26, PL27, PL28, PL29, Michael Stewart, PL30, PL31, PL32, PL33, PL34, PL35, PL36, PL37, PL38, PL39, PL40, PL41, PL42, PL43, PL44, PL45 ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" and "Class members"), bring this class action complaint against Defendant Meta Platforms, Inc. ("Meta") and Defendant Luxottica of America, Inc. ("Luxottica") (collectively, "Defendants"), and allege the following based upon information and belief, unless otherwise expressly stated as based upon personal knowledge.

## I. INTRODUCTION

1. This case is about a principle older than the Republic itself and the concepts of liberty upon which it was established: that a person's everyday life experiences and unguarded moments should not be subject to others' constant observation, judgment, or control. Justice Douglas stated it plainly nearly 75 years ago: "Liberty in the constitutional sense must mean more than freedom from unlawful governmental restraint; it must include privacy as well, if it is to be a repository of freedom. The right to be let alone is indeed the beginning of all freedom."[1] Ordinary consumers are deeply offended by digital corporate surveillance when they understand the true nature of such practices. Consumers such as Plaintiffs are outraged to learn that their most intimate moments and private information are being stolen by large corporations, stored for eternity and fed into its AI systems for their monetary gain.

2. A defining feature of the new AI economy is Big Tech's insatiable need for data to build and train generative AI systems, which runs head-long into the conceptions of freedom and of liberty which Justice Douglas enunciated. As the models grow more powerful, companies racing to

[1] *Pub. Utils. Comm'n v. Pollak*, 343 U.S. 451, 467 (1952) (Douglas, J., dissenting).

dominate the field face a real problem: they are running out of training data. The public, however, does not want their personal conversations, medical concerns, family interactions, or private moments fed into unpredictable AI systems without knowledge or consent. Yet Meta released a product to do exactly that in secret.

3. Meta's AI Glasses look like ordinary sunglasses. Defendants integrated cameras, microphones, Bluetooth, and artificial intelligence software into eyewear they designed to be nearly identical to, and practically indistinguishable from, standard Ray-Ban and Oakley models.[2] They are marketed as stylish, convenient, and "designed for privacy, controlled by you."

4. Behind the "privacy first" branding lies a pipeline built for one purpose: to extract real-world experience at scale and covertly feed it into Meta's AI system. Every activation of the AI features, intentional or accidental, captures video and audio that is transmitted to Meta's servers, routed overseas, and reviewed by low-paid human workers who watch, label, and embed these moments into Meta's AI models.

5. What that pipeline produces is as outrageous as it is predictable. A woman undresses in her own bathroom, thinking she is alone. Her husband's Meta AI Glasses sit on the bathroom counter, appearing inert. They have activated accidentally and begun recording her, and thousands of miles away, in Kenya, a stranger is watching. A father notices a rash on his daughter's skin and does what millions of parents now do—asks his Meta AI Glasses, "Hey Meta, what could it be?"—without being told that the Glasses had just captured video of his daughter's face and body, recorded their voices, and transmitted the footage overseas for a complete stranger to watch and to code in order to train Meta's AI.

---

[2] "Products," "Glasses," and "Meta AI Glasses" are used interchangeably herein and refer collectively to all smart glasses designed, developed, manufactured, marketed, distributed, or sold by Defendants that combine an integrated camera and microphones with Meta AI. The Products include, without limitation: Ray-Ban Meta Gen 1 and Gen 2 (including the Wayfarer, Headliner, and Skyler styles); Meta Ray-Ban Display; Oakley Meta HSTN; Oakley Meta Vanguard; and the Meta Glasses line introduced on June 23, 2026, including Meta Adventurer (Standard and Large), Meta Fury, and the Meta Starfire Kylie Edition designed with Kylie Jenner. The Products further include every generation, frame style, size, color, and lens configuration of the foregoing; every limited-edition, collaboration, or co-branded version thereof; and any predecessor, successor, or substantially similar product released before or during the pendency of this action.

6. Every model of the Meta AI Glasses shares the same core hardware and software architecture, and every activation of the AI features—by any user, anywhere—feeds the same pipeline. There are similar recordings of other Plaintiffs and millions of putative class members nationwide, from people using Meta AI Glasses to translate conversations with their medical doctors, to parents bathing toddlers, to intimate partners who believed they were alone in their bedroom. Defendants did not build a stylish AI "wearable" for consumer convenience. They built a tool for mass surveillance, the erosion of privacy, and the relentless extraction of personal data from the everyday lives of ordinary people.

7. None of this is incidental to the product. The Glasses are the only thing Meta sells that captures the physical world—not what users choose to upload, but what happens in front of them—and Meta's AI ambitions depend on a continuous supply of exactly that kind of data, which it cannot scrape from the internet, buy from a broker, or license from a publisher. The surveillance is not an accident; it is a feature that benefits Meta's AI development. Defendants' commercial interests are opposed to their customers' privacy interests, which is why this conduct will not stop without an order from this Court.

8. The Glasses' design also allows users to record bystanders covertly and with ease and provides no infrastructure for seeking, let alone ensuring, bystander consent. The Glasses place a camera and a microphone on an ordinary-looking pair of Ray-Bans or Oakleys, indistinguishable at conversational distance from ordinary eyewear that records nothing. The person facing them cannot tell whether he or she is being recorded. Neither can the person seated beside them, the child across the room, or the stranger on the train. Defendants' only concessions to bystanders are a very faint light that briefly flashes and a shutter sound, both of which are easily missed, obfuscated, or obscured.

9. For as long as cameras have existed, the act of recording has announced itself. A camera must be raised and pointed. A phone must be held up, screen glowing, lens turned toward its subject. Such a visible gesture is not a technicality. It is the mechanism by which a society that permits photography also permits those photographed to object, to step out of the frame, to lower a voice, to close a door, to leave the room. Defendants engineered away that ability. The Meta AI Glasses record

from the wearer's eye line, at conversational distance, with no motion that distinguishes recording from looking.

10. Even if a bystander notices the Glasses and agrees to be recorded, he or she cannot have consented to the mass amalgamation of their data when the Glasses are in AI mode, including visual recordings that are collected, stored, exploited, and visually inspected by persons overseas, because Defendants have made no effort to disclose these practices to bystanders or to seek their consent.

11. After years of Meta privacy scandals, consumers were wary of the company. Defendants responded by making privacy the centerpiece of their marketing for the AI Glasses. "Designed for privacy, controlled by you" was relentlessly touted in the marketplace. Mark Zuckerberg personally reinforced the core message, insisting that "giving people control over" what the Glasses capture and retain is critically "important."[3]

12. These promises were false. The Glasses record silently, with indicators difficult to see and easily obscured. The AI functions are designed to activate when mishearing ordinary words, when the frames are adjusted, or due to other incidental touching. Every activation sends footage, no matter how sensitive, into Meta's AI training pipeline. Contractors report seeing people showering, having sex, changing diapers, and discussing medical and financial information. They report that Meta's "face anonymization" does not work. Those who raised concerns were fired.

13. Recording is only the first step. A recording of a stranger becomes something else entirely once the stranger can be identified, and Defendants have built that capability. Meta developed facial recognition for the Glasses and distributed dormant components of it inside the companion application that Glasses users must install in order to use them. These components include artificial intelligence models that can detect a face, and encode it into a biometric signature. Defendants apparently intend to launch these capabilities in the future, as well as features that would allow the Glasses to run their cameras and sensors continuously.

[3] The Rundown AI, *Mark Zuckerberg on AI Glasses, Superintelligence, Neural Control, and More*, Interview by Rowan Cheung, YOUTUBE.COM (Sept. 17, 2025), https://www.youtube.com/watch?v=WuTJkFvw70o, at 34:09.

14. No reasonable consumer would expect that a product marketed as privacy-protective is a conduit for AI training and systemic surveillance. Nor would any reasonable consumer understand "designed for privacy" or "controlled by you" to mean that everything the Glasses' AI sees and hears, including people's most intimate moments, could be viewed by strangers overseas and used to train Meta's AI.

15. No purchaser or user gave Defendants informed consent to track and store their personal lives, deliver those recordings to strangers, or commercially exploit them by embedding them into Meta's AI models. Nor did any of the millions of bystanders recorded by the Glasses, including those captured in bathrooms, bedrooms, doctor's offices, workplaces, and private homes. No bystanders anywhere had any opportunity to, much less in fact did, consent to having their faces, bodies, voices, and personal information captured, reviewed, labeled, and embedded into Meta's AI systems.

16. The injury does not end when the recording stops. A stolen credit card can be canceled and a breached password can be changed, but a person whose face, body, voice, or private conversation has been fed into Meta's models cannot get any of it back. That material is not held in a file that can be located and deleted. It is dissolved into the statistical weights of systems that Meta will continue to deploy, license, and build upon indefinitely, and it will shape the outputs of those systems long into the future.

17. The public reaction to these harms has been overwhelming. Media outlets, privacy scholars, civil rights organizations, and elected officials have joined everyday people in condemning the product as a dangerous surveillance device masquerading as eyewear. The backlash has been swift and near-universal, including outrage, disgust, fear, and a growing recognition that Defendants have crossed a line society is not willing to tolerate.

18. Defendants' conduct is at odds with their marketing promises, violates reasonable expectations of privacy and decency, and inflicts severe ramifications on those subjected to covert surveillance. Plaintiffs therefore bring this class action individually and on behalf of all Meta AI Glasses purchasers and users, as well as all bystanders who were recorded, to vindicate their consumer, privacy, and other legal rights by way of injunctive relief and money damages. Purchasers also seek

compensation for the premium they paid for a product Defendants told them is designed and built for privacy, when in fact it is not.

## II. FACTS

### A. Defendants' Meta AI Glasses Are a Central Pillar to Meta's AI Infrastructure

19. In September 2020, Meta (then Facebook) announced a partnership with EssilorLuxottica, the parent company of Ray-Ban and Oakley, to make "smart glasses,"[4] which were first launched in September 2021 as "Ray-Ban Stories"—the first installment in Facebook's plans for a "metaverse."[5]

20. In October 2023, Defendants Meta and Luxottica released upgraded Meta Glasses which, for the first time, featured a voice interface with Meta AI.[6] As Meta advertised, users could "engage with Meta AI to spark creativity, get information, and control features—just by using your voice." Defendants' advertising encouraged users to capture personal moments like "birthday parties" and "first steps"—without any sign that anyone but the user, and whomever they chose to share them with, would ever see that footage – let alone that it would be stored and reviewed by third-party contractors on another continent.[7] On the contrary, Defendants assured consumers that "Ray-Ban Meta smart glasses are built with privacy at their core" and that "The Meta View App gives you easy access to privacy settings where you can manage your information and **choose whether to share your additional data with Meta to improve the app and glasses**."[8]

21. The product line now includes multiple models sold under the Ray-Ban Meta and Oakley Meta brands, all of which share the same core hardware and software architecture: a lentil-

---

[4] Adi Robertson, *Facebook Connect 7: The 5 Biggest Announcements*, THE VERGE (Sept. 16, 2020), https://www.theverge.com/2020/9/16/21440086/facebook-oculus-connect-recap-biggest-announcements-quest-rift-games.

[5] Elizabeth Culliford, *Facebook Unveils its First Smart Glasses*, REUTERS (Sept. 9, 2021), https://www.reuters.com/technology/facebook-unveils-its-first-smart-glasses-2021-09-09/.

[6] *Introducing the New Ray-Ban Meta Smart Glasses*, META (Sept. 27, 2023), https://about.fb.com/news/2023/09/new-ray-ban-meta-smart-glasses/.

[7] *Ray-Ban Meta Smart Glasses Collection: Now Available*, META (Oct. 17, 2023), https://www.meta.com/blog/ray-ban-meta-smart-glasses-collection-pre-orders/.

[8] *Id.*

sized built-in ultra-wide camera capable of recording videos and images, and a microphone array that captures spatial audio.

22. What distinguishes the Meta AI Glasses from ordinary eyewear is both the camera and microphones that blend into the Glasses and the AI infrastructure behind them. The Glasses are designed to function as an ambient AI interface housed in a frame that looks nearly identical to ordinary glasses.

23. The Meta AI Glasses are a central pillar of Meta's transformation into an artificial intelligence infrastructure company, and Meta has staked its future on artificial intelligence. The Glasses are the only Meta products that capture real-world audiovisual data. Unlike Facebook or Instagram—which receive data that users voluntarily upload—the Glasses passively capture the entire world around the wearer: the actions and speech of his or her spouse, children, friends, and others that pass within the camera's ultra-wide-angle view. The vast quantities of data captured by the Glasses provides the raw material Meta needs to train its multimodal AI.

24. Meta's entire AI architecture depends on a continuous supply of real-world audiovisual training data—data that is extracted from millions of users under a framework designed to maximize collection while minimizing transparency. For years, Meta has used its products, including its Meta AI Glasses, to farm such data from its own customers and to feed the growth of Meta's AI—which Defendants then sell back to consumers through products falsely advertised as protecting consumer privacy.

**B. Defendants Misrepresent that the Meta AI Glasses Are "Designed for Privacy"**

25. Privacy carries a premium in the marketplace. Consumers routinely seek and pay more for products they believe will protect their data, including VPN subscriptions, encrypted messaging platforms, privacy-focused browsers, and devices marketed as minimizing data collection.

26. Defendants know that poor privacy practices can lead to significantly reduced sales. A 2020 study from Pew Research Center found that "[a]bout half (52%) of U.S. adults said they decided

recently not to use a product or service" because of concerns over data collection.[9] Not only do privacy promises increase sales, but bad privacy practices can significantly decrease them.

27. Defendants, aware of the dual potential for charging a price premium for privacy and for losing clients due to privacy concerns, have and continue to advertise privacy as a core feature of Meta AI Glasses.

28. In July 2019, the Federal Trade Commission levied a $5 billion penalty on Meta (then Facebook) for violating users' privacy, and imposed extensive new privacy restrictions.[10] Meta reframed this censure as a marketing moment, promising "Rigorous New Standards for Protecting Your Privacy" that "surpass[] current US law and we hope will be a model for the industry."[11] Meta promised that henceforth, it would "Build[] Privacy into Every Product" with CEO Mark Zuckerberg agreeing to personally sign compliance reports.[12] Zuckerberg even promoted the new privacy priorities himself on Facebook, saying "We have a responsibility to protect people's privacy. We already work hard to live up to this responsibility, but now we're going to set a completely new standard for our industry."[13] The post was liked 91,000 times and shared 7,600 times.

---

[9] Andrew Perrin, *Half of Americans Have Decided Not to Use a Product or Service Because of Privacy* Concerns, PEW RESEARCH CENTER (Apr. 14, 2020), https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[10] *FTC Imposes $5 Billion Penalty and Sweeping New Privacy Restrictions on Facebook*, FED. TRADE COMM'N (July 24, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook.

[11] *FTC Agreement Brings Rigorous New Standards for Protecting Your Privacy,* META (July 24, 2019), https://about.fb.com/news/2019/07/ftc-agreement/.

[12] *Id.*

[13] Mark Zuckerberg, Facebook Post (July 24, 2019), quoted in *Facebook Will Pay an Unprecedented $5 Billion Penalty Over Privacy Breaches*, CNN (July 24, 2019), https://edition.cnn.com/2019/07/24/tech/facebook-ftc-settlement.




29. From that moment forward, Meta built a pervasive narrative as a company that would "make sure that we respect and honor people's privacy in everything that we do."[14] In January 2022, Meta launched its "Privacy Center," which claimed to "educate people on their privacy options" across all Meta platforms and products, and to "make it easier to understand how we collect and use information."[15] Meta continued to promote its "Privacy Efforts," building its image as a reputable company taking steps and innovating to protect consumer privacy, including "ensuring the integrity of international data flows," because "Privacy is an integral part of everything we do here at Meta, and we understand that this commitment means continuously improving and focusing on this every day."[16]

30. Over the years, Meta built the mythology around its privacy protection, with posts proclaiming that Meta was "Putting People First: Protective Privacy and Integrity" (July

[14] Michael Protti, Chief Privacy Officer, Product, *Our Privacy Progress and the Path Ahead*, META (Apr. 19, 2021), https://about.fb.com/news/2021/04/our-privacy-progress/.

[15] *Introducing Privacy Center*, META (Jan. 7, 2022), https://about.fb.com/news/2022/01/introducing-privacy-center/.

[16] *Recapping Our Privacy Efforts on Data Privacy Day*, Meta (Jan. 28, 2022), https://about.fb.com/news/2022/01/recapping-our-privacy-efforts-on-data-privacy-day/.

2022)[17];"Building and Innovating with Privacy in Mind" (January 2023)[18]; and that "Feedback is a Gift: How We Collaborate to Build Privacy-First Experiences" (October 2023).[19]

31. Meta harnessed social media to propel its privacy promises, including a popular Facebook post on January 30, 2025, which claimed, "Privacy is at the core of everything we build at Meta." The post and accompanying video garnered 175,000 views, and 16,000 "like" or "love" reactions.[20]




[17] Camille Fischer, Privacy and Data Policy Manager, *Putting People First: Protecting Privacy and Integrity*, META (July 25, 2022) https://about.fb.com/news/2022/07/how-metas-protecting-privacy-and-integrity/.

[18] Michael Protti, Chief Privacy Officer, Product, *Building and Innovating with Privacy in Mind*, META (Jan. 23, 2023), https://about.fb.com/news/2023/01/building-and-innovating-with-privacy-in-mind/.

[19] Erin Egan, Chief Privacy Officer, Policy, *Feedback is a Gift: How We Collaborate to Build Privacy-First Experiences*, META (Oct. 5, 2023), https://about.fb.com/news/2023/10/collaborating-to-build-privacy-first-experiences/.

[20] "*Privacy is at The Core of Everything We Build at Meta*," FACEBOOK (Jan. 30, 2025), https://www.facebook.com/LifeAtMeta/videos/privacy-is-at-the-core-of-everything-we-build-at-meta-this-data-privacy-week-wer/515879304856322/.

32. In September 2025, with the launch of their third-generation smart Glasses, Defendants doubled down on reassuring the public that consumers would maintain control over their data collected by the Glasses. This included the launch of a targeted and specific marketing and advertising campaign portraying the Glasses as a product "designed for privacy, controlled by you:"




Figure 1. Screenshot taken from Ray Ban Meta Glasses Product Page, META, https://www.meta.com/ai-glasses/privacy/ (last visited Mar. 4, 2026).

33. Defendants assured consumers that they would have control of their own data. On a page dedicated to the Product's privacy, they touted: "You're in control of your data and content" with "Clear, easy device and app settings" to "help you manage your information, giving you control over what content you choose to share with others, and when."




Figure 2. Screenshot taken from Ray Ban Meta Glasses Product Page, META, https://www.meta.com/ai-glasses/privacy/ (captured Mar. 4, 2026).

34. Defendants promoted and continue to promote the Meta AI Glasses as "Built for your privacy and others' too," explicitly representing that their Products protect the privacy of not only the user of the Meta AI Glasses, but also of the people who may be captured in photos and videos taken by users. Defendants explicitly promise that "When you use your glasses camera for AI features, we take steps to protect people's privacy, like removing key identifiable information."




Figure 3. Screenshot taken from Ray Ban Meta Glasses Product Page, META, https://www.meta.com/ai-glasses/privacy/ (captured Mar. 4, 2026).

35. The Meta AI Glasses website even offers tips for consumers on "How to wear your Ray-Ban Meta glasses responsibly," in order to make others feel "safe and comfortable while you're wearing your glasses," implying that safety and privacy are important to Defendants, and that it is possible for consumers to use the Product in a way that keeps data privacy "safe."

36. Meta further promotes the AI Glasses as a tool that inherently protects the user's privacy, advertising that consumers "can privately view text and multimedia messages."

37. Mark Zuckerberg personally reinforced this narrative, saying, "I just think that you want a way to control your computing device that is private and discreet and subtle."[21] In one interview, when asked what would happen when AI Glasses "see everything we see, hear everything we hear," Zuckerberg quickly insisted, "I'm not sure I agree that they're going to see everything. Or

[21] The Rundown AI, *Mark Zuckerberg on AI Glasses, Superintelligence, Neural Control, and More,* Interview by Rowan Cheung, *supra* at 9:51-10:18.

maybe there will be some sensor that does, but they're not necessarily going to retain it. I'm not sure that you want them to. . . . **[G]iving people control over that is important**."[22]

38. A Meta spokesperson reiterated: "The people who use [the Glasses] and those around them need to trust [the Glasses]. That's why we built privacy into our AI glasses from the ground up.[23]

39. Even the Product purchase page on the official Meta Store on Amazon.com promises "PRIVACY CONTROLS — Ray-Ban Meta glasses put you in control of your privacy."

- PRIVACY CONTROLS — Ray-Ban Meta glasses put you in control of your privacy. Enable voice commands and turn them off any time, and manage other privacy preferences with settings.




Figure 4. Screenshots taken from Ray Ban Meta Glasses Product Page, Amazon.com, https://a.co/d/0fU95ScU (captured Aug 25, 2026).

[22] *Id*. at 33:31–34:14.

[23] Queenie Wong, *Fear and Backlash Build Over Smart Glasses and Privacy*, THE LOS ANGELES TIMES (Aug. 7, 2026), https://www.latimes.com/business/story/2026-08-07/pervert-glasses-backlash-against-metas-smart-glasses-grows.

40. Defendants' strategy of centering consumer privacy in their advertising was lucrative: while Defendants sold about 2 million Glasses in 2023 and 2024 combined, the Glasses sales climbed to 7 million in 2025 alone.[24]

41. In June 2026, Defendants launched several new models of the Glasses, this time incorporating "Muse Spark," promoted as a "completely rebuilt Meta AI." Defendants advertised these new Glasses as putting "Privacy first – As with all of our AI glasses, Meta Glasses have clear, easy settings that help you control what you choose to share with others, as well as built-in safeguards to the respect the privacy of people around you."[25]

42. The June 2026 Glasses introduced a new feature to the Glasses which would enable consumers to more discreetly, or at times accidentally, trigger the AI function of the Glasses: the "action button," which sits on the inner right temple arm of the Glasses.[26] Users are encouraged to use this button to "Activate Meta AI" or "Capture with alternate video modes" without even having to verbalize the "Hey Meta" command, or activate it with a slight movement to tab the button pressed against the user's temple.



Meta Glasses have a configurable action button located on top of the right temple arm which you can customize in the Meta AI mobile app.

[24] Samantha Subin, *Ray-Ban Maker EssilorLuxottica Says it More Than Tripled Meta AI Glasses Sales in 2025*, CNBC (Feb. 11, 2026), https://www.cnbc.com/2026/02/11/ray-ban-maker-essilorluxottica-triples-sales-of-meta-ai-glasses.html; *see also Q4/Full Year 2025 Results*, ESSILORLUXOTTICA (Feb. 11, 2026), https://www.essilorluxottica.com/en/newsroom/press-releases/q4-full-year-2025-results/; *Q4/FY 2024 Results*, ESSILORLUXOTTICA, https://www.essilorluxottica.com/cap/content/245084/.

[25] *We're Partnering with EssilorLuxottica to Launch Meta Glasses*, META (June 23, 2026), https://about.fb.com/news/2026/06/meta-essilorluxottica-partner-launch-meta-glasses/.

[26] *How to Use the Action Button on Meta Glasses*, META (June 2026), https://www.meta.com/help/ai-glasses/1767196644651038/ (last visited Aug. 30, 2026).

43. Even with a June 2026 refresh to its Product page coinciding with the launch of new models of Meta AI Glasses, Defendants continue to promote the Glasses as "Designed for privacy, controlled by you," with the additional promise that consumers can "Manage your data and customize your experience on your terms."




44. Defendants particularly emphasize use of the Meta Glasses and their AI features with children—without any disclosure that doing so might subject young children to having their images captured and stores by the Glasses and exploited for AI development purposes, including processing by human data annotators half the world away.



45. On July 7, 2026, Meta published an FAQ in which it promised consumers that "You, and only you" can see the photos and videos taken with the Glasses, "unless you choose to share them." Meta further assured consumers that "Photos and videos you capture with your AI glasses for your gallery are stored privately on your glasses. You choose when to import them to our phone. Once imported to your phone, they're saved to your phone's gallery just like any other photo or video you may take." Meta even closes out the FAQs by assuring consumers that "more privacy features" will be coming to the AI Glasses, because "we believe it's an essential component of any good technology."[27]

46. Just a few weeks before filing, Meta still proclaimed its dedication to consumer privacy, including with articles like, "The Future is for Everyone: A Path to a Positive AI Future" (Aug 10, 2026) in which Meta describes how it "is building personal superintelligence to improve all of our lives" which "will have strong privacy and security options so you can trust it to handle all your personal content knowing that no one else can access your information."[28]

47. EssilorLuxottica also claims to be "committed to protecting the Personal Data we process."[29]

48. Even now at the time of this filing Meta continues to emphasize its claims to privacy on its website, proclaiming to the public: "We're committed to giving you control over your privacy and protecting your information," and that "we've built the tools to help you secure your information, and to make the right privacy choices, while adhering to stringent industry standards for privacy and protecting your data."

---

[27] *Meta's AI Glasses: Your Questions Answered*, META (July 7, 2026), https://about.fb.com/news/2026/07/metas-ai-glasses-your-questions-answered/.

[28] *The Future is for Everyone*, META (Aug 10, 2026) https://about.fb.com/news/2026/08/the-future-is-for-everyone/.

[29] *Data Privacy*, ESSILORLUXOTTICA, https://www.essilorluxottica.com/en/governance/data-privacy/ (last visited Aug 25, 2026).




Figure 5. Screenshots taken from Protecting Privacy and Security, Meta.com, https://www.meta.com/actions/protecting-privacy-and-security/ (captured Aug 25, 2026).

49. Under "Actions we're taking on privacy," Meta promises consumers that "We're giving you more control over your privacy choices, and holding ourselves accountable for keeping your data secure." Meta further promises consumers that it is "Giving you more control" and that "We build tools to give you more control over your privacy and help you understand what happens with your information":




Figure 6. Screenshots taken from Protecting Privacy and Security, Meta.com, https://www.meta.com/actions/protecting-privacy-and-security/ (captured Aug 25, 2026).

## Giving you more control

We build tools to give you more control over your privacy and help you understand what happens with your information.

**Manage your information**
Easily access, manage, download or delete the personal data you've provided.

**Transfer your data**
We make it simple to move information, such as posts, photos and videos, to another service.

**Accounts Center**
Control the experiences you've connected across our apps by using our Accounts Center.

**IG Activity Center**
Access and manage content you've commented on, shared or sent on Instagram.

**Privacy Checkup**
This tool helps you control who can see what you share, how your information is used and how to secure your account.

**Why Am I Seeing This Ad?**
You can tap on posts from the friends, Pages, and Groups you follow as well as some of the posts we suggest to get more context on why they're appearing in your News Feed.

Figure 7. Screenshots taken from Protecting Privacy and Security, Meta.com, https://www.meta.com/actions/protecting-privacy-and-security/ (captured Aug 25, 2026).

50. Meta even promises additional tools designed to put consumers at ease about their privacy, such as a "Privacy Checkup feature" and a "Transparency Report" published to Meta's site—all meant to put consumers at ease that "Safeguarding your data is [Meta's] highest priority" and that Meta is "Designing for Privacy."

## Designing for Privacy

Safeguarding your data is our highest priority, and we want to provide a window into how we protect your data and keep it secure.

Privacy Progress Update +

Designing for Privacy −

We're ensuring new products and features are built with privacy in mind. Learn more about how we're designing privacy into our products on our Privacy Matters blog.

→ Learn More

Data for Good: COVID-19 +

End-to-End Encryption +

Restricted Partner App Access +

Transparency Report: Combating Scraping +



51. These promises and representations were and are false (collectively, the "Challenged Representations"). Recordings and data captured by the Glasses were not in the user's or purchaser's control at all because Defendants designed these AI Glasses to spy on users, purchasers, and bystanders.

52. No reasonable purchaser encountering these representations would have expected the AI Glasses to become a surveillance tool for Defendants. Any person reading or hearing Defendants' Challenged Representations would reasonably conclude that footage stayed on their devices. Plaintiffs had no "control" over data in AI mode, a core feature of the glasses, as their videos and audio recordings were collected, unloaded and stored by Meta, watched by someone they never met, and exploited to build out Meta's infrastructure.

**C. Defendants' Glasses Systematically Record, Intercept, Transmit, and Divulge User and Bystander Data Without Their Knowledge or Consent**

53. The Meta AI Glasses transmit data to Meta whenever Meta AI is triggered during their use. Meta AI may be triggered in several ways and often is triggered accidentally, including by people in the vicinity of the user. It may be triggered, among other means, by touching and holding the trackpad on the temple of the Glasses. This can occur accidentally through hand placement when a user puts the glasses on his or her face, fidgeting with the frames, or accidental touching. It can also be triggered by speaking the wake phrase "Hey Meta" or "Okay, Meta," by replying during the interval in which the Glasses continue listening after Meta AI responds, by touching the frames on the right temple, or by starting a Live AI session. The Glasses also can be triggered accidentally by language spoken by third parties near the Glasses that was either not intended to trigger Meta AI and which may have been misheard or misinterpreted by the Glasses. Likewise, the Glasses can be triggered accidentally when adjusting the frames. When AI is invoked, the Glasses capture audio, images, video, and associated metadata; transmit that content by Bluetooth or Wi-Fi to the user's paired smartphone running the Meta AI application; and simultaneously transmit it to Meta's cloud servers.[30] This

[30] Naipanoi Lepapa, et al., *She Came Out of the Bathroom Naked, Employee Says*, SVENSKA DAGBLADET (Feb. 27, 2026), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything.

transmission occurs in real time, as the video and audio are captured. This occurs irrespective of whether the user has enabled the "Cloud media" setting described below.

54. By default, the Glasses listen continuously for the wake phrase. The microphone is therefore active whenever the Glasses are powered on, whether or not the user has invoked Meta AI. When the Glasses misidentify ordinary speech as the wake phrase, they capture and transmit audio even when the user never intended to activate the AI. Meta retains that audio, transcribes it, and subjects it to human review on the same terms as intentional invocations.[31]

55. The recorded/transmitted footage enters a data annotation pipeline managed by commercial subcontractors, including Sama, in Nairobi, Kenya. All captured videos are subject to human review.

56. Recent whistleblower accounts reveal that when consumers use their Meta AI Glasses' AI features, the footage and associated audio is not processed privately or locally as consumers expected. Instead, videos and photographs and associated audio captured through the Glasses, including highly sensitive moments inside homes and other private spaces, are manually viewed and labeled by Sama's workers to train Meta's AI models.[32]

57. Meta began using Sama as early as April 2019, originally as content moderators for its social media platform. Subsequently around the time the first version of Meta Glasses in 2021 were released, the contract extended to AI-Training annotators.

58. Troves of data, including sensitive and highly private moments—materials of hackers' and kidnappers' and blackmailers' dreams—are all funneled into the hands of offshore contractors working for a few dollars an hour.[33] These contractors report seeing everything: People changing clothes, using the bathroom, engaging in sexual activity, handling financial information, and

---

[31] Karissa Bell, *Are Ray-Ban Meta Glasses a Privacy Risk? Here's What You Should Know*, ENGADGET, (Aug. 7, 2026) https://www.engadget.com/2232153/are-ray-ban-meta-glasses-a-privacy-risk-here-s-what-you-should-know/.

[32] Naipanoi Lepapa, et al., *She Came Out of the Bathroom Naked, Employee Says*, *supra*.

[33] Jason Koebler, '*AI Is African Intelligence': The Workers Who Train AI Are Fighting Back*, 404 MEDIA (Mar. 12, 2026) https://www.404media.co/ai-is-african-intelligence-the-workers-who-train-ai-are-fighting-back/.

conducting other private activities inside their homes that no reasonable consumer would ever expect a stranger to watch. They say that Meta's supposed "face anonymization" does not work. And those who raise concerns about the highly personal nature of what they are forced to watch and label are fired.[34]

59. As for bystanders, the Glasses are designed to blend in so that people can easily be filmed without their knowledge. The Glasses provide only a faint flashing light indicating a recording is in progress. This light often goes unnoticed and, in any event, can be concealed with minimal effort for purposes of ensuring surreptitious recording of unsuspecting individuals. Users can take advantage of these design flaws. Indeed, the Meta AI Glasses have come to be known as "pervert glasses"[35] or "predator glasses"[36] for their covert recording capabilities, as in the following picture distributed online:



Figure 8. Image from Kofi Mframa, USA TODAY (see fn.34).

[34] Naipanoi Lepapa, *She Came Out of the Bathroom Naked, Employee Says*, *supra*.

[35] Queenie Wong, *'Pervert glasses': Backlash Against Meta's Smart Glasses Grows*, The Seattle Times (Aug. 8, 2026), https://www.seattletimes.com/business/technology/pervert-glasses-backlash-against-metas-smart-glasses-grows/?utm_source=referral&utm_medium=mobile-app&utm_campaign=ios.

[36] Kofi Mframa, *Ray-Ban Meta AI Glasses are Scaring Me and my Homegirls*, USA TODAY (Aug. 12, 2026), https://www.usatoday.com/story/opinion/columnist/2026/08/12/kylie-jenner-meta-glasses-gen-z-surveillance-state/91183522007/.

60. "In one instance, a woman told the BBC that a man recorded her and then demanded money to remove the videos from social media. Another woman described being recorded during sexual encounters without her agreement."[37] No one can legally consent to Meta's use and exploitation of data obtained with Meta AI Glasses because Meta has never advised how the data is being collected, stored and exploited by Meta and third parties.

**D. Defendants Knowingly Omit and Conceal that Meta's Employees and Contractors Review Intimate Content Captured by the Meta AI Glasses**

61. Defendants' failure to inform purchasers, users, and bystanders that troves of data, including videos and recordings captured on the Meta AI Glasses, are being transmitted offshore to be systematically viewed by strangers, labeled, and embedded into Meta's AI models, is a material omission (the "Challenged Omission"). Reasonable people would view this information as critical to their decision to buy, use, or even be captured by the product, as the public reaction and widespread outrage to the revelations discussed in this lawsuit confirm.

62. Despite marketing the Meta AI Glasses as "privacy first" devices that are "designed for privacy," "controlled by you," and equipped with "robust measures to protect user data," Meta failed to disclose that troves of data, including intimate videos, images, and audio are routinely captured by the Glasses, transmitted to Meta's servers, stored by Meta, and viewed, catalogued, and used as AI training data by Defendants' employees and contractors. This material omission directly contradicts Meta's affirmative privacy claims and has resulted in the exposure of consumers' most intimate moments to thousands of strangers for Meta's undisclosed commercial benefit.

63. Individuals reasonably expect that any data generated using AI Glasses, devices worn continuously throughout the day as intended by Meta, will remain stored locally on the device to which the Glasses are connected, or otherwise under the user's direct control.

64. Individuals would not reasonably expect troves of data, including their intimate and deeply personal recordings to be broadly collected, accessed, or retained by the manufacturer and third

[37] Helena Horton, *Restaurants, Pubs and Theatres Ban Meta's 'Spy Glasses' Over Privacy Fears*, THE GUARDIAN (Aug. 6, 2026), https://www.theguardian.com/technology/2026/aug/06/restaurants-pubs-and-theatres-ban-metas-spy-glasses-over-privacy-fears.

parties across the world; nor would they expect it to be viewed, labeled and otherwise used to train Meta's large language models.

65. A reasonable person would not expect that the footage captured by Meta AI Glasses worn in everyday life would be transmitted to third-party human contractors for review and analysis, including recordings of the most intimate and private moments. This is particularly concerning given that these Glasses accompany users throughout their daily routines in their homes, bathrooms, bedrooms, and other private spaces, capturing deeply private moments: changing clothes, using the toilet, engaging in sexual activity, caring for children, and more.

66. These facts are material to a reasonable person's purchasing decision. A consumer deciding whether to adopt a device worn continuously on one's face—capable of capturing real-time audio, visual, and behavioral data, including potentially medical and financial information—would consider it highly important to know whether personal and sensitive information (and that of family, friends, sexual partners, and children) is being collected beyond the device, transferred to foreign jurisdictions, viewed by others, or repurposed for secondary uses such as AI training. The omission of this information deprives consumers of the ability to make an informed choice about whether to purchase or use the Glasses or allow themselves to be filmed by it.

67. Transmitting troves of individuals' personal data, including extremely intimate recordings, to overseas contractors also created obvious and foreseeable risks. Once such recordings are sent to third-party human contractors, these individuals can copy, retain, distribute, and exploit the recordings for sale, identity fraud, harassment, blackmail, public dissemination, or other reasons. Defendants' omission regarding this unreasonable safety hazard deprived consumers of material information necessary to decide whether to purchase, use, or allow themselves to be recorded by the Glasses.

68. Defendants have known since their initial launch of the Meta AI Glasses in 2021 that human review of troves of personal data, including videos, audio, and images, would expose intimate content. Indeed, the inherent risks of human review of user-generated content captured by always-on wearable cameras are well established in the technology industry, putting Defendants on direct notice

that consumers would expect prominent disclosure of these risks and that failure to disclose them creates significant privacy harms.

69. Despite their actual knowledge of the human review pipeline and the inherent safety and privacy risks associated with such sharing of data, Defendants have continued to market the Glasses using "designed for privacy," "controlled by you," and similarly false and misleading representations.

70. By highlighting the Meta AI Glasses' privacy features, while concealing the critical fact that intimate footage is routinely reviewed by Defendants' employees and third parties, Defendants created a false impression that the Glasses provided comprehensive protection of user privacy, when in reality the marketed privacy features do nothing to prevent the most significant privacy risk that the Glasses pose: the exposure of personal data, including audio, video footage, and photographs, to strangers for covert commercial exploitation by Meta to train its AI models.

### E. Defendants' Omissions Implicate the Central Function of the Meta AI Glasses and Present an Unreasonable Safety Risk to Consumers, Users and Bystanders

71. Defendants' failure to disclose that troves of the personal videos, photographs, and audio data is uploaded and stored by Meta and viewed by offshore strangers to label them for embedding into Meta's AI products implicates and materially affects the central function of the Meta AI Glasses. Defendants marketed the Products' privacy architecture as core product features, essential to a camera and microphone designed to be worn on a user's face throughout daily life, including intimate and private settings. Any consumer who does not wish to have their most intimate moments transmitted to Meta's servers and reviewed by offshore human contractors is left with a $299 to $799 pair of sunglasses frames with no AI or "smart" functionality whatsoever.

72. Independent of the impact on the central function of the Glasses, Defendants' omissions also present an unreasonable safety issue to consumers. The omissions render the Meta AI Glasses' privacy features materially misleading, transforms the product from a personal device into a surveillance conduit, and exposes consumers to unreasonable risks of loss of privacy, dignitary harm, emotional distress, stalking, extortion, identity theft, and reputational injury. Meta employees and contractors have described viewing credit card numbers, nudity, sexual activity, and identifiable faces

in the footage they reviewed. The exposure of such content to thousands of unknown individuals creates a persistent and unreasonable risk of harm that Meta's marketed privacy features were represented to, but do not, prevent.

73. Meta's failure to disclose this information when it first introduced the AI Glasses to the market is critical. As designed, Meta's AI Glasses are unreasonably dangerous, as they introduce significant risks that exceed any ordinary consumers' expectations, and cannot be avoided without abandoning the Product's core use.

74. Access to the data collected by these glasses—be it financial details, health related information, information about minors, family members, partners, friends—presents a uniquely valuable target for unauthorized access and misuse of this information. The combination of always-on collection, covert recording capabilities, intimate proximity to the customers and bystanders, and transmission of data across jurisdictions amplifies these risks in a way that is materially different from other consumer technology.

### F. Defendants' Product Design Completely Disregards Bystanders' Privacy Rights

75. Although Defendants have violated bystanders' privacy rights, they have admitted that such rights exist. Defendants described these features as "our way of ensuring that we protect other people's privacy."[38] The features that Meta describes as designed to protect bystanders are a faint light that is easily obscured or disabled and a shutter sound that is easily missed or masked by other noises. Meta also published a privacy guide which implores users to protect the privacy rights of bystanders:




[38] Marita Alonso, *The Big Problem With Meta Glasses*, EL PAÍS (July 30, 2026), https://english.elpais.com/technology/2026-07-30/the-big-problem-with-meta-glasses-does-recording-and-sharing-everything-put-us-at-risk.html.

76. Defendants' privacy guide and the features in question are wholly insufficient, as evidenced by the proliferation of social media posts portraying videos obtained with the Glasses of bystanders who either did not know they were being recorded or did not agree to be recorded, the numerous instructional videos available to help users successfully disable the Meta AI Glasses' already-faint recording light,[39] and the products available for sale to accomplish the same goal.[40] In addition, given the Glasses' design, users' hair or hats can purposely or inadvertently cover the recording light.[41]

77. Given Defendants' inadequate notice mechanisms and procedures, people and business have resorted to altering their own behavior. Female influencers, recognizing that they are unable to reliably identify Meta AI Glasses, have suggested singing Disney songs while in public in the hopes that any recording that is obtained and posted publicly will be promptly removed under Disney's strict mechanisms for enforcing its intellectual property rights. Another group of women created a mobile app that tracks nearby Bluetooth devices and identifies whether any Meta AI Glasses are present near them. These "remedies" are limited for obvious reasons.

78. Government agencies and private businesses have begun attempting to ban the Glasses to protect their customers from unwanted surveillance or covert recording but have struggled given the non-descript and ordinary appearance of the Glasses.[42]

79. Meta's CEO, Mark Zuckerberg, was recently admonished in a Los Angeles Superior Court for wearing the Glasses. The Judge was unsure whether Mr. Zuckerberg was recording or using

[39] *E.g.*, BigWonka, *Disable Ray Ban Meta Gen 2 Light*, (Sept. 20, 2025) https://www.youtube.com/watch?v=Rg5nDlBK3DQ (last visited Aug. 18, 2026).

[40] *E.g.*, Steven Sullivan, *Ray Ban Meta Remove LED Light NEW Accessory WORKS!*, (May 13, 2026) https://www.youtube.com/watch?v=ebscxb6KuqY. Many such products are available on eBay as of this writing. *E.g.*, https://ebay.io/m/zEgG5z (last visited Aug. 18, 2026).

[41] Luke Fortney, *Dinner Is Being Recorded, Whether You Know It or Not*, THE NEW YORK TIMES (Feb. 16, 2026), https://www.nytimes.com/2026/02/16/dining/meta-ray-ban-glasses-restaurants.html.

[42] Eli Tan & Hamed Aleaziz, *ICE Bars Its Workers From Wearing Meta's Smart Glasses on the Job*, THE NEW YORK TIMES (Aug. 18, 2026), https://www.nytimes.com/2026/08/18/technology/ice-meta-smart-glasses.html

facial recognition and required immediate deletion of any recordings.[43] Meta Glasses have been banned in courts in England and Whales "amid a mounting backlash against what has been described as 'spyware.'"[44]

### G. Defendants Developed Facial Recognition for the Meta AI Glasses and Refuse to Disavow Deploying It

80. Defendants considered adding facial recognition technology to the first version of their Ray-Ban smart glasses in 2021 but pulled back over technical challenges and ethical concerns.[45] Meta never publicly released the feature on its smart glasses.[46]

81. Defendants have since renewed that effort. Meta plans to add facial recognition to the Meta AI Glasses through a feature known internally as "Name Tag," which would let wearers of the Glasses identify people and obtain information about them through Meta's artificial intelligence assistant. Meta has conferred since early 2025 about how to release a feature that, in the words of Meta's own internal document, carries "safety and privacy risks."[47]

82. An internal document from Meta's Reality Labs division, dated May 2025, stated that Meta is waiting until the political environment is more favorable to Meta before releasing this feature: "We will launch during a dynamic political environment where many civil society groups that we would expect to attack us would have their resources focused on other concerns."[48]

---

[43] Tim Higgins, *The Backlash Against AI Devices That Are Always Watching*, THE WALL STREET JOURNAL (Mar. 14, 2026), https://www.wsj.com/tech/ai/the-backlash-against-ai-devices-that-are-always-watching-bb556f8d.

[44] Matthew Weaver, *Meta Glasses Banned From Courts in England and Wales*, THE GUARDIAN (Aug. 11, 2026), https://www.theguardian.com/technology/2026/aug/11/meta-glasses-banned-from-courts-in-england-and-wales.

[45] Kashmir Hill, et al., *Meta Plans to Add Facial Recognition Technology to Its Smart Glasses*, THE NEW YORK TIMES (Feb. 13, 2026, updated Feb. 14, 2026), https://www.nytimes.com/2026/02/13/technology/meta-facial-recognition-smart-glasses.html.

[46] Ryan Mac, *Facebook Is Considering Facial Recognition For Its Upcoming Smart Glasses*, BUZZFEED NEWS (Feb. 25, 2021), https://www.buzzfeednews.com/article/ryanmac/facebook-considers-facial-recognition-smart-glasses; *see also* Letter from Sens. Markey, Wyden & Merkley, *infra* (Meta "never publicly releas[ed] the feature on its smart glasses citing privacy concerns").

[47] Kashmir Hill, et al., *Meta Plans to Add Facial Recognition Technology to Its Smart Glasses, supra*.

[48] *Id.*

83. Meta is separately developing glasses, known internally as "super sensing," that would continually run cameras and sensors to keep a record of the wearer's day. Facial recognition would be a key feature of those glasses. Mark Zuckerberg has questioned whether such glasses should keep their LED light on to show people that the feature is in use, or whether they should use some other signal.[49]

84. Meta's development of facial recognition for the Glasses has progressed well beyond planning. In June 2026, a review of Meta's own software revealed that Meta had already distributed dormant facial recognition code, internally called "NameTag," inside the Meta AI companion application that is required to use key features of the Meta AI Glasses and that has been downloaded more than 50 million times. Core components of the spyware had been integrated into software distributed to consumers as early as January 2026. Three artificial intelligence models powering the spyware had been deployed from Meta's servers onto consumers' phones: one detects faces, one crops them, and a third encodes them into biometric data. The spyware is designed to transform faces captured by the Glasses into unique biometric signatures, commonly known as faceprints, and to check each one against faceprints stored on the user's phone—a database configured to receive updates from Meta. Recognized faces trigger notifications, while the rest are cropped, indexed, and saved to a folder marked "pending." A May 2026 version of the spyware rebranded the feature for users as "Connections," inviting them to "remember the people you met."[50]

85. The findings were independently reproduced by outside security researchers who separately examined the application. To test whether the matching system worked, one researcher added a single faceprint to the application's gallery and then triggered NameTag with a matching image; the application returned a notification reading "Person recognized." As that researcher explained, "[t]he main components of a face-recognition feature are already in Meta's companion app," and "[n]ot many pieces stand between this and a working feature."[51]

---

[49] *Id.*

[50] Dhruv Mehrotra & Dell Cameron, *Meta Silently Added Face-Recognition Code for Its Smart Glasses to Millions of Phones*, WIRED (June 4, 2026), https://www.wired.com/story/meta-smart-glasses-face-recognition-nametag-connections/.

[51] *Id.*

86. Meta also licensed facial recognition and liveness-detection technology from Rank One Computing, a government and defense contractor, for its smart glasses project. The liveness technology determines whether a camera "is viewing a real person rather than a photo, mask or other representation of a face."[52]

87. Meta distributed the NameTag Code, designed to pull faceprints from Meta's servers and store them on users' own devices, to consumers. Although Meta removed the Name Tag code from the application after researchers publicly discussed it, Meta did not disavow the feature.

88. On March 17, 2026, United States Senators Edward J. Markey, Ron Wyden, and Jeffrey A. Merkley wrote to Meta's Chief Executive Officer demanding answers by April 6, 2026 concerning Meta's plans to deploy facial recognition technology in the Meta AI Glasses. The Senators warned that "[g]iven Meta's vast data collections, its smart glasses could capture images of thousands of people without their knowledge or consent and then instantly link those faces to names, workplaces, or personal profiles, creating serious risks of stalking, harassment, and targeted intimidation."[53] The Senators further demanded that Meta explain how it would "obtain affirmative express consent from every individual whose biometric data its smart glasses capture, including bystanders, and other non-users," and how it would "notify individuals that its smart glasses may collect their biometric data without their consent when they appear in the device's field of view."[54]

89. The Senators observed that smart glasses are "often indistinguishable from regular glasses" and are "designed to be worn throughout the day as its user passes hundreds, if not thousands, of people," such that "[i]n a single day, the user could scan thousands of faces, with no practical way for a bystander to consent or even know about such real-time identification." The Senators further asked whether Meta "plan[s] to match faces captured by its smart glasses to profiles, images, or

---

[52] Anthony Kimery, *Meta Licensed ROC Facial Recognition, Liveness for Smart Glasses Project*, BIOMETRIC UPDATE.COM (June 15, 2026), https://www.biometricupdate.com/202606/meta-licensed-roc-facial-recognition-liveness-for-smart-glasses-project.

[53] Miles Klee, *The Rise of the Ray-Ban Meta Creep*, WIRED (Mar. 23, 2026), https://www.wired.com/story/the-rise-of-the-ray-ban-meta-creep/.

[54] Letter from Sens. Edward J. Markey, Ron Wyden & Jeffrey A. Merkley to Mark Zuckerberg, Chief Executive Officer, Meta Platforms, Inc. (Mar. 17, 2026), https://www.markey.senate.gov/imo/media/doc/letter_to_meta_on_frt_in_smart_glasses1.pdf.

identifiers stored on Meta-owned platforms, including Facebook and Instagram," and whether Meta "intend[s] to share biometric data—or any outputs generated by facial recognition features in its smart glasses—with federal, state, or local law-enforcement agencies, including the Department of Homeland Security."[55]

90. On April 13, 2026, the American Civil Liberties Union and 75 other organizations publicly called on Meta to "immediately halt and publicly disavow" its plans to equip its Ray-Ban and Oakley glasses with facial recognition, warning that the technology would eliminate "the expectation of privacy or anonymity in public." Meta has neither halted nor disavowed those plans.[56]

91. This would not be Meta's first deployment of facial recognition technology. Meta operated a facial recognition system on Facebook for approximately a decade. On November 2, 2021, after paying $650 million in a settlement with Illinois users who accused Meta (then known as Facebook) of violating the Illinois Biometric Information Privacy Act, Meta announced that it would shut that system down and delete the facial recognition templates of more than one billion people, stating that "the many specific instances where facial recognition can be helpful need to be weighed against growing concerns about the use of this technology as a whole," and that "regulators are still in the process of providing a clear set of rules governing its use." Meta simultaneously reserved the right to return to the technology, stating that it "still see[s] facial recognition technology as a powerful tool," and describing its continued work on on-device facial recognition.[57]

92. Meta's 2021 announcement was not understood within the company as a permanent retreat. Joseph Jerome, a former Meta Reality Labs policy official who worked on privacy reviews for Meta's augmented- and virtual-reality products and who joined Reality Labs in mid-2021, has stated

---

[55] *Id.*

[56] Press Release, American Civil Liberties Union, *ACLU and 75 Organizations Sound Alarm on Meta's Plan to Add Facial Recognition Technology to Ray-Ban and Oakley Eyeglasses* (Apr. 13, 2026), https://www.aclu.org/press-releases/aclu-and-75-organizations-sound-alarm-on-metas-plans-to-add-facial-recognition-technology-to-ray-ban-and-oakley-eyeglasses.

[57] Jerome Pesenti, VP of AI, *An Update On Our Use of Face Recognition*, META (Nov. 2, 2021), https://about.fb.com/news/2021/11/update-on-use-of-face-recognition/.

that the decision "was never understood internally as a permanent retreat," and that "[t]here was always this tension of, well, when do we roll back out face recognition?"[58]

93. Meta did return to it. In October 2024, Meta reintroduced facial recognition on its platforms. Meta has also paid approximately $2 billion to settle claims brought by the States of Illinois and Texas alleging that Meta collected users' facial data without their permission through the since-shuttered Facebook system.[59]

94. The risk that the Meta AI Glasses will be used to identify bystanders is not hypothetical. In October 2024, two university students demonstrated that Meta AI Glasses paired with a commercially available facial recognition service could identify strangers in public and retrieve personal information about them in real time.[60]

95. Defendants have never disclosed to purchasers, users, or bystanders that they have developed, licensed, tested, and distributed facial recognition code for the Meta AI Glasses, or that they intend to deploy facial recognition in the Products.

96. Given Meta's abysmal record regarding consumer privacy, including biometrics, Plaintiffs seek injunctive relief to prevent Meta from deploying biometric tools through the Glasses.

### H. First-Person Recordings Are Some of the Scarcest and Most Expensive Inputs in Generative AI, and They Have an Established Market Price

97. Generative AI systems are not authored in the ordinary sense. They are trained. Their capabilities are a function of the volume, nature, quality, and specificity of the material fed into them, which means that the material itself is a major input cost of the industry. Not all training material is equally useful or available, and the industry knows precisely which material it wants most.

---

[58] Mehrotra & Cameron, *Meta Silently Added Face-Recognition Code for Its Smart Glasses to Millions of Phones, supra*.

[59] *Facebook Owner Meta Restarts Facial Recognition Tech in 'Celeb-Bait' Crackdown*, CNBC (Oct. 21, 2024), https://www.cnbc.com/2024/10/21/facebook-owner-meta-restarts-facial-recognition-tech-in-celeb-bait-crackdown-.html. The Illinois and Texas settlements are reported in Kashmir Hill, et al., *Meta Plans to Add Facial Recognition Technology to Its Smart Glasses*, *supra*.

[60] John Koetsier, *Meta's Ray-Ban Smart Glasses Used To Instantly Dox Strangers In Public, Thanks To AI And Facial Recognition*, FORBES (Oct. 3, 2024), https://www.forbes.com/sites/johnkoetsier/2024/10/03/metas-ray-ban-smart-glasses-used-to-instantly-dox-strangers-in-public-thanks-to-ai-and-facial-recognition/.

98. Extended audiovisual recordings of identifiable individuals speaking, moving, gesturing, and reacting are the hardest category of data to obtain at scale and the most useful for the model capabilities with the greatest commercial value, including video generation, speech synthesis, speech recognition, and the depiction of human subjects.

99. Companies developing artificial intelligence models recognize as much in their own technical publications. Meta's own researchers disclosed that, in constructing the training set for a commercial video-generation model, they assembled on the order of one hundred million video-text pairs, deliberately curated for human subjects: the team "established a taxonomy of 600 human verbs and expressions and performed zero-shot text-to-video retrieval using the taxonomy to select videos with humans in them," and engineered the high-resolution portion of the corpus so that "at least 60%" of those videos contain human beings.[61] The same publication describes pre-training on approximately 100 million videos and one million hours of audio.[62] Similarly, the developer of a widely deployed commercial speech-recognition model reported training the model on "680,000 hours" of human speech drawn from the internet.[63]

100. The commercial value of the data Defendants extract from the Meta AI Glasses is a function of scarcity. The generative artificial intelligence industry has consumed the supply of data on which it was built. Stanford University's 2026 AI Index Report concludes that the available pool of high-quality human text and web data for training large models has been exhausted.[64]

101. Defendants are aware of the scarcity of the recorded human experience as captured from the vantage point of a person moving through the real world—what researchers call egocentric, or first-person, data. Meta knows this, because Meta has said so. In November 2023, Meta announced Ego-Exo4D, a research dataset it assembled precisely because data of this kind did not otherwise exist

---

[61] Adam Polyak et al., Movie Gen: A Cast of Media Foundation Models, (Oct. 17, 2024), https://arxiv.org/html/2410.13720v1.

[62] *Id.*

[63] Alec Radford et al., Robust Speech Recognition via Large-Scale Weak Supervision, at 1-2, 10, https://cdn.openai.com/papers/whisper.pdf.

[64] Stanford University Institute for Human-Centered Artificial Intelligence, *Artificial Intelligence Index Report 2026*, at 25, https://hai.stanford.edu/assets/files/ai_index_report_2026.pdf

in sufficient quantities. Existing datasets, Meta explained, "are few, small in scale," and are "too staged or curated to be resilient to the diversity of the real world."[65]

102. To obtain that data lawfully, Meta had to manufacture it. Meta and its research partners recruited more than 800 "skilled participants" across six countries and captured more than 1,400 hours of video under controlled conditions, with the knowledge and participation of those recorded.[66]

103. Because this material is both essential and scarce, a commercial market for it exists, and its prices are known. Artificial intelligence data firms have emerged that are "building networks of short-term contract workers to produce custom visuals and voice samples from scratch."[67] Reporting describes prevailing rates paid by companies such as Meta range from "$1 to $2 per image, $2 to $4 per short-form video and $100 to $300 per hour of longer films."[68] More sensitive data is sold at higher rates, including "[i]mages of nudity, which require the most sensitive handling, go for $5 to $7."[69]

104. This is what first-person audiovisual data costs when the people who supply it know they are doing so and are properly compensated.

105. In another example, the Neon app pays users for recording their phone conversations, which are subsequently passed along to artificial intelligence developers who use it to train their chatbots. Neon pays users 30 cents per minute when they speak with other Neon members and 15 cents per minute for speaking to a non-Neon user. In either case, only the Neon users' side of the conversation is shared, and users can earn up to $30 per day for their conversations.[70]

---

[65] Meta AI, *Introducing Ego-Exo4D: A foundational dataset for research on video learning and multimodal perception* (Nov. 30, 2023), https://ai.meta.com/blog/ego-exo4d-video-learning-perception/.

[66] *Id.*

[67] Katie Paul & Anna Tong, Inside Big Tech's underground race to buy AI training data (Apr. 5, 2024), https://www.investing.com/news/stock-market-news/inside-big-techs-underground-race-to-buy-ai-training-data-3367240.

[68] *Id.*

[69] *Id.*

[70] Lance Whitney, *This App Will Pay You $30/Day to Record Your Phone Calls For AI - But is it Worth it?*, ZDNET (September 25, 2025), https://www.zdnet.com/article/this-app-will-pay-you-30day-to-record-your-phone-calls-for-ai-but-is-it-worth-it/.

106. Independent market researchers valued the global market for artificial intelligence training datasets at approximately $3.2 billion in 2025, growing to a projected $16.3 billion by 2033, with image and video data constituting the largest single segment at roughly 41.9% of 2025 revenue.[71]

107. Defendants also obtain Plaintiffs' and Class members' internet data, for example, when users rely on "Hey Meta" to search the internet or provide answers to questions. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[72] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[73] That article noted that the value of a single user's data varied from about $15 to more than $40.

108. In addition, Defendants' systemic surveillance of individuals using Meta's AI Glasses and those around them, provides large quantities of valuable personal, health, and consumer information. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[74]

109. The economic value of consumer data has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can

---

[71] Grand View Research, AI Training Dataset Market Size, Share & Trends Analysis Report, https://www.grandviewresearch.com/industry-analysis/ai-training-dataset-market.

[72] Sam Jossen, *The World's Most Valuable Resource is No Longer Oil, But Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[73] Pauline Glikman & Nicolas Glady, *What's the Value of Your Data?*, TECHCRUNCH (OCTOBER 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[74] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[75]

110. There is immense value that software and machine learning developers find in the data available in the images, videos, and conversations captured by the Meta AI Glasses that are used for training Meta's AI systems, and Meta obtains value from these illicitly recorded videos.

111. Meta has staked its future, and an extraordinary amount of capital, on artificial intelligence. On April 29, 2026, Meta forecast capital expenditures of between $125 billion and $145 billion for 2026 alone, principally to build the data centers and computing infrastructure on which its artificial intelligence models are trained. Mark Zuckerberg has explained that this investment is intended to strengthen Meta's advertising business through improved recommendations and ad targeting, and to develop personal artificial intelligence agents.[76] Meta is spending on the scale of a national economy to process training data. The data itself is the input that makes that expenditure worth making.

112. Defendants understood the value of the recordings and data they took. Defendants elected not to participate in that market with respect to the individuals using their Glasses and the bystanders around them. Instead, Meta secretly took the material for free and without consent.

113. Plaintiffs' and Class members' data has value, and Meta harmed Plaintiffs and the Class members by not compensating them for the value of their data, while hiding how their data would actually be used and monetized. Luxottica contributed to Plaintiffs' and Class members' harm by designing and marketing the Glasses and through Luxottica's contributions to the Challenged Representations and Omissions as alleged above.

---

[75] Ken Mercadante, *See 10 Apps for Selling Your Data for Cash*, BEST WALLET HACKS, https://wallethacks.com/apps-for-selling-your-data/.

[76] Meta Platforms, Inc. Q1 2026 earnings release and call transcript (Apr. 29, 2026), https://s21.q4cdn.com/399680738/files/doc_financials/2026/q1/META-Q1-2026-Earnings-Call-Transcript.pdf.

### I. Meta Systematically Disregards the Privacy of Consumers, Users, and Bystanders

114. Meta's surreptitious tracking of users was not accidental but rather part of its corporate DNA. Meta is a repeat privacy offender. Although it regularly claims to keep its users' information private to garner a competitive advantage, it repeatedly fails to honor or adhere to its privacy promises and representations.

115. Regulators and courts have repeatedly warned Meta regarding this type of behavior, and the company has been sued repeatedly for its surreptitious tracking. For example, in 2012, Meta (then Facebook) entered into a consent agreement with the Federal Trade Commission ("FTC") after the FTC alleged that Facebook deceived consumers by misrepresenting their ability to control their privacy and personal information and by sharing that information in violation of the privacy choices those consumers made. As part of that agreement, Facebook agreed to make substantial changes prohibiting misrepresentation by Facebook regarding privacy and required clear and prominent privacy notices, limitations on sharing information with app developers, the implementation of a comprehensive privacy program and third-party audits and oversight by the FTC.[77]

116. Despite the 2012 Agreement, Meta continued to violate its users' privacy rights and repeatedly breached the prior FTC agreement. This resulted in the FTC taking further action in 2019 and Facebook agreeing to "pay a record-breaking $5 billion penalty, and submit to new restrictions and a modified corporate structure that will hold the company accountable for the decisions it makes about its users' privacy" based on Meta's failure to comply with the 2012 consent agreement.[78]

117. Yet again, Meta failed to comply with the 2012 and 2019 consent agreements that it had entered into with the FTC, causing the FTC in 2023 to propose revoking the 2019 order and reopening the case to increase the fine, force additional privacy changes, and increase monitoring to

---

[77] *Decision and Order*, *In the Matter of re Facebook, Inc*., Docket No. C-4365, 2012 FTC LEXIS 135 (July 27, 2012), https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebookdo.pdf.

[78] *FTC Imposes $5 Billion Penalty, Sweeping New Privacy Restrictions on Facebook*, FEDERAL TRADE COMMISSION, (July 24, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook.

force Meta to comply with the prior orders.[79] Despite Meta's attempts to reframe itself as a company that respects user privacy, it acts no differently than it has in the past.

118. Meta's long history of false statements and privacy scandals is a part of its business model. Meta has repeatedly pushed boundaries on user tracking and data collection, violating user trust, and yet, despite paying billions in fines and settlements, it continues to find ways to obtain more data from consumers through deceptive means, and to sell more products with false promises of privacy and user control of data.

119. At this point, Meta's pattern of behavior is clear and alarming: violate consumers' privacy interests, monetize the data collected, pay the fines, and then rinse and repeat. As long as profits outweigh penalties, nothing changes. Meta's pattern of misconduct must be stopped through the injunctive relief that Plaintiffs seek.

## III. JURISDICTION

120. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

121. This Court has personal jurisdiction over Defendants. The Court has general jurisdiction over Meta because it is headquartered in the State of California. The Court also has specific jurisdiction over both Defendants because both purposefully availed themselves of this forum by conducting substantial business within California and thus both have significant, continuous, and pervasive contacts with the State of California.

[79] *Order to Show Cause Why the Commission Should Not Modify the Order and Enter the Proposed New Order*, *In the Matter of Facebook, Inc.*, Docket No. C-4365 (May 3, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/C4365-Commission-Order-to-Show-Cause-%28Redacted-Public%29.pdf.

## IV. DIVISIONAL ASSIGNMENT

122. This civil action arises in San Mateo County, California. Accordingly, assignment to the San Francisco Division is proper pursuant to Civil L.R. 3-2(c) and Civil L.R. 3-2(d).

## V. VENUE

123. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant Meta Platforms Inc. resides in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## VI. PARTIES

### A. Plaintiffs

#### i. Allegations Common to Purchaser Plaintiffs

124. Except where specifically alleged otherwise, Beltran, Perez, Moore, PL01, PL02, Diedrich, PL03, PL04, Fraser, PL05, Doerr, PL06, PL07, PL08, PL09, Woodhead, Hatch, PL10, Hardman, PL11, Russi, PL12, Lewis, PL13, PL14, Galindo, Lopez, PL15, Yancy, Dezarn, Stewart, Singh, PL17, PL18, PL19, PL20, Miller, Williams, Dawson, Bodine, PL21, Johnson, Enriquez, Sukhai, PL23, Decker, PL24, PL25, PL26, PL27, and PL43 ("Purchaser Plaintiffs") each allege the allegations set forth in this subsection. These allegations are in addition to, and do not limit, the allegations specific to each Plaintiff set forth below.

125. Purchaser Plaintiffs purchased the Meta AI Glasses for personal use. In deciding to make their purchases, each Purchaser Plaintiff viewed and heavily relied on the Challenged Representations and Omissions, leading each Purchaser Plaintiff to believe that the Meta AI Glasses were designed for, and would, protect their and User's privacy.

126. At the time of purchase, no Purchaser Plaintiff knew that the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect their privacy; that Meta uploaded and stored video and audio captured by the Glasses and transmitted it to offshore human reviewers, and used this data to train Meta's AI systems without purchasers' or users' consent.

127. No Purchaser Plaintiff noticed any disclaimer, qualifier, or other explanatory statement or information on the Products' advertising or marketing that contradicted the prominent Challenged

Representations and Omissions or otherwise suggested that the Meta AI Glasses would not have the advertised privacy protections.

128. No Purchaser Plaintiff would have purchased the Products, or would have paid as much for the Products, had Defendants not made the false and misleading Challenged Representations and Omissions and/or had the Purchaser Plaintiffs otherwise known that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections.

129. Each Purchaser Plaintiff cares deeply about their privacy and would not have purchased or used the Product in the manner that they did if they knew that Meta would surreptitiously collect, store, transfer, and otherwise allow unknown individuals to view images and videos listen to audio taken by the Products or that Meta would build its AI infrastructure on such data.

130. Each Purchaser Plaintiff desires to purchase Defendants' Products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected privacy, as advertised.

131. In the future, each Purchaser Plaintiff will therefore be unable to determine the truth and accuracy of the Products' Challenged Representations and Omissions, as well as whether the Defendants ensure their privacy is protected and images and videos taken with the Glasses not collected, stored, and viewed by currently unknown third parties or exploited by Meta to develop its AI systems.

132. Each Purchaser Plaintiff is, and continues to be, unable to rely on the truth of the Challenged Representations and Omissions on the Products' advertising and marketing.

133. Defendants continue to market and sell the Products and have not taken appropriate action to make clear the falsity or misleading nature of the Challenged Representations and Omissions. Accordingly, each Purchaser Plaintiff is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products to perform as advertised and that the Product features are accurately described.

134. As a direct result of Defendants' conduct, Purchaser Plaintiffs have suffered injury and damages, including, but not limited to, economic injury stemming from the diminished value of the Product and/or expenditure of funds on the Product, a loss of privacy, frustration of reasonable

expectations of privacy, mental anguish, humiliation, lost value in personal data, and face an ongoing risk of further unauthorized disclosure.

**ii. Allegations Common to the User Plaintiffs**

135. Except where specifically alleged otherwise, Plaintiffs Beltran, Perez, Moore, PL01, PL02, Diedrich, PL03, PL04, Fraser, K. Stewart, PL05, Doerr, PL06, PL07, PL08, PL09, Woodhead, Hatch, PL10, Hardman, PL11, Russi, PL12, Lewis, PL13, PL14, Galindo, Lopez, PL15, Yancy, Dezarn, PL16, Singh, PL17, PL18, PL19, PL20, M. Miller, Williams, Dawson, Bodine, PL21, Johnson, Tittl, Enriquez, Sukhai, PL22, PL23, Decker, PL24, PL25, PL26, PL27, PL28, PL29, PL40, and PL43 ("User Plaintiffs") each allege the allegations set forth in this subsection. These allegations are in addition to, and do not limit, the allegations specific to each Plaintiff set forth below.

136. Meta deliberately captured, transmitted, and stored droves of personal data, including imagery and audio recorded on each User Plaintiff's Meta AI Glasses. Meta routed to third-party human annotators at Sama personal data, including imagery and audio depicting private settings and personal activities that the User Plaintiff reasonably expected to remain private. No User Plaintiff provided express consent for Meta to collect and store this data or disclose it to third-party annotators for review and labeling, or use it to train Meta's proprietary AI models. This highly sensitive personal data, including visual and audio data is no longer under the control of the User Plaintiffs, and Meta cannot assure that it will not be viewed, distributed, or used by unauthorized parties.

137. When Meta AI is invoked on the Glasses—whether intentionally, accidentally, or through a misidentified wake phrase—the Glasses capture audio, images, video, and associated metadata and transmit the content by Bluetooth or Wi-Fi to the user's paired smartphone running the Meta AI application and to Meta's cloud servers.

138. These transmissions include both electronic and oral communications and constitute transfers of signs, signals, images, sounds, data, and intelligence by radio, electromagnetic, and photoelectronic systems affecting interstate commerce. Each User Plaintiff intended those transmissions to be private and had a reasonable expectation that they were private, based on Defendants' representations that the Products were designed for privacy and that users controlled their own data.

139. Meta acquired the contents of that data, including oral and electronic communications, in real time, contemporaneously with their transmission, and not from storage after the transmission was complete.

140. The Glasses-to-smartphone transmission of electronic communications occurs between two devices belonging to User Plaintiffs. Meta was not an intended participant in that transmission. Meta acquired the contents of these electronic communications through a separate and simultaneous channel, in a manner undetectable by the User Plaintiffs.

141. User Plaintiffs' oral communications and conversations are recorded in real time by Meta. Meta was not a participant in those conversations. It was an unannounced silent auditor.

142. Further, Meta disclosed the contents of those oral and electronic communications to third-party human annotators at Sama, and used them to train Meta's AI models, knowing that the contents had been obtained through interception.

143. No User Plaintiff expressly or impliedly consented to the interception, disclosure, or use of any of these oral or electronic communications. No User Plaintiff consented to the interception of audio captured when the Glasses were triggered accidentally or by a misidentified wake phrase, and no act of any User Plaintiff could give rise to an inference of consent to such interception.

144. As a direct result of Meta's conduct, intentional and surreptitious intrusion upon each User Plaintiff's seclusion, solitude, and private life, each User Plaintiff has suffered injury and damages, including but not limited to, a loss of privacy, frustration of their reasonable expectations of privacy, mental anguish, and lost value in their personal data, and faces an ongoing risk of further unauthorized disclosure

**iii. Allegations Common to the Bystander Plaintiffs**

145. Except where specifically alleged otherwise, Plaintiffs PL24, PL27, PL28, PL29, PL30, PL31, PL32, PL33, PL34, PL35, PL36, PL37, PL38, PL39, PL40, PL41, PL42, PL44 and PL45 ("Bystander Plaintiffs") each allege the allegations set forth in this subsection. These allegations are in addition to, and do not limit, the allegations specific to each Plaintiff set forth below.

146. Defendants designed the Meta AI Glasses to be worn continuously in public and private spaces and to be visually indistinguishable at conversational distance from ordinary Ray-Ban and Oakley eyewear that records nothing.

147. The Products' microphone array and camera capture the speech, image, and likeness of every person within range of the wearer, whether or not that person is a user of the Products, has any relationship with the wearer, or is aware of the Products' capabilities and Meta's practices.

148. Meta deliberately captured, duplicated, transmitted, and stored droves of personal data and communications, including audio, images, and video of Bystander Plaintiffs and Bystander Class members, and routed that content to third-party human annotators at Sama for review and labeling. Meta used that content to train Meta's proprietary artificial intelligence models. This data included videos, photographs, and audio of persons who were bystanders—persons depicted, seen, or heard in these videos, photographs, and audio recordings, but who were not the user of the Meta AI Glasses at the time they were recorded. Bystanders reasonably expected the recorded moments to remain private and, as alleged in more detail above, generally had no knowledge that they were being recorded in the first place.

149. No Bystander Plaintiff or Bystander Class member gave express or implied consent for Meta to collect and store this data, to disclose it to third-parties, or to use it to train Meta's proprietary AI models.

150. Bystander Plaintiffs had no knowledge nor expectation that their data and communications were being intercepted by Meta. The notice mechanisms Defendants built into the Glasses fail to provide a reasonably effective announcement that a person's electronic communication, conversation, image, or likeness is being recorded or transmitted, because: (a) the light is frequently unnoticed at conversational distance and is not visible to a person outside the wearer's line of sight; (b) the light can be concealed with minimal effort, and instructional videos and products enabling wearers to disable it are widely available; (c) the shutter tone is readily masked by ambient noise; and (d) neither operates when Meta AI is triggered accidentally. Defendants knew the notice mechanisms were inadequate. Defendants published a privacy guide describing the indicator light and shutter tone

as their means of protecting the privacy of people around the wearer, while continuing to market and sell a device that records nonconsenting bystanders and delivers those recordings to Meta.

151. Even Bystanders who agreed to be recorded on a particular occasion never provided legal consent to Meta's practices because they were never apprised that the recording of their likeness would be transmitted, stored, and exploited by Meta for AI purposes, or viewed by strangers overseas.

152. Bystander Class members include minors under the age of 13. Defendants captured, transmitted, retained, and routed to Sama audio, images, and video of minor bystanders. No parent or guardian of any minor bystander received notice of, or provided verifiable consent to, that collection. Meta's conduct violates the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501–06, and the COPPA Rule, 16 C.F.R. pt. 312, which prohibit an operator of a website or online service directed to children, or an operator having actual knowledge that it is collecting personal information from a child under 13, from collecting such information without first obtaining verifiable parental consent. Personal information includes a photograph, video, or audio file containing a child's image or voice. 16 C.F.R. § 312.2.

153. No parent of any minor Bystander had any knowledge or expectation that a minor's interactions with Meta Glasses' AI features would capture videos, images, and the voice of the minor, and that Meta would intercept, upload, store and exploit such data to build its AI models or disclose it to off-shore human reviewers who would access and view such sensitive data.

154. Bystander Plaintiffs and Bystander Class members suffered injury and damages, including but not limited to, a loss of privacy, frustration of their reasonable expectations of privacy, mental anguish, and lost control over and value in their personal data, misappropriation and loss of value of their likeness, and an ongoing risk of further unauthorized disclosure.

### iv. Allegations Specific to Each Plaintiff

#### 1. Plaintiff Steven Beltran (California) (Purchaser and User)

155. Plaintiff Steven Beltran is, and at all relevant times has been, a citizen and resident of the State of California. In or about November 2025, Plaintiff Beltran purchased one pair of Ray-Ban Wayfarer Second Generation Meta AI Glasses.

156. Before learning that Defendants' Challenged Representations and Omissions were false, Plaintiff Beltran used his Glasses with the AI feature frequently, including, but not limited to, asking questions.

157. Plaintiff Beltran did not know that Meta was surreptitiously collecting and capturing the moments every time he activated Meta's AI and sending them to their offshore contractors for review, tagging the images and videos, and storing them to train AI. He did not and could not have expected that all these images, videos, and audio would be subject to a systematic review, annotation, and embedding into AI models.

158. Plaintiff Beltran's Glasses falsely activate twice a day.

159. Meta captured, transmitted, and routed to Sama the imagery and audio recorded on Plaintiff Beltran's Glasses depicting private settings and personal activities he reasonably expected to remain private. Plaintiff Beltran never expressly nor implicitly consented to Meta's collection of this data, disclosing it to Sama for review and labeling, or using it to train Meta's AI models. That footage is no longer under his control, and Meta cannot guarantee it will not be viewed, distributed, trained on, or used by others. Plaintiff Beltran desires to purchase and use Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected his privacy, as advertised.

**2. Plaintiff Alicia Perez (New York) (Purchaser and User)**

160. Plaintiff Alicia Perez is, and at all relevant times has been, a citizen and resident of the State of New York. In or about February 2025, Plaintiff Perez purchased one pair of Ray-Ban Gen 1 Skyler Meta AI Glasses. In or about March 2026, Plaintiff Perez purchased one pair of Ray Ban Wayfarer Gen 2 Meta AI Glasses.

161. Before learning that Defendants' Challenged Representations and Omissions were false, Plaintiff Perez used her Glasses with the AI feature frequently, including, but not limited to, asking questions. Plaintiff Perez did not know that Meta was surreptitiously collecting and capturing the moments every time she activated Meta's AI and sending them to their offshore contractors for review, tagging the images and videos, and storing them to train AI. She did not and could not have

expected that all these images, videos, and audio would be subject to a systematic review, annotation, and embedding into AI models.

162. Plaintiff Perez's Glasses falsely activate frequently.

163. Meta captured, transmitted, and routed to Sama the imagery and audio recorded on Plaintiff Perez's Glasses depicting private settings and personal activities she reasonably expected to remain private. Plaintiff Perez never expressly nor implicitly consented to Meta's collection of this data, disclosing it to Sama for review and labeling, or using it to train Meta's AI models. That footage is no longer under her control, and Meta cannot guarantee it will not be viewed, distributed, trained on, or used by others. Plaintiff Perez desires to purchase and use Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected his privacy, as advertised.

**3. Plaintiff Terrance Moore (Illinois) (Purchaser and User)**

164. Plaintiff Terrance Moore is, and at all relevant times has been, a citizen and resident of the State of Illinois. Plaintiff Moore purchased one pair of Ray Ban First Generation Meta AI Glasses in approximately March 2025. Plaintiff Moore purchased one pair of Ray Ban Second Generation Meta AI Glasses in approximately March 2026.

165. Before learning that Defendants' Challenged Representations and Omissions were false, Plaintiff Moore used his Glasses with the AI feature frequently, including, but limited to, listening to music, recording videos, and asking questions. He did not know that Meta was surreptitiously collecting and capturing the moments within view of the Glasses every time he activated Meta's AI and sending them to their offshore contractors for review, tagging the images and videos, and storing them to train AI. He did not and could not have expected that all these images, videos, and audio would be subject to a systematic review, annotation, and embedding into AI models.

166. Plaintiff Moore's Glasses falsely activate frequently.

167. Meta captured, transmitted, and routed to Sama the imagery and audio recorded on Plaintiff Moore's Glasses depicting private settings and personal activities he reasonably expected to remain private. Plaintiff Moore never expressly nor implicitly consented to Meta's collection of this data, disclosing it to Sama for review and labeling, or using it to train Meta's AI models. That footage

is no longer under his control, and Meta cannot guarantee it will not be viewed, distributed, trained on, or used by others. Plaintiff Moore to purchase and use Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected his privacy, as advertised.

**4. PL01 (California) (Purchaser and User)**

168. Plaintiff PL01 is a citizen of California and has resided in Los Angeles County, California, at all times relevant to this Complaint. PL01 purchased the Meta AI Glasses from the Sunglass Hut store in the Century City Mall, believing that the Meta AI Glasses would not transmit his private data without his consent.

169. Before learning that Defendants' Challenged Representations and Omissions were false, PL01 used his Glasses with the AI feature frequently, asking AI questions, playing music, and capturing private moments in his everyday life. In at least one instance, PL01 used the "Hey Meta" feature during an intimate moment in the privacy of his bedroom. He did not know that Meta was surreptitiously collecting and capturing that very moment, and would send this moment, along with many others captured every time he activated Meta's AI, to their offshore contractors for review, tagging the images and videos, and storing them to train AI. He did not and could not have expected that all these images, videos, and audio would be subject to a systematic review, annotation, and embedding into AI models.

170. Meta captured, transmitted, and routed to Sama the imagery and audio recorded on PL01's Glasses depicting private settings and personal activities he reasonably expected to remain private. PL01 never expressly nor implicitly consented to Meta's collection of this data, disclosing it to Sama for review and labeling, or using it to train Meta's AI models. That footage is no longer under his control, and Meta cannot guarantee it will not be viewed, distributed, trained on, or used by others. PL01 desires to purchase and use Defendants' products again if the Challenged Representations and Omissions were true—i.e., if Defendants' Products were designed for and actually protected his privacy, as advertised.

**5. Plaintiff PL02 (Florida and Alabama Purchaser, Alabama User)**

171. Plaintiff PL02 is a citizen and resident of Shelby County, Alabama.

172. On October 18, 2023, while physically in the state of Florida, PL02 purchased a pair of Meta AI Glasses from Amazon, one of Defendants' authorized retailers, for $405.53. On July 11, 2025, while physically in the state of Alabama, PL02 purchased another pair of Meta AI Glasses, again from Amazon, for $566.90. At the time of each purchase, PL02 believed that the Meta AI Glasses would not transmit his private data without his consent.

173. Before learning that the Challenged Representations and Omissions were false, PL02 wore his prescription Meta AI Glasses regularly, including using the AI feature to make intentional recordings about once a week—not realizing that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. PL02 has worn his Glasses and used the AI features during intimate moments, while changing clothes, while looking at financial information on his computer, and while speaking passwords aloud. He frequently left his Glasses on the bathroom counter while showering.

**6. Plaintiff James Diedrich (Alabama) (Purchaser and User)**

174. Plaintiff James Diedrich is a citizen and resident of Madison County, Alabama.

175. On January 21, 2026, while physically present in the State of Alabama, Diedrich purchased the Meta AI Glasses from the Meta online store for $409.32 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy, controlled by you" and would not transmit his private data without his consent.

176. In deciding to make the purchase, Diedrich viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Diedrich to believe that the Meta AI Glasses were designed for, and would, protect his privacy. In particular, Diedrich viewed the representations on Meta's website about privacy protections and saw additional advertisements on social media in which the Glasses were portrayed as "secured." Diedrich relied heavily on this when deciding to purchase the Product. At the time of purchase, Diedrich did not know the Challenged Representations and Omissions were false and deceptive—i.e., that the Meta AI Glasses were not designed for and would not protect his privacy: that the Glasses recorded and

transmitted video and audio captured by the Glasses to offshore human reviewers, and used this data to train Meta's AI systems without purchasers' or users' consent.

177. Before learning that the Challenged Representations and Omissions were false, Diedrich wore his Glasses a few times a week and used the "Hey Meta" feature to listen to music and record his surroundings, including when using the restroom. He has used the "Hey Meta" feature while looking at his banking information. However, he noticed photos showing up in the gallery of his Meta Glasses App which he did not take, which meant that the Glasses' AI activated and captured images without his knowledge or command.

**7. Plaintiff PL03 (Colorado) (Purchaser and User)**

178. Plaintiff PL03 is a citizen and resident of Arapahoe County, Colorado.

179. While in the State of Colorado, PL03 purchased the Meta AI Glasses from the Meta online store on May 2, 2025 for $396.00, plus $0.29 retail delivery fee, for a total of $400.41, after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

180. Before learning that the Challenged Representations and Omissions were false, PL03 used the Glasses and their AI features frequently, including during intimate moments with his spouse, at his children's performance events, while looking at his banking information, and at sensitive family moments including his father's funeral. PL03 used the AI features of his Glasses to take a photo of his driver's license. AI features on PL03's Facebook account once showed him a photo of his wife which PL03 had taken with his Glasses but had never uploaded to social media, and PL03 was unsure how Facebook had access to this photo of his wife. PL03 has also noticed that his Glasses sometimes make the "after recording" noise prompt, when he has not instructed them to record anything. This means that the Glasses often activated its AI even without his instruction, recording his surroundings and individuals, including during private moments.

**8. Plaintiff PL04 (Florida) (Colorado Purchaser and Florida User)**

181. Plaintiff PL04 is a citizen and resident of Florida.

182. On June 8, 2024, while physically present in the State of Colorado, PL04 purchased a pair of Meta AI Glasses online from Best Buy for $349.76. On February 14, 2026, PL04 purchased

another pair from a Sunglass Hut—one of Defendants' authorized retailers—in Cherry Creek, Colorado for $544.66. PL04 believed the Glasses would not transmit his private data without his consent.

183. Before learning that the Challenged Representations and Omissions were false, PL04 wore his prescription Meta Glasses daily frequently and used the Glasses in his day-to-day activities, including paying bills, looking at private financial documents, and bathing his two-year-old child at least once a week between September 2025 and February 2026. PL04 frequently used the "Hey Meta" feature to ask questions and play music, including during these activities, not realizing that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. PL04 is concerned that the Glasses captured sensitive family moments and private financial information.

**9. Plaintiff Rickford Fraser (Massachusetts) (Purchaser and User)**

184. Plaintiff Rickford Fraser is a citizen and resident of Hampden County, Massachusetts.

185. On October 18, 2025, Fraser purchased the Meta AI Glasses from a Walmart Eye Clinic—one of Defendants' authorized retailers of the Product—in Springfield, Massachusetts for $42 (insurance covered the remainder) believing that the Meta AI Glasses would not transmit his private data without his consent.

186. The customer service representative who sold Fraser his Glasses set up the Meta Glasses App, synced the App with Fraser's Glasses, and clicked through the service agreement in the App. Fraser did not view or approve of the service agreement.

187. Before learning that the Challenged Representations and Omissions were false, Fraser used his Meta Glasses daily as his prescription glasses, including wearing them to doctor's appointments, using them while speaking with the doctors about his health, medical conditions, and sensitive medical questions. He wore them at home, activating AI to play music while he got dressed, made calls, and went about his day not realizing that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. Fraser did not know any of it, that his voice, his face, his medical history could and ultimately would end up reviewed by stranger across the globe.

**10. Plaintiff Kristi Stewart (Michigan) (User)**

188. Kristi Stewart is a citizen of Michigan and has resided in Montcalm County, Michigan at all times relevant to this Complaint. Stewart requested, and received, the Meta AI Glasses from her husband, who, while in Michigan, purchased them on eBay on December 13, 2025 for $379.99.

189. In deciding to request the Glasses from her husband, Stewart viewed and relied on Defendants' advertising and marketing, including the Challenged Representations and Omissions, leading Plaintiff Stewart to believe that the Meta AI Glasses were designed for, and would, protect her privacy.

190. Before learning that the Challenged Representations and Omissions were false, Stewart used the Glasses frequently, including using the AI features of the Glasses to make phone calls, send private text messages, and to record her children's sporting events. Stewart used to wear the Glasses to dance competitions and would wear them backstage while changing costumes in the dressing room, sometimes using the Meta Glasses to make calls while doing so—thereby activating the AI features of the Meta Glasses and triggering them to capture what was in view. Every call she made through the Glasses meant that whoever she was speaking with, friends, family, children's doctors, and anyone else had their voice and conversations captured too, without ever knowing it. In using Glasses' AI features regularly while having private conversations with her friends, family members, and others, Stewart did not know that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. Stewart has also worn the Glasses and used their AI features to respond to text messages while in the bathroom—again triggering the Glasses to capture images or recording of her.

**11. Plaintiff PL05 (Michigan) (Purchaser and User)**

191. PL05 is a citizen of Michigan and has resided in Oakland County, Michigan, at all times relevant to this Complaint.

192. On September 4, 2024, PL05 purchased the Meta AI Glasses in person from the Lens Crafters in Troy, Michigan—one of Defendants' authorized retailers of the Product—for $688.33, believing that the Meta AI Glasses would not transmit her private data without her consent.

193. Before learning that the Challenged Representations and Omissions were false, PL05 used the Meta AI Glasses daily as her prescription glasses, and used the AI feature frequently to take general pictures and video for her own private use – such as photos and videos of her family members or friends, or review her financial information. PL05 wore her prescription Glasses during most waking hours and used the AI features to listen to music much of the time, including when changing clothes in the privacy of her room in front of a mirror, while changing into a gown at the doctor's office, while looking over private medical records, and while using the restroom. She has left her Glasses on the nightstand and used them to play music while intimate with her partner—not knowing that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it and feeding it into the systematic training of Meta's AI models.

**12. Plaintiff Daniel Doerr (Nevada) (Purchaser and User)**

194. Plaintiff Daniel Doerr is a citizen and resident of Clark County, Nevada.

195. While physically present in the State of Nevada, Doerr purchased the Meta AI Glasses from Meta's website at www.meta.com in April 2025 for $328.38, after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

196. Before learning that the Challenged Representations and Omissions were false, Doerr wore his Glasses and used AI features while viewing personal sensitive information, including personal banking information, not realizing that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**13. Plaintiff PL06 (New York) (Purchaser and User)**

197. Plaintiff PL06 is a citizen of New York and has resided in Queens County, New York, at all times relevant to this Complaint.

198. On August 2, 2025, PL06 purchased the Meta AI Glasses from the Ray-Ban online store for $404.61 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

199. Before PL06 learned that the Challenged Representations and Omissions were false, she used the Glasses frequently, including using the AI feature to answer the phone with the Glasses when she was caring for her toddler—including bathing and diaper changes—or when she was driving, exposing her private conversations with others to a device she believed only she controlled. She also used to wear her Glasses while delivering packages for Amazon, and would look at customers' addresses while wearing the Glasses. After her mother's death, PL06 wore the Glasses while viewing private and personal documents, including her family members' social security numbers. She has also been in conversations, discussing private or personal matters, including her daughter's behavior at school, Medicaid and social security information, and funeral arrangements for her mother, during which times she has heard the Glasses say "huh" as though she had said "Hey Meta," when she had not said anything to trigger the AI. She did not realize that her or Meta's own activation of the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**14. Plaintiff PL07 (North Carolina) (Purchaser and User)**

200. Plaintiff PL07 is a citizen of North Carolina and has resided in Mecklenburg County, North Carolina, at all times relevant to this Complaint.

201. On March 18, 2024, PL07 purchased the Meta AI Glasses from a Target Optical in Matthews, North Carolina for $564.38, believing that the Meta AI Glasses would not transmit her private data without her consent.

202. Before learning that the Challenged Representations and Omissions were false, PL07 wore her prescription Meta Glasses every day, using the AI features to photograph her minor child throughout all different moments of childcare—changing diapers, bathing her child—moments no parent thinks to guard against because the only person they imagine watching is themselves. She wore the Glasses at work where she regularly handled other people's personally identifiable information on her computer, unintentionally exposing not only her own but other people's personally identifiable information and the confidential data of other people. She did not know that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**15. Plaintiff PL08 (Texas) (Purchaser and User)**

203. Plaintiff PL08 is a citizen and resident of Harris County, Texas.

204. On November 21, 2025, PL08 purchased the Meta AI Glasses in-person at a Target located in Houston, Texas—one of Defendants' authorized retailers—for $450.55, believing that the Meta AI Glasses would not transmit his private data without his consent.

205. Before learning that the Challenged Representations and Omissions were false, PL08 used the Glasses and their AI features frequently to play music, record videos, engage in his real estate business, and has left his glasses on the bedside during private and intimate moments with his partner, never imaging that footage would leave his device or be subject to review by others. PL08 often used the Glasses' AI features to listen to radio, including while using the restroom, when naked and changing clothes in front of a mirror, and when looking at his personal banking data. He has also used the "Hey Meta" feature to take photos of and ask questions about bills. He did not know that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**16. Plaintiff PL09 (Pennsylvania) (Purchaser and User)**

206. Plaintiff PL09 is a citizen and resident of Pike County, Pennsylvania.

207. On December 26, 2024, PL09 purchased a pair of Meta AI Glasses in-person at a LensCrafters in Stroudsburg, Pennsylvania—one of Defendants' authorized retailers—for $476.19 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

208. Before learning that the Challenged Representations and Omissions were false, PL09 wore the Glasses most of the time and used the AI features while looking at his personal health information, passwords, and credit card numbers. He wore the Glasses and used the AI feature during intimate moments with his wife, and while his wife was within sight breastfeeding their child, and at her bedside in the hospital as she was prepared to give birth — including while she was nude. PL09 feels distress that naked and sensitive images of his pregnant wife have been captured by the Meta Glasses without their intent, and is concerned about the potential for personal financial information being compromised, as he never thought that activating the AI meant sending whatever the Glasses

saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**17. Plaintiff Jeffry Woodhead (Utah) (Purchaser and User)**

209. Plaintiff Jeffry Woodhead is a citizen and resident of Salt Lake County, Utah.

210. On December 8, 2025, Woodhead purchased the Meta AI Glasses from a Lens Crafters in Murray, Utah—one of Defendants' authorized retailers—for $720.52, believing that the Meta AI Glasses would not transmit his private data without his consent.

211. Before learning that the Challenged Representations and Omissions were false, Woodhead wore his prescription Meta Glasses daily and used the "Hey Meta" feature frequently—experimenting with asking about what he was seeing, about the weather, and similar everyday prompts, while he was at home, at work, and surrounded by other people in private settings. Woodhead used the Glasses while looking at sensitive work information. Woodhead did not know that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. On some occasions Woodhead set his Glasses down beside him while he was getting dressed. Most recently, in early March 2026, Woodhead was in a dressing room at a Zion Canyon hot spring and had placed his glasses beside him when he realized they had been recording him when he was undressed—without his knowledge, intent, or any command form him.

**18. Plaintiff Jason Hatch (Virginia) (Purchaser and User)**

212. Plaintiff Jason Hatch is a citizen and resident of Frederick County, Virginia.

213. On December 15, 2023, while in the Commonwealth of Virginia, Hatch purchased the Meta AI Glasses from the Ray-Ban online store for $453.40 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

214. Before learning that the Challenged Representations and Omissions were false, Hatch used the Meta AI Glasses frequently, including during his work with refugees —people for whom revealing their whereabouts, identities, and information could endanger themselves and loved ones. Hatch also wore his Glasses and used AI features while looking at his banking information,

license plate, and other identifying information. Hatch has used the AI feature of the Meta Glasses to share and go over medical documents with his wife, and to go over a prenuptial agreement that implicated all his and his wife's financial information. Hatch has worn his Glasses and looked directly at his credit card while paying for gas, sometimes while also using AI features. Hatch had no way to know that all that footage, once captured, would leave his device, reach reviewers with no connection to his work, no security clearance, and no reason to handle any of this with any care at all. Hatch was unaware that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**19. Plaintiff PL10 (New York) (Purchaser and User)**

215. Plaintiff PL10 is a citizen and resident of New York.

216. PL10 purchased two pairs of Meta AI Glasses from a Sunglass Hut in Brooklyn, New York: generation 1 Glasses in February 2023, and generation 2 Glasses in August 2025, paying about $300 for each. PL10 purchased the Glasses relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

217. Before learning that the Challenged Representations and Omissions were not true—i.e., that the Products did not contain the advertised privacy protections— PL10 used his Meta AI Glasses extensively, including in taking footage of family members which included footage of children: his daughter, nephews, and cousins. PL10 used the AI function of his Glasses extensively, including in translating conversations into Spanish, when he underwent a dental procedure in Colombia, and while discussing sensitive health and financial information. PL10 also used Glasses and AI features during intimate moments or when some individuals were undressing, and also while viewing financial information, health information, and passwords. He had no reason to think that a routine medical appointment, moments with loved ones, private conversations, intimate moments, and review of financial or medical information would end with all this information being captured and saved by Meta, viewed by strangers across the world, and used to train AI models systematically.

**20. Plaintiff Ryanna Hardman (Michigan) (Purchaser and User)**

218. Plaintiff Ryanna Hardman is a citizen and resident of Michigan.

219. While in Michigan, Hardman purchased the Meta AI Glasses online from the Amazon Meta store on June 8, 2025, for $281.10 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

220. Before learning that the Challenged Representations and Omissions were false, Hardman wore her Meta Glasses regularly. She wore the Glasses when visiting a hospitalized family member. She never intended to take any photos during that visit, but she later checked her gallery and discovered that the Glasses without any specific command had taken photos, capturing sensitive family moments and health information. The Glasses' AI activated without her knowledge and consent. She could not even imagine that those private moments would be recorded, or worse yet that since the AI was activated, it meant that the Glasses sent whatever they saw and heard to Meta's servers, exposing those private moments to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. Hardman now lives with the specific anxiety of not knowing what else the Glasses have recorded and taken from her and people around her.

**21. Plaintiff PL11 (Tennessee) (Purchaser and User)**

221. Plaintiff PL11 is a citizen and resident of Tennessee.

222. While in Tennessee, PL11 purchased the Meta AI Glasses online from glasses.com on January 10, 2026, for $500 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

223. Before learning that the Challenged Representations and Omissions were false, PL11 wore the Glasses and used the AI features while spending time with his family, during sensitive family moments, in private and while he was alone with his significant other in the privacy of his bedroom, and while reviewing his financial information. He did not know that any time AI activated on the Glasses, it was sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**22. Plaintiff Kevin Russi (Oregon) (Purchaser and User)**

224. Plaintiff Kevin Russi is a citizen and resident of Oregon.

225. While in Oregon, Russi purchased the Meta AI Glasses online from the Ray-Ban store on October 1, 2024, for $621.20 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

226. Before learning about the Challenged Representations and Omissions, Russi wore his Glasses and used the AI regularly, during everyday life moments, at home, in the bathroom, with his family and friends, exposing the Glasses to sensitive information from his everyday life and private conversations. He did not know that every time the Glasses AI activated, it was sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**23. Plaintiff PL12 (South Carolina) (Purchaser and User)**

227. Plaintiff PL12 is a citizen and resident of South Carolina.

228. PL12 purchased the Meta AI Glasses from a Best Buy in Summerville, South Carolina on December 20, 2025, for $394.24, plus $35.48 tax, for a total of $429.72, believing that the Meta AI Glasses would not transmit her private data without her consent.

229. Before learning that the Challenged Representations and Omissions were false and deceptive, PL12 wore her Glasses and used the AI features almost daily – during private conversations with her children, family, and friends, the moments she never imagined were heard by anyone but the people she was speaking to. She also wore the Glasses during worship services, moments of private religious practice, during intimate moments with her fiancé, while looking at her financial information, not knowing that anytime AI activated – whether intentionally or inadvertently – the Glasses were sending whatever they saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**24. Plaintiff Elizabeth Lewis (Washington, D.C.) (Purchaser and User)**

230. Plaintiff Elizabeth Lewis is a citizen and resident of Washington, D.C.

231. While in Washington, D.C., Lewis purchased the Meta AI Glasses online from Amazon.com in September 2023 for about $330, believing that the Meta AI Glasses would not transmit her private data without her consent.

232. Before learning that the Challenged Representations and Omissions were false and deceptive, Lewis wore her Glasses for hours each day. Lewis used the "Hey Meta" feature frequently out of excitement for the new technology, not knowing that activating AI triggered capturing and sending whatever the Glasses saw and heard to Meta's servers including sensitive financial information, exposing all of that sensitive information to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**25. Plaintiff PL13 (Georgia) (Purchaser and User)**

233. Plaintiff PL13 is a citizen and resident of Georgia.

234. While in Georgia, PL13 purchased a pair of Meta AI Glasses online from Ray-Ban on July 5, 2025, for about $800, and a second pair in person at a Best Buy in Douglasville, Georgia for about $400, believing that the Meta AI Glasses would not transmit his private data without his consent.

235. Before learning that the Challenged Representations and Omissions were false and deceptive, PL13 wore his prescription Glasses constantly, at home, at work, and throughout every part of his day, using "Hey Meta" feature often. PL13 did not know that activating the AI meant sending whatever the Glasses see and hear to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. The AI Glasses had been exposed to the entirety of his everyday life, everything he saw from the intimate moments in his bedroom, shower, bathroom, to his work, and more – all of the information he could not have imagined would be captured and misused.

**26. Plaintiff PL14 (Louisiana) (Purchaser and User)**

236. Plaintiff PL14 is a citizen and resident of Louisiana.

237. While in Louisiana, PL14 purchased the Meta AI Glasses online from Target.com on November 28, 2024, for $252.63, believing that the Meta AI Glasses would not transmit her private data without her consent.

238. Before learning that the Challenged Representations and Omissions were false and deceptive, PL14 wore the Meta Glasses daily and used the “Hey Meta” feature constantly, exposing the glasses to sensitive and private conversations with her family, friends, and doctors, including intimate conversations with her partner, while undressing in restrooms, during dental procedures (such as requesting to play music), while getting medical exams, and while looking at her personal financial information, including credit card numbers. She did not know that the innocent ask of Glasses AI to play or change songs or posing it simple questions, would secretively capture and send whatever the Glasses saw and heard to Meta’s servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta’s AI models.

**27. Plaintiff Favian Aveja Galindo (Indiana) (Purchaser and User)**

239. Plaintiff Favian Aveja Galindo is a citizen and resident of Indiana.

240. Galindo purchased the Meta AI Glasses from a Sam Wholesale in Indiana on September 16, 2025, for $263.12, believing that the Meta AI Glasses would not transmit his private data without his consent.

241. Before learning that the Challenged Representations were false and misleading, Galindo used the Glasses daily, as his primary glasses because they have prescription lenses, regularly using AI for innocuous things such as playing music or asking standard questions. Galindo wore the Glasses while entering private passwords, and while looking at medical bills, and afterwards was targeted for ads for consolidated loans for medical bills on social media. The Glasses also captured images from Galindo browsing his health records while wearing them. Galindo has also viewed highly confidential documents at work while wearing the Glasses, and since the AI often activates without a command, he is also concerned that the Glasses may have captured confidential data that he was reviewing.

**28. Plaintiff Angela Ruiz Lopez (Hawaii) (Purchaser and User)**

242. Plaintiff Angela Ruiz Lopez is a citizen and resident of Hawaii.

243. While in Hawaii, Lopez purchased the Meta AI Glasses online from the Meta store on December 22, 2025, for $409.00, plus $19.27 for taxes & fees, for a total of $428.27, after relying on

Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

244. Before learning that the Challenged Representations and Omissions were false and deceptive, Lopez used the Glasses every day, frequently using the "Hey Meta" feature to translate conversations into Spanish, using them for directions, and for general information. Lopez wore the Glasses and used the AI features while logging into her bank and health accounts. She did not know that every time she activated the AI or AI activated without her consent, whatever the Glasses saw and heard was being sent to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**29. Plaintiff PL15 (Kansas) (Purchaser and User)**

245. Plaintiff PL15 is a citizen and resident of Kansas.

246. While in Kansas, PL15 purchased the Meta AI Glasses online from Ray-Ban's website on July 16, 2025, for $396.00, believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

247. Before learning that the Challenged Representations and Omissions were false and deceptive, PL15 wore AI Glasses and used the AI features daily, not knowing that each time they captured sensitive moments, including intimacy. PL15 did not know that activating the AI meant sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**30. Plaintiff Chelasty Yancy (Florida) (Purchaser and User)**

248. Plaintiff Chelasty Yancy is a citizen and resident of Florida.

249. While in Florida, Yancy purchased the Meta AI Glasses online from the Oakley website on August 22, 2025, for $479.00, plus $33.53 tax, for a total of $512.53, believing that the Meta AI Glasses would not transmit his private data without his consent.

250. Before learning that the Challenged Representations and Omissions were false and deceptive, Yancy wore the Glasses and used the "Hey Meta" command while at work, when he was looking at confidential documents and passwords, and when he was at home, undressing, changing clothes, using the shower/bathroom—never knowing that any of it could be seen by anyone but him.

He did not know that each time AI was activated Meta was sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**31. Plaintiff Elvis Dezarn (Ohio) (Purchaser and User)**

251. Plaintiff Elvis Dezarn is a citizen and resident of Ohio.

252. While in Ohio, Dezarn purchased the Meta AI Glasses online from Meta.com on September 19, 2025, for $489.98, believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

253. Before learning that the Challenged Representations and Omissions were false and deceptive, Dezarn used his Glasses regularly, including frequently using the "Hey Meta" feature to ask questions. Sometimes, the AI feature on the Glasses activated on its own, without his command – talking or answering Dezarn when he did nothing to trigger it. He did not know that each time AI activated Meta was sending whatever the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. Since Dezarn used Glasses and AI features frequently—inside his home, in restrooms, during private conversations—the Glasses captured tremendous amount of personal and private information that he never expected anyone to see.

**32. Plaintiff PL16 (New Jersey) (User)**

254. Plaintiff PL16 (user) is a citizen and resident of New Jersey.

255. While in New Jersey, PL16's husband purchased the Meta AI Glasses for PL16 from LensCrafters Online on April 18, 2025, for $330. Both PL16 and his husband believed that the Meta AI Glasses would not transmit PL16's private data without his consent.

256. PL16 is concerned about the Glasses having captured sensitive footage. For example, PL16 wore the Glasses during intimate moments. He noticed that even during those private moments in the bedroom, AI activated when he did not ask anything at all. He did not know that Meta sent everything the Glasses saw and heard, including all of those captured intimate moments – especially the ones the AI recorded on its own, without his ever triggering it, to Meta's servers, exposing it to

strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. PL16 has also worn the Glasses and used the AI while looking at credit card and financial information.

**33. Plaintiff Sahilpreet Singh (New Hampshire) (Purchaser and User)**

257. Plaintiff Sahilpreet Singh is a citizen and resident of New Hampshire.

258. On October 11, 2025, Singh purchased a pair of Meta AI Glasses from a LensCrafters in Salem, New Hampshire for about $374. While in New Hampshire, Singh purchased a second pair of Meta AI Glasses online from Best Buy on November 21, 2025, for $374. In making these purchases, Singh relied on Meta's pervasive marketing campaign and believed that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

259. Prior to learning that the Challenged Representations and Omissions were false, Singh used his Glasses for multiple hours a day. Singh used them to assist with his hearing, used the "Hey Meta" feature for directions while driving, and used the Glasses and AI features when using his computer, while looking at his sensitive personal and financial information. The captured information included moments when Singh was intending to be alone, when he reviewed his personal financial information, and many more – as he used the Glasses for hours at a time. He did not know that all those times that he asked Meta for help, Meta sent everything the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**34. Plaintiff PL17 (Alaska) (Purchaser and User)**

260. Plaintiff PL17 is a citizen and resident of Alaska.

261. While in Alaska, PL17 purchased the Meta AI Glasses online from Meta's site on October 21, 2025 for $502.95 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

262. Before PL17 learned that the Challenged Representations and Omissions were false, PL17 used the Glasses daily, including AI features. PL17 used the Glasses and AI features when often looking at sensitive personal and financial data. PL17 has also noticed that frequently AI activated on its own, without any command at all. For example, after PL17 left his AI Glasses in the car, the Glasses

activated and recorded a private conversation between PL17's friend and his girlfriend—a video that appeared in PL17's gallery. In other instances, PL17 used the "Hey Meta" feature of the Glasses during intimate moments with his girlfriend, when he did not know that every time AI was summoned whether intentionally or unintentionally, everything the Glasses saw and heard Meta sent to its servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. PL17 and his girlfriend have broken up in part over concerns about these intimate moments that had been captured by Meta's AI.

**35. Plaintiff PL18 (California) (Purchaser and User)**

263. Plaintiff PL18 is a citizen and resident of California.

264. While in California, PL18 has purchased four pairs of Meta AI Glasses from the online Meta store: a Ray-Ban Skyler model on December 23, 2025, for $309.12; two pairs of Wayfarers on December 20, 2025 for $214.51 each; and a pair of Oakleys on March 5, 2026 for $449. In making these purchases, PL18 relied on Meta's pervasive marketing campaign and believed that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

265. Before learning that the Challenged Representations and Omissions were false and deceptive, PL18 used his Meta AI Glasses and AI features regularly. PL18 was wearing them inside the house, placing them on the bathroom counter in a way that any pair of glasses would be used. He noticed that at times photos of his family members using the bathroom and bathing began appearing in his gallery—footage no one in his household intended to take, and no one knew why it was being recorded, including the family members in it. PL18 used to wear his Glasses while looking at personal financial information. PL18 has also worn the Glasses during intimate moments with his wife and is concerned that the Glasses may have captured these moments without his knowledge—the same way that the Glasses had captured many other private moments. PL18 did not know that every time AI activated and proceeded to respond, record, or listen, Meta sent everything the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**36. Plaintiff PL19 (California) (Purchaser and User)**

266. Plaintiff PL19 is a citizen and resident of California.

267. While in California, PL19 purchased the Meta AI Glasses with a neural band online from Best Buy on February 4, 2026, for a total price of $799.99, believing that the Meta AI Glasses would not transmit his private data without his consent.

268. Before learning that the Challenged Representations and Omissions were false, PL19 used to wear his Meta Glasses for several hours a day, both at home and at work, and would use the "Hey Meta" function. PL19 used the Glasses and AI when looking at his sensitive medical and financial data, and when spending private moments with his family. PL19 works in healthcare and used to regularly wear his Meta Glasses, and including at times the AI features, while working with sensitive patient financial and health data—not knowing that any of this content could be exposed to any third party. PL19 has young children and used to wear the Glasses or keep them nearby while caring for his children, including when changing his child's diaper. PL19 has used the "Hey Meta" feature to ask for directions while traveling with his family and noticed that at times the Glasses would record his family and their surroundings without any command. At the time, PL19 thought this was only a "glitch." He did not know that every time AI activated (even without his summoning it), Meta captured everything the Glasses saw and heard and sent to its servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**37. Plaintiff PL20 (Illinois Purchaser, Illinois and Florida User)**

269. Plaintiff PL20 is a citizen and resident of Florida but also spends part of the year in Illinois.

270. While in Illinois, PL20 purchased a pair of Meta AI Glasses online from For Eyes in or around February 2025, believing that the Meta AI Glasses were "designed for privacy" and would not transmit her private data without her consent.

271. PL20 is concerned about the Glasses having captured sensitive personal footage and financial data. Before learning that the Challenged Representations and Omissions were false, PL20 used the Glasses daily as her prescription glasses. PL20 frequently activated the AI features for translation purposes. Once, while she was using the translation capabilities, she tried to play music with the Glasses and found that the music would not play. She discovered that the reason the music would not play was because the Glasses were recording—even though she had not told the Glasses to

record anything. PL20 was shocked to see that her conversation had been recorded without her knowledge or consent and some images saved in her gallery. PL20 has frequently worn her Glasses while taking care of her granddaughter, including when changing her granddaughter's diaper, and is concerned about the Glasses having captured footage exposing her infant granddaughter. PL20 has also worn the Glasses while paying bills and while using the restroom—and many other occasions when she expected to be alone. Once, PL20 used the AI Glasses to record intimacy with her husband and is anxious and mortified that those instances are being viewed by third parties, and are used to train Meta's AI.

**38. Plaintiff Mike Miller (Idaho) (Purchaser and User)**

272. Plaintiff Mike Miller is a citizen and resident of Idaho.

273. Miller purchased the Meta AI Glasses, along with prescription lenses from a LensCrafters in Boise, Idaho on October 16, 2025, for $793.99, believing that the Meta AI Glasses would not transmit his private data without his consent.

274. Miller's daughter set up the Meta Glasses App for Miller on his phone and clicked through the service agreement. Miller did not view the service agreement.

275. Miller had been wearing the Glasses for about a week before he synced them with his smartphone. When he did, he saw that the Glasses had taken photos of Miller using the restroom—without Miller's knowledge and without Miller telling the Glasses to record anything—and had uploaded the photos to Miller's Meta Glasses gallery. Miller had not realized that the Glasses were taking photos at all and did not even know the AI had activated. Miller also used to leave his Glasses on his nightstand while he slept and would sometimes notice the light come on to indicate the Glasses were recording, even though Miller had not instructed the Glasses to record or capture anything. Miller is concerned about what other sensitive or personal information the Glasses may have captured without his knowledge. Miller did not know that every time the AI was activated, even when he did not say "Hey Meta", Meta captured everything the Glasses saw and heard and sent it to Meta's servers, exposing many of these private moments—from the moments in the bathroom to the bedroom—to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**39. Plaintiff Benita Williams (Tennessee) (Purchaser and User)**

276. Plaintiff Benita Williams is a citizen and resident of Tennessee.

277. Williams purchased the Meta AI Glasses from a LensCrafters in Memphis, Tennessee in about May 2025 for $380, believing that the Meta AI Glasses would not transmit her private data without her consent.

278. Prior to learning that the Challenged Representations and Omissions were false, Williams wore the Glasses daily as her prescription eyeglasses, including to medical appointments, business meetings, and everywhere else that she went in her day. Williams used the "Hey Meta" feature frequently, not knowing that every time AI activated, Meta captured everything the Glasses saw and heard to Meta's servers, exposing it to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models, including sensitive information such as medical, or private information discussed in business meetings including financial information. Williams is concerned that the Glasses captured her private medical information, her private financial information, or other sensitive or confidential data discussed at work and in her daily life.

**40. Plaintiff Breandan Dawson (Mississippi) (Purchaser and User)**

279. Plaintiff Breandan Dawson is a citizen and resident of Mississippi.

280. In or about May 2025, while in Mississippi, Dawson purchased the Meta AI Glasses online from Amazon.com for about $300 after viewing and relying on Meta's pervasive marketing campaign that the Glasses were "designed for privacy, controlled by you," and believing that the Meta AI Glasses would not transmit his private data without his consent.

281. Dawson is concerned that the Glasses captured sensitive images, such as nudity, and personal financial and medical information. For example, before learning that the Challenged Representations and Omissions were false, Dawson wore his Meta AI Glasses daily, and they were one of the first things he reached for when we woke up in the morning. He often wore them in the bathtub while listening to music and using AI features and is concerned that the Glasses may have captured nude images without his knowledge. He has also worn his AI Glasses and used the AI features while at the doctor's office, and while paying for purchases with his credit card—in situations in which his credit card number would have been clearly visible to the Glasses. At no time did Dawson know

that activating AI would let Meta send everything the Glasses saw and heard to Meta's servers, exposing his private moments, including in the bathtub and/or in a medical office, to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models. Dawson is worried about future consequences of the exposure of his financial information, and the embarrassment of someone seeing him in a compromising position.

**41. Plaintiff Russell-Phillip Bodine (Texas) (Purchaser and User)**

282. Plaintiff Russell-Phillip Bodine is a citizen and resident of Texas. On November 15, 2025, while in Texas, Plaintiff Bodine purchased the Meta AI Glasses online from the Ray Ban store for $807.67 after relying on Meta's pervasive marketing campaign and believing that the Meta AI Glasses were "designed for privacy" and would not transmit his private data without his consent.

283. Before learning that the Challenged Representations and Omissions were false, Bodine wore his prescription Meta AI Glasses as his standard Glasses, and sometimes used the AI features in the privacy of his home. Bodine did not know that the Glasses captured much of his day-to-day moments, including personal sensitive information when he activated AI or when AI activated without his knowledge, sending everything the Glasses saw and heard to Meta's servers, exposing all of those captured moments to strangers paid to watch it, and feeding it into the systematic training of Meta's AI models.

**42. Plaintiff PL21 (California Purchaser and Maryland User)**

284. Plaintiff PL21 is a resident and citizen of Maryland. On September 14, 2024, while in California, PL21 bought a pair of Meta AI Glasses from a Best Buy in Chula Vista, California for $492.17.

285. Before learning that the Challenged Representations and Omissions were false, PL21 wore AI Glasses almost every day, and used the "Hey Meta" feature constantly to play music, take photos, answer phone calls, and send messages hands-free—entirely unaware that using the AI features triggered Meta to capture and transmit everything the Glasses saw and heard to Meta's servers, train its AI on them, and expose it to strangers across the world. PL21 used the "Hey Meta" feature of his Glasses to capture silly photos and video of his young children, including in the bathtub, asked "Hey Meta, what time is it?" while changing his own and his children's clothes, and even while using

the bathroom—thus triggering the AI feature to capture images of PL21 in very private moments every person expects to be alone. He has also left his Glasses on the nightstand during intimacy with his partner, unintentionally facing the bed, and had seen that several times the AI activated without him touching or saying, "Hey Meta." PL21 is deeply concerned that all these private moments are being viewed by other individuals and are being used to train Meta's AI, which he never intended.

**43. Plaintiff Dijjean Johnson (North Carolina) (Purchaser and User)**

286. Plaintiff Dijjean Johnson is a citizen and resident of North Carolina. On November 26, 2024, he purchased a pair of Meta AI Glasses at a LensCrafters in Cedar Rapids, Iowa for about $250.19. He was told by a salesperson that the pictures taken with the Glasses would just "sit in a cloud." Before purchasing the Glasses, Johnson reviewed Meta's site to understand the features and read that the information from his Glasses would not be collected or stored, and that in general the Glasses would be private.

287. Before learning that the Challenged Representations and Omissions were false, Johnson wore his prescription Glasses frequently and often used the "Hey Meta" feature to ask questions about the weather, and about buildings and trees that he saw. He also used the "Hey Meta" feature to listen to music while viewing his banking information with his Glasses, unknowingly exposing his highly sensitive banking information to third parties and Meta.

**44. Plaintiff Peter Tittl (California) (User)**

288. Plaintiff Peter Tittl is a citizen and resident of California. On December 25, 2025, Tittl's daughter gifted him one pair of Ray-Ban Meta Wayfarer Gen 2 glasses. His daughter purchased the Glasses in Santa Monica, California. Based upon Defendants' pervasive advertisement campaign, Tittl believed that the Glasses would protect his privacy and would not transmit his data without his consent. In or about February 2026, Tittl purchased prescription progressive transition lenses for the glasses from Target Optical in San Clemente, California, an authorized retailer.

289. Before learning that the Challenged Representations and Omissions were false, Tittl wore his prescription Meta AI Glasses daily, and frequently activated the AI features. As his daily corrective and sunglasses, Tittl wore his Meta AI Glasses everywhere he went, including while at medical visits and reviewing private health reports and financial information. He intentionally

activated Meta's AI several times per day concerning topics including his medical imaging and bloodwork results. Tittl had no idea that each time AI activated, Meta captured his data and disclosed it to human annotators who could review it, and into the training pipeline for Meta's AI models. Tittl was not informed, and did not consent to, Defendants' conduct.

**45. Antonio Enriquez (Illinois) (Purchaser and User)**

290. Plaintiff Antonio Enriquez is a citizen and resident of Illinois. While in Illinois, Enriquez purchased a pair of Meta AI Glasses in November 2025 for about $472.22.

291. Before learning that the Challenged Representations and Omissions were false, Enriquez used his prescription Glasses frequently, including using the AI features to record his family and young children enjoying time together in their home—videos that no one would have expected to be leaked. Once, Enriquez used the "Hey Meta" feature to record a fender bender to have a record for insurance purposes. Unbeknown to Enriquez, the video was auto-uploaded to social media, where it was viewed several times and amassed comments from strangers. Enriquez was horrified that the video had been uploaded and viewed by others and took it down to protect the privacy of all involved. After that incident, Enriquez stopped intentionally recording with this Glasses, concerned that any such recording could be auto-uploaded to social media. However, Enriquez still used AI features of the Meta Glasses, including to listen to music—with no expectation that by simply using the Glasses' AI features, he was triggering Meta to capture video within the Glasses' view, transfer captured video to a data center to be viewed by strangers, and use it to train Meta's AI.

**46. Jaipaul Sukhai (Connecticut) (Purchaser and User)**

292. Plaintiff Jaipaul Sukhai is a citizen and resident of Connecticut. On February 18, 2026, Plaintiff Sukhai purchased a pair of Meta AI Glasses on Amazon.com—an authorized seller—for about $450.

293. Before learning that the Challenged Representations and Omissions were false, Sukhai used to wear his Glasses consistently, including using AI features to record videos of his minor nieces and nephews. Sukhai wore his Glasses, including using the AI features, while looking at his banking information and looking at personal mail—moment Sukhai expected to remain confidential, rather than shared with Meta, its human data annotators, and used in training Meta's AI systems.

**47. Plaintiff PL22 (Florida) (User)**

294. Plaintiff PL22 is a citizen and resident of Florida. The AI Glasses were given to him as a gift in 2024.

295. Before learning that the Challenged Representations and Omissions were false, PL22 used his Glasses and the AI features frequently. PL22 has used the "Hey Meta" feature of his Glasses to record intimacy with his partner—unaware that doing so triggered Meta to transfer intimate videos to its data annotation center for training its AI. He has also worn the Glasses while changing and while looking at banking information on his phone.

**48. Plaintiff PL23 (Connecticut) (Purchaser and User)**

296. Plaintiff PL23 is a citizen and resident of Connecticut. PL23 purchased the Second-Generation Ray-Ban Meta AI Glasses through Facebook for approximately $299 on or about May 2026.

297. Defendants captured video of Plaintiff PL23 engaging in intimate intercourse with his wife and shared it with third parties, including Sama and its contractors and employees. Footage taken on PL23's Glasses through the "Hey Meta" wake-word command includes, but is not limited to, a video of intimate intercourse with his wife. The footage contains both video and audio of Plaintiff PL23 and his wife engaged in intimate intercourse, including the nudity of both parties, in the privacy of their bedroom. Defendants disclosed Plaintiff PL23's intimate intercourse with his wife to human annotators at Sama.

298. Defendants also captured video in which Plaintiff PL23 overheard his clients' highly private and sensitive third-party conversations and shared it with third parties, including Sama and its contractors and employees. Plaintiff PL23 works as a chauffeur and routinely overhears, or even participates in, clients' private or sensitive conversations while his Glasses are activated using the "Hey Meta" command.

299. Defendants captured video that included Plaintiff PL23's financial and payment card information and shared it with third parties, including Sama and its contractors and employees. Plaintiff PL23 wore the Glasses and used the "Hey Meta" command while paying or using his personal

finances, including his bank account information, and while the Glasses' AI features were activated after using the "Hey Meta" command.

300. Defendants captured video of confidential passwords of Plaintiff PL23 and shared that video with Sama and its contractors and employees. Plaintiff PL23 viewed and inputted these passwords while wearing the Glasses and while its AI features were activated after the "Hey Meta" command. Plaintiff PL23 received a notification in July 2026 that his passwords have been leaked. The leaked passwords were passwords that PL23 inputted while wearing the activated Glasses.

301. Defendants captured additional private moments and information and shared them with Sama and its employees and contractors given the extent of Plaintiff PL23's use of the Glasses. Plaintiff PL23 wears his Meta Glasses approximately eight hours per day, or until the battery runs out. He says the "Hey Meta" wake-word approximately 10-20 times per day, and notices false AI activations approximately twice daily.

**49. Plaintiff Kathleen Decker (Kentucky) (Purchaser and User)**

302. Plaintiff Kathleen Decker is a citizen and resident of Kentucky. Decker purchased Ray-Ban Meta AI Glasses on or about August 2026.

303. Defendants captured videos displaying her entire medical history, including, but not limited to, confidential medical diagnoses and prescriptions, and shared it with third parties, including Sama and its contractors and employees. While checking in to the doctor's office on August 12, 2026, to renew a medical prescription, Plaintiff Decker said the "Hey Meta" wake-word command to take a photograph of a code needed to log into her medical history account on her phone. This account showed the entirety of her personal medical history, including any potentially existing mental and physical health conditions, prescriptions, and visit history. All this personal health information was displayed to the activated Glasses.

**50. Plaintiff PL24 (Maine) (Purchaser, User, and Bystander)**

304. Plaintiff PL24 is a citizen and resident of Maine. PL24 purchased Ray-Ban Meta AI Glasses with prescription lenses on or about August 2025.

305. Defendants captured a four minute and sixteen second video on May 26, 2026, of Plaintiff PL24 using the restroom, and shared it with third parties, including Sama and its contractors

and employees. PL24 was listening to an audio book through her Meta Glasses when she used the restroom. The video showed her knees, her lowered pants, her underwear, and the feminine hygiene products she was using, as well as the toilet bowl before she flushed.

306. The glasses created this video recording while she was listening to an audio book after they were activated by a false "Hey Meta" wake-word command. PL24 encounters false and unintended activations of the glasses frequently. PL24 did not know that the Glasses were recording her at this time and can be heard in the video trying to figure out why the audio book from her Meta Glasses had suddenly paused.

307. PL24's Glasses also frequently fail to activate the recording light that is supposed to be activated every time the Glasses are recording. This failure of the light to activate when recording occurs in approximately half of the recordings taken by PL24. The failure of the light to activate only further diminishes her ability to determine when the Glasses are recording.

308. Defendants also captured topless videos of PL24 and shared it with third parties, including Sama and its contractors and employees. PL25, PL24's husband, also owned a pair of Meta AI Glasses. He uses the Glasses in the privacy of their home and bedroom, saying the "Hey Meta" wake word approximately twice per week. PL24 was recorded topless during PL25's use of the glasses when activated.

**51. Plaintiff PL25 (Maine) (Purchaser and User)**

309. Plaintiff PL25 is a citizen and resident of Maine. PL25 purchased a pair of prescription-lens Oakley Meta HSTN Second Generation Meta AI Glasses on or about November 2025.

310. Defendants captured video of PL25's nude step-grandchildren, and shared it with third parties, including Sama and its contractors and employees. He uses the Glasses in the privacy of his home, which he shares with his seven grandchildren. He says the "Hey Meta" wake word approximately twice per week, and wears the Glasses constantly, since they contain his prescription lenses.

311. Defendants also captured video of PL25's confidential business documents, and shared it with third parties, including Sama and its contractors and employees. PL25 wears the Glasses

as he reviews applications to the restaurant he manages, thus viewing addresses, contact information, and Social Security numbers of applicants while wearing the Glasses. PL25 used the "Hey Meta" command while looking at applications.

312. Plaintiff PL25 experiences false activations of the Glasses' AI features approximately twice a week. He has also noticed, after not prompting any recordings, the Glasses emit a light chime or faint light, indicating that the Glasses are recording.

**52. Plaintiff PL26 (Montana Purchaser and Washington User)**

313. Plaintiff PL26 is a citizen and resident of Washington. PL26 purchased the Meta Ray-Ban First Generation Wayfarer AI Glasses in early 2026 in the State of Montana while traveling. He purchased the Glasses to play music and utilize AI hands-free for his personal use.

314. Defendants captured video and audio of Plaintiff PL26 engaging in intimate intercourse with his partner, and shared it with third parties, including Sama and its contractors and employees. The AI features of the Glasses were activated during the recording. Both Plaintiff PL26 and his partner are nude in the video, which was taken in a bedroom.

315. Defendants also captured video of PL26's credit and debit card details and shared them with third parties, including Sama and its contractors and employees. PL26 frequently uses the Glasses to play music while he attends restaurants and bars while traveling for work and paying by credit and debit card. There are approximately 100 instances since Plaintiff PL26 purchased the Glasses in which they were activated while his card details were in view of the Glasses as he waited to pay his tab.

**53. Plaintiff PL27 (South Carolina) (Purchaser, User, and Bystander)**

316. Plaintiff PL27 is a citizen and resident of South Carolina. PL27 purchased his wife a pair of Ray-Ban Meta AI Glasses on or about December 2024 as a gift and also purchased his own pair of Ray-Ban Meta AI Glasses in the summer of 2026.

317. PL27 did not download or set up the application associated with the Meta Glasses on his phone. His then-minor daughter set up the mobile app without PL27's involvement.

318. Defendants captured video and audio of Plaintiff PL27 engaging in intimate intercourse with his wife, and shared it with third parties, including Sama and its contractors and

employees. Both Plaintiff PL27 and his wife are nude in the video, which was taken in a bedroom. The "Hey Meta" activation was used while PL27 and his wife were engaging in intimacy.

319. Defendants also captured video of PL27's confidential and private business matters, since he wears the Glasses and uses the "Hey Meta" wake-word throughout the workday. PL27 manages real estate properties, and sensitive and nonpublic information regarding the pricing, status, and availability of these properties was captured on the videos that Defendants shared with third parties, including Sama and its employees and contractors.

320. PL27 experiences false and unprompted activations of the glasses' AI features 4 to 5 times a day.

**54. Plaintiff PL28 (South Carolina) (User and Bystander)**

321. Plaintiff PL28 is a citizen and resident of South Carolina. PL28 received the First Generation Ray-Ban Meta AI Glasses as a gift from her husband on or about December 2024. PL28's husband also purchased his own pair of glasses.

322. PL28 did not download or set up the application associated with the Meta Glasses on her phone. Her then-minor daughter set up the mobile app without PL28's involvement.

323. Defendants captured video and audio of Plaintiff PL28 engaging in intimate intercourse with her husband, and shared it with third parties, including Sama and its contractors and employees. Video and audio of PL28 engaging in intimate intercourse with her husband was captured on both her Glasses and those of her husband. Both Plaintiff PL28 and her husband are nude in the video, which was taken in a bedroom. The "Hey Meta" activation was used while PL28 and her husband were engaged in intimacy.

324. Defendants also captured video disclosing PL28's private medical information when PL28 wore the Glasses while speaking with her physician regarding a highly sensitive and private medical procedure and shared the video with Sama and its contractors and employees. The AI features of the Glasses were activated during PL28's consultation with her physician.

325. Defendants also captured videos containing PL28's financial card and account information when PL28 used the Glasses while paying with her Venmo financial card or viewing

financial account information, shared them with third parties, including Sama and its contractors and employees.

326. Defendants also captured footage, including nude footage, of PL28's minor and adult clients. PL28 is a hair and makeup artist. Plaintiff PL28 wears her Glasses all day, since they are her prescription lenses. She also says the "Hey Meta" wake-word to activate recordings throughout the entire workday to capture client makeover transformations. Her clients are often undressed or in the process of changing clothes and are in the vicinity of her Glasses' camera while she is working on hair or makeup. Children and adults were captured by the Glasses in states of undress while PL28 was using them. PL28 had no knowledge or awareness that Defendants would be sharing these videos and audio with any third parties.

**55. Plaintiff PL29 (South Carolina) (User and Bystander)**

327. Plaintiff PL29 is a citizen and resident of South Carolina. PL29 borrowed her mother PL28's Meta AI Glasses in preparation for a beauty pageant competition in December 2024.

328. Plaintiff PL29 cares deeply about her privacy. This is especially true because she is a celebrity beauty pageant contestant and a designer. Thus, she is very concerned that any disclosure of her personal information would attract elevated levels of attention and result in embarrassment and stress.

329. When PL29 was 17 years old, Defendants captured videos of PL29 without clothes on. PL29 used the Glasses and activated their AI features with the "Hey Meta" command to assess the evenness of an artificial tanner that she applied in a private changing room while preparing for a beauty pageant. Her twin sister recorded the nude video of PL29 so that PL29 could see the tanner application from all angles. PL29 also used the Glasses to take a nude video of her twin sister for the same reason at the same time and place. The "Hey Meta" command was used to initiate both videos.

330. When PL29 was 17 years old, Defendants captured a video of her naked in the shower, and shared it with third parties, including Sama and its contractors and employees. Moments after saying the "Hey Meta" command to use the Glasses, PL29 set the Glasses down to take a shower. Without intending to be recorded nude, PL29 was captured in the nude by the Glasses.

**56. Plaintiff Michael Stewart (Michigan) (Purchaser)**

331. Plaintiff Michael Stewart is a citizen and resident of Michigan.

332. On 13, 2025, while physically in Michigan, Plaintiff Stewart purchased a pair of Meta AI Glasses online from PayMore for $379.99 as a gift for his wife. Stewart has not himself used the Glasses, did not download the Meta Glasses App, and did not otherwise review or sign any terms of service from Defendants related to the Meta AI Glasses.

333. Before purchasing the Glasses, Plaintiff M. Stewart researched different smart glasses options and chose Defendants' Glasses in part because he believed they would offer the best privacy protection.

**57. Plaintiff PL30 (California) (Bystander)**

334. Plaintiff PL30 is a citizen and resident of California. PL30 was recorded by a purchaser and user of Meta AI Glasses but did not purchase or use Meta AI Glasses herself.

335. Plaintiff PL30 cares deeply about her privacy and would not have agreed to be filmed or photographed with the Glasses if she knew that Meta would surreptitiously collect, record, transfer, and otherwise allow unknown individuals to view images and videos taken by the Glasses. In fact, she only allowed herself to be recorded through the Glasses after receiving assurances from the Glasses' owner that the footage would never be disclosed to anyone else.

336. Defendants captured video and audio of Plaintiff PL30 engaging in intimate intercourse on or about December 2023 with the owner of the Glasses, and shared the video and audio with third parties, including Sama and its contractors and employees. Plaintiff PL30 is nude in the video, which was taken in a bedroom. The AI features of the Glasses were activated during the recording.

**58. Plaintiff PL31, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander)**

337. Plaintiff PL31 is a minor and a citizen and resident of Connecticut. Plaintiff PL31 brings this action by and through her parent and natural guardian PL23.

338. Plaintiff PL31 is an eight-year-old girl.

339. Defendants captured video in which Plaintiff PL31 appeared nude and shared it with third parties, including Sama and its contractors and employees. The Glasses of Plaintiff PL31's father were activated by the "Hey Meta" command before capturing Plaintiff PL31 running without clothing into a swimming pool on PL23's property in June 2026.

340. Defendants captured additional private moments of Plaintiff PL31 and shared them with Sama and its employees and contractors given the extent of her father's use of the Glasses. Her father wears his Meta Glasses approximately eight hours per day, or until the battery runs out. Her father says the "Hey Meta" wake-word approximately 10-20 times per day, and notices false AI activations approximately twice daily.

**59. Plaintiff PL32, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander)**

341. Plaintiff PL32 is a minor and a citizen and resident of Connecticut. Plaintiff PL32 brings this action by and through his parent and natural guardian PL23.

342. Plaintiff PL32 is a five-year-old boy.

343. Defendants captured video in which Plaintiff PL32 appeared nude and shared it with third parties, including Sama and its contractors and employees. The Glasses of Plaintiff PL32's father were activated by the "Hey Meta" command before capturing Plaintiff PL32 running without clothing into a swimming pool on PL23's property in June 2026.

344. Defendants captured additional private moments of Plaintiff PL32 and shared them with Sama and its employees and contractors given the extent of his father's use of the Glasses. His father wears his Meta Glasses approximately eight hours per day, or until the battery runs out. His father says the "Hey Meta" wake-word approximately 10-20 times per day, and notices false AI activations approximately twice daily.

**60. Plaintiff PL33, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander)**

345. Plaintiff PL33 is a minor. Plaintiff PL33 is a citizen and resident of Connecticut. Plaintiff PL33 brings this action by and through his parent and natural guardian PL23.

346. Plaintiff PL33 is a three-year-old boy.

347. Defendants captured video in which Plaintiff PL33 appeared nude and shared it with third parties, including Sama and its contractors and employees. The Glasses of Plaintiff PL33's father were activated by the "Hey Meta" command before capturing Plaintiff PL33 running without clothing into a swimming pool on PL23's property in June 2026.

348. Defendants captured additional private moments of Plaintiff PL33 and shared them with Sama and its employees and contractors given the extent of her father's use of the Glasses. His father wears his Meta Glasses approximately eight hours per day, or until the battery runs out. His father says the "Hey Meta" wake-word approximately 10-20 times per day, and notices false AI activations approximately twice daily.

**61. Plaintiff PL34, a minor, by and through their parent Plaintiff PL23 (Connecticut) (Bystander)**

349. Plaintiff PL34 is a minor. PL34 is a citizen and a resident of Connecticut. Plaintiff PL34 brings this action by and through his parent and natural guardian PL23.

350. Plaintiff PL34 is a one-year-old boy.

351. Defendants captured video in which Plaintiff PL34 appeared nude and shared it with third parties, including Sama and its contractors and employees. The Glasses of Plaintiff PL34's father were activated by the "Hey Meta" command before capturing Plaintiff PL34 running without clothing into a swimming pool on PL23's property in June 2026.

352. Defendants captured additional private moments of Plaintiff PL34 and shared them with Sama and its employees and contractors given the extent of her father's use of the Glasses. His father wears his Meta Glasses approximately eight hours per day, or until the battery runs out. His father says the "Hey Meta" wake-word approximately 10-20 times per day, and notices false AI activations approximately twice daily.

**62. Plaintiff PL35, a minor, by and through their parent GAL1 (Maine) (Bystander)**

353. Plaintiff PL35 is a minor. Plaintiff PL35 is a citizen and resident of Maine. PL35 brings this action by and through his parent and natural guardian GAL1. Plaintiff PL35 and GAL1 live

with GAL1's mother, Plaintiff PL24, who owns Ray-Ban Meta AI Glasses, and GAL1's stepfather, Plaintiff PL25, who owns Second Generation Oakley Meta HSTN AI Glasses.

354. Plaintiff PL35 is a seven-year-old boy.

355. PL24 and PL25 wore their Meta AI Glasses and activated AI features within view of PL35 when PL35 was nude. Defendants captured nude footage of PL35 through his grandmother and step grandfather's Glasses, and shared it with third parties, including Sama and its contractors and employees.

**63. Plaintiff PL36, a minor, by and through their parent GAL1 (Maine) (Bystander)**

356. Plaintiff PL36 is a minor. Plaintiff PL36 is a resident and citizen of Maine. Plaintiff PL36 brings this action by and through his parent and natural guardian GAL1. Plaintiff PL36 and GAL1 live with GAL1's mother, Plaintiff PL24, who owns Ray-Ban Meta AI Glasses, and GAL1's stepfather, Plaintiff PL25, who owns Second Generation Oakley Meta HSTN AI Glasses.

357. Plaintiff PL36 is a one-year-old boy.

358. PL24 and PL25 wore their Meta AI Glasses and activated AI features within view of PL36 when PL36 was nude. Defendants captured nude footage of Plaintiff PL36 through his grandmother and step grandfather's Glasses, and shared it with third parties, including Sama and its contractors and employees.

**64. Plaintiff PL37, a minor, by and through their parent GAL1 (Maine) (Bystander)**

359. Plaintiff PL37 is a minor. Plaintiff PL37 is a citizen and resident of Maine. Plaintiff PL37 brings this action by and through her parent and natural guardian GAL1. Plaintiff PL37 and GAL1 live with GAL1's mother, Plaintiff PL24, who owns Ray-Ban Meta AI Glasses, and GAL1's stepfather, Plaintiff PL25, who owns Second Generation Oakley Meta HSTN AI Glasses.

360. Plaintiff PL37 is a five-year-old girl.

361. While PL24 was wearing her Meta AI Glasses within view of PL37 when PL37 was topless, the AI features were accidentally activated with a false "Hey Meta" command. Defendants

captured footage in which Plaintiff PL37 was topless and shared it with third parties, including Sama and its contractors and employees.

362. Defendants captured nude footage of Plaintiff PL37 through her grandmother and step grandfather's Glasses, and shared it with third parties, including Sama and its contractors and employees.

**65. Plaintiff PL38, a minor, by and through their parent GAL1 (Maine) (Bystander)**

363. Plaintiff PL38 is a minor. Plaintiff PL38 is a citizen and resident of Maine. Plaintiff PL38 brings this action by and through her parent and natural guardian GAL1. Plaintiff PL38 and GAL1 live with GAL1's mother, Plaintiff PL24, who owns Ray-Ban Meta AI Glasses, and GAL1's stepfather, Plaintiff PL25, who owns Second Generation Oakley Meta HSTN AI Glasses.

364. Plaintiff PL38 is a five-year-old girl.

365. While PL24 was wearing her Meta AI Glasses within view of PL38 when PL38 was topless, the AI features were accidentally activated with a false "Hey Meta" command. Defendants captured footage in which Plaintiff PL38 was topless and shared it with third parties, including Sama and its contractors and employees. The glasses belonging to Plaintiff PL38's grandmother, Plaintiff PL24, were falsely activated by the "Hey Meta" command before recording Plaintiff PL38 without a shirt on.

366. Defendants captured nude footage of Plaintiff PL38 through her grandmother and step grandfather's Glasses, and shared it with third parties, including Sama and its contractors and employees.

**66. Plaintiff PL39, a minor, by and through their parent GAL1 (Maine) (Bystander)**

367. Plaintiff PL39 is a minor. Plaintiff PL39 is a citizen and resident of Maine. Plaintiff PL39 brings this action by and through her parent and natural guardian GAL1. Plaintiff PL39 and GAL1 live with GAL1's mother, Plaintiff PL24, who owns Ray-Ban Meta AI Glasses, and GAL1's step-father, Plaintiff PL25, who owns Second Generation Oakley Meta HSTN AI Glasses.

368. Plaintiff PL39 is a two-year-old girl.

369. While PL24 was wearing her Meta AI Glasses within view of PL39 when PL39 was topless, the AI features were accidentally activated with a false "Hey Meta" command. Defendants captured footage in which Plaintiff PL39 was topless and shared it with third parties, including Sama and its contractors and employees.

370. Defendants captured nude footage of Plaintiff PL39 through her grandmother and step grandfather's Glasses, and shared it with third parties, including Sama and its contractors and employees.

**67. Plaintiff PL40, a minor, by and through their parent Plaintiff PL26 (Washington) (User and Bystander)**

371. Plaintiff PL40 is a minor. Plaintiff PL40 is a citizen and resident of Washington. Plaintiff PL40 brings this action by and through her parent and natural guardian, PL26. PL26 purchased the Meta Ray-Ban First Generation Wayfarer AI Glasses in early 2026. He purchased the Glasses to play music and utilize AI hands-free for his personal use.

372. Plaintiff PL40 is a 6-year-old girl.

373. Defendants captured a video in which Plaintiff PL40 appeared nude and shared it with third parties, including Sama and its contractors and employees. Plaintiff PL26's Glasses were activated by the "Hey Meta" command to play music before he helped Plaintiff PL26 change into a swimsuit at a community swimming center in the privacy of a bathroom stall.

374. Defendants also captured video of Plaintiff PL40 using the restroom, and shared it with third parties, including Sama and its contractors and employees. This video was captured right after Plaintiff PL26 taught Plaintiff PL40 how to use the "Hey Meta" command to take pictures and play music. Plaintiff PL40 used the "Hey Meta" command while entering and using the bathroom.

375. Defendants captured additional private and sensitive video of Plaintiff PL40 that they shared with third parties, including Sama and its contractors and employees. Plaintiff PL26 wears his Glasses for approximately six hours per day on approximately five days per week and uses the "Hey Meta" command approximately 30-40 times per day. Plaintiff PL26 also experiences false activations of the Glass' AI features approximately 4 times a day.

**68. Plaintiff PL41, a minor, by and through their parent, Plaintiff PL18 (California) (Bystander)**

376. Plaintiff PL41 is a minor and is a resident of California. Plaintiff PL41 brings this action by and through his parent and natural guardian PL18.

377. Plaintiff PL41 is seven years old. Once, in early 2026, while in the state of California, PL41's parent used Meta AI Glasses to inspect PL41's eyes, which had turned yellow, and used the "Hey Meta" feature to ask Meta's AI questions about PL41's medical conditions, including his eye discoloration and related symptoms that PL41's parent later reported to emergency room physicians. Meta has captured this exchange and transmitted PL41's sensitive health information, along with a recognizable image of PL41's face, a biometric identifier.

378. Between late December 2025 and August 2026, PL41's parent customarily left Meta AI Glasses on the bathroom counter when not in use. When checking the Glasses App, PL41's parent noticed that the Glasses had captured footage of family members using the restroom or bathing in the bathroom, unbeknown to PL41, his parent, or any family member, which indicate that Meta's AI features had been activated unintentionally. Meta AI Glasses captured footage of PL41 while using this bathroom or bathing, and in otherwise private activities in the bathroom. Neither PL41 nor any family member consented to this recording and certainly they did not provide consent for this data to be stored and used by Meta and its offshore contractors to train Meta's AI systems.

**69. Plaintiff PL42, a minor, by and through their parent, Plaintiff PL19 (California) (Bystander)**

379. Plaintiff PL42 is a minor, and a citizen and resident of California. Plaintiff PL42 brings this action by and through their parent and natural guardian PL19.

380. Plaintiff PL42 is two years old. From February to August 2026, PL42's parent regularly left his Meta AI Glasses on a table facing PL42 while changing PL42's diaper. PL42's parent sometimes used the "Hey Meta" feature of the Glasses while changing PL42's diaper. Unbeknown to PL42 or his parent, the Glasses captured private and sensitive footage or images of PL42 while his parent was changing his diaper. Neither PL42 nor his parents consented to this recording, nor to its transmittance to a third party and use in training Meta's AI.

**70. Plaintiff PL43 (Georgia) (Purchaser and User)**

381. Plaintiff PL43 is a citizen and resident of Georgia. PL43 has purchased two pairs of Meta AI Glasses while in Georgia: the first on May 21, 2025, and the second on June 26, 2026.

382. Before learning that the Challenged Representations and Omissions were false, PL43 wore his prescription Meta Glasses daily and used the AI features frequently, including using the "Hey Meta" feature to take videos and photos of his family members—not knowing that by doing so, he was triggering his Glasses to record and transmit everything within view to be annotated and used in training Meta's AI. The Glasses saw everything that PL43 saw, including private financial information, and private moments such as using the restroom or changing clothes.

**71. Plaintiff PL44, a minor, by and through their parent, PL43 (Georgia) (Bystander)**

383. Plaintiff PL44 is a minor. PL43 is a citizen and resident of Georgia. PL44 brings this action by and through their parent and natural guardian PL43.

384. Plaintiff PL44 is three months old. From before PL44's birth until late August 2026, his parent wore prescription AI Meta Glasses daily in all aspects of caretaking, including bathing PL44 and changing PL44's diaper. PL44's parent used to use the AI function frequently to take photos, not realizing that, by activating the AI feature, the Meta AI Glasses were recording the whole time, including sensitive images of PL44, and transmitting captured data to data centers overseas.

**72. Plaintiff PL45, a minor, by and through their natural guardian (Florida) (Bystander)**

385. Plaintiff PL45 is a minor. PL45 is a citizen and resident of Florida. Plaintiff PL45 brings this action by and through her natural guardian, GAL2.

386. PL45 is one year old. From December 2025 through August 2026, PL45's grandmother, PL20, wore Meta AI Glasses daily as her prescription glasses, and used the AI features of the Glasses, including to listen to music and make phone calls, at least daily while caring for PL45. PL45's grandmother, PL20 used the AI features while changing PL45's diaper and giving her baths—not realizing that by activating the AI feature of the Meta Glasses, she was triggering the Glasses to

record and capture sensitive images of her granddaughter, and that this sensitive data would be transmitted to data centers overseas and used to train Meta's AI.

**B. Defendants**

387. **Defendant Meta Platforms, Inc.** is a Delaware corporation with its principal place of business located at 1 Meta Way, Menlo Park, California 94025. Meta, in partnership with Luxottica, designs, manufactures, advertises, markets, and sells the Meta AI Glasses throughout the United States. Meta is a sophisticated applications developer in the business of commercializing personal data extracted from the use of tools and services connected to the internet. As such, Meta is aware of and benefits from the conduct described herein. The unfair, unlawful, deceptive, and misleading Challenged Representations and Omissions on the Products were prepared, authorized, ratified, and/or approved by Meta and its agents, and were disseminated throughout California and the nation by Meta and its agents to deceive and mislead consumers in the State of California and throughout the United States into purchasing the Meta AI Glasses.

388. **Defendant Luxottica of America, Inc.** is an Ohio corporation with its principal place of business located at 4000 Luxottica Place, Mason, Ohio 45040-8114. Luxottica of America, Inc., in partnership with Meta, designs, manufactures, advertises, markets, and sells the Meta AI Glasses throughout the United States. The unfair, unlawful, deceptive, and misleading Challenged Representations and Omissions on the Products were prepared, authorized, ratified, and/or approved by Luxottica and its agents, and were disseminated throughout California and the nation by Luxottica and its agents to deceive and mislead consumers in the State of California and throughout the United States into purchasing the Meta AI Glasses.

389. **No Agency, Contract, or Derivative Liability Alleged.** No allegation in this Complaint is intended to allege that either Defendant acted as the agent, servant, employee, or alter ego of the other, or that either Defendant is a party to, an intended beneficiary of, or otherwise entitled to enforce any agreement between Plaintiffs or Class members and the other Defendant. Plaintiffs' claims against each Defendant arise from that Defendant's own conduct and from duties imposed by law. Plaintiffs' contract and warranty claims arise from Defendants' advertising and product representations, and not from any terms of service, supplemental terms and conditions, end-user

license agreement, privacy policy, or other online agreement. Plaintiffs do not seek to enforce and do not rely upon any such agreement, and nothing in this Complaint shall be construed as an admission that any such agreement was formed, is enforceable, or applies to the claims alleged. Bystander Plaintiffs and Bystander Class members never entered into any agreement with either Defendant.

## VII. TOLLING OF STATUTE OF LIMITATIONS

### A. Discovery Rule

390. Defendants' knowing and active concealment and denial of the facts alleged herein toll any applicable statute(s) of limitations. Plaintiffs and Class members could not reasonably have discovered the true nature and extent of Meta's collection, transmission, storage, and use of data captured through the Meta AI Glasses until the facts alleged herein became known.

391. The whistleblower reports about what happens when AI is activated in Meta Glasses had only came out recently, on around February 27, 2026. No one until this year had any reasonable ability to discover, within the applicable statute of limitations, that Defendants were misrepresenting the privacy protections, data practices, and safeguards of the Meta AI Glasses, and could not have discovered through the exercise of reasonable diligence that Defendants were concealing such information and misrepresenting the features, capabilities, privacy controls, reliability, functionality, characteristics, and performance of the Meta AI Glasses.

392. Any statutes of limitation otherwise applicable to any claims asserted herein thus have been tolled by the discovery rule.

### B. Fraudulent Concealment

393. All applicable statutes of limitations have also been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the material facts alleged herein.

394. Defendants had a duty to disclose, among other things, the true scope and nature of the data collection, transmission, retention, and use practices associated with the Meta AI Glasses, because such practices are central to the privacy and functionality of the product and were the subject of Defendants' own affirmative marketing representations.

395. Despite their knowledge, Defendants actively concealed these material facts from Plaintiffs and Class members while continuing to profit from the sale of Meta AI Glasses they marketed as a product "designed for privacy, controlled by you."

396. As a result of Defendants' active concealment, all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**C. Estoppel**

397. Defendants had a duty to disclose to Plaintiffs and Class members the true character, nature, and quality of the Meta AI Glasses, including the facts that the Glasses transmit user and bystander data to Meta's cloud servers for analysis and AI model training, that the LED privacy indicator is inadequate as a bystander notice mechanism, and that the privacy protections Meta marketed were false.

398. Instead, Defendants concealed the true character, nature, and quality of the Meta AI Glasses and knowingly made misrepresentations about the privacy protections, data practices, reliability, functionality, characteristics, and performance of the Meta AI Glasses.

## VIII. CLASS ALLEGATIONS

399. **Class Definition.** Plaintiffs bring this action as a class action on behalf of themselves, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1)-(3). The Classes are defined as follows:

**A. Purchaser Classes:**

**<u>Nationwide Purchaser Class:</u>**

All persons or entities who purchased the Product in the United States.

**<u>California Purchaser Subclass:</u>**

All persons or entities who purchased the Product in the State of California.

**<u>Alabama Purchaser Subclass:</u>**

All persons or entities who purchased the Product in the State of Alabama.

**<u>Colorado Purchaser Subclass:</u>**

All persons or entities who purchased the Product in the State of Colorado.

**<u>Connecticut Purchaser Subclass:</u>**

All persons or entities who purchased the Product in the State of Connecticut.

**Florida Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Florida.

**Georgia Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Georgia.

**Hawaii Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Hawaii.

**Illinois Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Kentucky.

**Kentucky Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Kentucky.

**Maine Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Maine.

**Massachusetts Purchaser Subclass:**

All persons or entities who purchased the Product in the Commonwealth of Massachusetts.

**Michigan Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Michigan.

**Montana Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Montana.

**Nevada Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Nevada.

**New York Purchaser Subclass:**

All persons or entities who purchased the Product in the State of New York.

**North Carolina Purchaser Subclass:**

All persons or entities who purchased the Product in the State of North Carolina.

**Pennsylvania Purchaser Subclass:**

All persons or entities who purchased the Product in the Commonwealth of Pennsylvania.

**South Carolina Purchaser Subclass:**

All persons or entities who purchased the Product in the State of South Carolina.

**Tennessee Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Tennessee.

**Texas Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Texas.

**Utah Purchaser Subclass:**

All persons or entities who purchased the Product in the State of Utah.

**Virginia Purchaser Subclass:**

All persons or entities who purchased the Product in the Commonwealth of Virginia.

**B. User Classes:**

**Nationwide User Class:**

All users of the Products in the United States.

**California User Subclass:**

All users of the Products in the State of California.

**Connecticut User Subclass:**

All users of the Products in the State of Connecticut.

**Florida User Subclass:**

All users of the Products in the State of Florida.

**Georgia User Subclass:**

All users of the Products in the State of Georgia.

**Hawaii User Subclass:**

All users of the Products in the State of Hawaii.

**Illinois User Subclass:**

All users of the Products in the State of Illinois.

**Kentucky User Subclass:**

All users of the Products in the State of Kentucky.

**Maine User Subclass:**

All users of the Products in the State of Maine.

**Massachusetts User Subclass:**

All users of the Products in the Commonwealth of Massachusetts.

**New Jersey User Subclass:**

All users of the Products in the State of New Jersey.

**New York User Subclass:**

All users of the Products in the State of New York.

**Pennsylvania User Subclass:**

All users of the Products in the Commonwealth of Pennsylvania.

**South Carolina User Subclass:**

All users of the Products in the State of South Carolina.

**Tennessee User Subclass:**

All users of the Products in the State of Tennessee.

**Washington User Subclass:**

All users of the Products in the State of Washington.

**C. Bystander Classes:**

**Nationwide Bystander Class:**

All natural persons in the United States who were recorded by Meta AI Glasses.

**California Bystander Subclass:**

All natural persons in the State of California who were recorded by Meta AI Glasses.

**Connecticut Bystander Subclass:**

All natural persons in the State of Connecticut who were recorded by Meta AI Glasses.

**Florida Bystander Subclass:**

All persons in the State of Georgia who were recorded by Meta AI Glasses.

**Georgia Bystander Subclass:**

All persons in the State of Georgia who were recorded by Meta AI Glasses.

**Maine Bystander Subclass:**

All natural persons in the State of Maine who were recorded by Meta AI Glasses.

**South Carolina Bystander Subclass:**

All natural persons in the State of South Carolina who were recorded by Meta AI Glasses.

**Washington Bystander Subclass:**

All natural persons in the State of Washington who were recorded by Meta AI Glasses.

400. Collectively, the Nationwide Purchaser Class, the Nationwide User Class, and the Nationwide Bystander Class, and the State Subclasses) are referred to as the "Classes" or "the Class."

401. **Class Definition Exclusions.** The following individuals are excluded from the Classes: officers and directors of Defendants and their parents, subsidiaries, affiliates, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

402. **Reservation of Rights to Amend the Class Definitions.** Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendants, changes in the facts or the law, or otherwise.

403. **Numerosity.** Members of the Classes are so numerous that joinder of all members is impracticable. The Nationwide Classes consist of millions of individuals dispersed throughout the United States, and the State Subclasses likewise consist of at least thousands of purchasers (if not more) dispersed throughout numerous states across the country. Accordingly, it would be impracticable to join all members of the Classes before the Court.

404. **Predominance.** There are numerous and substantial questions of law or fact common to all members of the Classes that predominate over any individual issues, making class certification appropriate under Fed. R. Civ. P. 23(b)(3). The predominant questions of law or fact, include but are not limited to:

a. Whether Defendants engaged in unlawful, unfair, or deceptive business practices in their advertising for the Products;

b. Whether Defendants' advertising and marketing of the Products was false, misleading, or deceptive to purchasers and users of the Products;

c. Whether Defendants knew or should have known that their advertising and marketing of the Products was false or misleading;

d. Whether Defendants affirmatively misrepresented the capabilities, quality, and nature of the Products;

e. Whether Defendants had a duty to disclose material facts about the Products that were omitted from their representations;

f. Whether Defendants knew or should have known that the Products did not conform to their advertising, marketing, warranties, and representations, or were not suitable for their intended use;

g. Whether Defendants breached the terms of their contracts with the consumers, including the express warranties, by not providing products that conform to the advertising and marketing claims;

h. Whether Defendants breached the implied warranty of merchantability;

i. Whether Defendants negligently misrepresented the capabilities, quality, and nature of the Products;

j. Whether Purchaser Plaintiffs and the Class paid a price premium for the Products as a result of Defendants' false marketing;

k. Whether Purchaser Plaintiffs and the Class are entitled to damages, restitution, injunctive relief, and/or declaratory relief;

l. Whether Defendants were unjustly enriched by their conduct;

m. Whether Meta's conduct constitutes an egregious breach of social norms underlying the privacy rights of users and of bystanders;

n. Whether Meta acted intentionally in violating the privacy rights of users and of bystanders;

o. Whether Defendants designed the Products in a defective manner that rendered them unreasonably dangerous to users' and bystanders' privacy and dignitary interests;

p. Whether Defendants failed to adequately warn consumers of the risks associated with the Products' data collection, transmission, and human review practices; and

q. Whether safer alternative designs existed that were technically and commercially feasible and would have reduced or eliminated the privacy harms at issue.

405. **Typicality.** Plaintiffs' claims are typical of the claims of the Class members that Plaintiffs seek to represent. Plaintiffs' and Class members' claims arise from the same practices and course of conduct and are based on the same legal theories.

a. Purchaser Plaintiffs, like the Class members, purchased Defendants' misleading and deceptive Products, relying on Defendants' Challenged Representations and Omissions. Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Purchaser Plaintiffs and the Class sustained similar injuries arising out of Defendants' conduct.

b. User Plaintiffs, like the members of the User Classes, recorded video footage or photographs on Meta AI Glasses that they believed was private and was not being (1) tracked, viewed, and catalogued by Defendants or (2) shared by Defendants with third parties. Contrary to their understanding and Defendants' representations, User Plaintiffs and Class members nonetheless had private video footage tracked, viewed, and catalogued by Defendants and disseminated to third parties. User Plaintiffs and Class members did not consent to Defendants tracking their private videos and photographs or sharing them with third parties.

c. Bystander Plaintiffs, like the members of the Bystander Classes, were recorded by Meta AI Glasses without knowledge that Defendants would track, view, and catalogue the recordings and share the material with third parties, including for purposes of training AI in perpetuity.

d. Moreover, Plaintiffs and Class members suffer a substantial risk of repeated injury in the future. Defendants have shown deliberate indifference to Plaintiffs' and Class members' privacy rights. Indeed, Defendants have taken pains to deceive and mislead Plaintiffs and Class members and conduct its business contrary to their privacy rights and contrary to the plain meaning of its own privacy representations in favor of surreptitiously and deceitfully

monitoring their private communications, actions, and likeness. Defendants' deceptive and deliberate actions have thwarted and continue to threaten Plaintiffs' and Class members' ability to exercise control over their own privacy while using or being recorded by Meta AI Glasses. Because the conduct complained of herein is systemic, Plaintiffs and Class members face substantial risk of the same injury in the future. Defendants' conduct is common to all Class members and represents a common pattern of conduct resulting in injury to all Class members.

406. **Adequacy.** Plaintiffs are adequate representatives of the Class they seek to represent because Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs will fairly and adequately protect Class members' interests and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

407. **Superiority and Substantial Benefit.** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

1. The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Classes;
2. Absent a Class, the members of the Classes will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;
3. Given the size of individual Class members' claims, few, if any, Class members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

4. When the liability of Defendants has been adjudicated, claims of all members of the Classes can be administered efficiently and/or determined uniformly by the Court; and

5. This action presents no difficulty that would impede the management by the Court as a class action, which is the best available means by which Plaintiffs and Class members can seek redress for the harm caused to them by Defendants.

408. **Inconsistent Rulings.** Because Plaintiffs seek relief for all members of the Classes, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

409. **Injunctive/Declaratory Relief.** The prerequisites to maintaining a class action for injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2) are met here. In acting as alleged herein, and in failing and refusing to cease and desist despite being exposed, Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief each appropriate with respect to the Class as a whole. Injunctive relief is necessary to prevent further unlawful and unfair conduct by Defendants. Money damages, alone, could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendants from continuing the unlawful conduct alleged herein.

410. **Manageability.** Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

411. **Issues Class.** Alternatively, Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(c)(4) on behalf of the above-defined classes for some or all the issues identified in the commonality and predominance section, above, as well as other issues which may be later identified.

## IX. PURCHASER CAUSES OF ACTION

### A. COUNT 1: Fraud by Misrepresentation (Common Law)

412. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

413. Purchaser Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class under common law, or alternatively, the State Purchaser Subclasses against all Defendants.

414. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

415. Defendants affirmatively misrepresented the capabilities, quality, and nature of the Products when selling and marketing them.

416. Defendants also knew that their misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendants' representations in making purchasing decisions.

417. Plaintiffs and Purchaser Class members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

418. Plaintiffs and Purchaser Class members would have been reasonable in relying on Defendants' misrepresentations in making their purchasing decisions.

419. Plaintiffs and Purchaser Class members had a right to rely upon Defendants' representations as Defendants maintained monopolistic control over knowledge of the true quality of the Products and the fact that the Products did not protect their privacy as claimed by the Defendants. Plaintiffs and Purchaser Class members sustained damages as a result of their reliance on Defendants' misrepresentations, thus causing Plaintiffs and Purchaser Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**B. COUNT 2: Fraud by Concealment/Omission (Common Law)**

420. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

421. Purchaser Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or in the alternative, the State Purchaser Subclasses, against all Defendants.

422. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

423. Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to their customers that they would be unable to maintain privacy and control of their data while using the Product, and that Defendants would subject consumers' captured data to review and data annotation by subcontractors for the purpose of training Meta's AI model. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding whether to purchase Defendants' Products and similar technology.

424. Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

425. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants, who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs and the Purchaser Class members. These omitted facts were material because they directly impact the privacy and safety of sensitive consumer data.

426. Defendants were in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Purchaser Class members. Defendants also possessed exclusive knowledge of the Material Omission.

427. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Purchaser Class members to purchase the Products at a higher price, which did not match the Products' true value.

428. Plaintiffs and the Purchaser Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiffs and the Purchaser Class members were justified.

429. Plaintiffs and the Purchaser Class members reasonably relied on these omissions and suffered damages as a result.

430. As a result of these omissions and concealments, Plaintiffs and the Purchaser Class members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase of the Products.

431. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Purchaser Class members sustained damage. Plaintiffs and the Purchaser Class members reserve their right to elect either to (a) rescind their purchase of the Products and obtain restitution or (b) affirm their purchase of the Products and recover damages.

432. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiffs and the Purchaser Class members. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined.

**C. COUNT 3: Negligent Misrepresentation (Common Law)**

433. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

434. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses against all Defendants.

435. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

436. Defendants had a duty to Plaintiffs and the Purchaser Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

437. Defendants breached their duty to Plaintiffs and the Purchaser Class by advertising the products as having privacy safeguards and controls they do not actually have.

438. Defendants knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendants.

439. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Purchaser Class have suffered actual damages in that they would not have purchased the Products had they known that the Products do not conform to the Product's marketing, advertising, or statements.

440. Plaintiffs and the Purchaser Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

**D. COUNT 4: Breach of Express Warranty**

441. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

442. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses, against all Defendants.

443. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

444. Defendants expressly warranted that the Products would perform as advertised. Defendants' claims regarding the Products constituted an affirmation of fact, promise, and/or description of the goods that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promise. Plaintiffs and the Purchaser Class members placed importance on Defendants' claims.

445. The Products did not conform to Defendants' express warranties, as more fully alleged above. The Products were not designed for privacy and did not leave purchasers in control of their data or content.

446. All conditions precedent to Defendants' liability have been satisfied, waived, or excused. Defendants had actual knowledge of the nonconformities alleged herein, including through publicly reported accounts from the data annotators who reviewed the footage, their own internal documents and testing , the reports of contractors who raised concerns and were terminated, sustained media reporting, and inquiries from Members of Congress. Certain Plaintiffs notified Defendants of their breaches within a reasonable time, as alleged above.

447. No part of this claim arises from or depends upon any terms of service, supplemental terms, end-user license agreement, or other online agreement. The express warranties alleged herein arise from Defendants' affirmations, promises, and descriptions of the goods.

448.

449. As a result of Defendants' breach of contract, Plaintiffs and the Purchaser Class members have been damaged in the amount to be determined at trial.

### E. COUNT 5: Quasi-Contract/Unjust Enrichment (Common Law)

450. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

451. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses, against all Defendants.

452. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

453. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

454. Plaintiffs and Purchaser Class members conferred monetary benefits on Defendants by purchasing the Products. Defendants' profits are funded entirely from their generated revenues—including payments made by or on behalf of Plaintiffs and Purchaser Class members. As such, a portion of these payments was attributable to Defendants' Challenged Representations and Omissions.

455. Through their unlawful, unfair and deceptive conduct, Defendants knowingly obtained significant revenue from the premium charged due to the Meta AI Glasses' alleged privacy features.

456. The Defendants were able to charge a price premium due to the claimed privacy features they regularly advertised, while actually failing to protect the privacy of their customers through the unlawful collection, use, processing, and transfer of Plaintiffs' and Purchaser Class members' personal data to third parties. Defendants also failed to disclose material facts, like their sharing of data with third parties, that, if disclosed, would have resulted in Defendants' inability to charge a price premium for privacy. Defendants knew that advertising the Products as protecting customers privacy and failing to disclose their sharing of data with third parties would drive sales and allow them to sell the Products for a higher price. Defendants thus benefited from their false representations and omissions.

457. The Defendants enriched themselves by charging more for the Products through their false claims of privacy, while knowing that the Products would not actually keep this information private. As a result, the value of the Products is significantly less than they were sold for, or would be if the privacy claims were actually true. Due to the Defendants' conduct, Plaintiffs and Purchaser Class

Members suffered harm, including paying a premium for the Products even though the privacy features did not exist.

458. It would be inequitable and unjust to permit the Defendants to retain the enormous economic benefits (financial and otherwise) they have obtained from and/or at the expense of Plaintiffs and Purchaser Class members.

459. The Defendants will be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by Plaintiffs and Purchaser Class members through the premium charged for the alleged privacy of the Products.

460. Plaintiffs and Purchaser Class members are therefore entitled to recover the amounts realized by the Defendants at their expense.

461. Since Plaintiffs and the Purchaser Class members have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of the Defendants' ill-gotten gains, and/or other sums as may be just and equitable. In the absence of completed discovery regarding class certification and merits, forcing an election of remedies at the initial pleading stage is premature.

**F. COUNT 6: Strict Product Liability – Design Defect (Common Law)**

462. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

463. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses, against all Defendants.

464. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

465. Meta and Luxottica designed, engineered, manufactured, marketed, distributed, and sold the Products to Plaintiffs and Purchaser Class members.

466. Meta and Luxottica placed the Products into the stream of commerce, knowing and intending that they would be purchased and used by Plaintiffs and Purchaser Class members throughout the United States without any inspection for defects by end users.

467. The Products were defective in design when they left Defendants' possession and control because, inter alia, they were designed so that, during ordinary and intended use: (1) they are

designed and marketed to be worn continuously throughout the day and, upon activation, to capture photo, video, and audio content, including inside homes, bedrooms, and bathrooms, and during other intimate moments; (2) that content is automatically transmitted off-device to Meta's servers and then to human "data annotators" overseas for review and labeling; (3) this pipeline of intimate, sensitive footage to human annotators is implemented without adequate in-product controls or transparent, conspicuous disclosures consistent with Defendants' privacy-centric representations; and (4) they are designed such that surreptitious recording is readily available to any user, in that the recording indicator is a faint light that is easily obscured, hidden, or disabled, the Glasses blend in with ordinary eyewear even when the indicator is lit, and the Products provide no mechanism for obtaining the consent of those recorded or for ensuring that such consent is obtained.

468. Defendants simultaneously marketed the Products with privacy-centric statements, including that the Products are "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

469. No reasonable consumer would expect that, by using a product advertised as "designed for privacy" in ordinary, foreseeable ways (e.g., wearing it at home, in bedrooms or bathrooms, while undressing, or around family members), their intimate video, photographs, and audio would be routed to and watched by strangers overseas, cataloguing financial details and moments like bathroom visits, sex, other intimate moments for AI-training purposes.

470. The Products failed to perform as safely as an ordinary consumer would expect because, contrary to Defendants' privacy-centric marketing: (1) they function as surreptitious conduits of highly sensitive and intimate personal and bystander data to human annotators; and (2) the Products' design, including reliance on a small LED indicator light, does not ensure that users or bystanders meaningfully understand that their intimate moments and environments are being recorded, offloaded, and reviewed.

471. Any purported benefits of designing the Products to route intimate user and bystander footage to human annotators rather than relying on less invasive or more privacy-protective AI-training methods are outweighed by the gravity and likelihood of harm of systemic sharing of recordings, including: (1) exposure of highly intimate, sexual, and bodily content to strangers; (2)

exposure of financial information; (3) heightened risks of identity theft, stalking, extortion, and reputational harm; and (4) economic harm from paying for a product that does not conform to its privacy-centric marketing.

472. Plaintiffs and Purchaser Class members used the Products in intended and reasonably foreseeable ways, including wearing them in daily life, inside homes, and around family and friends.

473. A safer alternative design that would have eliminated or reduced injuries to Plaintiffs' privacy was technically and commercially feasible. For example, Meta and Luxottica could have designed the Products such that use of and access to the Products' core AI features was decoupled from the human review pipeline or required explicit user consent for each piece of footage routed to human contractors.

474. The Products' defective design was a substantial factor in causing Plaintiffs' and Purchaser Class members' injuries, including economic harm (paying a price premium and/or the purchase price itself for Products that were not as represented) and loss of the benefit of their bargain, as well as loss of privacy and dignitary harms associated with the exposure of intimate footage to human annotators.

475. Plaintiffs and Purchaser Class members would not have purchased the Products, or would have paid significantly less for them, had they known of the Products' true design and the attendant privacy risks.

476. As a direct and proximate result of Defendants' defective design, Plaintiffs and Purchaser Class members have suffered the injury at the time of purchase, and will continue to suffer injury, including ascertainable losses of money or property.

477. Plaintiffs and Purchaser Class members seek all monetary and non-monetary relief allowed by law as a result of Defendants' strict product liability, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

**G. COUNT 7: Strict Product Liability – Failure to Warn (Common Law)**

478. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

479. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Purchaser Class, or alternatively, the State Purchaser Subclasses, against all Defendants.

480. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs purchased the Products.

481. Defendants manufactured, designed, marketed, distributed, and sold the Products.

482. At the time the Products were manufactured, distributed, and sold, they had potential and known risks that were known or knowable in light of generally accepted knowledge in the relevant communities, including that: (1) the Products capture highly sensitive video and audio inside private spaces; (2) that media is transmitted to Meta's servers and routed to human annotators in Nairobi, Kenya for review and labeling; (3) annotators "see everything—from living rooms to naked bodies," including bathroom visits, sexual activity, and financial information; (4) it is impossible to both avoid the human review pipeline and make use of the Products' core AI features; and (5) such practices create serious privacy, safety, and dignitary harms.

483. These potential risks present a substantial danger when the Products are used or misused in an intended or reasonably foreseeable manner because users will naturally wear the Products in homes, bathrooms, bedrooms, and other intimate settings, with spouses, partners, children, guests, and bystanders present.

484. Ordinary consumers are not likely to recognize these risks, particularly given the Products' marketing as "designed for privacy, controlled by you" and the absence of any clear disclosure that human contractors overseas watch and annotate sensitive footage captured via the Products and that users who wish to make use of the Products' core AI features cannot avoid that human review pipeline.

485. At all relevant times, safer and feasible alternative designs existed that would have substantially reduced or eliminated the unreasonable privacy and safety risks created by the Meta AI Glasses, including: (a) performing AI processing entirely on-device, without uploading raw, identifiable content to remote servers; (b) limiting uploads to anonymized or redacted images that remove faces, bodies, and other identifying features; (c) obtaining explicit, granular, opt-in consent before routing any content to human reviewers and limiting such review to non-intimate scenes; and (d) allowing users to permanently disable any upload of AI-related content while still retaining local

AI functionality. Defendants nevertheless opted for a design that maximized the volume of intimate, identifiable data sent to offshore human reviewers, without disclosing these tradeoffs to consumers.

486. Defendants failed to provide adequate warnings or instructions concerning: (1) the fact that content captured with the Products would be transmitted to Meta's servers for AI-related processing; (2) the fact that human contractors, including those working for Meta's vendor Sama in Nairobi, would review and annotate highly sensitive user and bystander footage, including bathroom, sexual, and financial scenes; and (3) the nature and extent of privacy, safety, and dignitary risks created by this human-review pipeline.

487. The small LED indicator light on the Products is inadequate as a warning or notice to users or bystanders regarding the existence and extent of human review and data-annotation practices; it does not meaningfully inform consumers that their intimate footage may be watched by strangers overseas. Moreover, it is easily disabled or concealed, as alleged above.

488. Meta's claims that it disclosed to users that some footage may be shared with human reviewers, even if true, are inadequate, because consumers were not provided adequate notice of these supposed disclosures, and these disclosures do not meaningfully inform consumers who wish to make use of the Products' core AI features that they cannot do so while avoiding that human review pipeline.

489. Defendants knew or, by the use of reasonably developed skill and foresight, should have known of these risks and of the Products' human-review pipeline, as evidenced by: (1) their own design and implementation of the Products and related AI systems; (2) their contracting with Sama and other vendors; and (3) internal knowledge that intimate footage, including nudity, sex, and financial information, was being viewed by annotators.

490. Defendants had a duty to provide clear, prominent warnings and instructions so that consumers could decide whether to use the Products at all, or use them in ways that would minimize the degree of danger—such as by avoiding use in bathrooms and bedrooms or when handling financial information.

491. Defendants breached this duty by failing to provide adequate warnings and instructions and by instead emphasizing privacy-centric marketing messages inconsistent with the underlying data-handling and human-review practices.

492. Plaintiffs and Purchaser Class members were injured, including economic losses such as the Product's purchase price, price premium, and loss of benefit of the bargain, as a direct and proximate result of Defendants' failure to warn.

493. Had Defendants provided adequate warnings and instructions about the Products' human-review pipeline and associated risks, Plaintiffs and Purchaser Class members would not have purchased the Products, or would have paid significantly less for them, and would have avoided or mitigated their harm.

494. Defendants' failure to warn was a substantial factor in causing Plaintiffs' and Purchaser Class members' injuries.

495. Plaintiffs and Purchaser Class members seek all monetary and non-monetary relief allowed by law, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

**Purchaser Claims – California**

**H. COUNT 8: California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq*.)**

496. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

497. Plaintiffs Beltran, PL01, PL18, and PL19 (for purposes of this section, "California Plaintiffs") bring this claim on behalf of themselves and the California Purchaser Subclass against all Defendants.

498. The California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*. ("CLRA") provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

499. The Products are "goods," as defined by the CLRA in California Civil Code §1761(a) because they are tangible objects that the California Plaintiff and California Purchaser Subclass members purchased primarily for personal, family, or household purposes.

500. Defendants are "persons," as defined by the CLRA in California Civil Code §1761(c) because they are corporations.

501. California Plaintiffs and California Purchaser Subclass members are "consumers," as defined by the CLRA in California Civil Code §1761(d) because they are individuals who purchased the Products for personal, family, or household purposes.

502. The purchases of the Products by the California Plaintiff and California Purchaser Subclass members are "transactions" as defined by the CLRA under California Civil Code § 1761(e) because California Plaintiffs and the California Purchaser Subclass members entered into agreements with Defendants or their authorized vendors to purchase the Products.

503. Defendants violated the following sections of the CLRA by selling the Products to California Plaintiffs and the California Purchaser Subclass members through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

a. Section 1770(a)(5) by representing that the Products have "characteristics, . . uses [or] benefits . . . which they do not have."

b. Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . when they are of another."

c. Section 1770(a)(9) by advertising the Products "with [the] intent not to sell [] as advertised."

504. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their Challenged Representations and Omissions were misleading.

505. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including California Plaintiffs, to increase the sale of the Products.

506. California Plaintiffs and California Purchaser Subclass members could not have reasonably avoided such injury. California Plaintiffs and California Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and California Plaintiffs and California Purchaser Subclass members would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

507. California Plaintiffs and California Purchaser Subclass members suffered harm as a result of Defendants' violations of the CLRA because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

508. California Plaintiff PL01 provided Defendants with notice of its CLRA violations pursuant to California Civil Code § 1782(a) on March 20, 2026.

509. As a direct and proximate result of Defendants' misconduct in violation of the CLRA, California Plaintiffs and the California Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. They also seek other available to them remedies, including punitive damages.

510. California Plaintiffs and California Purchaser Subclass seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. The California Plaintiffs and California Purchaser Subclass Members also request a court order requiring Defendants to provide restitution for the money wrongfully acquired. Unless this injunctive relief is granted, the California Plaintiffs and California Purchaser Subclass members will suffer irreparable harm. Plaintiffs have no way of knowing whether Defendants had stopped unlawful practices, and verify the accuracy of representations in the future.

511. California Plaintiffs and California Purchaser Subclass respectfully request that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to § 1780(a)(2). In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

512. California Plaintiffs and California Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

513. Injunctive relief is appropriate on behalf of California Plaintiffs and the California Purchaser Subclass members because Defendants have failed to make the Challenged Omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Product. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, public injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while public injunctive relief is necessary to remedy future harm (i.e., prevent future members of the public from being misled), under the current circumstances where the dollar amount of future damage is not reasonably ascertainable at this time. California Plaintiffs are currently unable to accurately quantify the damage caused by Defendants' future harm (e.g., the dollar amount that the California Plaintiffs and California Purchaser Subclass members overpay for the Products), rendering injunctive relief a necessary remedy.

### I. COUNT 9: California Unfair Competition Law (Cal. Civ. Code § 17200, *et seq*.)

514. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

515. Plaintiffs Beltran, PL01, PL18, PL19, and PL21 (for purposes of this section, "California Plaintiffs") bring this claim individually and on behalf of the California Purchaser Subclasses against all Defendants.

516. California Business & Professions Code, sections 17200, *et seq*. (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

517. Defendants, in their pervasive advertising and marketing of the Products, made misleading statements regarding the quality and characteristics of the Products—specifically, the

Challenged Representations and Omissions regarding the data safety and privacy of consumers of Meta AI Glasses. Instead, Meta funnels the consumer data, including sensitive videos captured with Meta AI Glasses, to be viewed and annotated by human "data annotators," all so that Meta could use the videos in training Defendants' own AI model.

518. Defendants do not have any reasonable basis for the Challenged Representations and Omissions made in Defendants' advertising because Defendants did not maintain consumers' data privacy. Thus, the Products fail to deliver the advertised functionality for everyday use and during various activities, as directed and intended by Defendants. Defendants knew (and knows) that they do not maintain the privacy of consumer data captured by the Products, posing a misrepresentation of their functionality, and yet Defendants intentionally advertised and marketed the Products to deceive reasonable consumers and continues to do so presently.

519. Defendants' advertising and marketing of the Products led to, and continues to lead to, reasonable consumers, including the California Plaintiff and California Purchaser Subclass members, believing that they will be able to maintain the privacy and control of their data while using the Products as Defendants advertised.

520. California Plaintiffs and the California Purchaser Subclass members have suffered injury in fact and have lost money or property as a result of and in reliance upon the Challenged Representations—namely California Plaintiffs and the California Purchaser Subclass members lost the purchase price for the Products they bought from the Defendants.

521. Defendants' conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which

advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

522. Defendants failed to avail themselves of reasonably available, lawful alternatives to further their legitimate business interests.

523. All of the conduct alleged herein occurred and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendants voluntarily alter their conduct or Defendants are otherwise ordered to do so.

524. Pursuant to Business and Professions Code Sections 17203 and 17535, California Plaintiffs and the members of the California Purchaser Subclass seek public injunctive relief in the form of an order from this Court enjoining Defendants from continuing to engage, use, or employ their practice of false and deceptive advertising and marketing of the Products. Likewise, California Plaintiffs and the members of the California Purchaser Subclass seek an order requiring Defendants to disclose such misrepresentations, and to preclude Defendants' failure to disclose the existence and significance of said misrepresentations.

525. As a direct and proximate result of Defendants' misconduct in violation of the UCL, California Plaintiffs and the California Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Further, California Plaintiffs and the California Purchaser Subclass members have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, California Plaintiffs and California Purchaser Subclass members seek a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate California Plaintiffs and the California Purchaser Subclass members for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

***"Unfair" Prong***

526. Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not

reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

527. Defendants' action of falsely advertising the Products with the Challenged Representations and Omissions encouraged consumers to purchase the Products with the expectation that they would maintain privacy and control over their data while using the Products, as advertised. However, the consumer data is not kept private or protected as advertised, causing financial injuries to consumers, who do not receive Products commensurate with their reasonable expectations, overpay for the Products, and receive Products of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendants' deceptive advertising and marketing of the Products. Accordingly, the injuries caused by Defendants' deceptive advertising and marketing outweigh any benefits.

528. Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

529. Here, Defendants' conduct of falsely advertising that consumers' data privacy would be protected while using the Product despite subjecting consumer data to human review results in financial harm to consumers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of the harm.

530. Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

531. Defendants' advertising and marketing of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendants knew or should have known of their unfair conduct. Defendants' misrepresentations constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

532. There existed reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations and Omissions.

533. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

534. Pursuant to Business and Professions Code Sections 17203, California Plaintiffs and the California Purchaser Subclass members seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practices of advertising and marketing the Products with the Challenged Representations and Omissions.

535. California Plaintiffs and the California Purchaser Subclass members have suffered injury in fact, have lost money and purchased an inferior product as a result of Defendants' unfair conduct. California Plaintiffs and the California Purchaser Subclass members paid an unwarranted premium for these Products. Specifically, California Plaintiffs and the California Purchaser Subclass members paid for Products which were advertised as maintaining consumers' privacy and control over data. California Plaintiffs and the California Purchaser Subclass members would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and marketing were deceptive. Accordingly, the California Plaintiffs and California Purchaser Subclass members seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

***“Fraudulent” Prong***

536. The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

537. Defendants used the Challenged Representations and Omissions with the intent to sell the Products to consumers, including California Plaintiffs and the California Purchaser Subclass members. The Challenged Representations and Omissions are deceptive, and Defendants knew, or should have known, of their deception. The Challenged Representations and Omissions are likely to

mislead consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

538. As alleged herein, the misrepresentations by Defendants constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

539. California Plaintiffs and the California Purchaser Subclass members reasonably and detrimentally relied on the material and deceptive Challenged Representations and Omissions to their detriment in that they purchased the Products.

540. Defendants have reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations and Omissions.

541. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

542. Pursuant to Business and Professions Code Sections 17203, California Plaintiffs and the California Purchaser Subclass members seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising and marketing the Products with the Challenged Representations and Omissions.

543. California Plaintiffs and the California Purchaser Subclass members have suffered injury in fact and have lost money as a result of Defendants' fraudulent conduct. The California Plaintiffs and California Purchaser Subclass members paid an unwarranted premium for the Products. Specifically, California Plaintiffs and the California Purchaser Subclass members paid for Products for which Defendants advertised that consumers would maintain privacy and control over their personal data. Instead, Defendants used consumers' captured data for human review by subcontractors and for training of Meta's AI models. Accordingly, California Plaintiffs and California Purchaser Subclass members seek damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

### ***"Unlawful" Prong***

544. The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

545. Defendants' advertising and marketing of the Products, as alleged herein, violates California Civil Code sections 1750, *et seq*. (the "CLRA") and California Business and Professions Code sections 17500, *et seq*. (the "FAL") as set forth below in the sections regarding those causes of action.

546. Additionally, Defendants' use of the Challenged Misrepresentations and Omissions to sell the Products violates California Civil Code sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710 (fraudulent deceit), and 1711 (deceit upon the public), as set forth above.

547. Defendants' conduct in making the deceptive representations described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendants' misrepresentations of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law claims stated in this lawsuit.

548. Defendants' advertising and marketing of the Products, as alleged herein, are deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendants knew or should have known of their unlawful conduct.

549. Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from advertising the Products with the Challenged Representations and Omissions.

550. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

551. Pursuant to Business and Professions Code Section 17203, California Plaintiffs and the California Purchaser Subclass members seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of deceptive advertising of the Products.

552. California Plaintiffs and the California Purchaser Subclass members have suffered injury in fact and have lost money as a result of Defendants' unlawful conduct. California Plaintiffs

and the California Class members paid an unwarranted premium for the Products. California Plaintiffs and the California Purchaser Subclass members would not have purchased the Products if they had known about the Challenged Omissions. Accordingly, California Plaintiffs and California Purchaser Subclass members seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL and additionally seek public injunctive relief in the form of an order directing Defendants to cease the ongoing unlawful conduct alleged herein.

### J. COUNT 10: California False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq*.)

553. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

554. Plaintiffs Beltran, PL01, PL18, PL19, and PL21 (for purposes of this section, "California Plaintiffs") bring this claim individually and on the behalf of the California Purchaser Subclass against all Defendants.

555. The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, *et seq*., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

556. Defendants violated section 17500 when they advertised and marketed the Products through the unfair, deceptive, and misleading Challenged Representations and Omissions disseminated to the public through the Products' advertising and marketing. These representations were deceptive because the Products do not conform to them. The representations were material because they are likely to mislead a reasonable consumer into purchasing the Products.

557. In making and disseminating the Challenged Representations and Omissions alleged herein, Defendants knew or should have known that the representations were untrue or misleading, and acted in violation of § 17500.

558. Defendants' Challenged Representations and Omissions were specifically designed to induce reasonable consumers, like California Plaintiffs and the California Purchaser Subclass members, to purchase the Products.

559. As a direct and proximate result of Defendants' misconduct in violation of the FAL, California Plaintiffs and the California Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Further, the California Plaintiffs and the California

Purchaser Subclass members have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, the California Plaintiffs and California Purchaser Subclass members seek a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate California Plaintiffs and the California Purchaser Subclass members for said monies, as well as public injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm to the public that will result, as well as a corrective advertising campaign to correct prior misrepresentations.

**K. COUNT 11: Breach of Implied Warranty of Merchantability (Cal. Com. Code §§ 2314 and 10212)**

560. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

561. Plaintiffs Beltran, PL01, PL18, PL19, and PL21 (for purposes of this section, "California Plaintiffs") bring this claim individually and on behalf of the California Purchaser Subclass against all Defendants.

562. Defendants are and were at all relevant times "merchants" with respect to the Products under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of the Products under § 2103(1)(d).

563. With respect to leases, Defendants are and were at all relevant times "lessors" of the Products under Cal. Com. Code § 10103(a)(16).

564. The Products are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

565. A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

566. The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human

annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

567. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to California Plaintiffs and the California Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

568. As a result of Defendants' misleading conduct, California Plaintiffs and the California Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

569. Defendants did not exclude or modify the Products' implied warranty of merchantability.

570. Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

571. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, California Plaintiffs and the other California Purchaser Subclass members have been damaged in an amount to be proven at trial. California Plaintiffs and the California Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline. California Plaintiffs and the California Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

572. As a result of Defendants' breach of the implied warranty of merchantability, California Plaintiffs and the California Purchaser Subclass members have been damaged in the amount to be determined at trial.

**L. COUNT 12: Breach of Implied Warranty (Cal. Civ. Code §§ 1791.1 and 1792)**

573. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

574. Plaintiffs Beltran, PL01, PL18, and PL19, and PL21 (for purposes of this section, "California Plaintiffs") bring this claim individually and on behalf of the California Purchaser Subclass against all Defendants.

575. California Plaintiffs and the other California Purchaser Subclass members who purchased the Products in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

576. The Products are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

577. Defendants are "manufacturers" of the Products within the meaning of Cal. Civ. Code § 1791(j).

578. Defendants impliedly warranted to California Plaintiffs and the other California Purchaser Subclass members that the Products were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, the Products do not have the quality that a buyer would reasonably expect.

579. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

a. Pass without objection in the trade under the contract description.

b. Are fit for the ordinary purposes for which such goods are used.

c. Are adequately contained, packaged, and labeled.

d. Conform to the promises or affirmations of fact made on the container or label.

580. The Products would not pass without objection in the trade because of the defects in the Products' design and data-handling practices. Because the Products were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you," they are not in merchantable condition and thus not fit for ordinary purposes.

581. The Products are not adequately labeled because the labeling fails to disclose the Products' human review pipeline and the true nature of the Products' data-handling practices. The

Products do not conform to the promises and affirmations made by Defendants, including that the Products were "designed for privacy, controlled by you," "built for your privacy," and that consumers would maintain privacy and control over their personal data while using the Products.

582. Defendants' breach of the implied warranty of merchantability caused damage to California Plaintiffs and the California Purchaser Subclass members who purchased the Products. The amount of damages due will be proven at trial.

583. Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, California Plaintiff and the California Purchaser Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

**Purchaser Claims - Connecticut**

**M. COUNT 13: Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq*.)**

584. Plaintiffs incorporate paragraphs 1 through 411 and 513-552 as though fully set forth here.

585. Plaintiffs Sukhai and PL23 (for purposes of this section, "Connecticut Purchaser Plaintiffs") bring this claim on behalf of themselves and the Connecticut Purchaser Subclass against all Defendants.

586. CUTPA declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Conn. Gen. Stat. § 42-110b(a).

587. Defendants' conduct, as alleged above, offends public policy as established by statute and common law, is immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers that they could not reasonably have avoided and that is not outweighed by any countervailing benefit. For instance, the Connecticut legislature recently amended the Connecticut Data Protection Act to require "clear affirmative" consent from users whose private information is used to train artificial intelligence models. Conn. Gen. Stat. § 42-520(a)(2). Such disclosure must be made separate from broad privacy terms that provide "descriptions of personal data processing along

with other, unrelated information." Conn. Gen. Stat. § 42-515(7). Consent does not include any "agreement obtained through the use of dark patterns." *Id.*

588. Connecticut Plaintiffs and the Connecticut Purchaser Subclass seek actual damages, punitive damages, and costs and reasonable attorneys' fees under Conn. Gen. Stat. § 42-110g(a), (d).

**Purchaser Claims – Colorado**

**N. COUNT 14: Colorado Consumer Protection Act (Col. Rev. Stat. § 6-1-101, *et seq*.)**

589. Plaintiffs incorporate paragraphs 1 through 411 and 513-552 as though fully set forth here.

590. Plaintiffs PL03 and PL04 (for purposes of this section, "Colorado Purchaser Plaintiffs") bring this claim on behalf of themselves and the Colorado Purchaser Subclass against all Defendants.

591. Defendants are "persons" under section 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101 *et seq*.

592. Colorado Plaintiffs and the Colorado Purchaser Subclass members are "consumers" for purposes of section 6-1-113(1)(a) of the Colorado CPA, each of whom purchased one or more of the Products.

593. In the course of their business, Defendants participated in deceptive trade practices that violated the Colorado CPA, as described above and below. Defendants are directly liable for these violations of law.

594. Defendants failed to disclose and actively concealed the material facts that the Products transmit intimate footage to Meta's servers and expose that footage to human annotators overseas, including highly sensitive bathroom, bedroom, sexual, and financial content.

595. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including:

a. knowingly making a false representation as to the characteristics, uses, and benefits of the Products that had the capacity or tendency to deceive the Colorado Plaintiffs and the Colorado Purchaser Subclass members;

b. representing that the Products are of a particular standard, quality, and grade even though Defendants knew or should have known they are not;

c. advertising the Products with the intent not to sell them as advertised; and

d. failing to disclose material information concerning the Products that was known to Defendants at the time of advertisement or sale with the intent to induce Colorado Plaintiffs and the Colorado Purchaser Subclass members to purchase the Products.

596. Defendants knew that the Products were designed so that intimate footage captured during ordinary use would be transmitted to Meta's servers and routed to human annotators overseas for review and labeling, and that the Products did not maintain consumer privacy as advertised. Defendants, nevertheless, failed to warn Colorado Plaintiffs or the Colorado Purchaser Subclass members about these practices despite having a duty to do so.

597. Defendants had the duty to Colorado Plaintiffs and the Colorado Purchaser Subclass members to disclose the Products' human review pipeline and the true nature of the Products' data-handling practices because:

a. Defendants were in a superior position to know the true state of facts about the Products' data-handling and human review practices;

b. Colorado Plaintiffs and the Colorado Purchaser Subclass members could not reasonably have been expected to learn or discover that the Products transmitted intimate footage to human annotators overseas until such practices were publicly reported;

c. Defendants knew that Colorado Plaintiffs and the Colorado Purchaser Subclass members could not reasonably have been expected to learn about or discover the Products' human review pipeline and associated privacy risks; and

d. Defendants actively concealed the human review pipeline and its scope by marketing the Products as "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

598. Defendants' practices significantly affected the public as consumers of the Products because, among other things, the Products function as conduits of highly sensitive and intimate personal and bystander data to human annotators overseas without adequate disclosure or meaningful consent.

599. Whether or not a product marketed as "designed for privacy" actually maintains the privacy of intimate user data is a fact a reasonable consumer would consider important in selecting a product to purchase. When the Colorado Plaintiffs and the Colorado Purchaser Subclass members purchased the Products for personal, family, or household purposes, they reasonably expected the Products would maintain the privacy and control over their data as advertised.

600. Defendants' deceptive practices were likely to and did in fact deceive reasonable consumers, including Colorado Plaintiffs and the Colorado Purchaser Subclass members, about the true privacy and data-handling practices of the Products.

601. Colorado Plaintiffs and the Colorado Purchaser Subclass members suffered injury-in-fact to their legally protected interests as a result of Defendants' violations of the Colorado CPA. Colorado Plaintiffs and the Colorado Purchaser Subclass members currently own or, within the class period, have owned the Products.

602. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were misleading.

603. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Colorado Plaintiffs, to increase the sale of the Products.

604. Colorado Plaintiffs and Colorado Purchaser Subclass members could not have reasonably avoided such injury. Colorado Plaintiffs and the Colorado Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Colorado Plaintiffs and the Colorado Purchaser Subclass members would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

605. Colorado Plaintiffs and the Colorado Purchaser Subclass members suffered harm as a result of Defendants' violations of the Colorado CPA because they relied on Defendants' representations and omissions in deciding to purchase the Products. The representations and omissions were a substantial factor. The representations and omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

606. As a direct and proximate result of Defendants' misconduct in violation of the Colorado CPA, Colorado Plaintiffs and the Colorado Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Accordingly, Plaintiffs seek a monetary award for violation of the Colorado CPA in the form of restitution, and/or disgorgement of ill-gotten gains to compensate Colorado Plaintiffs and the Colorado Purchaser Subclass members for said monies.

607. Colorado Plaintiffs seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. The Colorado Plaintiffs also request a court order requiring Defendants to provide restitution to Colorado Plaintiffs and the Colorado Purchaser Subclass for the money wrongfully acquired. Unless this injunctive relief is granted, Colorado Plaintiffs and Colorado Purchaser Subclass members will suffer irreparable harm.

608. Colorado Plaintiffs respectfully request that the Court enjoin the Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

609. Colorado Plaintiffs and members of the Colorado Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

610. Injunctive relief is appropriate on behalf of Colorado Plaintiffs and members of the Colorado Purchaser Subclass because Defendants have failed to make the challenged omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Products. Injunctive relief is necessary to correct past harm and prevent future harm—none of which

can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future damages is not reasonably ascertainable at this time. Colorado Plaintiffs are currently unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that Colorado Plaintiffs and Colorado Purchaser Subclass members overpay for the Products), rendering injunctive relief a necessary remedy.

611. Colorado Plaintiffs and the Colorado Purchaser Subclass members seek all available relief under Section 6-1-113(2) of the Colorado CPA, including actual damages sustained, injunctive relief, and attorneys' fees and costs.

**O. COUNT 15: Breach of Implied Warranty of Merchantability (Col. Rev. Stat. §§ 4-2-314 and 4-2.5-212)**

612. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

613. Plaintiffs PL03 and PL04 (for purposes of this section, "Colorado Purchaser Plaintiffs") bring this claim on behalf of themselves and the Colorado Purchaser Subclass against all Defendants.

614. Defendants are and were at all relevant times "merchants" with respect to the Products under Colorado Revised Statutes §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of the Products under section 4-2-103(1)(d).

615. The Products are and were at all relevant times "goods" within the meaning of Colorado Revised Statutes §§ 4-2-105(1) and 4-2.5-103(1)(h).

616. A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Colorado Revised Statutes §§ 4-2-314 and 4-2.5-212.

617. The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

618. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to Colorado Plaintiffs and the Colorado Purchaser Subclass members in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

619. As a result of Defendants' misleading conduct, Colorado Purchaser Plaintiffs and the Colorado Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

620. Defendants did not exclude or modify the Products' implied warranty of merchantability.

621. Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

622. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, Colorado Purchaser Plaintiffs and the other Colorado Purchaser Subclass members have been damaged in an amount to be proven at trial. Colorado Purchaser Plaintiffs and the Colorado Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review

pipeline. Colorado Purchaser Plaintiffs and the Colorado Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

623. As a result of Defendants' breach of the implied warranty of merchantability, Colorado Purchaser Plaintiffs and the Colorado Purchaser Subclass members have been damaged in the amount to be determined at trial.

**Purchaser Claims – Florida**

**P. COUNT 16: Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*)**

624. Plaintiffs incorporate paragraphs 1 through 411 and 513-551 as though fully set forth herein.

625. Plaintiff Yancy and PL02 (for purposes of this section, "Florida Purchaser Plaintiffs") bring this claim individually and on behalf of the Florida Purchaser Subclass against all Defendants.

626. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.201(2).

627. Florida Purchaser Plaintiffs and Florida Purchaser Subclass members are "consumers" within the meaning of the FDUTPA. *Id.* § 501.203(7).

628. Defendants advertise, offer, and distribute Meta AI Glasses and therefore conduct "trade or commerce within the meaning of the FDUTPA. *Id.* § 501.203(8).

629. Defendants' Challenged Representations and Omissions constitute unfair and deceptive acts and practices, in violation of the FDUTPA, by, inter alia, falsely representing to Florida Purchaser Plaintiffs and Florida Purchaser Subclass members that their privacy would be in their control and protected when using their Meta AI Glasses and omitting material facts regarding human review and third-party access.

630. Defendants' unfair and deceptive acts and practices were likely to, and did, deceive reasonable consumers acting reasonably under the circumstances, including Plaintiffs and Florida Purchaser Subclass members.

631. Florida Purchaser Plaintiffs and Florida Purchaser Subclass members would not have purchased the Glasses, or would have paid significantly less, had Defendants disclosed the true nature of the Glasses and Defendants' privacy practices.

632. As a direct and proximate result Florida Purchaser Plaintiffs and Florida Purchaser Subclass members suffered actual damages, including the amounts paid for the Glasses, and any interest that would have accrued on those monies, loss of the benefit of their bargain, and non-economic harms, including loss of privacy and emotional distress.

633. Florida Purchaser Plaintiffs and Florida Purchaser Subclass members seek all remedies permitted under the FDUTPA, including actual damages, declaratory relief, injunctive relief, and an award of reasonable attorneys' fees and costs.

**Purchaser Claims – Hawaii**

**Q. Count 17: Hawaii Unfair Competition (Haw. Rev. Stat. §§ 480-2, 480-13)**

634. Plaintiffs incorporate paragraphs 1 through 411 and 513-551 as though fully set forth here.

635. Plaintiff Lopez brings this claim individually and on behalf of the Hawaii Purchaser Subclass against all Defendants.

636. Hawaii declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Haw. Rev. Stat. § 480-2(a).

637. Defendants' conduct, as alleged in paragraphs 1 through 411 and 515 through 552, constitutes unfair and deceptive practices within the meaning of the Hawaii unfair competition law.

638. Defendants' deceptive and unlawful practices and acts caused substantial injury to the Plaintiff Lopez and Hawaii Purchaser Subclass members that they could not reasonably avoid.

639. Plaintiff Lopez and the Hawaii Purchaser Subclass the greater of $1,000 or threefold actual damages, injunctive relief, and reasonable attorneys' fees and costs under Haw. Rev. Stat. § 480-13(b).

**Purchaser Claims – Illinois**

**R. COUNT 18: Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. 510/2, *et seq*.)**

640. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

641. Plaintiffs Moore, PL20, and Enriquez (for purposes of this section, "Illinois Purchaser Plaintiffs") brings this claim individually and on behalf of the Illinois Purchaser Subclass against all Defendants.

642. The Illinois Uniform Deceptive Trade Practices Act ("Illinois UDTPA") prohibits deceptive trade practices and provides relief "in addition to remedies otherwise available against the same conduct under the common law or other statutes." See 815 Ill. Comp. Stat. 510/2(a), 510/3. Under the Illinois UDTPA, a plaintiff "need not prove . . . actual confusion or misunderstanding." *Id*. § 510/2(b).

643. Defendants, Plaintiffs and Illinois Purchaser Subclass members are "persons" within the meaning of the Illinois UDTPA. See 815 Ill. Comp. Stat. 510/1(5).

644. The Glasses are "goods" within the meaning of the Illinois UDTPA. See 815 Ill. Comp. Stat. 510/2.

645. Defendants' Challenged Representations and Omissions constitute deceptive trade practices in the conduct of their business. Defendants' practices violate the Illinois UDTPA, including by:

a. Representing that Glasses have goods or characteristics that they do not have;

b. Advertising the Glasses with intent not to sell them as advertised; and

c. Engaging in other conduct, including the Challenged Omissions, which create a likelihood of confusion or misunderstanding.

646. Defendants intended to mislead Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members and induce them to rely on Defendants' Challenged Representations and Omissions.

647. Defendants' deceptive practices were likely to, and did, deceive reasonable consumers, including Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members.

648. Defendants' Challenged Representations and Omissions were material in that Plaintiffs and Illinois Purchaser Subclass members would not have purchased the Glasses, or would have paid significantly less, had Defendants disclosed the true nature of the Glasses and Defendants' privacy practices.

649. Defendants' deceptive acts were immoral, unethical, oppressive, and unscrupulous and caused substantial injury that consumers could not reasonably avoid. This substantial injury outweighs any purported benefits to consumers or to competition.

650. As a direct and proximate result of Defendants' Challenged Representations and Omissions, Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members suffered ascertainable losses and actual damages, including the amounts paid for the Glasses, and any interest that would have accrued on those monies, loss of the benefit of their bargain, and privacy and dignitary harms associated with exposure of their data to human reviewers.

651. Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members seek all monetary and non-monetary relief permitted by the Illinois UDTPA, including damages, restitution, punitive damages, injunctive relief, and an award of reasonable attorneys' fees and costs.

### S. COUNT 19: Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq*.)

652. Plaintiffs incorporate paragraphs 1 through 172 as though fully set forth here.

653. Plaintiffs Moore, PL20, and Enriquez (for purposes of this section, "Illinois Purchaser Plaintiffs") bring this claim individually and on behalf of the Illinois Purchaser Subclass against all Defendants.

654. The Illinois Consumer Fraud Act and Deceptive Business Practices Act ("Illinois CFA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the [Illinois UDTPA]." 815 Ill. Comp. Stat. 505/2.

655. Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members are "consumers" and "persons" within the meaning of the Illinois CFA. See 815 Ill. Comp. Stat. 505/1(c), (e).

656. The Glasses are "merchandise" within the meaning of the Illinois CFA. See 815 Ill. Comp. Stat. 505/1(b).

657. Defendants have, at all relevant times, engaged in "trade" and "commerce" within the meaning of the Illinois CFA. See 815 Ill. Comp. Stat. 505/1(f).

658. Defendants' Challenged Representations and Omissions constitute deceptive, unfair, and unlawful trade acts or practices in violation of the Illinois CFA, by, for example knowingly and intentionally misrepresenting that the Glasses would maintain the privacy and security of users' data and omitting, concealing, and/or failing to disclose material facts that the products transmit footage, audio recordings, and images to Meta's servers and expose that footage to human reviewers overseas.

659. Defendants intended to mislead Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members and induce them to rely on Defendants' Challenged Representations and Omissions.

660. Defendants' unfair and deceptive acts and practices were likely to, and did, deceive reasonable consumers, including Plaintiffs and Illinois Purchaser Subclass members.

661. Defendants' Challenged Representations and Omissions were material in that Plaintiffs and Illinois Purchaser Subclass members would not have purchased the Glasses, or would have paid significantly less, had Defendants disclosed the true nature of the Glasses and Defendants' privacy practices.

662. Defendants' unfair and deceptive acts were immoral, unethical, oppressive, and unscrupulous and caused substantial injury that consumers could not reasonably avoid. This substantial injury outweighs any purported benefits to consumers or to competition.

663. As a direct and proximate result of Defendants' Challenged Representations and Omissions, Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members suffered ascertainable losses and actual damages, including the amounts paid for the Glasses, and any interest that would have accrued on those monies, loss of the benefit of their bargain, and privacy and dignitary harms associated with exposure of their data to human reviewers.

664. Illinois Purchaser Plaintiffs and Illinois Purchaser Subclass members seek all monetary and non-monetary relief permitted by the Illinois CFA, including damages, restitution, punitive damages, declaratory relief, injunctive relief, and an award of reasonable attorneys' fees and costs.

**Purchaser Claims – Maine**

**T. COUNT 20: Maine Unfair Trade Practices Act (5 M.R.S.A. § 206, *et seq.*)**

665. Plaintiffs incorporate paragraphs 1 through 411 and 515 through 552 as though fully set forth here.

666. Plaintiff PL24 and PL25 (for purposes of this section, "Maine Purchaser Plaintiffs") bring this individually and on behalf of the Massachusetts Purchaser Subclass against all Defendants.

667. The Maine Unfair Trade Practices Act ("Maine UTPA") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207.

668. Defendants advertised, offered for sale, and sold the Meta AI Glasses to consumers in Maine and thereby engaged in trade and commerce within the meaning of the Maine UTPA.

669. Defendants violated the Maine UTPA by selling the Products to Maine Purchaser Plaintiffs and the Maine Purchaser Subclass members through the misleading, deceptive, and fraudulent Challenged Representations and Omissions, constituting unfair methods of competition and unfair or deceptive acts or practices in violation of the Maine UTPA.

670. Defendants' unlawful conduct alleged in paragraphs 512 through 550 is unfair and deceptive.

671. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

672. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Maine Purchaser Plaintiffs, to increase the sale of the Products.

673. Maine Purchaser Plaintiffs and Maine Purchaser Subclass members could not have reasonably avoided such injury. Maine Purchaser Plaintiffs and Maine Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

674. Maine Purchaser Plaintiffs and Maine Purchaser Subclass members suffered harm as a result of Defendants' violations of the Maine UTPA because they relied on the Challenged Representations and Omissions in deciding to purchase the Products and were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

675. As a direct and proximate result of Defendants' misconduct in violation of the Maine UTPA, Maine Purchaser Plaintiffs and Maine Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products, loss of the benefit of their bargain, and loss of control over and value of their valuable recordings and personal information.

676. The Maine Purchaser Plaintiffs and the Maine Purchaser Subclass seek all relief available under 5 M.R.S.A. § 213, including actual damages, restitution, such other equitable relief as the Court determines to be necessary and proper, and costs and reasonable attorneys' fees

**Purchaser Claims – Maine**

**U. COUNT 21: Maine Uniform Deceptive Trade Practices Act (10 M.R.S.A. § 1211, *et seq.*)**

677. Plaintiffs incorporate paragraphs 1 through 411 and 513 through 552 through as though fully set forth here.

678. Plaintiffs PL24 and PL25 (for purposes of this section, "Maine Purchaser Plaintiffs") bring this individually and on behalf of the Massachusetts Purchaser Subclass against all Defendants.

679. The Maine Uniform Deceptive Trade Practices Act ("Maine UDTPA") makes it unlawful for to engage "in a deceptive trade practice[s]" within the course of business. 10 M.R.S.A. § 1212.

680. Defendants and the Maine Purchaser Plaintiffs are each a "person" within the meaning of 10 M.R.S.A. § 1211(5), and the Glasses are "goods" within the meaning of § 1211(3).

681. Defendants' Challenged Representations and Omissions constitute deceptive trade practices in the conduct of their business. Defendants' practices violate the Maine UDTPA as alleged herein, including, but not limited to:

a. Representing that Glasses have characteristics that they do not have;

b. Representing that Glasses are of a particular standard, when they are not;

c. Advertising the Glasses with intent not to sell them as advertised; and

d. Engaging in other conduct, including the Challenged Omissions, which create a likelihood of confusion or misunderstanding.

682. Defendants intended to, and did, mislead Maine Purchaser Plaintiffs and Maine Purchaser Subclass members and induce them to rely on Defendants' Challenged Representations and Omissions.

683. Defendants' deceptive practices were likely to, and did, deceive reasonable consumers, including Maine Purchaser Plaintiffs and Maine Purchaser Subclass members.

684. Defendants' Challenged Representations and Omissions were material in that Maine Purchaser Plaintiffs and Maine Purchaser Subclass members would not have purchased the Glasses, or would have paid significantly less, had Defendants disclosed the true nature of the Glasses and Defendants' privacy practices.

685. Defendants' deceptive acts were immoral, unethical, oppressive, and unscrupulous and caused substantial injury that consumers could not reasonably avoid. This substantial injury outweighs any purported benefits to consumers or to competition. Defendants willfully engaged in the unfair and deceptive practices alleged herein.

686. As a direct and proximate result of Defendants' Challenged Representations and Omissions, Maine Purchaser Plaintiffs and Maine Purchaser Subclass members suffered ascertainable losses and actual damages, including the amounts paid for the Glasses, and any interest that would have accrued on those monies, loss of the benefit of their bargain, and privacy and dignitary harms associated with exposure of their data to human reviewers.

687. The Maine Purchaser Plaintiffs and the Maine Purchaser Subclass seek all relief available under 10 M.R.S.A. § 1213, including injunctive relief, actual damages, restitution, such other equitable relief as the Court determines to be necessary and proper, and costs and reasonable attorneys' fees.

**Purchaser Claims – Massachusetts**

**V. COUNT 22: Massachusetts Consumer Protection Act (Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq*.)**

688. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

689. Plaintiff Fraser (for purposes of this section, "Massachusetts Purchaser Plaintiff") brings this claim on behalf of himself and the Massachusetts Purchaser Subclass against all Defendants.

690. The Massachusetts Consumer Protection Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

691. The Products are "goods," as used by the Act, because they are tangible objects that Massachusetts Plaintiff and the Massachusetts Purchaser Subclass purchased primarily for personal, family, or household purposes.

692. Massachusetts Purchaser Plaintiff and Massachusetts Purchaser Subclass members are "persons" as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(a).

693. Defendants engaged in "trade or commerce" as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b), by offering goods and services and engaging in business practices that directly or indirectly affect the people of Massachusetts.

694. Defendants violated the Act by selling the Products to Massachusetts Plaintiff and the Massachusetts Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions, constituting unfair methods of competition and unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

695. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

696. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Massachusetts Purchaser Plaintiff, to increase the sale of the Products.

697. Massachusetts Purchaser Plaintiff and Massachusetts Purchaser Subclass members could not have reasonably avoided such injury. Massachusetts Plaintiff and the Massachusetts Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

698. Massachusetts Purchaser Plaintiff and the Massachusetts Purchaser Subclass members suffered harm as a result of Defendants' violations of the Act because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

699. As a direct and proximate result of Defendants' misconduct in violation of the Act, Massachusetts Purchaser Plaintiff and the Massachusetts Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products, loss of the benefit of their bargain, and loss of control over and value of their personal information.

700. The initial demand letter requirement under Mass. Gen. Laws ch. 93A, § 9(3) has been satisfied. A member of the Massachusetts Purchaser Subclass, a prior proposed class representative, sent a written demand, and Defendants failed to respond with a reasonable tender of settlement.

701. Massachusetts Purchaser Plaintiff and the Massachusetts Purchaser Subclass seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

**W. COUNT 23: Breach of Implied Warranty of Merchantability (Mass. Gen. Laws C. 106 §§ 2-314 and 2a-212)**

702. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

703. Plaintiff Fraser (for purposes of this section, "Massachusetts Purchaser Plaintiff") brings this claim on behalf of himself and the Massachusetts Purchaser Subclass against all Defendants.

704. Defendants are and were at all relevant times "merchants" with respect to the Products under M.G.L. c. 106 § 2-104(1), and "sellers" of the Products under § 2-103(1)(d).

705. The Products are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

706. A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which the Products are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

707. Defendants impliedly warranted that the Products were of good and merchantable quality and fit, and safe for their ordinary intended use.

708. Defendants provided Massachusetts Plaintiff and the members of the Massachusetts Purchaser Subclass with an implied warranty that the Products, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendants impliedly warranted that the Products were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Products Defendants manufactured, supplied, distributed, and/or sold would function as represented and would not contain material defects or deficiencies; and (ii) a warranty that the Products would be fit for their intended use.

709. However, the Products at the time of sale and thereafter were and are not fit for their ordinary purpose because, as alleged herein, Defendants misrepresented the nature, quality, and characteristics of the Products through the Challenged Representations and Omissions, including by failing to disclose that consumers cannot maintain privacy or control over their personal data while using the Products.

710. Massachusetts Purchaser Plaintiff notified Defendants of their breach within a reasonable time, and/or was not required to do so because affording Defendants a reasonable opportunity to cure their breaches would have been futile. In any event, Defendants knew about the defects and deficiencies described herein but chose to conceal them as a means of avoiding compliance with their warranty obligations.

711. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Massachusetts Purchaser Plaintiff and the Massachusetts Purchaser Subclass members have been damaged in that they purchased the Products they otherwise would not have, overpaid for the Products, did not receive the benefit of their bargain, and the Products suffered a diminution in value.

**Purchaser Claims - Michigan**

**X. Count 24: Michigan Consumer Protection Act (Mich. Comp. Laws § 445.901, *et seq*.)**

712. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

713. Plaintiffs M. Stewart, PL05, and Hardman (for purposes of this section, "Michigan Purchaser Plaintiffs") bring this claim on behalf of themselves and the Michigan Purchaser Subclass against the Defendants.

714. The Michigan Purchaser Plaintiffs, the Defendants, and Michigan Purchaser Subclass members are each "persons" as defined by Mich. Comp. Laws § 445.902(d).

715. Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws § 445.902(g).

716. Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws § 445.903(1), including:

a. Representing that their goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws § 445.903(1)(c);

b. Representing that their goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws § 445.903(1)(e);

c. Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws § 445.903(1)(bb); and

d. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws § 445.903(1)(cc).

717. The Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

718. The Defendants intended to mislead the Michigan Purchaser Plaintiffs and Michigan Purchaser Subclass members and induce them to rely on its misrepresentations and omissions.

719. The Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Michigan Purchaser Subclass members' rights. Defendants' knowledge that they shared consumer data with subcontractors for review and data annotation put them on notice that the Meta AI Glasses were not as advertised.

720. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, the Michigan Purchaser Plaintiffs and Michigan Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing their Meta AI Glasses.

721. The Michigan Purchaser Plaintiffs and Michigan Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, and any other relief that is just and proper.

**Purchaser Claims – Nevada**

**Y. COUNT 25: Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. § 598.0903, *et seq*.)**

722. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

723. Plaintiff Doerr (for purposes of this section, "Nevada Purchaser Plaintiff") brings this claim individually and on behalf of the Nevada Purchaser Subclass against all Defendants.

724. The Nevada Deceptive Trade Practices Act prohibits deceptive trade practices in the course of a person's business or occupation. Nev. Rev. Stat. §§ 598.0915–598.0925.

725. The Products are "goods," as used by the Act, because they are tangible objects that Nevada Plaintiff and the Nevada Purchaser Subclass purchased primarily for personal, family, or household purposes.

726. Defendants are "persons" as defined by Nev. Rev. Stat. § 598.0923(1) because it is a corporation.

727. Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass members purchased goods or services primarily for personal, family, or household purposes.

728. Defendants advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

729. Defendants violated the following sections of the Act by selling the Products to Nevada Plaintiff and the Nevada Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

a. Section 598.0915(5) by knowingly making false representations as to the characteristics, uses, or benefits of the Products;

b. Section 598.0915(7) by representing that the Products are of a particular standard, quality, or grade when Defendants knew or should have known that they are of another;

c. Section 598.0915(9) by advertising the Products with intent not to sell them as advertised;

d. Section 598.0923(2) by failing to disclose material facts in connection with the sale of the Products; and

e. Section 598.0923(A)(3) by violating state and federal statutes or regulations relating to the sale of goods or services.

730. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

731. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Nevada Plaintiff, to increase the sale of the Products.

732. Defendants intended to mislead Nevada Plaintiff and Nevada Purchaser Subclass members and induce reliance on its Challenged Representations and Omissions.

733. Nevada Purchaser Plaintiff and Nevada Purchaser Subclass members could not have reasonably avoided such injury. Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

734. Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass members suffered harm as a result of Defendants' violations of the Act because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

735. As a direct and proximate result of Defendants' misconduct in violation of the Act, Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

736. Nevada Purchaser Plaintiff and Nevada Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, restitution, punitive damages, attorneys' fees, filing fees, and costs.

**Z. COUNT 26: Breach of Implied Warranty of Merchantability (Nev. Rev. Stat. §§ 104.2314, 104A.2212)**

737. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

738. Plaintiff Doerr (for purposes of this section, "Nevada Purchaser Plaintiff") brings this claim on behalf of himself and the Nevada Purchaser Subclass against all Defendants.

739. Defendants are and were at all relevant times "merchants" with respect to the Products under Nev. Rev. Stat. § 104.2104(1) and "sellers" of the Products under § 104.2103(1)(c).

740. The Products are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

741. A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

742. The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

743. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to Nevada Plaintiff and the Nevada Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

744. As a result of Defendants' misleading conduct, Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

745. Defendants did not exclude or modify the Products' implied warranty of merchantability.

746. Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

747. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, Nevada Purchaser Plaintiff and the other Nevada Purchaser Subclass members have been damaged in an amount to be proven at trial. Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline.

748. Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

749. As a result of Defendants' breach of the implied warranty of merchantability, Nevada Purchaser Plaintiff and the Nevada Purchaser Subclass members have been damaged in the amount to be determined at trial.

**Purchaser Claims – New Hampshire**

**AA. Count 27: New Hampshire Consumer Protection Act (N.H. Rev. Stat. §§ 358-A:2, 358-A:10)**

750. Plaintiffs incorporate paragraphs 411 through 513-552 as though fully set forth here.

751. Plaintiff Singh (for purposes of this section, "New Hampshire Purchaser Plaintiff") brings this claim on behalf of himself and the New Hampshire Purchaser Subclass against all Defendants.

752. The New Hampshire Consumer Protection Act declares unlawful any unfair method of competition or unfair or deceptive act or practice in the conduct of any trade or commerce, including representing that goods have characteristics or benefits they do not have and that goods are of a particular standard or quality when they are of another. N.H. Rev. Stat. § 358-A:2(V), (VII).

753. The conduct alleged in paragraphs 1 through 411 and 515 through 552 constitutes unfair and unlawful conduct within the meaning of the New Hampshire Consumer Protection Act.

754. Defendants' deceptive and unlawful practices and acts caused substantial injury to Plaintiff Singh and New Hampshire Purchaser Subclass members that they could not reasonably avoid.

755. Plaintiff Singh and the New Hampshire Purchaser Subclass seek the greater of $1,000 or actual damages and, because Defendants' conduct was a willful and knowing violation, up to treble damages but not less than double, together with costs and reasonable attorneys' fees. *See* N.H. Rev. Stat. § 358-A:10.

**Purchaser Claims – New York**

**BB. COUNT 28: New York General Business Law (N.Y. Gen. Bus. Law §§ 349, 350)**

756. Plaintiffs incorporate paragraphs 1 through 411 and 513 through 552as though fully set forth here.

757. Plaintiffs Perez, PL06 and PL10 (for purposes of this section, "New York Purchaser Plaintiffs") bring this claim on behalf of themselves and the New York Purchaser Subclass against all Defendants.

758. Defendants engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, as described herein.

759. Defendants engaged in false advertising in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 350, as described herein.

760. By the acts and conduct alleged herein, Defendants have committed unfair or deceptive acts and practices by making false representations and omissions regarding the Meta AI Glasses.

761. The foregoing deceptive acts and practices were directed at consumers.

762. The foregoing deceptive acts and practices are misleading in a material way because the Products did not contain the privacy preserving abilities, features and attributes that Defendants advertised.

763. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

764. Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded the New York Purchaser Plaintiffs' and New York Purchaser Subclass members' rights. Defendants' knowledge that the privacy preserving features of the Product did not exist put it on notice that the Products were not as advertised.

765. As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, the New York Purchaser Plaintiffs and New York Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

766. Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the thousands of New Yorkers who purchased Defendants Products.

767. The above deceptive and unlawful practices and acts by Defendants caused substantial injury to the New York Purchaser Plaintiffs and New York Purchaser Subclass members that they could not reasonably avoid.

768. The New York Purchaser Plaintiffs and the New York Purchaser Subclass members were injured as a result because (a) they would not have purchased and used the Products had they known the truth; (b) they overpaid for the Products on account of Defendants' misrepresentations and omissions; and (c) their Products have experienced a significant loss in use and value because of Defendants' misrepresentations and omissions.

769. On behalf of themselves and other members of the New York Purchaser Subclass, New York Purchaser Plaintiffs seek to enjoin the unlawful acts and practices described herein, to

recover her actual damages and/or three times actual damages, and reasonable attorneys' fees and costs of suit.

770. The New York Purchaser Plaintiffs and New York Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, and attorneys' fees and costs.

**Purchaser Claims – North Carolina**

### CC. COUNT 29: North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1, *et seq*.)

771. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

772. Plaintiff PL07 brings this claim individually and on behalf of the North Carolina Purchaser Subclass against all Defendants.

773. PL07 and the North Carolina Purchaser Subclass members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*. ("NCUDTPA").

774. Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in North Carolina General Statutes § 75-1.1(b).

775. The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. Gen. Stat. § 75-16.

776. In the course of their business, Defendants participated in deceptive trade practices that violated the NCUDTPA, as described above and below. Defendants are directly liable for these violations of law.

777. Defendants failed to disclose and actively concealed the material facts that the Products transmit intimate footage to Meta's servers and expose that footage to human annotators overseas, including highly sensitive bathroom, bedroom, sexual, and financial content.

778. Defendants engaged in deceptive trade practices prohibited by the NCUDTPA, including:

a. knowingly making a false representation as to the characteristics, uses, and benefits of the Products that had the capacity or tendency to deceive PL07 and the North Carolina Purchaser Subclass members;

b. representing that the Products are of a particular standard, quality, and grade even though Defendants knew or should have known they are not;

c. advertising the Products with the intent not to sell them as advertised; and

d. failing to disclose material information concerning the Products that was known to Defendants at the time of advertisement or sale with the intent to induce PL07 and the North Carolina Purchaser Subclass members to purchase the Products.

779. Defendants knew that the Products were designed so that intimate footage captured during ordinary use would be transmitted to Meta's servers and routed to human annotators overseas for review and labeling, and that the Products did not maintain consumer privacy as advertised. Defendants, nevertheless, failed to warn PL07 or the North Carolina Purchaser Subclass members about these practices despite having a duty to do so.

780. Defendants owed a duty to PL07 and the North Carolina Purchaser Subclass members to disclose the Products' human review pipeline and the true nature of the Products' data-handling practices because:

a. Defendants were in a superior position to know the true state of facts about the Products' data-handling and human review practices;

b. PL07 and the North Carolina Purchaser Subclass members could not reasonably have been expected to learn or discover that the Products transmitted intimate footage to human annotators overseas until such practices were publicly reported;

c. Defendants knew that PL07 and the North Carolina Purchaser Subclass members could not reasonably have been expected to learn about or discover the Products' human review pipeline and associated privacy risks; and

d. Defendants actively concealed the human review pipeline and its scope by marketing the Products as "designed for privacy, controlled by you," "built for

your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

781. Defendants' practices significantly affected the public as consumers of the Products because, among other things, the Products function as conduits of highly sensitive and intimate personal and bystander data to human annotators overseas without adequate disclosure or meaningful consent.

782. Whether or not a product marketed as "designed for privacy" actually maintains the privacy of intimate user data is a fact a reasonable consumer would consider important in selecting a product to purchase. When PL07 and the North Carolina Purchaser Subclass members purchased the Products for personal, family, or household purposes, they reasonably expected the Products would maintain the privacy and control over their data as advertised.

783. Defendants' deceptive practices were likely to and did in fact deceive reasonable consumers, including PL07 and the North Carolina Purchaser Subclass members, about the true privacy and data-handling practices of the Products.

784. By intentionally failing to disclose material information regarding the Products' data-handling and human review practices, Defendants engaged in an unfair or deceptive act or practice, in that Defendants' practices were immoral, unethical, unscrupulous, or substantially injurious to consumers.

785. Defendants' acts and practices were deceptive in the sense that they had the capacity or tendency to deceive, because they induced PL07 and the North Carolina Purchaser Subclass members to purchase the Products when they would not have done so, or would have paid materially less, had they been aware of the information Defendants withheld.

786. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were misleading.

787. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including PL07, to increase the sale of the Products.

788. PL07 and North Carolina Purchaser Subclass members could not have reasonably avoided such injury. PL07 and the North Carolina Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and PL07 and the North Carolina Purchaser Subclass members would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

789. PL07 and the North Carolina Purchaser Subclass members suffered harm as a result of Defendants' violations of the NCUDTPA because they relied on Defendants' representations and omissions in deciding to purchase the Products. The representations and omissions were a substantial factor. The representations and omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

790. Defendants' acts and practices proximately caused actual injury to PL07 and the other North Carolina Purchaser Subclass members, as PL07 would not have purchased the Products, or would have paid materially less for the Products, if not for Defendants' misrepresentations and omissions.

791. As a direct and proximate result of Defendants' misconduct in violation of the NCUDTPA, PL07 and the North Carolina Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products. Accordingly, PL07 seeks a monetary award for violation of the NCUDTPA in the form of restitution, and/or disgorgement of ill-gotten gains to compensate them and the North Carolina Purchaser Subclass members for said monies.

792. PL07 and the North Carolina Purchaser Subclass members seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. PL07 and the North Carolina Purchaser Subclass also seek restitution for the money Defendants wrongfully acquired. Unless this injunctive relief is granted, PL07 and the North Carolina Purchaser Subclass members will suffer irreparable harm.

793. PL07 respectfully requests that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein. In addition, Defendants should be compelled to provide restitution to consumers who paid for Products that are not what they expected to receive due to Defendants' misrepresentations.

794. PL07 and members of the North Carolina Purchaser Subclass are entitled to equitable relief as no adequate remedy at law exists.

795. Injunctive relief is appropriate on behalf of PL07 and members of the North Carolina Purchaser Subclass because Defendants have failed to make the challenged omissions clear—i.e., that consumers cannot maintain privacy or control over their personal data while using the Products. Injunctive relief is necessary to correct past harm and prevent future harm—none of which can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Products that has resulted from Defendants' unfair, fraudulent, and unlawful marketing efforts. Such modifications would include maintaining consumer data privacy as advertised, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future damages is not reasonably ascertainable at this time. PL07 is currently unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that they and the North Carolina Purchaser Subclass members overpay for the Products), rendering injunctive relief a necessary remedy.

796. PL07 and the North Carolina Purchaser Subclass members are entitled to all actual and consequential damages resulting from Defendants' unfair and deceptive practices. PL07 and the North Carolina Purchaser Subclass members are also entitled to recovery of treble damages as provided in North Carolina General Statutes § 75-16. PL07 and the North Carolina Purchaser Subclass members are further entitled to attorneys' fees and costs based on Defendants' willful violation of the statute.

**DD. COUNT 30: Breach of Implied Warranty of Merchantability (N.C. Gen. Stat. § 25-2-314)**

797. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

798. Plaintiff PL07 brings this claim individually and on behalf of the North Carolina Purchaser Subclass against all Defendants.

799. Defendants are and were at all relevant times "merchants" with respect to the Products under North Carolina General Statutes § 25-2-314(1) and "sellers" of the Products under section 25-2-103(1)(d).

800. The Products are and were at all relevant times "goods" within the meaning of North Carolina General Statutes §§ 25-2-105(1) and 25-2A-103(1)(h).

801. A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which such products are used is implied by law pursuant to North Carolina General Statutes §§ 25-2-314 and § 25-2A-212.

802. The Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which such products are used. Specifically, the Products are inherently defective in that they were designed so that, during ordinary and intended use, intimate footage captured by the Products is transmitted to Meta's servers and routed to human annotators overseas for review and labeling, contrary to Defendants' representations that the Products were "designed for privacy, controlled by you."

803. To be merchantable, goods must conform to the promises or affirmations of fact made in the advertising of the product. Defendants breached the implied warranty of merchantability to PL07 and the North Carolina Purchaser Subclass in their representations that the Products were "designed for privacy" and that consumers would be able to maintain privacy and control over their personal data while using the Products when this was actually false.

804. As a result of Defendants' misleading conduct, PL07 and the North Carolina Purchaser Subclass did not receive merchantable goods as impliedly warranted by Defendants.

805. Defendants did not exclude or modify the Products' implied warranty of merchantability.

806. Defendants were provided notice of these issues by, among other things, publicly reported accounts from data annotators employed by Meta's vendor Sama describing the intimate nature of the footage they were exposed to.

807. As a direct and proximate result of Defendants' breaches of the warranties of merchantability, PL07 and the other North Carolina Purchaser Subclass members have been damaged in an amount to be proven at trial. PL07 and the North Carolina Purchaser Subclass members were injured as a result of Defendants' failure to disclose material facts regarding the Products, including that Meta collected user intimate data and transmitted it for analysis by overseas human contractors without disclosing the nature, scope, and extent of this human review pipeline. PL07 and the North Carolina Purchaser Subclass members paid for a product that did not have the promised quality and nature, paid a premium for the Products when they could have instead purchased other less expensive products, and lost the opportunity to purchase similar products that would not have subjected them to undisclosed collection and sharing of their data.

808. As a result of Defendants' breach of the implied warranty of merchantability, PL07 and the North Carolina Purchaser Subclass members have been damaged in the amount to be determined at trial.

**Purchaser Claims – Oregon**

**EE. COUNT 31: Oregon Unlawful Trade Practices Act (O.R.S. § 646.608, *et seq*.)**

809. Plaintiffs incorporate paragraphs 1 through 411 and 513 through 552as though fully set forth here.

810. Plaintiff Russi brings this claim individually and on behalf of the Oregon Purchaser Subclass against all Defendants.

811. The Oregon Unlawful Trade Practices Act declares unlawful, among other things, representing that goods have characteristics, uses, or benefits they do not have; representing that goods are of a particular standard or quality when they are of another; and advertising goods with intent not to provide them as advertised. ORS § 646.608(1)(e), (g), (i).

812. The conduct alleged in paragraphs 1 through 411 and 515 through 552 constitutes unfair and unlawful conduct within the meaning of the Oregon Unlawful Trade Practices Act.

813. Defendants engaged in each of those practices in connection with the sale of the Products, willfully and with knowledge that the Products did not provide the advertised privacy protections.

814. Plaintiff Russi and the Oregon Purchaser Subclass seek actual damages or statutory damages of $200, whichever is greater, punitive damages, equitable relief, and reasonable attorney fees under ORS § 646.638.

**Purchaser Claims – Pennsylvania**

**FF.COUNT 32: Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. § 201-1, *et seq*.)**

815. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

816. Plaintiff PL09 brings this claim on behalf of himself and the Pennsylvania Purchaser Subclass against all Defendants.

817. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCP") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. 73 Pa. Stat. § 201-3.

818. The Products are "goods," as used by the Act, because they are tangible objects that Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass purchased primarily for personal, family, or household purposes.

819. Defendants are "persons" as defined by 73 Pa. Stat. § 201-2(2), which includes corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity.

820. Defendants engage in "trade" or "commerce" as defined by 73 Pa. Stat. § 201-2(3), which includes advertising, offering for sale, sale or distribution of any services and any property, and includes any trade or commerce directly or indirectly affecting the people of Pennsylvania.

821. Defendants violated the following sections of the Pennsylvania UTPCP by selling the Products to Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

a. Section 201-2(4)(v) by representing that the Products have characteristics, uses, or benefits which they do not have;

b. Section 201-2(4)(vii) by representing that the Products are of a particular standard, quality, or grade when they are of another;

c. Section 201-2(4)(ix) by advertising the Products with intent not to sell them as advertised; and

d. Section 201-2(4)(xxi) by engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

822. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

823. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Pennsylvania Plaintiff, to increase the sale of the Products.

824. Pennsylvania Plaintiff and Pennsylvania Purchaser Subclass members could not have reasonably avoided such injury. Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

825. Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass members suffered harm as a result of Defendants' violations of the Pennsylvania UTPCP because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

826. As a direct and proximate result of Defendants' misconduct in violation of the Pennsylvania UTPCP, Pennsylvania Plaintiff and the Pennsylvania Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

827. Pennsylvania Plaintiff and Pennsylvania Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages or one hundred dollars ($100), whichever is greater, treble damages, punitive damages, and reasonable attorneys' fees and costs.

**Purchaser Claims – Texas**

### GG. COUNT 33: Texas Deceptive Trade Practices–Consumer Protection Act (Tex. Bus. & Com. Code § 17.41, *et seq*.)

828. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

829. Plaintiffs PL08 and Bodine (for purposes of this section, "Texas Plaintiffs") bring this claim individually and on behalf of the Texas Purchaser Subclass against all Defendants.

830. The Texas Deceptive Trade Practices–Consumer Protection Act ("Texas DTPA") "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code § 17.44(a).

831. The Products are "goods," as defined by the DTPA in Tex. Bus. & Com. Code § 17.45(1), because they are tangible objects purchased for use.

832. Defendants are "persons" as defined by Tex. Bus. & Com. Code § 17.45(3), which includes a corporation, association, or other group, however organized.

833. Defendants engage in "trade" or "commerce" as defined by Tex. Bus. & Com. Code § 17.45(6), which includes advertising, offering for sale, sale or distribution of any services and any property, and includes any trade or commerce directly or indirectly affecting the people of Texas.

834. Defendants violated the following sections of the DTPA by selling the Products to Texas Plaintiffs and the Texas Purchaser Subclass through the misleading, deceptive, and fraudulent Challenged Representations and Omissions:

a. Section 17.46(b)(5) by representing that the Products have characteristics, uses, or benefits which they do not have;

b. Section 17.46(b)(7) by representing that the Products are of a particular standard, quality, or grade when they are of another;

c. Section 17.46(b)(9) by advertising the Products with intent not to sell them as advertised; and,

d. Section 17.46(b)(24) by failing to disclose information concerning the Products that was known at the time of the transaction with the intent to induce consumers into a transaction they otherwise would not have entered.

835. Defendants further violated Tex. Bus. & Com. Code sections 17.46(b)(2) and (3) by causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of the Products.

836. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its Challenged Representations and Omissions were misleading.

837. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Texas Plaintiff, to increase the sale of the Products.

838. In engaging in the above-described practices, Defendants acted intentionally and with flagrant disregard of prudent and fair business practices to the extent that Defendants should be treated as having acted intentionally. Tex. Bus. & Com. Code § 17.45(13).

839. Texas Plaintiffs and Texas Purchaser Subclass members could not have reasonably avoided such injury. Texas Plaintiffs and the Texas Purchaser Subclass members were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

840. Texas Plaintiffs and the Texas Purchaser Subclass members suffered harm as a result of Defendants' violations of the DTPA because they relied on the Challenged Representations and Omissions in deciding to purchase the Products. The Challenged Representations and Omissions were a substantial factor. The Challenged Representations and Omissions were material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

841. On March 20, 2026, Bodine sent a letter complying with Texas Business and Commercial Code § 17.505(a).

842. As a direct and proximate result of Defendants' misconduct in violation of the DTPA, Texas Plaintiffs and the Texas Purchaser Subclass members were harmed in the amount of the purchase price they paid for the Products.

843. Texas Plaintiffs and Texas Purchaser Subclass members seek all available relief under the Texas DTPA, including injunctive relief and monetary damages, including but not limited to attorneys' fees and punitive damages.

**HH. COUNT 34: Breach of Implied Warranty of Merchantability (Tex. Bus. & Com. Code § 2.314)**

844. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

845. Plaintiffs PL08 and Bodine (for purposes of this section, "Texas Plaintiff") brings this claim individually and on behalf of the Texas Purchaser Subclass against all Defendants.

846. Defendants are and were at all relevant times "merchants" with respect to the Products under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of the Products under § 2.103(a)(4).

847. The Products are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

848. A warranty that the Products were in merchantable condition and fit for the ordinary purpose for which the Products are used is implied by law, pursuant to Texas Business and Commercial Code §§ 2.314 and 2A.212.

849. Defendants impliedly warranted that the Products were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by Defendants would function as represented and would not contain material defects or deficiencies; and (ii) a warranty that the Products would be fit for their intended use.

850. Defendants breached the implied warranty of merchantability in that the Products were not in merchantable condition when they were sold to Texas Plaintiff and members of the Texas

Purchaser Subclass, and said Products were and are unfit for the ordinary purposes for which such Products are used because, as alleged herein, Defendants misrepresented the nature, quality, and characteristics of the Products through the Challenged Representations and Omissions.

851. Texas Plaintiffs notified Defendants of their breach within a reasonable time after Texas Plaintiffs learned about it.

852. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Texas Plaintiffs and members of the Texas Purchaser Subclass have suffered damages, including but not limited to incidental and consequential damages.

**Purchaser Claims – Utah**

**II. COUNT 35: Utah Consumer Sales Practices Act (Utah Code § 13-11-1, *et seq*.)**

853. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

854. Plaintiff Woodhead (for purposes of this section, "Utah Plaintiff") brings this claim on behalf of himself and the Utah Purchaser Subclass against all Defendants.

855. Each Defendant is a "person" as defined by Utah Code § 13-11-3(5).

856. Each Defendant is a "supplier" as defined by Utah Code § 13-11-3(6), because they regularly solicit, engage in, or enforce "consumer transactions," as defined by Utah Code § 13-11-3(2).

857. Defendants engaged in deceptive and unconscionable acts and practices in connection with consumer transactions, in violation of Utah Code § 13-11-4 and Utah Code § 13-11-5, as described herein.

858. Defendants intended to mislead the Utah Plaintiff and Utah Purchaser Subclass members and induce them to rely on its misrepresentations and omissions.

859. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

860. Defendants misrepresented to the Utah Plaintiff and Utah Purchaser Subclass members the capabilities of the Products related to their privacy features, or lack thereof. The Utah Plaintiff and the Utah Purchaser Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

861. Defendants had a duty to disclose the above facts due to the circumstances of this case. Defendants' duty to disclose arose from its:

a. Possession of exclusive knowledge regarding the privacy features, or lack thereof, of the Products;

b. Active concealment or misrepresentations regarding the lack of privacy the Products would provide; and

c. Incomplete representations about the Products, while purposefully withholding material facts from the Utah Plaintiff and the Utah Purchaser Subclass that contradicted these representations.

862. Defendants intentionally or knowingly engaged in deceptive acts or practices, violating Utah Code § 13-11-4(2) by:

a. Indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not;

b. Indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;

c. Indicating that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not; and,

d. Indicating that the subject of a consumer transaction will be supplied in greater quantity (e.g., more privacy and data security) than the supplier intends.

863. Defendants engaged in unconscionable acts and practices that were oppressive and led to unfair surprise, as shown in the setting, purpose, and effect of those acts and practices.

864. In addition, there was an overall imbalance in the obligations and rights imposed by the consumer transactions in question, based on the mores and industry standards of the time and place where they occurred. There is a substantial imbalance between the obligations and rights of consumers, such as the Utah Plaintiff and the Utah Purchaser Subclass, who purchased the Products based upon the publicly-available information in the marketplace, and Defendants, which had exclusive knowledge as to the true features, capabilities, and software included in the Products.

865. Defendants' acts and practices were also procedurally unconscionable because consumers, including the Utah Plaintiff and the Utah Purchaser Subclass, had no practicable option but to purchase the Products based upon publicly-available information, despite Defendants' omissions and misrepresentations. Defendants exploited this imbalance in power, and the asymmetry of information, to profit by selling the Products based on false promises of privacy preserving features.

866. As a direct and proximate result of Defendants' unconscionable and deceptive acts or practices, the Utah Plaintiff and Utah Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages including from not receiving the benefit of their bargain in purchasing the Products.

867. The Utah Plaintiff and Utah Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages of $2,000 per violation, amounts necessary to avoid unjust enrichment, under Utah Code §§ 13-11-19, *et seq*., and reasonable attorneys' fees and costs.

**Purchaser Claims – Virginia**

**JJ. Count 36: Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196, *et seq*.)**

868. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

869. Plaintiff Hatch (for purposes of this section, "Virginia Plaintiff") brings this claim on behalf of himself and the Virginia Purchaser Subclass against all Defendants.

870. The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

871. Each Defendant is a "person" as defined by Va. Code Ann. § 59.1-198.

872. Each Defendant is a "supplier" as defined by Va. Code Ann. § 59.1-198.

873. Defendants engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Defendants advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

874. Defendants engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, described herein.

875. Defendants intended to mislead the Virginia Plaintiff and Virginia Purchaser Subclass members and induce them to rely on their misrepresentations and omissions.

876. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

877. Defendants misrepresented to the Virginia Plaintiff and Virginia Purchaser Subclass members the capabilities of the Products related to their privacy features, or lack thereof. The Virginia Plaintiff and Virginia Purchaser Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

878. Defendants had a duty to disclose these facts due to the circumstances of this case. Defendants' duty to disclose also arose from its:

a. Possession of exclusive knowledge regarding the privacy features, or lack thereof, of the Products;

b. Active concealment or misrepresentations regarding the lack of privacy the Products would provide; and

c. Incomplete representations about the Products, while purposefully withholding material facts from the Virginia Plaintiff and the Virginia Purchaser Subclass that contradicted these representations.

879. The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

a. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

b. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

c. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

880. Defendants acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded the Virginia Plaintiff and Virginia Purchaser Subclass members' rights. Defendants' knowledge that the advertised privacy preserving features did not exist put it on notice that the Products were not as it advertised.

881. An award of punitive damages would serve to punish Defendants for their wrongdoing and warn or deter others from engaging in similar conduct.

882. As a direct and proximate result of Defendants' deceptive acts or practices, the Virginia Plaintiff and Virginia Purchaser Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

883. The Virginia Plaintiff and Virginia Purchaser Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, punitive damages, and attorneys' fees and costs.

## X. USER PLAINTIFFS CAUSES OF ACTION

### A. COUNT 37: Computer Fraud and Abuse Act (18 U.S.C. § 1030, *et seq.*)

884. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

885. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses as against Defendants.

886. Defendants' actions, as alleged herein, constitute a breach of the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. § 1030, Sections 1030(a)(2)(C), 1030(a)(4) and 1030(a)(5)(A).

887. 18 U.S.C. § 1030(a)(2)(C) makes it unlawful to "intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[] information from any protected computer."

888. 18 U.S.C. § 1030(a)(4) makes it unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value, unless the object of the fraud

and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

889. 18 U.S.C. § 1030(a)(5)(A) makes it unlawful to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

890. "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

891. A "protected computer" includes one that is used in or affecting interstate or foreign commerce. 18 U.S.C. § 1030(e)(2). The Products are "protected computers" under the CFAA because they process and store data and are used in and affect interstate or foreign commerce.

892. Under 18 U.S.C. § 1030(e)(6), "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."

893. Under 18 U.S.C. § 1030(e)(8), "damage" means "any impairment to the integrity or availability of data, a program, a system, or information."

894. Under 18 U.S.C. § 1030(e)(11), "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

895. In violation of 18 U.S.C. § 1030(a)(2)(C), Defendants intentionally accessed Plaintiffs' and User Class members' protected computers without authorization, or in excess of authorization, to obtain Plaintiffs' sensitive and valuable data. Defendants deceived Plaintiffs and User Class members about the scope of Defendants' access and activities in order to fraudulently induce authorization. Upon receiving the fraudulently-induced authorization, Defendants intentionally accessed Plaintiffs' and User Class members' protected computers.

896. In violation of 18 U.S.C. § 1030(a)(4), Defendants, knowingly and with intent to defraud, accessed without authorization, or in excess of authorization, the Plaintiffs' protected

computers to further its scheme to deliberately and covertly extract, capture, store, annotate, alter, and transmit to third parties, the sensitive and intimate personal data of millions of users in order to maximize data collection and to train AI tools.

897. Defendants' access to Plaintiffs' protected computers was without authorization or exceeded authorization because:

898. Defendants obtained, altered, and annotated Plaintiffs' intimate media and associated data that Defendants were not entitled to obtain, alter, or annotate. Defendants' obtainment, alterations, and annotations were also not reasonably necessary to provide the advertised consumer-facing functionality; and

899. Any purported access or damage authorization granted by Plaintiffs and User Class members was vitiated by Defendants' concealing their activities and misleading consumers about the nature of their access and activities. Defendants' deception of Plaintiffs and User Class members relates to the essential nature of Defendants' invasion and Plaintiffs' resulting injury. Any purported authorization that Defendants were granted is void because Defendants misdescribed the nature of the Products in order to gain access to Plaintiffs' and User Class members' protected computers and valuable data. Had Defendants disclosed their surreptitious data collection, storage, alteration, annotation, and transmission to third parties, they would never have been granted access to these protected computers. Any such purported authorization was induced by Defendants' deceit and concealment and would accordingly be invalid.

900. In violation of 18 U.S.C. § 1030(a)(5)(A), Defendants knowingly caused the transmission of the Meta AI application and associated software, which intentionally caused damage to Plaintiffs' and User Class members' highly sensitive audio and video data through the deliberate and covert extraction, transmission, alteration, and annotation of this data. Because Plaintiffs and Class members never authorized Defendants to alter or annotate Plaintiffs' sensitive and intimate data, Defendants were not authorized to cause such damage.

901. As a direct and proximate result of Defendants' violations of the CFAA, Plaintiffs and User Class members have suffered losses under 18 U.S.C. § 1030(e)(11) that are in excess of $5,000 within the meaning of 18 U.S.C. § 1030(e)(11), including:

a. the loss of the value and confidentiality of their data;

b. costs reasonably incurred in responding to Defendants' offense; and

c. costs, including time expended in this litigation, to restore the condition of their data prior to Defendants' offense.

902. As a direct and proximate result of Defendants' violations of the CFAA, Plaintiffs and User Class members have suffered damage under 18 U.S.C. § 1030(e)(8), including:

a. alteration and annotation of their data; and

b. compromise to the integrity of the data, including the state of its security and privacy.

903. Plaintiffs and User Class members seek all remedies available under 18 U.S.C. § 1030, including compensatory damages and injunctive and other equitable relief.

**B. COUNT 38: Electronic Communications Privacy Act (18 U.S.C. § 2510, *et seq*.)**

904. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

905. User Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses as against Meta.

906. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 (collectively, "ECPA"), prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

907. The ECPA also makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know that" the communication was obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c) & (d).

908. The ECPA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, used, or disclosed. 18 U.S.C. § 2520(a).

909. The ECPA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

910. The ECPA defines "electronic communication" as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

911. The ECPA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

912. The ECPA defines "contents," with respect to any covered communication, to include "any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

913. The ECPA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

914. Meta, a corporation, is a person as defined by 18 U.S.C. § 2510(6).

**Meta intercepts Plaintiffs' and Users' electronic communications**

915. The data and transmissions captured by and transmitted from Plaintiffs' and User Class members' Meta AI Glasses—including visual imagery, audio recordings, and metadata—constitute 'electronic communications,' as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems that affect interstate commerce.

916. As alleged herein, Meta has intercepted, in real time and as it was transmitted, the contents of electronic communications captured by Plaintiffs' and User Class members' Meta AI Glasses, and has diverted those communications to Meta's servers and to third-party subcontractors, including Sama, without consent. In the alternative, Meta procured Sama to intercept those communications.

917. Meta intercepted these electronic communications in real time, while they were in transit from the Glasses through Plaintiffs' and User Class members' paired mobile devices, and not merely upon their arrival at Meta's servers.

918. Meta intercepted these data transmissions by routing them from the Glasses' onboard sensors, during transmission, to Plaintiffs' and User Subclass members' mobile device and diverting those electronic communications to Meta's cloud servers and to Sama's annotation facilities in Nairobi, Kenya, unbeknown to Plaintiffs and User Class members. Meta was not a participant in any of those communications.

919. In the alternative, if Meta is deemed a party to any of those communications it intercepted those communications for a criminal and tortious purpose that satisfies the ECPA's crime-tort exception. The ECPA imposes liability where a party intercepts a communication "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Here, Meta intended to intercept the communications for the purpose of intruding upon Plaintiffs' and User Subclass members' privacy and seclusion in order to collect vast quantities of personal data, i.e., training materials for its AI models that Meta could not lawfully obtain with consent.

920. As detailed herein, the electronic communications that Meta has intercepted are tied to individual users and devices, and not anonymized.

**Meta intercepts Plaintiffs' and User Subclass members' oral communications**

921. The ECPA defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2).

922. Meta recorded Plaintiffs' and User Class members' oral communications via the Glasses' microphone array which continuously listens, often misidentifies ordinary speech as the wake phrase, and therefore captures and transmits audio even when the user never intended to activate the AI.

923. Plaintiffs and User Class members have a reasonable expectation of privacy not to be subject to the widespread intrusive surveillance alleged herein. Based upon Defendants' Challenged Representations and Omissions, Plaintiffs and User Subclass members believed that they were in control of their own data. Plaintiffs and User Subclass members had a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses, including private residences,

bathrooms, bedrooms, and other intimate settings, and Plaintiffs and User Class members reasonably expected privacy in such settings. Further, there is a reasonable expectation that communications, imagery and audio captured on the Glasses would not be routed to human reviewers at a third-party subcontractor in a foreign country.

924. Additionally, common understanding and experience regarding how consumer electronic devices work create a reasonable expectation that a device manufacturer like Meta would not surreptitiously record, intercept and divert the communications described above to third-party human annotators for review and AI model training.

925. Defendants intercepted Plaintiffs and User Subclass members' conversations by recording and duplicating the video and audio footage captured on the Meta AI Glasses and duplicating it onto Meta's servers without consent of any party to the conversation. Meta was not a participant in any of those conversations and was instead an unannounced second auditor.

926. In further violation of the ECPA, Meta has intentionally disclosed or endeavored to disclose to third parties—including Sama—the contents of the electronic and oral communications described above while knowing or having reason to know that the information was obtained through the interception of the communications in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(c).

927. In further violation of the ECPA, Meta has intentionally used or endeavored to use the contents of the communications described above knowing or having reason to know that the information was obtained through interception in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(d).

928. Specifically, Meta has disclosed and used the contents of the communications described above by routing Plaintiffs' and User Class members' captured imagery and audio to its own servers and on to Sama for manual annotation and labeling, and by incorporating the resulting training data into Meta's proprietary AI models, for its own commercial benefit.

929. As a result, Plaintiffs and User Class members have suffered harm and injury due to the interception, disclosure, and/or use of electronic communications and oral communications containing their private and personal information.

930. Pursuant to 18 U.S.C. § 2520, Plaintiffs and User Class members have been damaged by Meta's interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the User Class and any profits made by Meta as a result of the violation or (b) statutory damages for each User Class member of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

### C. COUNT 39: California Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502)

931. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

932. User Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses as against Meta.

933. California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, was enacted to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

934. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." *Id*.

935. CDAFA defines "access" to mean "to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

936. CDAFA defines "computer system" to mean "a device or collection of devices . . . one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

937. CDAFA defines "data" to mean "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions," which "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

938. The Meta AI Glasses, the paired smartphones on which the Meta AI application runs, and the network connecting them to Meta's servers each constitute a "computer," "computer system," or "computer network" within the meaning of Cal. Penal Code § 502(b).

939. The audio recordings, images, video, and associated metadata captured by and transmitted from the Meta AI Glasses constitute "data" within the meaning of Cal. Penal Code § 502(b)(8), whether resident on the Glasses, resident on the paired smartphone, or in transit.

940. California Plaintiffs and California User Subclass members are the owners or lessees of the Meta AI Glasses, of the paired smartphones, and of the data described above, within the meaning of Cal. Penal Code § 502(e)(1).

941. Meta knowingly accessed the Meta AI Glasses and the paired smartphones and, without permission, took, copied, and made use of data from those devices, in violation of Cal. Penal Code § 502(c)(2). Specifically, Meta caused the capture of audio, imagery, and video; caused that content to be routed off the devices to Meta's servers; and made use of that content by disclosing it to third-party annotators for review and labeling and by incorporating it into Meta's proprietary artificial intelligence models.

942. Meta knowingly accessed those computers and computer systems and, without permission, otherwise used the data resident on or generated by them in order to devise and execute a scheme or artifice to defraud and deceive, and to wrongfully control and obtain data, in violation of Cal. Penal Code § 502(c)(1). The scheme consisted of the Challenged Representations and Omissions alleged above, by which Meta induced California Plaintiffs and California User Subclass members to acquire and use the Products in the belief that the Products were "designed for privacy" and "controlled by you."

943. Meta knowingly and without permission used, and caused to be used, computer services — including data processing and storage functions — on the Glasses and on the paired smartphones, in violation of Cal. Penal Code § 502(c)(3).

944. Meta knowingly and without permission accessed, and caused to be accessed, the computers, computer systems, and computer networks described above, in violation of Cal. Penal Code § 502(c)(7).

945. Meta acted "without permission" within the meaning of Section 502. California Plaintiffs and California User Subclass members granted Meta no permission to route their private audio, imagery, and video to human annotators for review and labeling or to incorporate that content into Meta's artificial intelligence models. To the extent Meta contends that any permission was granted, that permission was procured by the Challenged Representations and Omissions and is therefore no permission at all; a consent obtained by deception as to the very use at issue does not authorize that use.

946. In addition, and independently, the Glasses capture and transmit data when their AI features are inadvertently triggered, as alleged above. As to those captures, California Plaintiffs and California User Subclass members took no action whatsoever, requested nothing, and granted no permission of any kind. Meta's access to and use of that data was without permission in the most literal sense.

947. Meta caused, by electronic means, the access of computers and computer systems located in California from outside California, and is therefore deemed to have personally accessed those computers and computer systems in California. Cal. Penal Code § 502(j).

948. California Plaintiffs and California User Subclass members suffered damage and loss by reason of Meta's violations of Section 502(c), including the diminution in value of their private data, the loss of exclusive control over that data, and expenditures reasonably and necessarily incurred to determine what data was taken from their devices and where it was sent.

949. Pursuant to Cal. Penal Code § 502(e), California Plaintiffs and California User Subclass members are entitled to compensatory damages — including any expenditure reasonably and necessarily incurred to verify whether their data was altered, damaged, or deleted by the access —

together with injunctive and other equitable relief, and reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e)(2).

950. Meta's violations were willful, and Meta acted with oppression, fraud, and malice as defined in Cal. Civ. Code § 3294(c). California Plaintiffs and California User Subclass members are therefore entitled to punitive and exemplary damages pursuant to Cal. Penal Code § 502(e)(4).

**D. COUNT 40: Strict Product Liability–Design Defect (Common Law)**

951. Plaintiffs incorporate paragraphs 1 through 411 and 462 through 477 as though fully set forth here.

952. User Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses as against Defendants.

953. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

954. Meta and Luxottica designed, engineered, manufactured, marketed, distributed, and sold the Products.

955. Meta and Luxottica placed the Products into the stream of commerce, knowing and intending that they would be used by Plaintiffs and User Class members throughout the United States without any inspection for defects by end users.

956. The Products were defective in design when they left Meta's possession and control because, inter alia, they were designed so that, during ordinary and intended use: (1) they are designed and marketed to be worn continuously throughout the day and, upon activation, to capture photo, video, and audio content, including inside homes, bedrooms, and bathrooms, and during other intimate moments; (2) that content is automatically transmitted off-device to Meta's servers and then to human "data annotators" overseas for review and labeling; and (3) this pipeline of intimate, sensitive footage to human annotators is implemented without adequate in-product controls or transparent, conspicuous disclosures consistent with Meta's privacy-centric representations.

957. Though Meta has publicly acknowledged that it "sometimes use[s] contractors to review" users' data, purportedly to improve the service, it has claimed that, "unless users choose to

share media they've captured with Meta or others, that media stays on the user's device" and that any content users do choose to share is "filtered to protect people's privacy."

958. Meta simultaneously marketed the Products with privacy-centric statements, including that the Products are "designed for privacy, controlled by you," "built for your privacy," and similar representations suggesting robust privacy protections and user control over captured content.

959. No reasonable consumer would expect that, by using a product advertised as "designed for privacy" in ordinary, foreseeable ways (e.g., wearing it at home, in bedrooms or bathrooms, while undressing, or around family members), their intimate video and audio would be routed to and watched by strangers overseas, cataloguing their "bathroom visits, sex and other intimate moments," and financial details for AI-training purposes.

960. The Products failed to perform as safely as an ordinary consumer would expect because, contrary to Meta's privacy-centric marketing: (1) they function as surreptitious conduits of highly sensitive and intimate personal and bystander data to human annotators; and (2) the Products' design, including reliance on a small LED indicator light, does not ensure that users or bystanders meaningfully understand that their intimate moments and environments are being recorded, offloaded, and reviewed.

961. Any purported benefits of designing the Products to route intimate user and bystander footage to human annotators—rather than relying on less invasive or more privacy-protective AI-training methods—are outweighed by the gravity and likelihood of harm, including: (1) exposure of highly intimate, sexual, and bodily content to strangers; (2) exposure of financial information; (3) heightened risks of identity theft, stalking, extortion, and reputational harm; and (4) economic harm from paying for a product that does not conform to its privacy-centric marketing.

962. Plaintiffs and User Class members used the Products in intended and reasonably foreseeable ways, including wearing them in daily life, inside homes, and around family and friends.

963. A safer alternative design that would have eliminated or reduced injuries to Plaintiffs' privacy was technically and commercially feasible. For example, Meta and Luxottica could have designed the Products such that use of and access to the Products' core AI features was decoupled

from the human review pipeline or required explicit user consent for each piece of footage routed to human contractors.

964. The Products' defective design was a substantial factor in causing Plaintiffs' and User Class members' injuries, including the loss of privacy and dignitary harms associated with the exposure of intimate footage to human annotators.

965. Plaintiffs and User Class members would not have used the Products had they known of the Products' true design and the attendant privacy risks.

966. As a direct and proximate result of Meta's defective design, Plaintiffs and User Class members have suffered and will continue to suffer injury, including non-economic harms relating to invasion of privacy and emotional distress.

967. Plaintiffs and User Class members seek all monetary and non-monetary relief allowed by law as a result of Meta's strict product liability, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

**E. COUNT 41 Strict Product Liability–Failure to Warn (Common Law)**

968. Plaintiffs incorporate paragraphs 1 through 411 and 478-495 as though fully set forth here.

969. User Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide User Class, or alternatively, the State User Subclasses as against Defendants.

970. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

971. Meta manufactured, designed, marketed, distributed, and sold the Products.

972. At the time the Products were manufactured, distributed, and sold, they had potential and known risks that were known or knowable in light of generally accepted knowledge in the relevant communities, including that: (1) the Products capture highly sensitive video and audio inside private spaces; (2) that media is transmitted to Meta's servers and routed to human annotators in Nairobi, Kenya for review and labeling; (3) annotators "see everything—from living rooms to naked bodies," including bathroom visits, sexual activity, and financial information; (4) it is impossible to both avoid

the human review pipeline and make use of the Products' core AI features; and (5) such practices create serious privacy, safety, and dignitary harms.

973. These potential risks present a substantial danger when the Products are used or misused in an intended or reasonably foreseeable manner because users will naturally wear the Products in homes, bathrooms, bedrooms, and other intimate settings, with spouses, partners, children, guests, and bystanders present.

974. Ordinary consumers are not likely to recognize these risks, particularly given the Products' marketing as "designed for privacy, controlled by you" and the absence of any clear disclosure that human contractors overseas watch and annotate sensitive footage captured via the Products and that users who wish to make use of the Products' core AI features cannot avoid that human review pipeline.

975. At all relevant times, safer and feasible alternative designs existed that would have substantially reduced or eliminated the unreasonable privacy and safety risks created by the Meta AI Glasses, including: (a) performing AI processing entirely on-device, without uploading raw, identifiable content to remote servers; (b) limiting uploads to anonymized or redacted images that remove faces, bodies, and other identifying features; (c) obtaining explicit, granular, opt-in consent before routing any content to human reviewers and limiting such review to non-intimate scenes; and (d) allowing users to permanently disable any upload of AI-related content while still retaining local AI functionality. Meta nevertheless opted for a design that maximized the volume of intimate, identifiable data sent to offshore human reviewers, without disclosing these tradeoffs to consumers.

976. Meta failed to provide adequate warnings or instructions concerning: (1) the fact that content captured with the Products would be transmitted to Meta's servers for AI-related processing; (2) the fact that human contractors, including those working for Meta's vendor Sama in Nairobi, would review and annotate highly sensitive user and bystander footage, including bathroom, sexual, and financial scenes; and (3) the nature and extent of privacy, safety, and dignitary risks created by this human-review pipeline.

977. The small LED indicator light on the Products is inadequate as a warning or notice to users or bystanders regarding the existence and extent of human review and data-annotation practices;

it does not meaningfully inform consumers that their intimate footage may be watched by strangers overseas.

978. Meta's claims that it disclosed to users that some footage may be shared with human reviewers, even if true, are inadequate, because consumers were not provided adequate notice of these supposed disclosures, and these disclosures do not meaningfully inform consumers who wish to make use of the Products' core AI features that they cannot do so while avoiding that human review pipeline.

979. Meta knew or, by the use of reasonably developed skill and foresight, should have known of these risks and of the Products' human-review pipeline, as evidenced by: (1) its own design and implementation of the Products and related AI systems; (2) its contracting with Sama and other vendors; and (3) internal knowledge that intimate footage, including nudity, sex, and financial information, was being viewed by annotators.

980. Meta had a duty to provide clear, prominent warnings and instructions so that consumers could decide whether to use the Products at all, or use them in ways that would minimize the degree of danger—such as by avoiding use in bathrooms and bedrooms or when handling financial information.

981. Meta breached this duty by failing to provide adequate warnings and instructions and by instead emphasizing privacy-centric marketing messages inconsistent with the underlying data-handling and human-review practices.

982. Plaintiffs and User Class members were injured, including harms related to invasion of privacy and emotional distress, as a direct and proximate result of Meta's failure to warn.

983. Had Meta provided adequate warnings and instructions about the Products' human-review pipeline and associated risks, Plaintiffs and User Class members would not have used the Products and would have avoided or mitigated their harm.

984. Meta's failure to warn was a substantial factor in causing Plaintiffs' and User Class members' injuries.

985. Plaintiffs and User Class members seek all monetary and non-monetary relief allowed by law, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

**F. COUNT 42: Intrusion into Private Affairs (Common Law)**

986. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

987. User Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or alternatively, the State Subclasses as against Defendants.

988. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

989. Plaintiffs and User Class members have a protected privacy interest in the imagery, audio, and associated data captured by their Meta AI Glasses and are entitled to the protection of such data against unauthorized access, disclosure, and use.

990. Plaintiffs and User Class members have a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses—including private residences, bathrooms, bedrooms, gyms, and other intimate or sensitive settings—and in any compilation of personal data resulting from the collection, annotation, and use of such imagery and audio.

991. As Plaintiffs and User Class members go about their daily lives wearing Meta AI Glasses they have unknowingly generated troves of highly sensitive visual and audio data depicting their private lives, which is then captured, transmitted, stored, routed to human annotators at a third-party subcontractor, reviewed, labeled, and used to train Meta's proprietary AI models—all without Plaintiffs knowledge or informed consent.

992. The continued nonconsensual surveillance of individuals in their private capacity, as Meta has done and continues to do, represents a fundamental violation of personal privacy, freedom, and autonomy. It is not simply an intentional intrusion but a profound infringement upon the most personal aspects of one's life.

993. As a result of Meta's intentionally intrusive conduct, Plaintiffs and User Class members have been and still remain today subject to a data collection, transmission, and human review pipeline that compromises their privacy, autonomy, and basic human dignity.

994. Plaintiffs and User Class members have a reasonable expectation that imagery and audio captured by a consumer wearable device in private settings would not be collected by Meta

without their express consent, routed to third-party human annotators without their knowledge, or used to train commercial AI models without meaningful disclosure.

995. Without the consent or knowledge of Plaintiffs and User Class members, Meta collected comprehensive visual and audio data that Plaintiffs and User Class members reasonably expected to remain private.

996. Meta then disclosed this highly personal and sensitive information to Sama, whose human workforce reviewed, labeled, and annotated the data for Meta's commercial benefit.

997. Meta intentionally invaded Plaintiffs' and User Class members' privacy interests by deliberately designing a data pipeline that surreptitiously captures, transmits, routes to human reviewers, and uses for AI training their confidential visual and audio data from private settings.

998. Meta's conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms underlying the right to privacy.

999. By capturing, transmitting, storing, routing to human annotators, and using for AI training Plaintiffs' and User Class members' private imagery and audio without authorization or consent to do so, Meta intentionally intruded upon Plaintiffs' and User Class members' seclusion, solitude, and private life, without their knowledge or permission.

1000. Meta's conduct infringed Plaintiffs' and User Class members' privacy interests by, among other things: (1) allowing the dissemination and/or misuse of their private imagery and audio data; (2) preventing Plaintiffs and User Class members from maintaining control over the type of information that Meta captures, stores, and routes to third parties; and (3) preventing Plaintiffs and User Class members from conducting personal activities without observation, intrusion, or interference.

1001. Meta has improperly profited from its invasion of Plaintiffs' and User Class members' privacy and its use of Plaintiffs' and User Class members' data for its economic value and its own commercial gain.

1002. As a direct and proximate result of Meta's unlawful invasion of privacy, Plaintiffs' and User Class members' reasonable expectations of privacy were frustrated, exploited, compromised, and defeated.

1003. Plaintiffs and User Class members were harmed by Meta's wrongful conduct causing their loss of privacy and the confidentiality of their own private conduct. This intrusion, disclosure of information, and loss of privacy and confidentiality has caused Plaintiffs to suffer mental anguish, actual damages, lost value in their personal data, and an invasion of their privacy in an amount to be determined at trial.

1004. Unless, and until, enjoined and restrained by order of this Court, Meta's wrongful conduct will cause irreparable injury to Plaintiffs and User Class members in that their private imagery and audio maintained by Meta and Sama may be viewed, distributed, and used by unauthorized third parties for years to come.

1005. Plaintiffs and User Class members seek nominal, compensatory, and punitive damages as a result of Meta's actions. Plaintiffs seek actual damages suffered, plus any profits attributable to Meta's use of Plaintiffs' and User Class members' private data. Punitive damages are warranted because Meta's malicious, oppressive, and willful actions were done in conscious disregard of their rights.

**G. COUNT 43: Quasi-Contract/Unjust Enrichment (Common Law)**

1006. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

1007. User Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or alternatively, the State User Subclasses as against Meta.

1008. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs used the Products.

1009. To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

1010. Plaintiffs and User Class members conferred monetary benefits on Meta by using the Products and providing Meta with their data. Meta's profits are funded entirely from their generated revenues, including payments made by or on behalf of Plaintiffs and User Class members. As such, a portion of these payments was attributable to the Challenged Representations and Omissions.

1011. Through its unlawful, unfair and deceptive conduct, Meta knowingly obtained significant revenue from the use of Plaintiffs' and User Class members' data by using and processing it for commercial gain, training its AI systems.

1012. By absconding and misusing Plaintiffs' and User Class members' personal data, Meta was unjustly enriched and received both financial and non-financial benefits. For example, Meta uses the data gathered from the Products to improve its AI and machine learning systems.

1013. Meta enriched itself by saving the costs it reasonably should have spent by obtaining users consent to record and use their private communications. Yet, to increase profits, and at the expense of Plaintiffs and the Class, it gained a competitive and financial advantage by failing to obtain proper consent to record and use this information. Due to Meta's conduct, Plaintiffs and User Class Members suffered harm, including from privacy invasion, loss of compensation/value for their data, and the lost profits from the use of their personal data.

1014. It would be inequitable and unjust to permit Meta to retain the enormous economic benefits (financial and otherwise) they have obtained from and/or at the expense of Plaintiffs and User Class members.

1015. Meta will be unjustly enriched if it is permitted to retain the economic benefits conferred upon it by Plaintiffs and User Class members through obtaining their valuable audio and audiovisual footage and personal data, and profiting from the unlawful, unauthorized, and impermissible thereof.

1016. Plaintiffs and User Class members are therefore entitled to recover the amounts realized by Meta at their expense.

1017. Since Plaintiffs and the User Class members have no adequate remedy at law and are therefore entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Meta's ill-gotten gains, and/or other sums as may be just and equitable. In the absence of completed discovery regarding class certification and merits, forcing an election of remedies at the initial pleading stage is premature.

### H. COUNT 44: Violations of State Wiretapping and Eavesdropping Statutes

1018. Plaintiffs incorporate paragraphs 1 through 411 and 904 through 930 as though fully set forth here and in the following subsections.

1019. User Plaintiffs bring this count individually and on behalf of the State User Subclasses identified in each subsection below.

1020. Defendants designed the Glasses with a microphone array that captures spatial audio and with cameras that capture video and images and designed them to transmit this data by Bluetooth or Wi-Fi to the user's paired smartphone.

1021. **Oral communications.** Meta intentionally intercepted and recorded the oral communications of User Plaintiffs and User Subclass members—conversations uttered in homes, vehicles, medical offices, and other private settings, under circumstances justifying an expectation that they were not subject to interception—by acquiring the captured audio and duplicating it onto Meta's servers. Meta was not a participant in those conversations between users and the individuals in their lives. Meta was an unannounced listener.

1022. **Electronic communications.** Meta separately intentionally intercepted the electronic communications of User Plaintiffs and User Subclass members by acquiring, contemporaneously with their transmission, the contents of the transfers of audio, images, video, and metadata passing from the Glasses to the User Plaintiff's paired smartphone and transmitting the contents to Meta's servers. Meta was not an intended participant in the transmission between the User Plaintiff's own two devices, and acquired its contents through a separate and simultaneous channel undetectable by the User Plaintiffs.

1023. Meta recorded the communications and conversations and intercepted the electronic communications without first obtaining consent from all persons engaged therein, or and without the parental consent of any minor. Meta intentionally intercepted the wire, oral, and electronic communications of Plaintiff and Florida User Subclass members

1024. Meta thereafter disclosed the contents of those oral and electronic communications to human annotators at Sama and used those contents to train its artificial intelligence models, knowing that the contents were obtained through interception.

1025. Meta intentionally disclosed and used the contents of those communications—by routing them to Sama for human review and by incorporating the resulting training data into Meta's AI models—knowing or having reason to know that the contents were obtained unlawfully. Meta knowingly disclosed the ill-gotten private conversations to third parties, including to Sama's human reviewers, and knowingly used, and continues to use, those conversations to train Meta's AI models.

1026. By designing, manufacturing, distributing, and operating the Meta AI Glasses and the associated network and annotation infrastructure, and by intercepting, recording, transmitting, retaining, disclosing, and using the oral and electronic communications of User Plaintiffs and User Subclass members without the requisite consent, Defendants violated the wiretapping and eavesdropping statutes of the several states as set forth below.

1027. User Plaintiffs and User Subclass members suffered injury and damages, including loss of privacy, frustration of their reasonable expectations of privacy, mental anguish, humiliation, and lost control over and value in their personal data, and face an ongoing risk of further unauthorized disclosure.

**i. Florida Security of Communications Act (Fla. Stat. §§ 934.03-934.10)**

1028. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1029. Plaintiffs PL04 and Yancy (for purposes of this section, "Florida User Plaintiffs") bring this claim individually and on behalf of the Florida User Subclass against Meta.

1030. The Florida Security of Communications Act ("FSCA") prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. Fla. Stat. § 934.03(1)(a).

1031. The FSCA further makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of the Act, Fla. Stat. § 934.03(1)(c), and to intentionally use, or endeavor to use, the contents of any such communication with the same knowledge. Fla. Stat. § 934.03(1)(d).

1032. The FSCA requires prior consent from "all of the parties to a communication." See Fla. Stat. § 934.03(2)(d). Even where consent is obtained, the FSCA makes it independently "unlawful to intercept any wire, oral, or electronic communication for the purpose of committing any criminal act." Fla. Stat. § 934.03(2)(e).

1033. The audio, imagery, and video captured by and transmitted from the Meta AI Glasses constitute oral and electronic communications within the meaning of the Act. Meta intercepted both categories contemporaneously with transmission, without the consent of all parties, and thereafter disclosed and used their contents by routing them to Sama and incorporating them into its AI models

1034. In further violation of the FSCA, Meta intentionally disclosed and used the contents knowing or having reason to know that the contents were obtained in violation of the FSCA.

1035. Neither Florida User Plaintiffs nor any Florida User Subclass members, nor any other party to the intercepted communications, consented to Meta's interception, disclosure, or use.

1036. In the alternative, if Meta is deemed a party to any of those communications, Meta intercepted those communications for the criminal and tortious purpose of intruding upon Plaintiffs' and User Subclass members' privacy in order to collect vast quantities of personal data to train its AI models—data that Meta could not lawfully obtain with consent. See 18 U.S.C. § 2511(2)(d).

1037. The Florida User Plaintiffs and Florida User Subclass members were harmed by the recording, interception, disclosure, and use of their electronic and oral communications.

1038. Pursuant to Fla. Stat. § 934.10, the Florida User Plaintiffs and the Florida User Subclass are entitled to recover: (a) preliminary, equitable, or declaratory relief; (b) actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is higher; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs.

**ii. Georgia Eavesdropping Act (Ga. Code Ann. § 16-11-62)**

1039. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1040. Plaintiff PL13 and PL43 (for purposes of this section, "Georgia User Plaintiffs") bring this claim individually and on behalf of the Georgia User Subclass against Meta.

1041. Georgia's Eavesdropping Act ("GEA") makes it unlawful for "(1) [a]ny person in a clandestine manner intentionally to overhear, transmit, or record or attempt to overhear, transmit, or record the private conversation of another which shall originate in any private place." Ga. Code Ann. § 16-11-62(1).

1042. The GEA additionally makes it unlawful for "(2) [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view." *Id.* § 16-11-62(2).

1043. In addition, it is unlawful for "[a]ny person to sell, give, or distribute, without legal authority, to any person or entity any photograph, videotape, or record, or copies thereof, of the activities of another which occur in any private place and out of public view without the consent of all persons observed." *Id.* § 16-11-62(6).

1044. Meta clandestinely overheard, transmitted, and recorded the private conversations of Georgia User Plaintiffs and Georgia User Subclass members originating in private places when they inadvertently activated Meta's AI or when it was falsely activated.

1045. Meta used devices, including the Glasses, together with its servers and annotation infrastructure, to clandestinely observe, photograph, and record Georgia User Plaintiffs' and Georgia User Subclass members' activities occurring in private places and out of public view without their consent.

1046. Meta gave and distributed those recordings to Sama, an outside entity, without the consent of all persons observed and without legal authority.

1047. Eavesdropping victims are permitted to bring civil actions under the GEA. *See Kemeness v. Worth Cnty., Ga.*, 449 F. Supp. 3d 1318, 1328 (M.D. Ga. 2020). Georgia User Plaintiffs and Georgia User Subclass members were injured by Meta's violations of the GEA and seek all recovery permissible.

**iii. Illinois Eavesdropping Act (720 ILCS 5/14-1, *et seq*.)**

1048. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1049. Plaintiffs Moore, Enriquez, and PL20 (for purposes of this section, "Illinois User Plaintiffs") bring this claim individually and on behalf of the Illinois User Subclass against Defendants.

1050. The Illinois Eavesdropping Act prohibits a person from knowingly and intentionally using an eavesdropping device to transmit or record "all or any part of any private conversation," unless the person does so with the consent of all parties to the conversation. 720 ILCS 5/14-2(a)(1). In addition, knowingly and intentionally "[u]s[ing] or disclos[ing] any information which he or she knows or reasonably should know was obtained from a private conversation," unless the person has the consent of all parties to the conversation. 720 ILCS 5/14-2(a)(5).

1051. The Illinois Eavesdropping Act additionally proscribes the knowing and intentional "[m]anufacture[], assemble[y], distribut[ion], or possess[ion of] any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations." 720 ILCS 5/14-2(a)(4).

1052. Defendants' Meta AI Glasses constitute an "eavesdropping device" within the meaning of the Illinois Eavesdropping Act because they include microphones, camera(s), and other technologies capable of capturing spoken communications near the wearer. 720 ILCS 5/14-2.

1053. Defendants knowingly and intentionally designed the Meta AI Glasses to seamlessly record the audio and video of conversations occurring in the surrounding environment. Defendants knew that the small camera, hidden microphone, and ordinary-looking frames would render the Meta AI Glasses primarily useful for surreptitious recording and transmission of private conversations. The Glasses' nickname as "pervert glasses" and the proliferation of social media posts obtained through the surreptitious recording of nonconsenting subjects and bystanders underscores the primary purpose of the Glasses. Further, that Defendants tried to encourage users not to record bystanders without their knowledge or consent, suggests that Defendants knew the design would render the Glasses primarily useful for surreptitious recording. Defendants failed to implement sufficient designs to prevent surreptitious recording or to notify bystanders and subjects that a recording is in progress.

1054. Meta knowingly and intentionally uses the Glasses and its associated infrastructure, in a surreptitious manner, to record and transmit the private conversations of Illinois User Plaintiffs and the Illinois User Subclass members without the consent of all parties, and to intercept and record their private electronic communications, to which Meta was not a party, without the consent of all parties.

1055. Meta separately violated the Illinois Eavesdropping Act by using and disclosing information it knew, or reasonably should have known, was obtained from private conversations and private electronic communications in violation of the Illinois Eavesdropping Act.

1056. The Illinois User Plaintiffs and Illinois User Subclass members did not consent to the recording, interception, transmission or use of their private conversations by Defendants or third parties.

1057. The Illinois User Plaintiffs and the Illinois User Subclass were harmed by the recording, interception, transmission or use of their private conversations without their consent.

1058. The Illinois User Plaintiffs and the Illinois User Subclass seek all remedies available under the Illinois Eavesdropping Act, including injunctive relief and actual and punitive damages.

**iv. Maine Interception of Wire and Oral Communications Act (15 M.R.S.A. § 710, *et seq*.)**

1059. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1060. Plaintiffs PL24, PL25, and PL35 through PL39 (for purposes of this section, "Maine User Plaintiffs") bring this claim individually and on behalf of the Maine User Subclass against Defendants.

1061. The Maine Interception of Wire and Oral Communications Act ("Maine Wiretap Act") provides, in pertinent part, that "[a]ny person . . . who intentionally or knowingly intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept any wire or oral communication is guilty of a Class C crime." 15 M.R.S.A. § 710(1).

1062. The Maine Wiretap Act additionally prohibits intentionally or knowingly disclosing, attempting to disclose, using, or attempting to use "the contents of any wire or oral communication, knowing that the information was obtained through interception." *Id*. §§ 710(3)(A)-(B).

1063. Meta intercepted the oral communications of Maine User Plaintiff and Maine User Subclass members, uttered in circumstances justifying an expectation that they were not subject to interception, and disclosed and used the contents of those communications knowing they were obtained through interception.

1064. Maine User Plaintiffs and the Maine User Subclass members were harmed by the recording, interception, and disclosure of their communications without their consent.

1065. Maine User Plaintiffs and Maine User Subclass members seek all relief available under the Maine Wiretap Act, including actual damages, but not less than liquidated damages, computed at the rate of $100 per day for each day of violation and reasonable attorneys' fees and costs.

**v. Maryland Wiretapping and Electronic Surveillance Act (Md. Code Ann., Cts. & Jud. Proc. §§ 10-401, *et seq*.)**

1066. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1067. Plaintiff PL21 (for purposes of this section, "Maryland Plaintiff") brings this claim individually and on behalf of the Maryland User Subclass against Defendants.

1068. The Maryland Wiretapping and Electronic Surveillance Act ("MWA") prohibits willfully intercepting "any wire, oral, or electronic communication," unless "all of the parties to the communication have given prior consent to the interception." Md. Code Ann., Cts. & Jud. Proc. §§ 10-402(a), (b)(3). The statute defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id*. § 10-401(10).

1069. Defendants' Meta AI Glasses constitute an electronic or mechanical device within the meaning of the MWA because they include microphones, camera(s), and other technologies capable of recording and transferring communications. *Id*. § 10-401.

1070. Meta willfully intercepted the wire or oral communications of Maryland User Plaintiff and Maryland User Subclass members by capturing audio and video data through the Meta AI Glasses, when Plaintiff and Maryland User Subclass members had a reasonable expectation of privacy in their communications, and transmitting that data to third parties, including Sama's human reviewers.

1071. Maryland User Plaintiff and Maryland User Subclass members did not consent to the interception of their communications by Meta, nor did they consent to having their communications transmitted to third parties, such as human reviewers.

1072. Maryland User Plaintiff and the Maryland User Subclass were harmed by the recording, interception, transmission or use of their private conversations without their consent.

1073. Pursuant to the MWA, Maryland User Plaintiff and the Maryland User Subclass are entitled to recover: (1) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (2) punitive damage; and (3) reasonable attorneys' fees and costs.

**vi. Massachusetts Wiretap Act (M.G.L. c. 272 § 99)**

1074. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1075. Plaintiff Fraser (for purposes of this section, "Massachusetts User Plaintiff") brings this claim individually and on behalf of the Massachusetts User Subclass against Meta.

1076. The Massachusetts Wiretap Act makes it unlawful to "secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication" through the use of any intercepting device and separately makes it unlawful to disclose or use the contents of any such communication knowing it was obtained through interception. Mass. Gen. Laws c. 272 §§ 99(C), (Q).

1077. Meta intercepted, in real time, the oral and wire communications of Massachusetts User Plaintiffs and Massachusetts User Subclass members as alleged herein.

1078. In further violation of the MWA, Meta has disclosed or attempted to disclose to third parties — including Sama — the contents of the communications described above while knowing that the information was obtained through interception in violation of the MWA. Mass. Gen. Laws C. 272 § 99(Q).

1079. In further violation of the MWA, Meta has used or attempted to use the contents of the communications described above while knowing that the information was obtained through interception in violation of the MWA. Mass. Gen. Laws C. 272 § 99(Q); *see Pine v. Rust*, 404 Mass. 411, 413–414, 535 N.E.2d 1247 (1989).

1080. Massachusetts Plaintiff and Massachusetts User Subclass members did not consent or otherwise authorize Meta to intercept, disclose, or use their communications.

1081. Massachusetts Plaintiff and Massachusetts User Subclass members are each an "aggrieved person" within the meaning of the MWA as they are each "a party to an intercepted wire or oral communication . . . who would otherwise have standing to complain that [their] personal or property interest or privacy was invaded in the course of an interception." Mass. Gen. Laws C. 272 § 99(B)(6).

1082. Massachusetts User Plaintiffs and Massachusetts User Subclass members seek all relief available under the Massachusetts Wiretap Act, including actual damages, but not less than liquidated damages and reasonable attorneys' fees and costs.

**vii. Michigan Eavesdropping (Mich. Comp. Laws § 750.539c)**

1083. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1084. Plaintiff Stewart, Hardman, and PL05 (for purposes of this section, "Michigan User Plaintiffs") bring this count individually and on behalf of the Michigan User Subclass against Meta.

1085. Mich. Comp. Laws § 750.539c is violated by "[a]ny person who is present or who is not present during a private conversation and who willfully uses any device to eavesdrop upon the conversation without the consent of all parties thereto." Mich. Comp. Laws § 750.539c. It is additionally unlawful to "knowingly aid[], employ[] or procure[] another person to do the same." *Id*.

1086. Meta willfully uses the Glasses and its associated infrastructure to eavesdrop upon the private conversations of Michigan User Plaintiffs and Michigan User Subclass members without the consent of all parties. Luxottica knowingly aided that conduct by designing, manufacturing, and marketing the device that made it possible.

1087. Pursuant to Mich. Comp. Laws § 750.539h, Michigan User Plaintiffs and Michigan User Subclass members, as parties to the conversations upon which eavesdropping was practiced, seek an injunction prohibiting further eavesdropping, actual damages, and punitive damages.

**viii. New Hampshire Eavesdropping Statute (N.H. Rev. Stat. § 570-A:1, *et seq.*)**

1088. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1089. Plaintiff Singh (for purposes of this section, "New Hampshire User Plaintiff") brings this claim individually and on behalf of the New Hampshire User Subclass against Meta.

1090. Eavesdropping under New Hampshire is defined as willfully intercepting "any telecommunication or oral communication" "without the consent of all parties to the communication." N.H. Rev. Stat. § 570-A:2(I). The Eavesdropping Statute further prohibits willfully using or disclosing "the contents of any telecommunication or oral communication, knowing or having reason to know that the information was obtained . . . in violation of this paragraph." *Id.* §§ 570-A:2(I)(c), (d).

1091. An "oral communication" is defined as "any verbal communication uttered by a person who has a reasonable expectation that the communication is not subject to interception" and "telecommunication" as "any form of information in whole or in part through the facilities of a communications common carrier." *Id.* §§ 570-A:1(I), (II).

1092. Defendants' Meta AI Glasses constitute an electronic or mechanical device within the meaning of the statute because they include microphones, camera(s), and other technologies capable of recording, intercepting and transferring oral communications and telecommunications. *Id.* § 570-A:1(IV).

1093. Meta willfully intercepted the telecommunications and oral communications of the New Hampshire User Plaintiff and New Hampshire User Subclass members by capturing audio and video data through the Meta AI Glasses, when the New Hampshire User Plaintiff and New Hampshire User Subclass members had a reasonable expectation of that their communications were not subject to interception.

1094. The New Hampshire User Plaintiff and New Hampshire Subclass members did not consent to the interception of their communications by Meta.

1095. Meta knew at all relevant times, or reasonably should have known, that the communications that Meta disclosed and used were recorded and intercepted without the consent of at least one party. Nevertheless, Defendants knowingly disclosed and used the contents.

1096. New Hampshire User Plaintiff and the New Hampshire User Subclass seek all available relief under the statute, including: (1) actual damages but not less than liquidated damages

computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (2) punitive damage; and (3) reasonable attorneys' fees and costs.

**ix. Pennsylvania Wiretapping and Electronic Surveillance Control Act (18 Pa. Cons. Stat. § 5701, *et seq*.)**

1097. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1098. Plaintiff PL09 (for purposes of this section, "Pennsylvania Plaintiff") brings this claim on behalf of himself and the Pennsylvania User Subclass against Meta.

1099. The Pennsylvania Wiretapping and Electronic Surveillance Control Act (WESCA), 18 Pa. Cons. Stat. § 5701, *et seq*., prohibits anyone from, among other things, "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, electronic or oral communication." 18 Pa. Cons. Stat. § 5703(1).

1100. The WESCA also makes it unlawful for any person to "intentionally disclose[] or endeavor[] to disclose[] to any other person" or to "intentionally use[], or endeavor[] to use[]," the "contents of any wire, oral, or electronic communication, or evidence derived therefrom, knowing or having reason to know that" the communication was obtained in violation of WESCA. 18 Pa. Cons. Stat. § 5703(1), (2), (3).

1101. Meta, as a corporation, and Pennsylvania User Plaintiff and Pennsylvania User Subclass members, as individuals, are each a person within the meaning of WESCA.

1102. The data transmissions captured by and transmitted from Pennsylvania User Plaintiff's and Pennsylvania User Subclass members' Meta AI Glasses constitute "electronic communications" within the scope of the WESCA as they are transfers of data, signals and intelligence transmitted by electromagnetic, photoelectronic, or photooptical systems within the scope of 18 Pa. C.S.A. § 5702.

1103. As alleged herein, Meta intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to Sama without consent.

1104. Pennsylvania Plaintiff and Pennsylvania User Subclass members have a reasonable expectation of privacy in the environments in which they use their Meta AI Glasses, and reasonably expected privacy in such settings.

1105. In further violation of WESCA, Meta disclosed or attempted to disclose to third parties — including Sama — the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of WESCA.

1106. In further violation of WESCA, Meta used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of WESCA.

1107. At all relevant times, Pennsylvania User Plaintiff and Pennsylvania User Subclass members were not aware that Meta was intercepting and routing their data to human annotators, and therefore could not provide consent to have any part of their communications intercepted and recorded, transmitted, disclosed, or used.

1108. As a direct and proximate result of Meta's violations of WESCA, Pennsylvania User Plaintiff and Pennsylvania User Subclass members were injured and suffered damages, including, but not limited to, the loss of privacy, the unauthorized disclosure of their private data to third-party human annotators, and economic harm stemming from Meta's exploitation of their data.

1109. Pursuant to 18 Pa. C.S.A. § 5725, Pennsylvania Plaintiff and Pennsylvania User Subclass members have been injured by the interception, disclosure, and/or use of their communications in violation of the Act and are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Pennsylvania Plaintiff and the Pennsylvania User Subclass or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs.

**x. Washington Privacy Act (Wash. Rev. Code § 9.73.030, *et seq*.)**

1110. Plaintiffs incorporate paragraphs 1018 through 1027 as though fully set forth here.

1111. PL26 and PL40 (for purposes of this section, "Washington User Plaintiffs") brings this claim individually and on behalf of the Washington User Subclass against Meta.

1112. The Washington Privacy Act ("WPA") makes it "unlawful for any individual, partnership, corporation, . . . to intercept, or record any: (a) Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or

without the state by any device electronic or otherwise designed to record and/or transmit said communication . . ., without first obtaining the consent of all the participants in the communication;" or "(b) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation . . . without first obtaining the consent of all the persons engaged in the conversation." Wash. Rev. Code § 9.73.030(1). The WPA holds liable "[a]ny person who" violates these provisions "directly or by means of a detective agency or any other agent." *Id.* § 9.73.060.

1113. The Meta AI Glasses are an electronic "device . . . designed to record and/or transmit" communications and conversations within the meaning of the WPA.

1114. Meta intercepted Washington User Plaintiff's and Washington User Subclass members' private communications and conversations. The conversations captured by the Products occurred in circumstances in which no participant intended or expected that a stranger would hear or preserve them.

1115. Meta never announced, in any reasonably effective manner or at all, to the Washington User Plaintiff, Washington User Subclass members, or any other persons engaged in the recorded conversations, that those conversations were about to be recorded and transmitted. *See id.* § 9.73.030(3). The faint, briefly flashing indicator light and the easily masked shutter sound built into the Products do not announce that a conversation is being recorded, are not reasonably effective, and in any event do not operate at all when Meta AI is triggered accidentally or by a misidentified wake phrase.

1116. The Washington User Plaintiffs and the Washington User Subclass members were injured in their person and reputation by Meta's violations, within the meaning of the WPA. Their communications and conversations were captured, duplicated onto Meta's servers, and exposed to strangers. Plaintiff and the Washington User Subclass members have endured mental pain and suffering as a result of Meta's violations.

1117. Pursuant to the WPA, Washington User Plaintiffs and the Washington User Subclass seek actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation, not to exceed $1,000 and reasonable attorneys' fees and litigation costs.

### I. COUNT 45: Violations of State Consumer Protection Statutes

1118. User Plaintiffs incorporate paragraphs 1 through 411 and 515 through 552 as though fully set forth herein and in the following subsection.

1119. User Plaintiffs bring this count individually and on behalf of the State User Subclasses identified in each subsection below.

1120. Defendants' conduct as alleged herein violates, among other laws, CIPA, ECPA, the various state eavesdropping and recording statutes, and the common law prohibition on intrusion into private affairs.

1121. Additionally, Defendants' COPPA violations are treated as unfair or deceptive acts or practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. See 16 C.F.R. § 312.9.

1122. Defendants' design of the Glasses is inherently misleading. Users are unable to reliably ascertain whether nearby Meta AI Glasses are recording them or whether any Meta AI Glasses have recorded them in the past. This is by design.

1123. Defendants' conduct is additionally deceptive in that Defendants misrepresented that the Glasses' indicator light and shutter tone protect the privacy of bystanders while knowing that they do not.

1124. Defendants committed unfair acts and practices by, inter alia, invading Plaintiffs' and User Subclass members' privacy while knowingly providing wholly insufficient measures to obtain consent from bystanders or effectively notify them of ongoing recordings and Defendants' interception of those communications.

1125. Defendants' conduct causes substantial injury to consumers and bystanders that they cannot reasonably avoid.

1126. Defendants' conduct as alleged herein is both unfair and deceptive, given Defendants' knowledge of, and failure to properly address, the privacy issues central to Plaintiffs' claims.

1127. The harm to Plaintiffs and User Subclass members vastly outweighs any utility of that conduct, and it is not an injury that bystanders could reasonably have avoided, because Defendants did not disclose the intrusive practices and affirmatively represented the opposite.

1128. Plaintiffs and User Subclass members have acted reasonably in their attempts to avoid being recorded by Meta AI Glasses without their consent. However, because of the covert and deceptive nature of the Glasses' design and infrastructure, only Defendants can fully protect Plaintiffs and User Class members from this harm.

1129. As a result of Defendants' unlawful, unfair, deceptive and fraudulent business practices, Plaintiffs and User Subclass members have suffered injury in fact and have lost control over and value in their personal data.

**i. California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq*.)**

1130. Plaintiffs incorporate paragraphs 1018 through 1129 as though fully set forth here.

1131. Plaintiffs Tittl, PL01, PL18, PL19, and PL30 ("User Plaintiffs") bring this count individually and on behalf of the Nationwide User Class, or alternatively the California User Subclass, against Defendants.

1132. California's Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong is independently actionable.

1133. ***Unlawful.*** Defendants' conduct as alleged herein violates the laws referenced in Paragraphs 544-52. Each such violation independently constitutes an unlawful business act or practice within the meaning of Section 17200.

1134. ***Unfair.*** Defendants' conduct as set forth above is unfair within the meaning of the UCL because the harm vastly outweighs any utility. Further, it is not an injury that bystanders could reasonably have avoided because Defendants did not disclose the intrusive practices and affirmatively represented the opposite.

1135. ***Fraudulent.*** Defendants' conduct as set forth above is unfair within the meaning of the UCL because the design of the Glasses is inherently misleading and likely to deceive, and did deceive, reasonable consumers into believing that the Glasses were not recording and transmitting their personal data and communications.

1136. These acts and practices alleged constitute business acts and practices within the meaning of Section 17200, and occurred in the course of Defendants' business.

1137. Accordingly, Plaintiffs and User Class members seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL to compensate Plaintiffs and User Subclass members for said monies, as well as public injunctive relief to enjoin Defendants' systemic surveillance of bystanders without their consent and to prevent ongoing and future harm that will result to User Plaintiffs, User Subclass members, and the general public.

**ii. Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq*.)**

1138. Plaintiffs incorporate paragraphs 1018 through 1129as though fully set forth here.

1139. Plaintiffs Sukhai and PL23 (for purposes of this section, "Connecticut User Plaintiffs") bring this claim individually and on behalf of the Connecticut User Subclass against Defendants.

1140. At all relevant times, Defendants were engaged in trade or commerce in Connecticut pursuant to Connecticut General Statutes (Conn. Gen. Stat.) § 42-110b(a).

1141. The acts and practices set forth above constitute deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

1142. Defendants' acts and practices set forth above offend public policy pertaining to the protection minors, and the public more broadly, from the invasion of their privacy rights, including through systemic surveillance.

1143. Defendants' acts and practices set forth above are oppressive, unethical, immoral, and unscrupulous.

1144. Defendants' conduct substantially harmed Connecticut consumers in that Defendants' unfair, deceptive, and unlawful acts and omissions caused significant intrusion into the private lives of Plaintiffs and User Subclass members causing mental anguish, as alleged above. Defendants' acts and practices, as described herein, therefore constitute unfair acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

1145. Defendants knew, or should have known, that their conduct was unfair or deceptive in violation of Conn. Gen. Stat. § 42-110b, and as a consequence Defendants are subject to civil penalties of not more than $5,000 per violation pursuant to Conn. Gen. Stat. § 42-110o(b).

**iii. Washington Consumer Protection Act (Wash. Rev. Code § 19.86.010, *et seq*.)**

1146. Plaintiffs incorporate paragraphs 1018 through 1129as though fully set forth here.

1147. Plaintiffs PL26 and PL40 (for purposes of this section, "Washington User Plaintiffs") bring this claim individually and on behalf of the Washington User Subclass against Defendants.

1148. The Washington Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

1149. Defendants, Washington User Plaintiffs, and the Washington User Subclass members are each a "person" within the meaning of the WCPA. *Id.* § 19.86.010(1).

1150. Defendants' design, manufacture, marketing, distribution, and sale of the Meta AI Glasses constitute "trade" and "commerce" within the meaning of the WCPA.

1151. The acts and practices set forth above constitute deceptive practices in violation of the WCPA.

1152. Independent of the deceptive practices, as alleged above, Defendants' practices are unfair in that they they cause substsntial injury to consumers that consumers cannot reasonably avoid.

1153. Defendants' acts and practices set forth in paragraphs 1 through 411 and 512 through 550 are substantially injurious to the public, including minors, and the public more broadly, from the invasion of their privacy rights, including through systemic surveillance.

1154. Defendants' conduct is not a private dispute or an isolated transaction. Defendants market the Products through a uniform, standardized advertising campaign to the general consuming public, and similarly capture troves of bystander data without their knowledge or consent. Defendants' conduct is ongoing, is capable of repetition, and will continue to harm Washington consumers absent injunctive relief.

1155. Defendants further obtained, without compensation, the economic value of the audio, images, video, and derived data extracted from the Washington Plaintiff and the Washington Purchaser Subclass members through the Products, which Defendants used as training material for Meta's artificial intelligence models. Personal data of this kind has an established and quantifiable market

value that Defendants' deceptively and unfairly escaped. Defendants acted knowingly and intentionally.

1156. Defendants' unfair and deceptive acts and practices were the proximate cause of PL40's injuries and those of the Washington Bystander Subclass, as alleged above.

1157. PL40, individually and on behalf of the Washington Bystander Subclass, seeks all relief available under the WCPA, including injunctive relief, actual and punitive damages, and costs and fees.

## XI. BYSTANDER CAUSES OF ACTION

### A. COUNT 46: Intrusion Upon Seclusion (Common Law)

1158. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

1159. Bystander Plaintiffs bring this claim individually and on behalf of the Nationwide Bystander Class, or alternatively, on behalf of the State Bystander Subclasses against all Defendants.

1160. This claim is brought under California law or, alternatively, the laws of the respective states where Bystander Plaintiffs were surreptitiously recorded.

1161. Defendants have intruded upon the legally protected privacy interests of Bystander Plaintiffs and the Nationwide Bystander Class by, among other things, surreptitiously recording, intercepting, and transmitting their private communications and behavior without their consent.

1162. Bystander Plaintiffs and the Nationwide Bystander Class maintain a reasonable expectation of privacy in their private and intimate communications, interactions, and personal data. They also maintain a reasonable expectation of privacy to be free from surreptitious surveillance, including from covert recordings on Meta AI Glasses, as they go about their daily lives, moving through public, semi-public, and private spaces. These expectations are reasonable. Defendants have failed to provide sufficient safeguards against surreptitious recording. No social norm places bystanders on notice that their personal communications and everyday lives may be surreptitiously recorded through Meta AI Glasses that are nearly indistinguishable from ordinary glasses. That Defendants have recognized these significant privacy concerns and attempted, but failed, to address them concedes the point that bystanders have a legitimate expectation of privacy and the right to know whether they are being recorded.

1163. Defendants continue to intentionally intrude upon Bystander Plaintiffs' and the Nationwide Bystander Class's privacy by designing, marketing and selling the Glasses that easily record, and even livestream, bystanders without their knowledge or consent. Further, the nonconsensual videos and recordings are subject to the same third-party disclosures and AI training underpinning User Class Members' privacy claims.

1164. These intrusions are highly offensive to a reasonable person and constitute an egregious breach of social norms underlying the right to privacy. The Glasses are covert by design. They indiscriminately capture unsuspecting bystanders in video footage that can be used to obtain intimate, personal and sensitive information, and personal and biometric data. Further, the recordings are disclosed to third parties, including human reviewers, AI programs, and social media postings.

1165. Defendants improperly profited from the invasion of Bystander Plaintiffs' and Nationwide Bystander Class members' privacy through their use of Bystander Plaintiffs' and Nationwide Bystander Class members' valuable data for their own commercial gain. Meta uses the data to train the AI that makes the Glasses and other Meta products and services valuable to consumers, and Luxottica benefits from the AI model improvements by selling more glasses.

1166. As a direct and proximate result of Defendants' intentional and intrusive conduct, Bystander Plaintiffs and the Nationwide Bystander Class suffered harm as detailed herein, including but not limited to loss of privacy, loss of control over their personal and biometric information, emotional distress, and other compensable harms. Further, Plaintiffs and the Nationwide Bystander Class remain subject to the covert recording, data collection, transmission, and human review pipeline that compromises their privacy, autonomy, and basic human dignity.

1167. Unless, and until, enjoined and restrained by order of this Court, Defendants' wrongful conduct will cause irreparable injury to Bystander Plaintiffs and Nationwide Bystander Class members in that they may continue to be covertly recorded without their knowledge or consent and their private imagery and audio maintained by third parties and Defendants may be viewed, distributed, and used without authorization for years to come.

1168. Bystander Plaintiffs and the Nationwide Bystander Class seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, and punitive damages where available, and injunctive relief to prevent further harm.

**B. COUNT 47: Right of Publicity (Common Law & Cal. Civ. Code § 3344)**

1169. Bystander Plaintiffs incorporate paragraphs 1 through 411 and 1158 through 1168 as though fully set forth here.

1170. Bystander Plaintiffs bring this claim individually and behalf of the Nationwide Bystander Class, or alternatively, on behalf of the State Bystander Subclasses against all Defendants.

1171. This claim is brought under California law or, alternatively, the laws of the respective states where Bystander Plaintiffs were surreptitiously recorded.

1172. California Civil Code § 3344 prohibits "knowingly us[ing] another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without that person's prior consent, or, in the case of a minor, the prior consent of their parent or legal guardian."

1173. Meta and Luxottica designed the glasses to capture identifiable video and audio recordings and images of Bystander Plaintiffs and Nationwide Bystander Class members, capturing "photographs" and their "likeness" and "voice" within the plain meaning of the statute.

1174. Meta and Luxottica use, and have used, the audio and video recordings and photographs captured of Bystander Plaintiffs and Nationwide Bystander Class members for Defendants' commercial advantage. The Glasses provide a constant stream of highly valuable AI training material, including identifiable images and audio and visual recordings of Bystander Plaintiffs and Bystander Class members across everyday experiences.

1175. Meta uses this data to train Meta's AI for the commercial purpose of improving Meta's AI models and for the additional benefit of improving the Glasses' AI functionality to solicit even more Glasses purchases, which benefits Luxottica as well as Meta. As alleged above, Defendants have also developed, licensed, tested, and distributed facial recognition code for the Meta AI Glasses, and

have declined to disavow deploying it. Facial recognition provides further commercial benefit as it derives biometric data from the videos, audio, and photographs obtained by Meta AI Glasses.

1176. Defendants marketed the Meta AI Glasses for this very purpose: the ability to seamlessly capture video, audio, and photographs of others from Glasses that appear innocuous. Defendants derive a commercial benefit from the use of Plaintiffs' and Bystander Class members' photographs, voice, and likeness, including: (1) free access to a vast quantity of recordings of human interactions with the real world that are used to train Meta's AI models for greater commercial success; and (2) the valuable data extracted from the videos of millions of bystanders, including particularly valuable deeply sensitive, revealing, and biometric data.

1177. Defendants did not obtain, and Bystander Plaintiffs and Nationwide Bystander Class members did not provide prior consent for the use of their valuable video and audio recordings or their photographs.

1178. Defendants' conduct was knowing and intentional. That the Glasses are designed to covertly capture videos and photographs of unsuspecting bystanders on a massive scale is not accidental. Nor was it accidental that Defendants marketed the Glasses for their ability to seamlessly capture this audiovisual footage and photographs—data which is highly valuable and difficult to obtain. Defendants are aware of the significant value in the AI training materials they are collecting. Meta has put effort into creating precisely the kinds of recordings at issue here. Meta also has paid for similar training materials. Here though, Defendants created a pipeline to surreptitiously collect vast quantities of this valuable data at no cost.

1179. Defendants' unauthorized use of Bystander Plaintiffs' and Nationwide Bystander Class members' images, voice, and likeness for commercial purposes constitutes a violation of California Civil Code § 3344 and violations of the common law right to publicity.

1180. As a direct and proximate result of Defendants' violations Plaintiffs and Nationwide Bystander Class members have been suffered damages, including the invasion of their privacy, the appropriation of their images and voice for commercial purposes, the loss of control over their biometric data, and emotional distress.

1181. Bystander Plaintiffs and Nationwide Bystander Class members are entitled to Defendants' gross revenues associated with the unauthorized use, punitive damages, injunctive relief, and attorneys' fees and costs.

**C. COUNT 48: Strict Product Liability (Common Law)**

1182. Plaintiffs incorporate paragraphs 1 through 411, 462 through 477, and 951 through 967 as though fully set forth here.

1183. Bystander Plaintiffs bring this claim individually and behalf of the Nationwide Bystander Class, or alternatively, the State Bystander Subclasses.

1184. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs were recorded by the Glasses.

1185. Meta and Luxottica designed, engineered, manufactured, marketed, distributed, and sold the Glasses.

1186. Meta and Luxottica placed the Glasses into the stream of commerce, knowing and intending that they would be used throughout the United States without any inspection for defects by end users.

1187. The Glasses were defective in design when they left Defendants' possession and control because, inter alia, they were designed so that, during ordinary and intended use covert and nonconsensual recording is readily available. The faint white indicator light and shutter sounds are easily overlooked when coupled with the design of the Glasses, which are meant to be indistinguishable from ordinary glasses. These design features allow for covert recording without the need to tamper with the Glasses in any way.

1188. In addition, the Glasses were defective in design when they left Defendants' possession and control because, inter alia, they were designed so that, during ordinary and intended use: (1) they are designed and marketed to be worn continuously throughout the day and, upon activation, to capture photo, video, and audio content, including inside homes, bedrooms, and bathrooms, and during other intimate moments; (2) that content is automatically transmitted off-device to Meta's servers and then to human "data annotators" overseas for review and labeling; (3) this pipeline of intimate, sensitive footage to human annotators is implemented without adequate in-

product controls or transparent, conspicuous disclosures consistent with Meta's privacy-centric representations; and (4) they are designed such that surreptitious recording is readily available to any user, in that the recording indicator is a faint light that is easily obscured, hidden, or disabled, the Glasses blend in with ordinary eyewear even when the indicator is lit, and the Products provide no mechanism for obtaining the consent of those recorded or for ensuring that such consent is obtained.

1189. No reasonable consumer would expect that by interacting with a person wearing deceptively ordinary-looking Meta AI Glasses that their intimate everyday moments would be recorded, let alone that these interactions would be livestreamed or watched by strangers overseas, cataloguing their "bathroom visits, sex and other intimate moments," and financial details for AI-training purposes.

1190. The Glasses failed to perform as safely as an ordinary bystander would expect because, contrary to Meta's privacy-centric marketing: (1) they function as surreptitious recording devices; (2) the recordings they capture of highly sensitive and intimate personal data are sent to human annotators; and (3) the Glasses are designed, including reliance on a faint LED indicator light, without any assurance that users, let alone bystanders, meaningfully understand that their intimate moments and environments are being recorded, offloaded, reviewed, and/or posted or livestreamed on social media.

1191. Any purported benefits of designing the Glasses to conspicuously record and to route intimate user and bystander footage to human annotators—rather than relying on less invasive or more privacy-protective designs, recording indicators, and AI-training methods—are outweighed by the gravity and likelihood of harm, including: (1) exposure of highly intimate, sexual, and bodily content to strangers; (2) exposure of financial information; (3) heightened risks of identity theft, stalking, extortion, and reputational harm; and (4) deeply offensive invasion of privacy and accompanying emotional distress.

1192. Although the Glasses were used in reasonably foreseeable ways, including wearing them in daily life and recording bystanders and others without their consent, Plaintiffs and Bystander Class members never provided their consent to be recorded or for those recordings to be shared with third parties.

1193. A safer alternative design that would have eliminated or reduced injuries to Plaintiffs' privacy was technically and commercially feasible. For example, Meta and Luxottica could have designed the Glasses such that they are readily distinguishable from ordinary glasses and/or recordings include only blurred faces of bystanders unless and until consent is obtained. Additionally, use of and access to the Glasses' core AI features could be decoupled from the human review pipeline or require explicit user consent for each piece of footage routed to human contractors.

1194. The Glasses' defective design was a substantial factor in causing Plaintiffs' and Bystander Class members' injuries, including the loss of privacy and dignitary harms associated with the collection of personal information without their consent and exposure of intimate footage to human annotators.

1195. Plaintiffs and Bystander Class members would not have consented to the recordings had they known the Glasses were recording or the attendant privacy risks.

1196. As a direct and proximate result of Defendants' defective design, Plaintiffs and Bystander Class members have suffered and will continue to suffer injury, including non-economic harms relating to invasion of privacy and emotional distress.

1197. Plaintiffs and Bystander Class members seek all monetary and non-monetary relief allowed by law as a result of Defendants' strict product liability, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

**D. COUNT 49: Strict Product Liability–Failure to Warn (Common Law)**

1198. Plaintiffs incorporate paragraphs 1 through 411, 478 through 495, and 968 through 985 as though fully set forth here.

1199. Plaintiffs PL30, PL41, and PL42 (for purposes of this section, "Plaintiffs") bring this claim individually and behalf of the Nationwide Bystander Class, the State Bystander Subclasses.

1200. This claim is brought under California law or, alternatively, the laws of the respective states where Plaintiffs were recorded by the Glasses.

1201. Meta and Luxottica designed, engineered, manufactured, marketed, distributed, and sold the Glasses.

1202. At the time the Glasses were manufactured, distributed, and sold, the Glasses contained known or knowable risks in light of generally accepted knowledge in the relevant communities, including that: (1) the Glasses covertly capture highly sensitive video and audio which is readily shared to social media or even livestreamed; (2) that media is transmitted to Meta's servers and routed to human annotators in Nairobi, Kenya for review and labeling; (3) annotators "see everything—from living rooms to naked bodies," including bathroom visits, sexual activity, and financial information; (4) it is impossible to both avoid the human review pipeline and make use of the Glasses' core AI features; and (5) such practices create serious privacy, safety, and dignitary harms.

1203. These potential risks present a substantial danger when the Glasses are used in a reasonably foreseeable manner, namely, to covertly record without subject and bystander consent. Indeed, Defendants recognized this substantial danger when they posted privacy guidelines for users and when they incorporated the insufficient indicator light and shutter sound into the Glasses.

1204. Reasonable individuals have been unable to distinguish the Meta AI Glasses from ordinary glasses and have been unable to reliably determine whether they are being recorded. No reasonable consumer would expect that by interacting with a person wearing deceptively ordinary-looking Meta AI Glasses that their intimate everyday moments would be recorded, let alone that these interactions would be livestreamed or watched by strangers overseas. In the absence of clear notice, there is no way for Plaintiffs and Bystander Class members to recognize and mitigate the risks of being covertly recorded by the Glasses and avoid the human review pipeline.

1205. At all relevant times, safer and feasible alternative designs existed that would have substantially reduced or eliminated the unreasonable privacy and safety risks created by the Meta AI Glasses, including: (a) designing the Glasses such that they are readily distinguishable from ordinary glasses; (b) enhance the visibility of the recording indicator mechanisms; (c) automatically blur faces of bystanders in recordings unless and until consent is provided; (d) performing AI processing entirely on-device, without uploading raw, identifiable content to remote servers; (e) obtaining explicit, granular, opt-in consent before routing any content to human reviewers and limiting such review to non-intimate scenes; and (d) allowing users to permanently disable any upload of AI-related content while still retaining local AI functionality. Meta nevertheless opted for a design that maximized the

ability to covertly record countless individuals and ported large volumes of intimate identifiable data to offshore human reviewers, without any opportunity for unsuspecting bystanders to consent to these practices.

1206. Meta and Luxottica failed to provide adequate indications that a recording is in progress or otherwise provide any means to obtain consent or indicate to bystanders that content captured with the Glasses would be transmitted to Meta's servers for AI-related processing and human review.

1207. The faint LED indicator light and shutter sound on the Glasses are inadequate as a warning or notice to users or bystanders regarding the presence of ongoing recording or the existence and extent of human review and data-annotation practices; it does not meaningfully inform consumers that their intimate footage may be watched by strangers overseas.

1208. Meta's claims that it disclosed to users that some footage may be shared with human reviewers, even if true, are inadequate, because consumers were not provided adequate notice of these supposed disclosures, and these disclosures do not meaningfully inform consumers who wish to make use of the Products' core AI features that they cannot do so while avoiding that human review pipeline.

1209. Meta and Luxottica knew or, by the use of reasonably developed skill and foresight, should have known of the risks of covert recording and of the Glasses' human-review pipeline, as evidenced by: (1) Meta's statement that the presence of the indicator light and shutter sounds are to protect the privacy of bystanders; (2) Defendants' minimal guidelines for users concerning protecting bystanders' privacy; (3) the proliferation of social media posts, including on Meta's own platforms, that display nonconsensual videos obtained on the Glasses; (4) Defendants' own design and implementation of the Glasses and related AI systems; (5) Meta's contracting with Sama and other vendors; and (6) Meta's internal knowledge that intimate footage, including nudity, sex, and financial information, was being viewed by annotators.

1210. Meta and Luxottica had a duty to provide clear, prominent warnings and instructions so that bystanders are aware of ongoing recordings and can make informed decisions about whether to consent to such recording and human review.

1211. Meta and Luxottica breached this duty by failing to incorporate and provide adequate warnings for bystanders and by instead designing the Glasses such that they are indistinguishable for ordinary glasses and with cameras and recording indicators that fail to provide adequate notice.

1212. Plaintiffs and Bystander Class members were injured, including harms related to invasion of privacy and emotional distress, as a direct and proximate result of Meta's and Luxottica's failure to warn.

1213. Had Meta and Luxottica provided adequate warnings about the Glasses' ongoing recordings, the human-review pipeline, and associated risks, Plaintiffs and Bystander Class members would have avoided or mitigated their harm.

1214. Defendants' failure to warn was a substantial factor in causing Plaintiffs' and Bystander Class members' injuries.

1215. Plaintiffs and Bystander Class members seek all monetary and non-monetary relief allowed by law, including compensatory damages, restitution, disgorgement, punitive damages where available, and attorneys' fees and costs.

**E. COUNT 50: Negligence (Common Law)**

1216. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

1217. Bystander Plaintiffs bring this claim individually and behalf of the Nationwide Bystander Class, or alternatively, on behalf of the State Bystander Subclasses against all Defendants.

1218. This claim is brought under California law or, alternatively, the laws of the respective states where Bystander Plaintiffs were surreptitiously recorded.

1219. Defendants negligently designed, manufactured, advertised and/or sold Meta AI Glasses with audio and visual recording devices that can easily be used to covertly record Plaintiffs and Bystander Class members without their consent, even in deeply personal and private settings.

1220. As a direct and foreseeable result of the Glasses' covert recording capabilities, the Meta AI Glasses captured video and audio recordings of Bystander Plaintiffs and Bystander Class members without their knowledge or consent, and in circumstances that violate social norms. Defendants owed a duty to Bystander Plaintiffs and Bystander Class members because they actively placed a harmful product into the stream of commerce.

1221. Defendants marketed the Glasses as a tool for seamlessly recording video content. Defendants knowingly and purposefully designed, manufactured and marketed the Meta AI Glasses to look like ordinary glasses, yet failed to take reasonable steps to prevent the Glasses from capturing recordings without the consent or knowledge of subjects and bystanders.

1222. Defendants marketed the Meta AI Glasses for use across public and private spaces and it was reasonably foreseeable that the covert recording capabilities would capture video and audio recordings with both public and private settings without consent. Indeed, Defendants published guidelines to encourage users to proactively protect bystanders' privacy even where Defendants failed to design the Glasses with these privacy protections in mind. Additionally, given the intentionally inconspicuous design of the Glasses, it was reasonably foreseeable that the Glasses would be used to collect nonconsensual recordings.

1223. Notwithstanding these foreseeable and unnecessary risks, Defendants failed to take reasonable care in designing, manufacturing, and marketing the Meta AI Glasses in a manner that would protect bystanders from covert surveillance of their everyday activities and recording of their private communications and personal data.

1224. Defendants owed a duty to exercise reasonable care so that bystanders would not fall victim to the covert recording capabilities of the Meta AI Glasses, but Defendants breached this duty in failing to provide sufficient physical and/or software-related safeguards. Defendants failed to act reasonably in failing to institute sufficient safety and notice mechanisms. Any social utility of Defendants' conduct is greatly outweighed by the nature of risk, the foreseeability of harm, and the strong public policy in favor of precluding covert recording and surveillance.

1225. Defendants breached and continue to breach, the duties it owes to Bystander Plaintiffs and members of the Bystander Class through its affirmative business decisions—which include developing, licensing, testing, and distributing facial recognition code for incorporation into the Meta AI Glasses, as alleged above, without adopting measures adequate to protect Bystander Plaintiffs and Bystander Class members—and continued negligent design of the Meta AI Glasses such that they are readily capable of covert nonconsensual recording of the masses.

1226. As a direct and proximate cause of Defendants' actions, Bystander Plaintiffs and Bystander Class members have suffered violations of their privacy rights and their right to publicity and suffered emotional distress and damages, and will continue to suffer harm.

### F. COUNT 51: California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*)

1227. Plaintiffs incorporate paragraphs 1 through 411, 515 through 552, and 1130 through 1137 as though fully set forth here.

1228. Bystander Plaintiffs bring this count individually and on behalf of the Nationwide Bystander Class, or in the alternative, on behalf of the California Bystander Subclass, against Defendants.

1229. California's Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong is independently actionable.

1230. ***Unlawful.*** Defendants' conduct as alleged herein violates, among other laws, CIPA, ECPA, the various state eavesdropping and recording statutes, and the common law prohibition on intrusion into private affairs. Defendants' COPPA violations are both unfair or deceptive acts or practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. See 16 C.F.R. § 312.9. Each such violation independently constitutes an unlawful business act or practice within the meaning of Section 17200. The harm to Bystander Plaintiffs and Bystander Subclass members vastly outweighs any utility of that conduct, and it is not an injury that bystanders could reasonably have avoided, because Defendants did not disclose the intrusive practices and affirmatively represented the opposite.

1231. ***Unfair.*** Defendants' conduct is unfair within the meaning of the UCL because the harm vastly outweighs any utility. Further, it is not an injury that bystanders could reasonably have avoided because Defendants did not disclose the intrusive practices and affirmatively represented the opposite. Defendants committed unfair acts and practices by, inter alia, invading Plaintiffs' and Bystander Subclass members' privacy while knowingly providing wholly insufficient measures to obtain consent from bystanders or effectively notify them of ongoing recordings and Defendants' interception of those communications.

1232. ***Fraudulent.*** Defendants' conduct is unfair within the meaning of the UCL because the design of the Glasses is inherently misleading and likely to deceive, and did deceive, reasonable consumers into believing that the Glasses were not recording and transmitting their personal data and communications. Bystanders are unable to reliably ascertain whether nearby Meta AI Glasses are recording them or whether any Meta AI Glasses have recorded them in the past. Additionally, Defendants misrepresented that the Glasses' indicator light and shutter tone protect the privacy of bystanders while knowing that they do not. Defendants' conduct as alleged herein is both unfair and deceptive, given Defendants' knowledge of, and failure to properly address, the privacy issues central to Plaintiffs' claims.

1233. These acts and practices alleged constitute business acts and practices within the meaning of Section 17200, and occurred in the course of Defendants' business.

1234. Defendants' conduct causes substantial injury to consumers and bystanders that they cannot reasonably avoid.

1235. Bystander Plaintiffs and Bystander Subclass members have acted reasonably in their attempts to avoid being recorded by Meta AI Glasses without their consent. However, because of the covert and deceptive nature of the Glasses' design and infrastructure, only Defendants can fully protect Plaintiffs and Bystander Class members from this harm.

1236. Accordingly, Bystander Plaintiffs and Bystander Subclass members seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL to compensate California Bystander Plaintiffs and Bystander Subclass members for said monies, as well as public injunctive relief to enjoin Defendants' systemic surveillance of bystanders without their consent and to prevent ongoing and future harm that will result to Bystander Plaintiffs, Bystander Subclass members, and the general public.

1237. As a result of Defendants' unlawful, unfair, deceptive and fraudulent business practices, Plaintiffs and Bystander Subclass members have suffered injury in fact and have lost control over and value in their personal data.

1238. As a result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs and Bystander Class members have suffered injury in fact and have lost value in their

personal data. Accordingly, Plaintiffs and Bystander Class members seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL to compensate Plaintiffs and Bystander Class members for said monies, as well as public injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result to Plaintiffs, Class members, and the general public.

**G. COUNT 52: California Constitutional Right to Privacy (Cal. Const. Art. I § 1)**

1239. Plaintiffs incorporate paragraphs 1 through 411 as though fully set forth here.

1240. Plaintiffs PL30, PL41, and PL42 (for purposes of this section, "California Bystander Plaintiffs") incorporate paragraphs 1 through 172 as though fully set forth herein.

1241. California Bystander Plaintiffs bring this claim individually and on behalf of the California Bystander Subclass against all Defendants.

1242. Article I, Section 1 of the California Constitution guarantees an inalienable right to privacy that protects against invasions by private actors, including the unauthorized collection and use of sensitive personal information.

1243. Defendants have intruded upon the legally protected privacy interests of California Bystander Plaintiffs and the California Bystander Subclass by, among other things, surreptitiously recording, intercepting, and transmitting their private communications and behavior without their consent.

1244. California Bystander Plaintiffs and the California Bystander Subclass maintain a reasonable expectation of privacy in their private and intimate communications, interactions, and personal data. They also maintain a reasonable expectation of privacy to be free from surreptitious surveillance, including from covert recordings on Meta AI Glasses, as they go about their daily lives, moving through public, semi-public, and private spaces. These expectations are reasonable. Defendants have failed to provide sufficient safeguards against surreptitious recording. No social norm places bystanders on notice that their personal communications and everyday lives may be surreptitiously recorded through Meta AI Glasses that are nearly indistinguishable from ordinary glasses. That Defendants have recognized these significant privacy concerns and attempted, but failed, to address them concedes the point that bystanders have a legitimate expectation of privacy and the right to know whether they are being recorded.

1245. Defendants continue to intentionally intrude upon California Bystander Plaintiffs' and the California Bystander Subclass's privacy by designing, marketing and selling the Glasses that easily record, and even live stream, bystanders without their knowledge or consent. Further, the nonconsensual videos and recordings are subject to the same human review, third-party disclosures, and AI training underpinning User Class members' privacy claims.

1246. These intrusions are highly offensive to a reasonable person and constitute an egregious breach of social norms. The Glasses are covert by design. They indiscriminately capture unsuspecting bystanders in video footage that can be used to obtain intimate, personal and sensitive information, and personal and biometric data. Further, the recordings are disclosed to third parties, including human reviewers, AI programs, and social media postings.

1247. Defendants improperly profited from the invasion of California Bystander Plaintiffs' and California Bystander Subclass members' privacy and Defendants' use of such persons' data for Defendants' economic value and its own commercial gain.

1248. As a direct and proximate result of Defendants' intentional and intrusive conduct, California Bystander Plaintiffs and the California Bystander Subclass suffered harm as detailed herein, including but not limited to loss of privacy, loss of control over their personal and biometric information, emotional distress, and other compensable harms. Further, California Bystander Plaintiffs and the California Bystander Subclass remain subject to the covert recording, data collection, transmission, and human review pipeline that violates their privacy, autonomy, and basic human dignity.

1249. Unless, and until, enjoined and restrained by order of this Court, Defendants' wrongful conduct will cause irreparable injury to California Bystander Plaintiffs and California Bystander Subclass members in that they may continue to be covertly recorded without their knowledge or consent and their private imagery and audio maintained by third parties and Defendants may be viewed, distributed, and used without authorization for years to come.

1250. California Bystander Plaintiffs and the California Bystander Subclass seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, and punitive damages where available, and injunctive relief to prevent further harm.

### H. COUNT 53: Violations of State Anti-Recording and Eavesdropping Statutes

1251. Plaintiffs incorporate paragraphs 1 through 411, 904 through 930, and 1018 through 1027 as though fully set forth here and in the subsections below.

1252. Bystander Plaintiffs bring this count individually and on behalf of the State Bystander Subclasses identified in each subsection below.

1253. Defendants designed the Glasses with a microphone array that captures spatial audio and with cameras that capture video and images and designed them to transmit this data by Bluetooth or Wi-Fi to the user's paired smartphone.

1254. Meta intercepted and recorded the conversations by transmitting the captured audio to Meta's servers.

1255. Meta was not a party to any of the communications alleged herein.

1256. Meta recorded the communications and conversations without first obtaining consent from all persons engaged therein.

1257. Meta did not obtain the consent of any party, or the parental consent of any minor, let alone the requisite consent of all parties.

1258. By designing, manufacturing, distributing, and operating the Meta AI Glasses and the associated network and annotation infrastructure, and by capturing, intercepting, recording, transmitting, retaining, and distributing the conversations, images, and likenesses of Bystander Plaintiffs and Bystander Class members, including minors, without the consent of all persons recorded, Defendants violated the anti-recording and eavesdropping statutes of the states set forth below.

1259. Bystander Plaintiffs and Bystander Subclass members suffered injury and damages, including but not limited to, a loss of privacy, frustration of their reasonable expectations of privacy, mental anguish, and lost control over and value in their personal data, and faces an ongoing risk of further unauthorized disclosure.

#### i. California Invasion of Privacy Act (Cal. Pen. Code § 632)

1260. Plaintiffs incorporate paragraphs 1251 through 1259 as though fully set forth here.

1261. Plaintiffs PL30, PL41, and PL42 (for purposes of this section, "California Bystander Plaintiffs") bring this count individually and on behalf of the California Bystander Subclass against Meta.

1262. The California Invasion of Privacy Act ("CIPA") subjects to liability "a person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a . . . device." Cal. Pen. Code § 632(a).

1263. The video and audio recordings collected by Defendants' devices constitute "confidential communications" in that California Bystander Plaintiffs and California Bystander Class members had a reasonable expectation that they were not being covertly recorded by Meta AI Glasses.

1264. Meta used an electronic recording device—the Glasses, together with its servers and annotation infrastructure—to record those confidential communications.

1265. California Bystander Plaintiffs and California Bystander Class members have been injured by Meta's violations of CIPA section 632 and therefore seek all relief available under CIPA section 637.2, including injunctive relief and statutory or actual damages.

**ii. Georgia Eavesdropping Act (Ga. Code Ann. § 16-11-62)**

1266. Plaintiffs incorporate paragraphs 1251 through 1259 as though fully set forth here.

1267. Plaintiff PL44 (for purposes of this section, "Georgia Bystander Plaintiff") brings this count individually and on behalf of the Georgia Bystander Subclass against Meta.

1268. Georgia's Eavesdropping Act ("GEA") makes it unlawful for "(1) [a]ny person in a clandestine manner intentionally to overhear, transmit, or record or attempt to overhear, transmit, or record the private conversation of another which shall originate in any private place." Ga. Code Ann. § 16-11-62(1).

1269. The GEA separately makes it unlawful for "(2) [a]ny person, through the use of any device, without the consent of all persons observed, to observe, photograph, or record the activities of another which occur in any private place and out of public view. *Id*. § 16-11-62(2).

1270. In addition, it is unlawful for "[a]ny person to sell, give, or distribute, without legal authority, to any person or entity any photograph, videotape, or record, or copies thereof, of the activities of another which occur in any private place and out of public view without the consent of all persons observed." *Id.* § 16-11-62(6).

1271. Meta clandestinely overheard, transmitted, and recorded the private conversations of Georgia Bystander Plaintiff and Georgia Bystander Subclass members originating in private places.

1272. Meta used devices, including the Glasses, together with its servers and annotation infrastructure, to clandestinely observe, photograph, and record Georgia Bystander Plaintiffs and Georgia Bystander Subclass members activities occurring in private places and out of public view without their consent.

1273. Meta gave and distributed those recordings to Sama, an outside entity, without the consent of all persons observed and without legal authority.

1274. Eavesdropping victims are permitted to bring civil actions under the GEA. *See Kemeness v. Worth Cnty., Ga.*, 449 F. Supp. 3d 1318, 1328 (M.D. Ga. 2020). Georgia Bystander Plaintiff and Georgia Bystander Subclass members were injured by Meta's violations of the GEA and seek all recovery permissible.

**iii. Maine Interception of Wire and Oral Communications Act (15 M.R.S.A. § 710, *et seq*.)**

1275. Plaintiffs incorporate paragraphs 1251 through 1259 as though fully set forth here.

1276. Plaintiffs PL35, PL36, PL37, PL38, and PL39 (for purposes of this section, "Maine Bystander Plaintiffs") bring this claim individually and on behalf of the Maine Bystander Subclass against Meta.

1277. The Maine Interception of Wire and Oral Communications Act ("Maine Wiretap Act") provides, in pertinent part, that "[a]ny person . . . who intentionally or knowingly intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept any wire or oral communication is guilty of a Class C crime." 15 M.R.S.A. § 710(1).

1278. The Maine Wiretap Act additionally prohibits intentionally or knowingly disclosing, attempting to disclose, using, or attempting to use "the contents of any wire or oral communication, knowing that the information was obtained through interception." *Id.* §§ 710(3)(A)-(B).

1279. Defendants' Meta AI Glasses constitute an "intercepting device" within the meaning of the Maine Wiretap Act because the Glasses are designed and commonly used for intercepting wire or oral communications. *Id.* §§ 709(3)-(4).

1280. Meta intercepted the oral communications of Maine Bystander Plaintiffs and Maine Bystander Subclass members, uttered in circumstances justifying an expectation that they were not subject to interception, and disclosed and used the contents of those communications knowing they were obtained through interception.

1281. Maine Bystander Plaintiffs and the Maine Bystander Subclass members were harmed by the recording, interception, and disclosure of their communications without their consent.

1282. Maine Bystander Plaintiffs and Maine Bystander Subclass members seek all relief available under the Maine Wiretap Act, including actual damages, but not less than liquidated damages, computed at the rate of $100 per day for each day of violation and reasonable attorneys' fees and costs.

### I. COUNT 54: Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a, *et seq.*)

1283. Plaintiffs incorporate paragraphs 1 through 411, 515 through 552, and 1138 through 1145 as though fully set forth here.

1284. Plaintiffs PL31, PL32, PL33, and PL34 (for purposes of this section, "Connecticut Bystander Plaintiffs") bring this count individually and on behalf of the Connecticut Bystander Subclass against Defendants.

1285. At all relevant times, Defendants were engaged in trade or commerce in Connecticut pursuant to Connecticut General Statutes (Conn. Gen. Stat.) § 42-110b(a).

1286. The acts and practices set forth herein constitute deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

1287. Defendants' acts and practices set forth in paragraphs 1 through 411 and 515 through 552, offend public policy pertaining to the protection minors, and the public more broadly, from the invasion of their privacy rights, including through systemic surveillance.

1288. Defendants' acts and practices set forth herein are oppressive, unethical, immoral, and unscrupulous.

1289. Defendants' conduct substantially harmed Connecticut consumers in that Defendants' unfair, deceptive, and unlawful acts and omissions caused significant intrusion into the private lives of Plaintiffs and Bystander Subclass members causing mental anguish, as alleged above. Defendants' acts and practices, as described herein, therefore constitute unfair acts or practices in violation of Conn. Gen. Stat. § 42-110b(a). In recognition of this type of harm, the Connecticut legislature recently amended the Connecticut Data Protection Act to require "clear affirmative" consent from users whose private information is used to train artificial intelligence models. Conn. Gen. Stat. § 42-520(a)(2). Such disclosure must be made separate from broad privacy terms that provide "descriptions of personal data processing along with other, unrelated information." Conn. Gen. Stat. § 42-515(7). Consent does not include any "agreement obtained through the use of dark patterns." *Id.*

1290. Defendants knew, or should have known, that their conduct was unfair or deceptive in violation of Conn. Gen. Stat. § 42-110b and, as a consequence, Defendants are subject to civil penalties of not more than $5,000 per violation pursuant to Conn. Gen. Stat. § 42-110o(b).

**COUNT 55: Washington Consumer Protection Act (Wash. Rev. Code § 19.86.010, *et seq.*)**

1291. Plaintiffs incorporate paragraphs 1 through 411, and 515-550, and 1130 through 1137as though fully set forth here.

1292. Plaintiff PL40 brings this count individually and on behalf of the Washington Bystander Subclass against Defendants.

1293. The Washington Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

1294. Defendants, PL40 and the Washington Purchaser Subclass members are each a "person" within the meaning of the WCPA. *Id.* § 19.86.010(1).

1295. Defendants' design, manufacture, marketing, distribution, and sale of the Meta AI Glasses constitute "trade" and "commerce" within the meaning of the WCPA.

1296. The acts and practices set forth herein constitute deceptive or practices in violation of the WCPA.

1297. Independent of the deceptive practices, as alleged above, Defendants' practices are unfair in that they they cause substsntial injury to consumers that consumers cannot reasonably avoid.

1298. Additionally, Defendants' COPPA violations are treated as unfair or deceptive acts or practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. See 16 C.F.R. § 312.9.

1299. Defendants' acts and practices set forth in paragraphs 1 through 411 and 512 through 550 are substantially injurious to the public, including minors, and the public more broadly, from the invasion of their privacy rights, including through systemic surveillance.

1300. Defendants' conduct is not a private dispute or an isolated transaction. Defendants market the Products through a uniform, standardized advertising campaign to the general consuming public, and similarly capture troves of bystander data without their knowledge or consent. Defendants' conduct is ongoing, is capable of repetition, and will continue to harm Washington consumers absent injunctive relief.

1301. Defendants further obtained, without compensation, the economic value of the audio, images, video, and derived data extracted from the Washington Plaintiff and the Washington Purchaser Subclass members through the Products, which Defendants used as training material for Meta's artificial intelligence models. Personal data of this kind has an established and quantifiable market value that Defendants' deceptively and unfairly escaped. Defendants acted knowingly and intentionally.

1302. Defendants' unfair and deceptive acts and practices were the proximate cause of PL40's injuries and those of the Washington Bystander Subclass, as alleged above.

1303. PL40, individually and on behalf of the Washington Bystander Subclass, seeks all relief available under the WCPA, including injunctive relief, actual and punitive damages, and costs and fees.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request the following from this Court:

a. **Certification:** For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel;

b. **Declaratory Relief:** For an order declaring that Defendants' conduct violates the statutes and laws referenced herein consistent with applicable law and pursuant to only those causes of action so permitted;

c. **Injunction:** For an order requiring Defendants to change their business practices to prevent or mitigate the risk of the consumer deception, bystander surveillance, privacy violations, and other violations of law outlined herein. This includes, for example, an order that immediately enjoins Defendants from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described; requiring Defendants to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendants' unlawful conduct; requiring Defendants to erase all images, recordings, and data obtained without consent and requiring Defendants to implement effective notice and consent procedures, as well as measures to protect the privacy of bystanders such as by blurring bystander faces; requiring Defendants to take all further and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted; and enjoining Defendants from implementing any biometric analysis, storage, or comparison without public disclosure of such practices and only with affirmative opt-in consent from users and bystanders;

d. **Public Injunctive Relief:** Where available and allowed under applicable state law, Plaintiffs specifically request the remedy of public injunctive relief.

e. **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class requested herein, consistent with applicable law and pursuant to only those causes of action so permitted;

f. **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted;

g. **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted, including, without limitation, under Cal. Code Civ. Pro. § 1021.5;

h. **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; and

i. **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues and causes of action so triable.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

Ryan J. Clarkson (SBN 257074)
rclarkson@clarksonlawfirm.com
**CLARKSON LAW FIRM, P.C.**
633 Howard St.
San Francisco, CA 94105

Telephone: (415) 651-7990
Facsimile: (213) 788-4070

Mark C. Molumphy (SBN 168009)
mmolumphy@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 687-6000
Facsimile: (650) 697-0577

*Interim Co-Lead Counsel for Plaintiffs*